UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MICHAEL JOSHUA HENDERSON,

Plaintiff,

9:12-CV-01704

v.

(TJM/TWD)

BRIAN FISCHER, et al.,

Defendants.

---

APPEARANCES: OF COUNSEL:

MICHAEL JOSHUA HENDERSON
Plaintiff *pro se*
06-A-5461
Attica Correctional Facility
Box 149
Attica, New York 14011

HON. ERIC T. SCHNEIDERMAN
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, New York 12224

ADRIENNE J. KERWIN, ESQ.
Assistant Attorney General

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

## I. INTRODUCTION

*Pro se* Plaintiff Michael Joshua Henderson, who is presently confined at Attica Correctional Facility ("Attica"), has commenced this *pro se* civil rights action under 42 U.S.C. § 1983 against Defendants Brian Fischer ("Fischer"), former Commissioner of the Department of Corrections and Community Supervision ("DOCCS"); Harold D. Graham ("Graham"), Superintendent of Auburn Correctional Facility ("Auburn"); and Auburn Corrections Officer

Justin E. Dennis ("Dennis"). (Dkt. No. 45 at ¶ 3.) Plaintiff has made claims that Defendants Dennis, Graham, and Fischer, individually and as a part of a conspiracy, have retaliated against him for filing grievance complaints by: (1) improperly revoking his mother's visitation privileges in violation of his rights under the First and Fourteenth Amendments and DOCCS Directive 4403; and (2) tampering directly or indirectly with his grievance complaints. *Id*. at ¶¶ 100-115. Plaintiff also claims that Dennis assaulted him and filed a false misbehavior report against him in retaliation for grievances he had filed. (Dkt. No. 47-1 at 36-38.)[1] In addition, Plaintiff has asserted supervisory liability claims against Defendants Fischer and Graham and claims for denying Plaintiff's appeals on Tier II and Tier III misbehavior reports and the revocation of his mother's visiting privileges. *Id.* at ¶¶ 116-135; Dkt. No. 47-1 at 20-23. Defendants have been sued in their official and individual capacities. *Id.* at ¶ 3.

This action was commenced in November of 2012 by the filing of a Complaint which survived initial review under 28 U.S.C. §§ 1915(e)(2) and 1915A. (Dkt. Nos. 1 and 7.) After Defendants filed their Answer (Dkt. No. 20), the parties engaged in discovery. This Court granted Plaintiff leave to file an Amended Complaint [2] in a Decision and Order filed on June 16,

---

[1] References to page numbers in citations to documents filed with the Clerk refer to the page numbers assigned by the Court's electronic filing system.

[2] A majority of the factual allegations in Plaintiff's 136 paragraph Amended Complaint, filed on June 16, 2014, concern nineteen or more Auburn corrections personnel who, while identified as defendants in the Amended Complaint, are not intended by Plaintiff to be defendants in this lawsuit. (*see* Dkt. Nos. 45 at 6; 42. at ¶ 4.) Most of the nineteen, as well as Defendants Dennis, Graham, and Fischer herein, were named as defendants in a lawsuit filed by Plaintiff on December 13, 2013, entitled *Michael Joshua Henderson v. Brian Fischer, et al.*, No. 9:13-CV-01537 (MAD/CFH) (N.D.N.Y.). The allegations in the Complaint in that action are largely verbatim to those in the Amended Complaint herein. (*see* No. 9:13-CV-01537, Dkt. No. 1.) That lawsuit was dismissed (without prejudice as to the claims asserted against the defendant's in their individual capacities) against all but five of the named defendants by the

2014.  (Dkt. Nos. 44 and 45.)   After answering the Amended Complaint  (Dkt. No. 46),

Defendants filed the motion for summary judgment now before the Court for report and

recommendation.  (Dkt. No. 47.)  Plaintiff has opposed the motion.  (Dkt. No. 55.)  For the

reasons that follow, the Court recommends that Defendants' motion for summary judgment be

**GRANTED** in its entirety and further recommends the *sua sponte* dismissal of Plaintiff's § 1983

claims for money damages against Defendants in their official capacities on Eleventh

Amendment grounds.

## II.     BACKGROUND

### A.     July 12, 2012, Incident with Dennis

According to Plaintiff, during the evening of July 12, 2012, Defendant Dennis placed

Plaintiff in the slop sink while he searched his cell.  (Dkt. No. 45 at ¶ 75.[3])  Plaintiff claims that

there was no legitimate security reason for not allowing him to be present during the search and

believes it was so that they could go through his property and legal work in order to have a better

understanding of his case and to destroy and mess up his cell.  *Id*.   Dennis acknowledges

conducting a frisk of Plaintiff's cell on July 12, 2012, pursuant to DOCCS policies and

procedures, and finding no contraband.  (Dkt. No. 47-4 at ¶ 10.)

---

Hon. Mae A. D'Agostino, D.J., upon initial review under 28 U.S.C. § 1915(e). (No. 9:13-CV-01537, Dkt. No. 5.)  Dismissal as to Defendants Dennis, Graham, and Fischer was based upon the pendency of this action found to be duplicative. *Id*. at 12-14.  The Court will disregard the factual allegations in Plaintiff' Amended Complaint regarding non-defendants except to the extent they may have relevance to the claims asserted against the Defendants in this lawsuit.

[3]  Because Plaintiff's Amended Complaint (Dkt. No. 45) is verified, it is being treated as an affidavit.  *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .")  (internal citations omitted).

Plaintiff's claims that when he was going back to his cell with Dennis after the search, Dennis started questioning him about the reason for his incarceration and told Plaintiff he made him sick because of what he had done  running someone over and then coming back and running more people over. (Dkt. Nos. 45 at ¶ 75; 47-1 at 33.) Dennis was particularly sickened by the Plaintiff having medical records of the victims in his cell. *Id*. Plaintiff responded to Dennis' comments by saying "yeah, well, you know what? You and that officer right there make me sick." (Dkt. No. 45 at ¶ 75.) According to Plaintiff, Dennis lost it and started repeatedly hitting him in the left side of his face and body. *Id*. Plaintiff then "locked in" his cell. *Id*. Dennis has denied using any force against Plaintiff on July 12, 2012, or at any other time. (Dkt. No. 47-4 at ¶ 14.)

In a Declaration submitted by Plaintiff in opposition to Defendants' motion, Ricardo Martinez ("Martinez"), an inmate at Auburn during 2012 and 2013, states that sometime during July and August of 2012, he overheard Dennis telling several other officers that he had read Plaintiff's legal papers, including the victims' medical records, during a cell search, which "eventually led to him hitting [Plaintiff]." (Dkt. No. 55-5 at ¶ 2.)

Plaintiff contends that when Dennis came back to his cell to give him a no contraband receipt, he asked why Dennis had punched him in the face, and Dennis replied "I don't know what you are talking about." (Dkt. No. 45 at ¶ 75.) Plaintiff then said, "are you fucking kidding me, you just punched me in my face." Dennis then said, "are you threatening me, good cause now I'm going to write you a ticket." *Id*. According to Dennis, when he gave Plaintiff the no contraband slip, Plaintiff became agitated and made several verbal threats which resulted in Dennis writing a misbehavior report charging Plaintiff with violating DOCCS rules 102.10

(threats) and 107. 10 (interference). (Dkt. Nos. 47-3 at 6; 47-4 at ¶¶ 11-12.) Plaintiff was found guilty of both charges following a hearing. (Dkt. No. 45 at ¶ 76.) On his appeal to Fischer from the guilty determination, Plaintiff claimed that the misbehavior report written by Dennis was fabricated in retaliation for grievances Plaintiff had filed, and that the sentence was harsh and excessive. (Dkt. No. 55 at 15-17.) The charges were modified on appeal to dismiss the interference charge. (Dkt. No. 45 at ¶ 75.) Martinez has stated in his Declaration that he overheard Dennis talking about the misbehavior report and admitting that he "made the whole thing up." (Dkt. No. 55-5 at ¶ 2.)

In his Amended Complaint, Plaintiff claims that as a result of the assault by Dennis, he sustained swelling around the left side of his face, a black eye, and was left with a twitching of his upper and lower eyelids when he squeezes his eye slightly shut. *Id*. at ¶ 75. However, at his deposition, Plaintiff described the injuries he sustained as a result of being hit by Dennis as *de minimis* and stated that he was not pursuing a claim for the alleged assault. (Dkt. No. 47-1 at 32.) Plaintiff testified as follows at his deposition:

> Q   And who is Justin Dennis?
>
> A   Officer Justin Dennis is the officer who searched my cell July 12th, 2012 and put his hands on me physically.
>
> Q   Are you making a claim in this case with regard to any injuries you suffered from him putting hands on you?
>
> A   I mean, it's not that serious. There's   I mean what claim can I make? It's like de minis (sic), not even serious or whatever you can it.
>
> Q   Okay. I just wanted to clarify that. So you're not making any claim because they were de minimis.

A Yes. I just want to expunge my tickets and get my mother's visits back . . . .

Id. at 31-32. Plaintiff has not asserted an Eighth Amendment claim for excessive force in his Amended Complaint, filed nearly a year after his deposition. (*see* Dkt. No. 45.)

On July 13, 2012, after realizing that his face was still swollen, Plaintiff made repeated attempts to report the assault by Dennis to the company officer with no success. (Dkt. No. 45 at ¶ 76.) When his requests were ignored, he gave his neighbor his pin numbers and asked him to call Plaintiff's mother and let her know what had happened. *Id*. After receiving a phone call from inmate Marty Bartel, Plaintiff's mother called the facility and spoke to Graham. (Dkt. No. 55-3 at ¶ 9.) She demanded that Plaintiff be taken to medical to have pictures taken of his injuries. *Id.* Plaintiff was escorted to medical where he was interviewed and pictures were taken. (Dkt. No. 45 at ¶ 76.)

When Dennis logged onto his Facebook account on his personal computer at home on July 14, 2012, he discovered he had received a threatening message from a person identified as "Lisa Lee." (Dkt. No. 47-4 at ¶ 3 and 6.) The Facebook threats specifically named Dennis' son as well as two of his sisters. *Id*. at ¶ 4. Dennis found the threats to be similar in nature to those made to him by Plaintiff two days earlier. *Id*. at ¶ 4. Plaintiff informed Captain Chuttey ("Chuttey") of the threat and provided him with a copy of the Facebook message. *Id*. at ¶ 5. On December 13, 2012, Dennis gave a statement to the Inspector General's Office ("IG") regarding the threat and has taken no further action in the matter. *Id*. at ¶¶ 6-7.

At his deposition, Plaintiff testified that he no longer doubted that Dennis had received the Facebook message, but knew that Dennis had not felt threatened by it. (Dkt. No. 47-1 at 44,

60.) Plaintiff's position regarding the Facebook posting was that Dennis should not have reported it because he was not threatened, and that because it was on Dennis' personal Facebook account, it had nothing to do with DOCCS and should have been reported to the police if Dennis actually felt threatened. *Id*. at 60-62. Plaintiff claims that Dennis reported the July 14, 2012, Facebook posting in retaliation for Plaintiff's accusation that Dennis had assaulted him on July 12, 2012, and for filing grievances against other corrections officers at Auburn. *Id*. at 59.

Despite his deposition testimony indicating he did not dispute the posting of the Facebook message, Plaintiff has submitted the Martinez Declaration in which Martinez states that he overheard Dennis mention the alleged threat in Facebook and say none of it was true, and he had only reported it to his supervisors because he knew it would cause problems for Plaintiff. (Dkt. No. 55-5 at ¶ 2.)

Plaintiff claims to have filed a grievance regarding the events of July 12 and 13, 2012, and the misbehavior reports filed by Dennis and Corrections Officers Stanley C. Dine ("Dine") and Corrections Sergeant James T. Wright ("Wright") on or about July 13 and 14, 2102.[4] (Dkt. No. 45 at ¶¶ 76-77.)

**B. Revocation of Plaintiff's Mother's Visitation Privileges**

On July 17, 2012, Defendant Graham wrote to Plaintiff's mother, Lisa Henderson, advising her that her visitation privileges had been revoked. (Dkt. No. 47-3 at 14.) The letter informed Lisa Henderson that there was an on-going investigation of whether she threatened a

---

[4] Dine is alleged to have filed a false misbehavior report against Plaintiff on July 13, 2012 in retaliation for Plaintiff's grievances. (Dkt. No. 45 at ¶¶ 75-76.) Wright filed a misbehavior report on or about July 14, 2012, that included charges regarding unauthorized telephone use and exchange of personal pin numbers. *Id*. at ¶ 77.

corrections officer and his family being conducted by the DOCCS IG.  *Id*.  The referenced threat

was the July 14, 2012, Facebook posting to Dennis from Lisa Lee.  (Dkt. No. 47-6 at ¶ 6.)  The

posting included a reference to something Dennis "did on July 12 at 8:30 PM," the date and time

Plaintiff claimed Dennis had assaulted him.  *Id*. at ¶¶ 5, 7.  Based upon specific references made

in the Facebook threat, DOCCS determined that "Lisa Lee" and Plaintiff's mother, "Lisa

Henderson," were likely the same person.  *Id.* at ¶ 7.  According to Graham, all threats against

corrections staff and personnel are considered to be serious risks to the safety, security, and good

order of the facility.  *Id*. at ¶ 10.  He therefore exercised his discretionary authority as

Superintendent at Auburn to revoke Lisa Henderson's right to visit any inmate at the facility until

the investigation was concluded by the IG.  *Id.* at ¶¶ 10-11.  The IG had not completed his

investigation as of the time Plaintiff was transferred from Auburn, and Graham has no personal

knowledge regarding the conclusion.  *Id*. at ¶¶ 16-17.

   The July 17, 2012, letter to Lisa Henderson advised her that she would be notified of the

outcome when the investigation was complete and informed her that she had a right to appeal the

revocation decision, in writing, to the DOCCS Commissioner within twenty-days of receipt of

the letter, or by submitting a request for a hearing to then DOCCS Commissioner Defendant

Fischer within thirty-days of receipt of the letter.  (Dkt. No. 47-3 at 13.)  Lisa Henderson, who

has denied ever making any threats against Dennis and his family or any other corrections officer

or his or her family, (Dkt. No. 55-3 at ¶ 10), sent a written request for a hearing and a written

appeal to Fischer on August 8, 2012.  (Dkt. No. 47-2 at 7-8.)  Plaintiff also submitted a written

appeal from the revocation to Fischer and claims to have submitted a grievance as well.  (Dkt.

Nos. 45 at ¶ 79; 55 at 13; 47-2 at 12-19.)  In accordance with N.Y. Comp. Codes R. & Regs.

("NYCRR") tit. 7, Part 201, appeals are delegated to the Department's Office of Counsel for response. *Id*. at ¶ 9.

DOCCS Deputy Counsel William Gonzalez ("Gonzalez") wrote to Lisa Henderson on October 4, 2012, in response to her request for a hearing. (Dkt. No. 47-2 at 21-22.) Plaintiff was copied on the letter. *Id*. at 22. Gonzalez informed Lisa Henderson that since the suspension of visiting rights during the ongoing investigation of the threat was not considered final, it would generally be advisable to wait until the issuance of a final decision and/or the conclusion of the investigation before proceeding with a hearing, if needed. *Id*. at 21-22. Gonzalez nonetheless agreed to have the Office of Counsel schedule a hearing if she wished to proceed at that point. *Id*. at ¶ 21. She was told that the purpose of a hearing at that point would be to determine whether the decision to suspend her visitation pending the investigation was within Graham's discretion. *Id*. at 22. Gonzalez also informed her that a written copy of the threat was being withheld from documents provided to her with the letter because it was being investigated by outside law enforcement agencies. *Id*.

Fischer has stated upon information and belief in his Declaration that Lisa Henderson did not respond to Gonzalez's October 4, 2012, letter. *Id*. at ¶ 11. Fischer has also noted that 7 NYCRR Part 201, effective October 1, 2012, allows a visitor whose visitation privileges have been indefinitely suspended to request reconsideration any time after the suspension has been in effect for one year, and on an annual basis thereafter by writing to the superintendent of the facility where the inmate is being housed. *Id.* at ¶ 13. Fischer has no knowledge whether Lisa Henderson has made any such request, and because he delegated responsibility for responding to

the appeals to the DOCCS Office of Counsel, he had no involvement in issuing any response to the appeals.  *Id*. at ¶¶ 13-14.

At his deposition in July of 2013, Plaintiff testified that the last time he had a visit with his mother was April 23, 2012.  (Dkt. No. 47-1 at 22, 48.)  Plaintiff testified that his mother had been refused visitation at Auburn, Southport Correctional Facility, where Plaintiff was transferred from on or about August 6, 2012, to November 27, 2012, when he returned to Auburn, and at Attica, where he was transferred on or about January 18, 2013.  *Id*. at 13-14.  According to Plaintiff, during the time his mother had been unable to visit, he had spoken with her on the telephone every chance he had, and that two or three days did not go by without her calling to check on how he was doing.  *Id.* at 48-49.

Plaintiff testified at his deposition that his mother had not explained to him any final conclusions that might have been reached with regard to her visitation privileges.  (Dkt. No. 47-1 at 22.)  She had not indicated to him whether she had received a final decision on her appeal or anything of that nature.  *Id.* at 23.  Plaintiff only knew of his mother's initial appeal and request for a hearing.  *Id.*  Plaintiff has provided no additional information with regard to the administrative process or the status of Lisa Henderson's visitation privileges in his opposition papers.  Lisa Henderson's Declaration contains no mention whatsoever regarding what has transpired administratively since her visiting privileges were temporarily revoked, or the present status of her privileges.  (Dkt. No. 55-3.)

None of the Defendants have provided evidence with regard to the status of Lisa Henderson's visiting privileges subsequent to Gonzalez's October 4, 2012, letter to her regarding her request for a hearing.  Graham, who has received no request from Lisa Henderson seeking

restoration of her visitation privileges, claims to have no knowledge regarding whether she appealed his temporary revocation of her visiting privileges and no personal knowledge regarding the conclusion of the IG's investigation, which was not yet complete when Plaintiff was transferred from Auburn.[5]  (Dkt. No.  47-3 at ¶¶ 14-18.)  Fischer has stated that Plaintiff and Lisa Henderson's appeals were delegated to DOCCS Office of Counsel for response, he had no involvement in issuing a response, and that he has no knowledge as to whether Lisa Henderson requested reconsideration of the revocation.  (Dkt. No. 47-2 at ¶¶  9, 11, 13-14.)  In short, all of the parties have been curiously silent as to the status or outcome of the IG's investigation, the present status of the revocation and of any appeals taken by Plaintiff and his mother, and whether Lisa Henderson has had her visitation reinstated or attempted to have her privileges reinstated since the time of Plaintiff's deposition.

## III.   APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

---

[5]  Pursuant to 7 NYCRR § 201.6(a), the request for reconsideration of visitation privileges goes to the superintendent of the facility where the inmate is confined.  7 NYCRR § 201.6(a).  Since Plaintiff was moved to Attica on or about January 18, 2013, the fact that Graham has not received a request does not foreclose the possibility that one has been made to the superintendent at Attica.  (Dkt. No. 47-1 at 13-14.)

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). As noted above, a plaintiff's verified complaint is to be treated as an affidavit.[6] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790

---

[6] Plaintiff's Amended Complaint (Dkt. No. 45) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

(2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[7] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV. ANALYSIS

### A. Deficiencies in Plaintiff's Opposition Papers

As required under N.D.N.Y. L.R ("L.R.) 7.1, Defendants have filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 47-6.) Although Plaintiff has responded to the statement of material facts filed by Defendants (Dkt. No. 47-6), he has failed to do so in the manner required under L.R. 7.1(a)(3). Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Although Plaintiff has admitted or denied each of the Defendants' assertions, his citations to the record do not reference evidence that he claims creates a material issue of fact, but rather simply mirror the citations relied upon by Defendants as support for the assertions in their statement of material facts. *Id.*

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's

---

[7] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

statement will be accepted as true (1) to the extent they are supported by evidence in the record,[8] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[9] *See Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status and his attempt, albeit inadequate, to respond to Defendants' statement of material facts, the Court has opted to review the entire summary judgment record.

**B. Official Capacity Claims for Money Damages**

Plaintiff has sued Defendants in their official capacities for money damages under § 1983. (Dkt. No. 45 at ¶ 3.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and

---

[8] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[9] Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 47 at 3.)

instrumentalities that are effectively arms of the state. (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006). The Eleventh Amendment bars all money damages claims against state officials acting in their official capacities, including the DOCCS Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against all individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).

Therefore, although Defendants have not raised an Eleventh Amendment argument in moving for summary judgment, the Court recommends the *sua sponte* dismissal with prejudice of Plaintiff's § 1983 claims for money damages against Defendants in their official capacities on Eleventh Amendment grounds. *See Wood*, 466 F.3d at 238 (recognizing that courts may raise the issue of Eleventh Amendment immunity *sua sponte*).

**C. Conspiracy Claims**

In his third cause of action, Plaintiff has alleged in conclusory fashion that Defendants Dennis, Graham, and Fischer conspired to violate his civil rights in violation of 42 U.S.C. §§ 1983, 1985(3), and 1986. (Dkt. No. 45 at ¶¶ 108-11.) In his fourth cause of action, Plaintiff has alleged, also in conclusory fashion, that the Defendants all had knowledge of the wrongs "conspired to be done," had the power to prevent them, and neglected to do so in violation of his statutory rights under §§ 1983, 1985(3), and 1986. *Id.* at ¶¶ 112-115. Plaintiff's seventh cause of action is entitled "Conspiracy to Violate Plaintiff's Civil Rights" but is devoid of language describing a conspiracy. *Id.* at ¶¶ 126-130.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted). The elements of a conspiracy claim under § 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . ; (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000) (quoting *Mian v. Donaldson, Lufkin & Jenrette Securities Corp*., 7 F.3d 1085, 1087 (2d Cir. 1993)), *overruled in part on other grounds by Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002). "[T]he conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *See Mian*, 7 F.3d at 1088 (citation and internal quotation marks omitted).

There is not one shred of evidence in the record establishing that the Defendants entered into an agreement to violate Plaintiff's constitutional rights, no evidence of overt acts in furtherance of such an agreement, and no evidence that Defendants were motivated by racial or class-based animus in their dealings with Plaintiff as required for a claim under § 1985(3). *See Scotto v. Almenas,* 143 F. 3d 105, 114 (2d Cir. 1988) (reiterating that "conclusory allegations" or "unsubstantiated speculation" will not defeat summary judgment on a § 1983 conspiracy claim); *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999) (grant of summary judgment in defendants' favor on § 1985(3) conspiracy claim appropriate where plaintiff's claims of conspiracy were conclusory and vague and did not establish the existence of an agreement among defendants to

deprive him of his constitutional rights) (citing *Mass v. McClenahan*, 893 F. Supp. 225, 231 (S.D.N.Y. 1995)) ("Absent specific factual allegations as to the participation of a particular defendant in the conspiracy, plaintiff's § 1985(3) claim cannot survive a motion for summary judgment by that defendant."). When a Plaintiff's § 1985(3) claim fails, a claim under § 1986 does as well. *See Brown*, 221 F.3d at 341.

Furthermore, the intra-corporate conspiracy doctrine, which has been applied by numerous district courts in the Second Circuit to conspiracy claims against DOCCS employees pursuant to both §§ 1983 and 1985(3), "'posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other.'"[10] *Toliver v. Fischer*, No. 9:12-CV-00077 (MAD/ATB), 2015 WL 403133, at * 8, 2015 U.S. Dist. LEXIS 10139, at * 19 (N.D.N.Y. Jan. 29, 2015) (quoting *Jefferson v. Rose,* 869 F. Supp. 2d 312, 317-18 (E.D.N.Y. 2012)).

For the foregoing reasons, the Court recommends that summary judgment be granted to Defendants Fischer, Graham, and Dennis on all of Plaintiff's conspiracy claims.

**D. Supervisory Liability Claims Against Graham and Fischer**

In his fifth, sixth, seventh, and eighth causes of action, Plaintiff claims that, as supervisory officials, Graham and Fischer, were aware or should have been aware of their subordinate Dennis' violations of his constitutional rights in taking adverse action against him for filing grievances, and either participated directly in the violations; failed to remedy the

---

[10] The Second Circuit has yet to validate the "intracorporate conspiracy doctrine in the context of a section 1983 action." *Toliver*, 2015 WL 403133, at *22 (quoting *Rahman v. Fischer*, No. 9:10-CV-1496 (LEK/TWD), 2012 WL 4492010, at *13 (N.D.N.Y. Sept. 28, 2012) ("[t]he Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, . . . but has not extended its application of the doctrine to conspiracy claims under § 1983").

violations after learning of them through reports or appeals; created policies or customs, or allowed the continuation of policies or customs under which unconstitutional practices occurred; were grossly negligent in supervising subordinates who violated Plaintiff's rights; and were deliberately indifferent to Plaintiff's constitutional rights by failing to act on information that violations of those rights were occurring.[11] (Dkt. No. 45 at ¶¶ 116-135.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d

[11] It is not entirely clear from the allegations in Plaintiff's Amended Complaint whether he intended for his supervisory liability claims to be limited to Dennis' alleged violation of his constitutional rights, or to include some or all of the nineteen or so non-party Auburn personnel identified in the Amended Complaint as well. (*See generally* Dkt. No. 45.) Whatever Plaintiff's intent, there is no evidence in the summary judgment record establishing or raising issues of fact with regard to either the alleged wrongdoing by the non-defendants, or the presence of any of the *Colon* criteria discussed herein with regard to Fischer and Graham in connection with their alleged actions. *See Colon*, 58 F.3d at 873.

205, 210 (2d Cir. 1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[12]

The fifth, sixth, seventh, and eighth causes of action in Plaintiff's Amended Complaint merely regurgitate the *Colon* criteria for supervisory liability. (Dkt. No. 45 at ¶¶ 116-135.) There is no record evidence establishing that any of Dennis' alleged retaliatory conduct is attributable to Fischer or Graham. There is no evidence in the record establishing, or raising a material issue of fact with regard to whether: (1) either Fischer or Graham participated directly in Dennis' alleged retaliatory acts against Plaintiff, *i.e.*, the cell search and going through Plaintiff's legal records; assaulting Plaintiff; filing a false misbehavior report; giving Chuttey the Lisa Lee

[12] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Facebook posting[13] or preventing Plaintiff's grievances from being filed; (2) the allegedly unconstitutional acts of Dennis occurred under policies or customs created by Fischer or Graham, or were allowed by them to continue; or (3) Fischer or Graham were grossly negligent with respect to Dennis' allegedly unconstitutional acts, or even aware of them at the time they are claimed by Plaintiff to have occurred.[14] Plaintiff's conclusory allegations of personal involvement of Fischer and Graham with regard to Dennis' allegedly unconstitutional conduct, without the requisite evidence to support them, are not sufficient to defeat summary judgment. *See Davis,* 316 F.3d at 100 ("[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion.").

The only *Colon* criteria potentially applicable is the second failure to remedy a violation after being informed through a report or appeal. *Colon*, 58 F.3d at 873. Plaintiff has alleged in his Amended Complaint that Graham affirmed the determination of guilt on the misbehavior report filed by non-defendant Dine.[15] (Dkt. No. 45 at ¶ 78.) In addition, Plaintiff's deposition testimony suggests that he may be attempting to assert claims for violation of his constitutional

[13] Graham and Fischer's personal involvement in the revocation of Plaintiff's mother's visitation rights is discussed separately below.

[14] There is no evidence that either Graham or Fischer had any reason to believe that Dennis was being deceptive or dishonest with regard to the posting, or that he disclosed it to Chuttey in retaliation for Plaintiff filing grievances.

[15] Plaintiff has also alleged that he appealed the denial of a grievance regarding his Administrative Segregation Status to Fischer on January 8, 2013. *Id*. at ¶ 98. However, there is no evidence in the record regarding the outcome of the appeal or establishing personal involvement on Fischer's part. *See Perrilla v. Fischer*, No. 13-CV-0398M, 2013 WL 5798557, at *7, 2013 U.S. Dist. LEXIS 154449, at * 21 (W.D.N.Y. Oct. 28, 2013) ("[I]t is well-established that the review, denial, or affirmance of a denial of a grievance is insufficient to establish personal involvement.") (citation and internal quotation marks omitted).

rights by Fischer in affirming the guilty findings on the Tier II and III retaliatory misbehavior reports filed against him by Dennis, Dine, and Wright relating to the events of July 12 and 13, 2012. (*See* Dkt. No. 47-1 at 20-21, 23-24.)

District courts in the Second Circuit are not in agreement on the issue of whether affirmance on appeal of the disposition of an inmate's administrative disciplinary hearing is sufficient to establish personal involvement. A number of courts have concluded it is not. *See, e.g., Tafari v. McCarthy,* 714 F. Supp. 2d 317 (N.D.N.Y. 2010) (Hurd, J. *adopting report and recommendation* by Lowe, M.J.) ("The affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation."); *Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009) ("The only allegation concerning [Director of Special Housing/Inmate Disciplinary Program] . . . is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU. That is not enough to establish [his] personal involvement."); *Chavis v. vonHagn*, No. 02-CV-0119 (Sr), 2009 WL 236060, at *68, 2009 U.S. Dist. LEXIS 6871, at * 199 (W.D.N.Y. Jan. 30, 2009) ("defendant Wilcox's decisions affirming or modifying the results of the disciplinary hearings do not, standing alone, establish a federal constitutional violation") (citations omitted).

Other district courts, generally in decisions involving the appeal of the denial of due process in the disciplinary hearing, have found that the review and response to an appeal of a disciplinary conviction is sufficient to establish personal involvement under the second of the *Colon* criteria.[16] *See, e.g., Vigliotti v. Selsky,* No. 08-CV-00875- JJM*,* 2014 WL 1451984, at * 8,

[16] In *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986), the Second Circuit concluded that there was an issue of fact precluding summary judgment in favor of a prison superintendent who had affirmed a disciplinary conviction on appeal where the plaintiff challenged the

2014 U.S. Dist. LEXIS 51422, at * 22 (W.D.N.Y. April 14, 2014) (denial of summary judgment to both hearing officer and SHU director who affirmed finding of guilt in administrative disciplinary hearing where the claim involved the alleged violation of plaintiff's due process rights by the hearing officer and evidence showed that the director had received a voluminous record on appeal and testified at his deposition that the affirmance was not a "rubber stamp decision"); (*Smith v. Rosati*, No. 9:10-CV-1502 (DNH/DEP), 2013 WL 1500422, at *8, 2013 U.S. Dist. LEXIS 54402, at * 28 (N.D.N.Y. Feb. 20, 2013) (finding that a reasonable factfinder could conclude, if plaintiff's testimony Were credited, that defendant's review on the appeal of plaintiff's disciplinary conviction revealed a due process violation, and by dismissing plaintiff's appeal the defendant failed to remedy that violation).

Plaintiff has not alleged specific facts, or submitted evidence to support a constitutional claim against Graham for affirming the guilty finding on the Dire misbehavior report. Plaintiff has done nothing more than allege that the affirmance occurred. *Id*. at ¶ 98. Therefore, the Court finds that to the extent Plaintiff intended to assert a constitutional claim against Graham with regard to the affirmance, there is no support whatsoever in the record for such a claim. Furthermore, Plaintiff has not claimed or submitted evidence showing that he was denied due process in the disciplinary hearings in which the guilty determinations affirmed by Fischer occurred, and there is no evidence that Fischer was aware, or had reason to be aware, that the

---

conviction on the grounds that the hearing officer had denied him the due process right to call witnesses. *See Friedland v. Otero,* No. 3:11cv606 (JBA), 2014 WL 1247992, at * 10, 2014 U.S. Dist. LEXIS 38767, at * 30 (D. Conn. Mar. 25, 2014) (construing *Williams* as holding that "a supervisory official in charge of a correctional facility may be personally involved in depriving an inmate of his due process rights during a hearing on a disciplinary charge if he or she has affirmed the appeal of the hearing officer's decision.")

misbehavior report filed by Dennis was false as Plaintiff claimed. Therefore, the Court finds that this case falls within those decisions concluding that the conduct in affirming or modifying the results of the disciplinary hearings at issue, standing alone, does not establish a federal constitutional violation.

Based upon the foregoing, the Court recommends that Defendants Graham and Fischer be granted summary judgment on the supervisory claims against them in the fifth, sixth, seventh, and eighth causes of action in Plaintiff's Amended Complaint, as well as his claims against Graham and Fischer for affirming the findings of guilt on the misbehavior reports.

**E. Retaliation Claims**

1. Law Relating to Retaliation Claims

Plaintiff claims that Defendants have retaliated against him in various ways for exercising his right to file grievance complaints while confined at Auburn. Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak*, 389 F.3d at 381-83.

Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims

> of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. 506.

To establish a First Amendment claim for retaliation, an inmate must present evidence showing that: (1) he was engaged in a constitutionally protected activity; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). "Adverse action" in the prison context has been defined by the Second Circuit as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 380.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at

872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation, the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

2.  Fischer

In his Amended Complaint, Plaintiff claims that Fischer retaliated against him for filing grievances by improperly revoking his mother's visitation privileges and tampering with his grievances and mail.[17] (Dkt. No. 45 at ¶¶ 100-107.) The filing of grievances has been found to constitute protected First Amendment conduct for purposes of a retaliation claim. *See David v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003) (the right to file a grievance is a constitutionally protected activity for retaliation purposes).

---

[17] One of the grounds for summary judgment on Plaintiff's retaliation claim raised by Fischer is failure to exhaust administrative remedies. Because it is so clear to the Court from the record evidence, or more accurately lack thereof, that no reasonable juror could find in Plaintiff's favor on his retaliation claim against Fischer, it has foregone an exhaustion analysis and recommends summary judgment on the merits. *See Anderson*, 477 U.S. at 256 (nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor.")

However, the record evidence shows that Fischer did not revoke Plaintiff's mother's visitation. The evidence establishes that it was Graham who temporarily revoked Lisa Henderson's visitation privileges pursuant to 7 NYCRR § 201.4, after learning of the July 14, 2012, Facebook post threatening Dennis and his family. (Dkt. No. 47-3 at ¶¶ 4-10.)

According to Fischer, he has been advised that Graham revoked Lisa Henderson's visiting rights; that the IG was conducting an investigation; that Lisa Henderson appealed the revocation and requested a hearing; and that she was informed that while a hearing was premature given the ongoing investigation, she could go forward if she wished to do so. (Dkt. No. 47-2 at ¶¶ 8-10.) Fischer has explained in his Declaration that while pursuant to 7 NYCRR Part 201 and DOCCS Directive 4403, a superintendent's revocation of visiting privileges can be appealed to the Commissioner, the office Fischer held at the time, he routinely designated the duty of reviewing and rendering decisions of appeal of that nature to the Department of Counsel, as he did in Lisa Henderson's case. *Id*. at ¶¶ 5-7. Fischer has denied being personally involved in the alleged conduct regarding the revocation of Lisa Henderson's visitation by Graham. (Dkt. No. 47-2 at ¶ 15.) There is no evidence in the record to the contrary. Therefore, even though Plaintiff may have filed grievances while at Auburn, there is no evidence of any adverse action by Fischer in retaliation.

While Plaintiff has alleged that Fischer tampered, directly or indirectly, with his grievances and mail, the record is devoid of evidence supporting the claim. Therefore, Plaintiff has also failed to show adverse action by Fischer with regard to his grievances and mail.

Given the absence of evidence showing adverse action by Fischer    an essential element of a retaliation claim    with regard to either the revocation or tampering assertions, the Court

recommends that Fischer be granted summary judgment on Plaintiff's retaliation claim against him.

3. Graham

Plaintiff also claims that Graham revoked his mother's visiting privileges and tampered, directly or indirectly, with his grievances and mail in retaliation for grievances filed by Plaintiff while at Auburn.[18] (Dkt. No. 45 at ¶¶ 100-107.) Graham has acknowledged that in the exercise of his discretion, as authorized by 7 NYCRR § 204.1, he temporarily revoked Lisa Henderson's visiting privileges pending an IG investigation after he learned of the Lisa Lee Facebook posting threatening Dennis and his family, and initial investigation indicated she and Lisa Lee were likely one and the same. (Dkt. No. 47-3 at ¶¶ 6-9.)

The Court finds for purposes of this motion that Graham's temporary revocation of Plaintiff's mother's visitation privileges constitutes adverse action for retaliation purposes. However, Plaintiff has failed to produce any evidence sufficient to raise a question of fact as to whether the grievances he filed during his time at Auburn were a "substantial or motivating factor" in Graham's temporary revocation of his mother's visitation privileges. *See Pidlypchak*, 389 F.3d at 380. With the exception of the grievance Plaintiff claims to have attempted to file against Graham regarding the revocation of his mother's visitation privileges, there is no evidence that Plaintiff had previously filed any grievances against Graham. (Dkt. No. 45 at ¶ 79.) A grievance filed after the act constituting the alleged retaliation cannot be deemed a substantial or

---

[18] As with Fischer, Graham has raised failure to exhaust as a ground for summary judgment on Plaintiff's retaliation claim. Because, as with Fischer, it is so clear to the Court from the evidence, or more accurately, lack thereof, that no reasonable juror could find in Plaintiff's favor on his retaliation claim against Graham, it has foregone an exhaustion analysis and recommends summary judgment on the merits.

motivating factor for the allegedly retaliatory act. *See Vallade v. Fischer*, No. 12-CV-00231 (A)(M), 2014 WL 5481881, at * 13, 2014 U.S. Dist. LEXIS 154306, at *34 (W.D.N.Y. Oct. 29, 2014) (no causal connection where grievance not prepared until after the alleged retaliatory action).

As a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about an incident involving another corrections officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at 18, 2014 U.S. Dist. LEXIS 120709, at * 49 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro,* 791 F. Supp. 2d at 369 (failure by plaintiff to provide any basis to believe corrections counselor would retaliate for a grievance in which she was not personally named); *Ciaprazi v. Goord*, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at * 8-9, 2005 U.S. Dist. LEXIS 38232, at * 22 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicate the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary hearing).

Plaintiff's claim that Graham retaliated against him for filing grievances against others during his time at Auburn is wholly conclusory. Plaintiff has failed to identify the specific grievances for which Graham was alleged to be retaliating. Plaintiff has also failed to submit

evidence raising a material issue of fact as to whether the grievances filed against others were a "substantial or motivating factor" in the revocation. *See Pidlypchak*, 389 F.3d at 380

Furthermore, even if Plaintiff had submitted evidence suggesting that Graham had acted in retaliation for grievances Plaintiff had filed against others while at Auburn, the undisputed evidence establishes that Graham acted well within his discretion in temporarily revoking Lisa Henderson's visiting privileges based upon the threatening Facebook post believed to have been posted by Lisa Henderson. *See Scott,* 344 F.3d at 287-88 (defendant may be entitled to summary judgment even in the presence of a retaliatory motive if he shows that even without improper motivation, the alleged retaliatory action would have occurred).

Plaintiff's claim that Graham tampered with his grievances and mail is also without merit. There is no evidentiary support for Plaintiff's claim that grievances against Graham are generally not filed. (Dkt. No. 45 at ¶ 79.) Furthermore, in his Amended Complaint, Plaintiff has alleged that it was not Graham but "some officer [who] thwarted and impeded his ability to file and fully exhaust his grievance [against Graham]. *Id. See Kerzer,* 156 F.3d at 400 (conclusory allegations are insufficient to create a genuine issue of fact on summary judgment). Thus, Plaintiff has failed to show adverse action by Graham for purposes of a retaliation claim.

Given the foregoing, the Court recommends that Graham be granted summary judgment on Plaintiff's retaliation claim against him.

4. Dennis

a. Claim that July 12, 2012, Assault and Misbehavior Report Were Retaliatory

Plaintiff claims that Dennis assaulted him and filed a false misbehavior report against him on July 12, 2012, in retaliation for all of the grievances Plaintiff had filed at Auburn since March 22, 2012.[19] (Dkt. No. 47-1 at 36-38.) An assault by corrections officers is sufficient to "chill a person of ordinary firmness from continuing to engage in his First Amendment activity" for purposes of a retaliation claim. *See Rivera v. Goord*, 119 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2000). Likewise, the filing of a false misbehavior report which results in an inmate being placed "in solitary" for an extended period of time, as Plaintiff claims happened to him (Dkt. No. 47-1 at 36), would generally be considered an adverse action for retaliation purposes. *See, e.g., Jeffrey v. Ahmed*, No. 9:09-CV-0327, 2011 WL 4390220, at *11, 2011 U.S. Dist. LEXIS 106607, at *33 (N.D.N.Y. Aug. 22, 2011).

However, Plaintiff has failed to produce sufficient evidence to raise a question of material fact about whether the grievances he had filed against other corrections officers at Auburn were a "substantial or motivating factor" in Dennis' alleged assault or filing an allegedly false misbehavior report.[20] *See Pidlypchak*, 389 F.3d at 380. As noted above, retaliation claims are

[19] DOCCS records submitted by Defendants reveal that Plaintiff exhausted an administrative grievance filed on July 17, 2012, complaining that he had been verbally abused and assaulted. (Dkt. No. 47-5 at 5.) Given the timing, the grievance was presumably the one Plaintiff claims to have filed against Dennis arising out of the alleged July 12, 2012, assault. (Dkt. No. 45 at ¶¶ 76-77.)

[20] According to Dennis, he did not use excessive force on Plaintiff and wrote the misbehavior report because Plaintiff had been verbally threatening. (Dkt. No. 47-4 at ¶¶ 11-13.)

scrutinized with particular care because of the relative ease with which they can be made, *Flaherty*, 713 F.2d at 13, and it is difficult for a plaintiff to establish that a defendant had cause to retaliate against him for filing grievances against other corrections officers. *See Wright,* 554 F.3d at 274.

At his deposition, Plaintiff testified that he was making no claim that he had any interaction with Dennis before the alleged assault and false misbehavior report on July 12, 2012. (Dkt. No. 47-1 at 36-37.) Plaintiff had no knowledge of Dennis having been required to respond to any of his grievances prior the alleged assault and false misbehavior report and merely noted in his deposition testimony that several officers had been required to respond to his grievances and like it. *Id.* 38-39. The only factual allegation in Plaintiff's Amended Complaint possibly offering support for Plaintiff's claim is the allegation that Dennis is good friends with a number of the non-defendant Auburn personnel about whom he has alleged wrongdoing, including Robin E. Richardson, about whom Plaintiff's mother had complained to the IG regarding an incident on March 22, 2012. (Dkt. No. at ¶¶ 6,76.) That is clearly not enough.

Martinez has stated in his Declaration that he overheard Dennis telling other officers sometime in July or August of 2012, that: (1) "he confronted [Plaintiff] about having the medical records [of his victims] and it eventually lead (sic) him to hitting [Plaintiff];" (2) that he made the whole misbehavior report up; and (3) he had "did it all" because of all the grievances Plaintiff was writing. (Dkt. No. 55-5 at ¶ 2.) The Court finds that the Martinez Declaration fails to raise

---

Dennis also denies ever directing or suggesting that any DOCCS employee retaliate against Plaintiff for any reason. *Id*. at ¶ 14.

an issue of material fact with regard to Plaintiff's claim that Dennis assaulted him and wrote a false misbehavior report in retaliation for filing grievances against other corrections officers.

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Statements, like those in the Martinez Declaration, "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

Given Dennis' denial and the complete absence of nonconclusory evidence supporting Plaintiff's retaliation claim, the Court recommends that Dennis be granted summary judgment on Plaintiff's claim that Dennis assaulted him and wrote a false misbehavior report in retaliation for grievances Plaintiff had written against other corrections officers.

b. Claim that Dennis' Report of the Threatening Facebook Post was Retaliatory

The Court finds that Plaintiff's claim that Dennis reported the threatening Facebook post to Chuttey in retaliation for grievances filed against other corrections officers and for his mother's telephone call to Auburn reporting the alleged assault on her son by Dennis on July 12,

2012, likewise fails to survive summary judgment. (Dkt. No 45 at ¶¶ 76, 78.) According to Dennis, the Facebook post he received on July 14, 2012, threatened him and his family, he reported the threat and gave a copy to Chuttey the same day, gave a statement to the IG several months later, and took no further action with regard to the post. (Dkt. Nos. 47-4 at ¶¶ 3-7; 47-1 at 59.) Plaintiff does not deny that the threatening Facebook post was made on Dennis' personal Facebook page, or that Dennis received the post, only that he reported the post to DOCCS "not because he felt threatened, but out of spite, to get back at Plaintiff." (Dkt. No. 45 at ¶ 78.) At his deposition, Plaintiff gave the following testimony regarding his retaliation claim:

> Q And then you said that [Dennis] used I guess some false reason to get your mother's visitation privileges revoked
>
> A Yeah.
>
> Q is that correct?
>
> A Yes. I mean, come on. I know he didn't feel threatened by the message. I know that. I mean, come on.
>
> Q Are you doubting that he received that message?
>
> A No, I don't doubt it anymore. I mean, I got the report from him to Captain Chuttey for you, one of the documents you sent me where he alleged he reported an incident against him[21] and [on] the day after my mother called the facility to make sure that pictures were taken of my injuries and that the incident was documented.

(Dkt. No. 47-1 at 44.)

---

[21] Dennis submitted a written statement regarding the threatening Facebook post to Chuttey on July14, 2012, in which he detailed the threats contained in the post and noted that the post referred to something Dennis had done on July 12, 2012 at 8:20 pm, the time Dennis allegedly assaulted Plaintiff. According to the statement, a second post was received theatening Dennis' sisters. (Dkt. No. 47-4 at 10.)

Plaintiff also testified that he did not think that Dennis was involved in the actual process of determining punishment    only that he would not have filed complaint against Plaintiff's mother but for his desire to retaliate for grievances Plaintiff had filed against other corrections officers and the complaint Plaintiff's mother made to Graham regarding Dennis' assault. *Id*. at 59.

Plaintiff has failed to produce any nonconclusory and non-speculative evidence that could be found to raise a material question of fact on his claim that Dennis did not feel threatened by the Facebook post and only reported it to create problems for Plaintiff and his mother. Martinez's statement that he overheard Dennis ". . . mention an alleged Facebook threat on facebook" and say "that none of it was true and that he only reported it to his supervisors because he knew it would cause [Plaintiff] trouble" is, as with Plaintiff's other retaliation claim against Dennis, "so devoid of any specifics" [and] replete with conclusions," that is insufficient to defeat Dennis' motion for summary judgment. *Bickerstaff,* 196 F.3d at 452.

Therefore, the Court recommends that Dennis be granted summary judgment on Plaintiff's retaliation claim arising out of Dennis' action in reporting the threatening Facebook post to Chuttey.

**F.      Suspension/Revocation of Visitation Mother's Privileges**

Defendants have moved for summary judgment on any independent constitutional claims Plaintiff may have intended to assert with regard to the temporary revocation of his mother's visitation privileges.  (Dkt. No. 47-7 at 4-8.)  Plaintiff has indicated in his opposition that he is not challenging the revocation of his mother's visitation as an independent violation of his

constitutional rights, but only as an adverse action taken against him by Defendants in retaliation for filing grievances. (Dkt. No. 55-1 at 7; *see also* Dkt. No. 45 at ¶¶ 115-135.) Nonetheless, given the Court's obligation to read *pro se* complaints with "special solicitude" and interpret them to raise the "strongest [claims] that they suggest," (*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006)) (internal quotation marks and citations omitted), the Court finds it appropriate to consider whether Plaintiff may have a § 1983 claim for violation of his constitutional rights in connection with the revocation of his mother's visitation privileges. Because the evidence submitted by the parties is restricted to the temporary revocation by Graham set forth in his July 17, 2012, letter to Lisa Henderson, appeals by Plaintiff and Lisa Henderson, and Lisa Henderson's request for a hearing and the response thereto, the Court's consideration is limited strictly to whether Plaintiff's constitutional rights were violated by the temporary revocation of visitation rights by Graham.

1. Standing

Defendants argue that Plaintiff lacks Article III standing to seek damages for his mother's loss of visitation privileges because it was his mother who lost visitation privileges, and Plaintiff has suffered no direct injury as a result of his mother being unable to visit him. (Dkt. No. 47-7 at 20.) Defendants have cited no on point case law supporting their position, and their argument is difficult to square with the number of cases in which courts have considered an inmate's claim challenging the suspension of a visitor's privileges. *See, e.g., Meadows v. Dodrill,* 872 F.2d 418 (4th Cir. 1989) (table) (inmate plaintiff claiming that his ex-wife was wrongfully denied visitation privileges for security reasons); *Rackley v. Blevins*, No. CIV-14-145-HE, 2014 WL 2519313, 2014 U.S. Dist. LEXIS 76178 (W.D. Okl. May 13, 2014) (plaintiff brought suit for

indefinite termination of his wife's visitation privileges); *Ford v. Fischer*, No. 9:09-CV-723 (DNH/ATB), 2011 WL 856416, 2011 U.S. Dist. LEXIS 23479 (N.D.N.Y. Jan. 31, 2011) (inmate sued for the indefinite suspension of his fiancee's visiting privileges because of, among other things, her alleged involvement in smuggling a note from another inmate to plaintiff); *LeCompte v. Ricci*, No. 11-1639 (JAP), 2011 WL 6130596, 2011 U.S. Dist. LEXIS 140586 (D. N.J. Dec. 7, 2011) (inmate plaintiff sued for the permanent visitation ban imposed on his mother on the grounds that she posed a substantial risk to the safety and security of the facility). Therefore, the Court concludes that Plaintiff has standing to assert a claim under § 1983 for the revocation of his mother's visitation privileges due to security concerns.

2. First Amendment Right to Freedom of Association

A prisoner retains those rights which are not inconsistent with his incarceration. *Overton v. Bazzetta, 539 U.S. 126, 131 (2003) (*citing *Jones v. North Carolina Prisoners' Labor Union*, *Inc*., 433 U.S. 119, 125 (1977); *Shaw v. Murphy*, 532 U.S. 223, 229 (2001)). In *Overton*, the Supreme Court found that "freedom of association is among the rights least compatible with incarceration" and "some curtailment of that freedom must be expected in the prison context." *Id*. at 131 (citations omitted). It is clear from *Overton* that inmates retain a limited First Amendment right of association, although the right may be withdrawn for various reasons relevant to legitimate penological interests. *Overton*, 539 U.S. at 131-36 (restrictions on visitation do not infringe on First Amendment rights of association where, *inter alia*, they bear a rational relationship to legitimate penological interests and alternative means of communication are available); *see also Caldwell v. v. Goord*, No. 09-CV-00945(Sr.), 2013 WL 1289410, at * 5, 2013 U.S. Dist. LEXIS 43536, at * 12 (W.D.N.Y. Mar. 27, 2013) (suspension of inmate's wife's

visiting privileges due to intentional conspiracy to smuggle drugs into the correctional facility

and denial of request for reinstatement did not infringe on inmate and his wife's First

Amendment rights of association where suspension bore a rational relationship to legitimate

penological interests and alternate methods of communications were available); *Ford,* 2011 WL

856416, at * 12 (no claim for infringement of First Amendment rights where denial of visiting

privileges was justified by legitimate penological interests when fiancee's privileges were

indefinitely suspended because of alleged smuggling of note from another inmate and because of

safety concerns).

      Lisa Henderson has denied ever threatening Dennis. (Dkt. No. 55-3 at ¶ 10.)  However,

the record evidence, including the threatening Facebook post (Dkt. No. 47-3 at 7), Dennis' report

regarding the post (Dkt. No. 47-4), and the specific references in the post that led to the

determination that "Lisa Lee" and Lisa Henderson were likely one and the same person (Dkt. No.

47-3 at ¶¶ 7-8), establishes that Graham had reasonable cause to believe that temporary

suspension of Plaintiff's mother's visitation privileges pending an investigation was necessary to

"maintain the safety, security, and good order of the facility." 7 NYCRR § 201.4; Dkt. No. 47-3

at ¶¶ 9-10.  *See Overton*, 539 U.S. at 132 (finding a legitimate penological interest in maintaining

prison security and noting that courts "must accord substantial deference to the professional

judgment of prison administrators, who bear a significant responsibility for defining the

legitimate goals of a corrections system and for determining the most appropriate means to

accomplish them.")  Moreover, Plaintiff has acknowledged that he was able to stay in frequent

telephone contact with his mother during the temporary revocation.  *Id*. at 135 (where it is shown

that no alternate means of communication were available, though it would not be conclusive, it would be some evidence that visitation restrictions were unreasonable).

Based on the foregoing, the Court finds that 7 NYCRR § 201.4 and the temporary revocation of Lisa Henderson's visitation privileges by Graham pending investigation of the threatening Facebook post did not violate Plaintiff's First Amendment right of association.

3. Due Process

To prevail on a procedural due process claim under § 1983, a plaintiff must show he possessed a protected property or liberty interest and that he was deprived of the interest without sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (liberty interest). In *Kentucky Dept. of Correc. v. Thompson*, 490 U.S. 454, 461 (1989), the Supreme Court held "[t]he denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence, and therefore is not independently protected by the Due Process Clause." *See also Midalgo v. Bass*, No. 9:03-CV-1128 (NAM/RFT), 2006 WL 2795332, at * 16, 2006 U.S. Dist. LEXIS 98871, at * 49 (N.D.N.Y. Sept. 26, 2006) ("family visitations for inmates constitute a privilege and not a right.")

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Court finds that, given the Supreme Court finding that denial of access to a particular visitor is "within the terms of confinement ordinarily

contemplated by a prison sentence," *Kentucky Dept. of Correc.*, 490 U.S. at 461, the temporary revocation of visitation privileges pending investigation imposed by Graham under 7 NYCRR § 201.4(a) would not impose an "atypical and significant hardship" on Plaintiff. *Sandin*, 515 U.S. at 484.

Even if the regulations in 7 NYCRR Part 201 could be construed to create such a liberty interest, Plaintiff and his mother were both afforded the right to appeal the temporary revocation, and Lisa Henderson was also given the right to request a hearing. *See* 7 NYCRR § 201.4(b) and (c). Plaintiff and his mother filed written appeals, and Plaintiff's mother asked for a hearing. (Dkt. Nos. 47-2 at 7-8 and 12-19; 47-3 at 13.) Since the parties have provided no evidence with regard to either a response by Lisa Henderson to Gonzalez' October 4, 2012, letter regarding the prematurity of the hearing request but nonetheless giving her the right to go forward, or the outcome of the appeals, the Court can find only that Plaintiff and his mother were afforded the right under the regulations to file appeals and request a hearing with regard to the temporary revocation.

Based upon the foregoing, the Court finds that the temporary revocation of his mother's visiting privileges did not violate his First Amendment right of association or his Fourteenth Amendment right to due process and recommends that Defendants be granted summary judgment with regard to the temporary revocation.

**G. Qualified Immunity**

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. (Dkt. No. 47-7 at 18-19.) Inasmuch as the Court

is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that Plaintiff's § 1983 claims for money damages against Defendants in their official capacities be *sua sponte* **DISMISSED WITH PREJUDICE**; and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: February 23, 2015
Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge


Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Charlette and Ricky CALDWELL, Plaintiffs,
v.
Glenn S. GOORD, Anthony Annucci, Leonard Mancini, Donald Selsky, Curtis Drown, Calvin West, Robert Woods, Darwin Laclair, and Captain Wenderlich, Defendants.

No. 09–CV–00945(Sr).
March 27, 2013.

Charlette Caldwell, Brooklyn, NY, pro se.

Ricky Caldwell, Auburn, NY, pro se.

Michael J. Russo, New York State Attorney General's Office, Buffalo, NY, for Defendants.

***DECISION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

***1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment. Dkt. # 17.

Ricky Caldwell, an inmate of the New York State Department of Correctional Services ("DOCS"), and his wife, Charlette Caldwell, commenced this action pursuant to 42 U.S.C. § 1983, alleging that defendants deprived plaintiff Charlette Caldwell of due process in determining that her visitation privileges should be suspended indefinitely and deprived plaintiff Ricky Caldwell of due process during the course of a prison disciplinary hearing. Dkt. # 1.

In lieu of answer, defendants move for summary judgment on all of plaintiffs' claims except Ricky Caldwell's claim of denial of due process in the course of a disciplinary hearing against defendants Wenderlich and Selsky. Dkt. # 24.

Plaintiffs' cross move for summary judgment. Dkt. # 29.

For the following reasons, defendants' motion for summary judgment is granted and plaintiffs' motion for summary judgment is denied.

**BACKGROUND**

By letter dated February 11, 2005, Elmira Correctional Facility ("Elmira"), Superintendent Calvin West notified plaintiff Charlette Caldwell that her visiting privileges were suspended due to her "intentional conspiracy to introduce contraband drugs into this Facility." Dkt. # 1, p.5.

On February 11, 2005, Ricky Caldwell was charged in an inmate misbehavior report authored by Investigator Hawes with drug possession, smuggling, call forwarding/third party calls, and exchanging PINS. Dkt. # 41, p.24. Specifically, the inmate misbehavior report alleges that

> Inmate did violate said department rules in that he conspired and solicited with his wife Charlette Caldwell and Tia Hurd to smuggle drugs into the Elmira CF. Tia Hurd the visitor of Inmate James Smith 92–A02048 was arrested by Investigators on 12/26/04 at the Elmira CF after smuggling drugs into this facility. A phone call that was made by Inmate Caldwell on said date and time using the inmate Pin # of 02–A–4010 revealed that Tia Hurd did receive said drugs from Charlette Caldwell

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

> which was also confirmed in a voluntary statement give to Investigators upon the arrest. This report is a result of an ongoing Narcotics Investigation being conducted by the NYSDOCS Inspector Generals Office.

Dkt. # 41, p.24.

A Tier III disciplinary hearing commenced on February 15, 2005. Dkt. # 41, p.29. Commissioner's Hearing Officer ("CHO"), Wenderlich found Ricky Caldwell guilty of all charges and imposed a penalty, *inter alia,* of 2 years in the Special Housing Unit. Dkt. # 41, p.141. Upon administrative appeal, Donald Selsky, Director of Special Housing/Inmate Disciplinary Program, affirmed the findings of the hearing. Dk. # 41, p.153.

By Memorandum Decision dated July 11, 2005, CHO Curtis P. Drown affirmed the indefinite suspension of Charlette Caldwell's visiting privileges upon appeal. Dkt. # 25, p.8. In support of the decision, CHO Drown relied upon the following:

> ***2** Investigator P. Hawes of Inspector General's office testified on behalf of the Department. On December 26, 2004 a visitor was arrested for trafficking drugs into Elmira Correctional Facility. Inv. Hawes testified that the arrest was a result of knowledge gained through listening to an audiotape of a telephone conversation between Inmate and Visitor, a "third party" call using another inmate's PIN number. The tape was presented by the Department. According to the testimony, Inmate and Visitor were engaged in ongoing illegal drug smuggling and sales at the facility. Inmate also testified that disbursement records of other inmates indicate drug payments in the hundreds of dollars were being forwarded to Visitor's residence. Inv. Hawes testified that the arrested coconspirator, who implicated Visitor, possessed both marijuana and heroin. Inv. Hawes also testified that on February 15, 2005, Visitor admitted to using visitors as "mules" to bring drugs into the facility, but stated that she had never brought the drugs into the facility herself.

Dkt. # 25, p.9. By Decision dated September 2, 2005, Leonard Mancini, Associate Counsel for DOCS, affirmed the CHO's decision and advised Charlette Caldwell that "she can request a reconsideration of her indefinite visitation suspension after one year." Dkt. # 25, p.12.

By Memorandum dated February 22, 2006, Upstate Correctional Facility Superintendent R.K. Woods denied Ricky Caldwell's request for restoration of visitation privileges due to plaintiff's disciplinary history of eight drug-related violations. Dkt. # 1–2, p.22. Superintendent Woods denied another request for reconsideration on July 6, 2006 following his review of the circumstances at Elmira. Dkt. # 1–2, p.23.

By Memorandum and Judgment issued November 30, 2006, the New York State Supreme Court, Appellate Division, Third Department, annulled the determination and directed DOCS to expunge all references to this matter from plaintiff's institutional record due to the CHO's improper denial of several of plaintiff's requests for documents and witnesses. Dkt. # 41, pp.157–159.

By Letter dated January 5, 2007, Deputy Commissioner Anthony Annucci advised Ricky Caldwell that

> The fact that a Tier III inmate disciplinary determination against you has been reversed and expunged does not, necessarily, affect the ability of your wife, Charlette Caldwell, to engage in visitation. Your wife's privilege to visit was revoked in accordance with Department Directive # 4403, "Inmate Visitor Program." Your wife challenged

Page 3

Not Reported in F.Supp.2d, 2013 WL 1289410 (W.D.N.Y.)
**(Cite as: 2013 WL 1289410 (W.D.N.Y.))**

> the revocation and was afforded a visitation hearing. On July 11, 2005, after a hearing was held, Commissioner's Hearing Officer Curtis P. Drown upheld the revocation. That decision was never reversed upon administrative appeal or through the courts.
>
> Notwithstanding the foregoing, in accordance with Section VII.F. of Department Directive # 4403, your wife may request a reconsideration of the revocation at any time after it has been in effect for one (1) year and on an annual basis thereafter.

***3** Dkt. # 1–2, p.34.

By letter dated March 13, 2007, Great Meadow Correctional Facility Superintendent, Darwin LaClair restored Charlette Caldwell's visiting privileges effective May 1, 2007. Dkt. # 51, p.4.

Plaintiffs commenced this action on November 3, 2009. Dkt. # 1. By Order entered March 18, 2010, the Hon. Michael A. Telesca, U.S.D.J., dismissed plaintiffs' claims against Investigator Hawes and also dismissed plaintiffs' claims against the remaining defendants in their official capacities. Dkt. # 8. Plaintiff Charlette Caldwell asserts a claim of denial of due process with respect to the revocation of her visiting privileges against Superintendent West, CHO Drown, and Associate Counsel Mancini. Dkt. # 1. Plaintiffs also claim that Superintendent Woods violated their constitutional rights by denying their request for reinstatement of visitation privileges and that Deputy Commissioner Annucci, Director Selsky, Superintendent LaClair violated their constitutional rights by failing to reinstate their visitation privileges immediately following the Third Department's reversal of the disciplinary proceeding. Dkt. # 1. Finally, plaintiff Ricky Caldwell asserts a claim of denial of due process with respect to the disciplinary hearing against Commissioner Goord, Superintendent West and CHO Wenderlich,. Dkt. # 1.

## DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> ***4** must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

**Statue of Limitations as to Charlette Caldwell's Claims**

In lieu of answer, defendants West, Mancini and Drown move for summary judgment on the ground that plaintiff Charlette Caldwell's due process claim with respect to the revocation of her visitation privileges is untimely. Dkt. # 26, p.7.

Plaintiff asserts that her claim did not accrue until the Third Department reversed the disciplinary determination on November 30, 2006. Dkt. # 30, pp.10–11. Alternatively, plaintiff contends that the accrual date should be May 1, 2007, the date her visiting privileges were restored. Dkt. # 51, p.1.

The statute of limitations for an action commenced in New York pursuant to 42 U.S.C. § 1983 is three years. *Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). The accrual date for such a claim is a question of federal law. *Wallace v. Kato,* 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). "The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981).

In the instant case, the elements of plaintiff's claim of denial of due process in the course of the decision to suspend her visitation privileges existed no later that September 2, 2005, the date when DOCS upheld the decision to suspend her visitation privileges. Dkt. # 25, p.12. As plaintiff's claim, to be timely, should have been filed no later than September 2, 2008, but wasn't filed until November 3, 2009, this aspect of defendants' motion for summary judgment is granted.

**Right to Visitation**

In lieu of answer, defendants West, Mancini, Wood, LaClair, Annucci and Selsky move for summary judgment on the ground that plaintiffs' have no constitutional right to visitation. Dkt. # 26, pp.8–9.

Plaintiffs respond that they possess a liberty interest in contact visits. Dkt. # 30, pp. 11–12.

"Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States. *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). It is clear, however, that "[t]he denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence and therefore is not independently protected by the Due Process Clause. *Id.* at 461 (internal quotation omitted). Nor can it be said that New York has created a protected liberty interest in visitation as "[i]t is well-established that contact visits are a *privilege* for inmates, not a *right." Saxon v. Goord,* No. 06–CV–826, 2007 WL 1695582, at *4 (W.D.N.Y. June 7, 2007); *See Midalgo v. Bass,* No. 9:03–CV–1128, 2006 WL 2795332, at *16 (N.D.N.Y. Sept.26, 2006) ("family visitations for inmates only constitute a privilege and not a right.").

***5** Although plaintiffs proceed on a due process claim, the Court notes that restrictions on inmates visitation privileges do not infringe on First Amendment rights of association where, as here, *inter alia,* the restrictions bear a rational relation to legitimate penological interests and alternate means of communication are available. *Overton v. Bazzetta,* 539 U.S. 126, 131–36, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003); *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 227 (W.D.N.Y.2003). Similarly, the Court also notes that denial of visitation for a limited time does not amount to the sort of wanton infliction of pain prohibited by the Eighth Amendment. *Overton,* 539 U.S. at 137;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Zimmerman v. Burge,* No. 06–CV–176, 2008 WL 850677, at *14 (N.D.N.Y. March 28, 2008) (collecting cases); *Hernandez,* 272 F.Supp.2d at 227.

Accordingly, the motion for summary judgment is granted with respect to plaintiffs' claim that their constitutional rights were violated by Superintendent Woods, Deputy Commissioner Annucci, Director Selsky, Superintendent LaClair's refusal to reinstate their visitation privileges.

**Lack of Personal Involvement by Goord and West**

In lieu of answer, defendants Goord and West move for summary judgment on the ground that they lacked personal involvement in the alleged denial of due process in the course of plaintiff Ricky Caldwell's disciplinary hearing. Dkt. # 43, pp. 12–14. Defendants do not oppose the claim going forward against defendant Selsky, even though he is not named as a defendant in this claim. Dkt. # 43, p.12.

Plaintiffs respond that Commissioner Goord is subject to supervisory liability. Dkt. # 30, p.12.

It is clear, however, that there is no respondeat superior liability in § 1983 cases. *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995). To the contrary, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon,* 58 F.3d at 873 (internal quotation omitted). As there is no allegation that either Commissioner Goord or Superintendent West were personally involved in the inmate disciplinary proceeding, this aspect of defendants' motion is granted.

**Plaintiffs' Cross–Motion for Summary Judgment**

As to the remaining denial of due process claim, plaintiffs argue that the reversal of the disciplinary finding by the Appellate Division demonstrates their entitlement to summary judgment. Dkt. # 30, p.3.

As defendants correctly assert (Dkt.# 43, pp. 10–12), a favorable decision in an article 78 proceeding does not establish a federal due process claim. "Federal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990). "[T]he fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action does not settle what protection the federal due process clause requires. *Id.* (internal quotation omitted). Accordingly, plaintiffs' motion for summary judgment is denied.

**CONCLUSION**

***6** For the reasons set forth above, plaintiffs' motion for summary judgment (Dkt.# 29), is denied and defendants' motion for summary judgment (Dkt.# 24), is granted except with respect to plaintiff Ricky Caldwell's cause of action for denial of due process in the course of an inmate disciplinary proceeding against defendants Selsky and Wenderlich, who are directed to file an Answer with respect to these allegations no later than **April 19, 2013.**

**SO ORDERED.**

W.D.N.Y.,2013.
Caldwell v. Goord
Not Reported in F.Supp.2d, 2013 WL 1289410 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

H
Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
George M. CHAVIS, Plaintiff,
v.
S. VONHAGN, et al., Defendants.

No. 02–CV–0119(Sr).
Jan. 30, 2009.

West KeySummary **Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases
(Formerly 310k17(2))

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

No genuine issue of material fact existed regarding whether prison medical staff violated a prisoner's Eighth Amendment rights by being deliberately indifferent to the prisoner's medical needs to preclude summary judgment. The evidence indicated that the prisoner was seen on eighteen occasions during December 1999 because the prisoner complained of ear problems. The prison medical staff examined the prisoner on those occasions, noted that it was not an ear infection, and advised the prisoner to stop putting foreign objects into his ears. The evidence further indicated that the prison medical staff administered Advil, ear drops, ear wash, and over-the-counter medication, such as skin cream, lip balm, and Sudafed, to the prisoner as he requested and needed it. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

George M. Chavis, Dannemora, NY, pro se.

Delia Dianna Cadle, New York State Attorney General's Office, Buffalo, NY, for Defendants.

***DECISION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

***1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct any and all further proceedings in this case, including entry of final judgment. Dkt. # 42.

Plaintiff filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt.1 and 9. Plaintiff alleges that while an inmate at the Southport Correctional Facility, his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 79. For the following reasons, defendants' motion for summary judgment is granted in its entirety.

***BACKGROUND***

Plaintiff, proceeding *pro se,* filed this action on or about February 11, 2002, seeking “dismissal” (expungement) of each “disciplinary ticket” (hereinafter referred to as “Misbehavior Report”) addressed in the amended complaint, termination of each defendant's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

employment with the New York Department of Correctional Services, and compensatory and punitive damages for violations of his rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.[FN1] *Id.* The following claims remain and are presently before this Court on defendants' motion for summary judgment: (1) in or about December 1999, defendants Brandt and vonHagn denied plaintiff emergency medical care and defendant Brandt denied plaintiff medication in or about January 2001; (2) defendants Brandt and vonHagn retaliated against plaintiff because plaintiff had filed grievances against defendants Brandt and vonHagn; (3) defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Selsky, Sheahan and Wilcox violated plaintiff's due process rights under the Fourteenth Amendment in connection with disciplinary hearings and appeals handled by each of the defendants; (4) defendant Gardner interfered with plaintiff's legal mail and denied plaintiff permission to take a religious correspondence course in violation of the First Amendment; and (5) defendants Corcoran and Weingartner violated plaintiff's First Amendment right of access to the New York Court of Claims.

FN1. Plaintiff filed his original complaint together with a motion to proceed *in forma pauperis* on or about February 11, 2002. Dkt.1 and 2. By Order filed March 7, 2002, United States District Judge Charles J. Siragusa granted plaintiff permission to proceed *in forma pauperis* and dismissed all but two of plaintiff's original claims. Dkt. # 3. Plaintiff was granted leave to amend his complaint with respect to certain of his dismissed claims. *Id.* Plaintiff filed an amended complaint on or about May 31, 2002. Dkt. # 9. Thereafter, by Order filed July 1, 2002, United States District Judge David G. Larimer dismissed certain of plaintiff's claims and terminated certain of the defendants. Dkt. # 10. Specifically, Judge Larimer dismissed plaintiff's official capacity claims against all defendants, plaintiff's interference with non-legal mail claim against defendant Gardner and all claims against defendant Hazelton. *Id.*

### A. Deliberate Indifference Claim

At all times relevant to the allegations in the amended complaint, defendants Sabrina vonHagn, R.N. and Robert Brandt, R.N. were employed by the New York State Department of Correctional Services ("DOCS") at the Southport Correctional Facility ("Southport"). Dkt. # 82, ¶ 1; Dkt. # 83, ¶ 1. Plaintiff's deliberate indifference claim against defendant vonHagn states, in part:

> On the date [sic] of 12–16–99 to 12–22–99, S. VonHagan [sic], inside of this Southport Prison, while acting under State color [sic], in her individual and official [FN2] capacities, had [sic] knowingly, intentionally, and wilfully denied me 'emergency' medical care for a serious—extremely painful ear infection resulting in my total loss of hearing ability in my ear for a time period of two weeks.

FN2. As noted in footnote 1 *supra,* Judge Larimer dismissed plaintiff's official capacity claims against all defendants.

***2** Dkt. # 9, p. 5. Similarly, plaintiff's deliberate indifference claim against defendant Brandt states, in part:

> Additionally, on the date [sic] of 12–16–99 to 12–22–99, this same defendant [Brandt], who is the medical staff co-worker and morning partner of defendant S. VonHagan [sic] (para # 1), had done [sic] SHU–AM cell visits on these dates above and knowingly, wilfully, and intentionally 'aided' in the *denial* of my receiving [sic] 'emergency' medical care for my ear infection resulting in extreme pain and loss in hearing ability for a two week time period.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Id.* at p. 5–B (emphasis in original). Plaintiff also alleges (as part of his retaliation claim) that defendant Brandt "violated my right to proper medication" in January 2001. Dkt. # 9, p. 5–A.

In or about December 2004, defendant vonHagn had been a licensed registered nurse for approximately 28 years and had been employed as a registered nurse at Southport since 1994. Dkt. # 83, ¶ 1. Also in or about December 2004, Defendant Brandt had been a licensed registered nurse for approximately 25 years and had been employed as a registered nurse at Southport since 1992. Dkt. # 82, ¶ 1. At all times relevant to the claims alleged in the amended complaint, John Alves, M.D. was the Facility Health Services Director of the Medical Services Unit at Southport and held that position since 1995. Dkt. # 81, ¶ 1. As of December 2004, Dr. Alves had been licensed to practice medicine for approximately 25 years. *Id.*

**1. December 1999**

Plaintiff was transferred to Southport on or about March 24, 1999. Dkt. # 81, ¶ 6. During December 1999, plaintiff's ambulatory health records reveal that he had eighteen encounters with medical staff. Dkt. # 81, ¶ 7. Indeed, prior to December 16, 1999, plaintiff was seen by medical staff on the following nine occasions, December 2 (Brandt), December 3 (vonHagn), December 4 (vonHagn), December 7 (vonHagn—twice), December 10 (vonHagn), December 13 (Brandt), and December 14 (Brandt and Hearn). Dkt. # 81, ¶¶ 7–11; Dkt. # 82, ¶ 9; Dkt. # 83, ¶¶ 8–9. On December 16, 1999, plaintiff was seen by defendant Brandt during morning sick call. Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. During this sick call, plaintiff requested an ear check and stated that he could not hear. *Id.* On or about December 16, 1999, defendant Brandt made the following notations in plaintiff's medical records, "ear / some wax noted drum visible canal mildly irritated from inmate using pen cap paper [sic] for cleaning ear." *Id.;* Dkt. # 70, p. 0843. Defendant Brandt advised plaintiff of his findings and plaintiff demanded ear drops. *Id.* Defendant Brandt further advised plaintiff that ear drops were not indicated and defendant Brandt noted that plaintiff was "very verbal, screaming, banging on cell bars." *Id.* Defendant Brandt again saw plaintiff on December 17, 1999, wherein plaintiff again demanded ear drops and complained of a headache. *Id.* Defendant Brandt again advised plaintiff against cleaning his ears with foreign objects and provided plaintiff with Advil. *Id.*

***3** Plaintiff was seen by defendant vonHagn on December 18, 1999, during morning sick call. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. At that time, plaintiff demanded a second ear check and stated that he could not hear out of both ears. *Id.* Defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves, if possible, and noted in plaintiff's medical records for plaintiff to follow up with the block RN. *Id.* Defendant vonHagn further noted that, despite complaints that he could not hear, plaintiff heard her statements. *Id.* Plaintiff began demanding an ear examination immediately. *Id.* Defendant vonHagn also saw plaintiff during morning sick call on December 19 and 20, 1999. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 14; Dkt. # 83, ¶ 11. On December 19, 1999, plaintiff requested Advil, however, defendant vonHagn noted that plaintiff had received Advil on December 17, 1999 and it could not be refilled until December 20, 1999. *Id.* Notwithstanding the foregoing, defendant vonHagn provided plaintiff with Advil and as reflected in plaintiff's medical records, advised plaintiff that he was on the MD list for an ear examination. *Id.*

On December 20, 1999, plaintiff continued to complain of ear blockage and an infection. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12. In plaintiff's medical records, defendant vonHagn noted that plaintiff's ear examination was rescheduled, and that an ear examination was conducted in the office. *Id.* Defendant vonHagn also made the following notes in plaintiff's medical records: "ear / in office left ear

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cereum [sic] impaction seen, right ear some impaction seen, no visualization of tm (tampanic [FN3] [sic] membrane) seen in either ear." *Id.* According to both Dr. Alves and defendant vonHagn, "visualization" is a sign of an ear infection and as noted, defendant vonHagn did not observe any visualization. Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12. Defendant vonHagn further noted that she provided plaintiff with debrox (ear drops) daily for seven days and ear wash and noted to schedule a follow up. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12.

FN3. Tympanic membrane.

It was not until December 23, 1999, that plaintiff again requested morning sick call. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 16; Dkt. # 82, ¶ 11. Plaintiff was seen by defendant Brandt and requested over-the-counter medication for general use and defendant Brandt provided him with skin cream, lip balm and Sudafed. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 16; Dkt. # 82, ¶ 11. Notably, plaintiff made no complaint of ear pain on December 23, 1999. *Id.* Plaintiff next requested a morning sick call on December 27, 1999, at which time he was seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 17; Dkt. # 82, ¶ 12. Defendant Brandt noted in plaintiff's medical records that plaintiff wrote the following on his sick call request, "c/o [complains of] ears and ear drops." *Id.* Defendant Brandt further noted that he stopped at plaintiff's cell to do an ear check and plaintiff refused an ear examination, was extremely verbal, nasty and confrontational and stated, "get the fuck away from me white boy you fucking piece of racist homo shit. Leave me alone and stick those [ear drops] up your white homo asshole." *Id.* Thereafter, defendant Brandt terminated plaintiff's sick call, provided ear drops to plaintiff and made a note in plaintiff's medical records to follow up by afternoon sick call, if plaintiff was more compliant and less confrontational. *Id.*

***4** Two days later on December 29, 1999, plaintiff again requested morning sick call and plaintiff was seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 18; Dkt. # 82, ¶ 13. Plaintiff complained of his ears and requested over-the-counter medications. *Id.* Defendant Brandt attempted to check plaintiff's ears but plaintiff refused, stating, "fuck you white homoboy." *Id.* Defendant Brandt made the following additional notations in plaintiff's medical records, "balm, AF, MD callout." *Id.* Nurse vonHagn next saw plaintiff on December 31, 1999, during morning sick call. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 19; Dkt. # 83, ¶ 13. At that time, plaintiff requested Eucerin cream and when asked to show defendant vonHagn his dry skin, plaintiff refused and became verbally abusive. *Id.* In addition, plaintiff requested and was provided with Sudafed. *Id.* On January 4, 2000, plaintiff refused to see Dr. Alves during the MD callout and Dr. Alves noted plaintiff's refusal in plaintiff's medical records. Dkt. # 70, p. 0840; Dkt. # 81, ¶ 20. Defendant Brandt also noted plaintiff's refusal to see Dr. Alves in plaintiff's medical records and further noted that when he tried to speak to plaintiff, plaintiff stated "F you + your Dr to check my ear assholes." Dkt. # 70, p. 0840; Dkt. # 81, ¶ 21; Dkt. # 82, ¶ 15.

**2. January and February 2000**[FN4]

FN4. As noted elsewhere, although plaintiff's deliberate indifference claims against defendants vonHagn and Brandt allege wrongdoing in December 1999 and January 2001, plaintiff's amended complaint also alleges retaliation claims against these same defendants. Accordingly, a further discussion of plaintiff's medical care for the period January 2000 through February 2001 is appropriate for the purpose of demonstrating that at no time relevant to the allegations in the amended complaint were defendants vonHagn and Brandt deliberately indifferent to plaintiff's medical needs and to address plaintiff's claims that defendants refused or failed to provide plaintiff with medical care.

Page 5

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

Plaintiff was next seen at morning sick call on January 8, 2000 by Nurse Whedon who noted that plaintiff requested refills of certain medications, however, Nurse Whedon noted that plaintiff did not have any symptoms of a cold, cough or congestion. Dkt. # 70, p. 0840; Dkt. # 81, ¶ 22. Plaintiff made no complaint on January 8, 2000 about his ears. *Id.* On January 12, 2000, plaintiff was seen during morning sick call by defendant Brandt wherein plaintiff complained of a cold and a sore throat. Dkt. # 70, p. 0839; Dkt. # 81, ¶ 23; Dkt. # 82, ¶ 16. Plaintiff requested hydrocortisone cream and Eucerin, but plaintiff refused to show a need for the cream and became verbally abusive. *Id.* Plaintiff did not make any complaints about his ears on January 12, 2000. *Id.*

Defendant vonHagn next saw plaintiff on January 14, 2000 during morning sick call, wherein plaintiff signed for his eyeglasses and became verbally abusive to defendant vonHagn.[FN5] Dkt. # 70, p. 0839; Dkt. # 81, ¶ 24; Dkt. # 83, ¶ 15. Plaintiff did not make any complaints about his ears on January 14, 2000. *Id.* On January 18, 2000, plaintiff requested morning sick call and was seen by defendant Brandt. Dkt. # 70, p. 0839; Dkt. # 81, ¶ 25; Dkt. # 82, ¶ 17. At that time, plaintiff refused his tuberculosis test and became verbally abusive; plaintiff did not, however, complain about his ears. *Id.* According to plaintiff's medical records, plaintiff requested morning sick call on January 24, 25, and 29, 2000 and February 6, 2000. Dkt. # 70, pp. 0838–0837. Plaintiff was not seen by either defendant Brandt or defendant vonHagn on the three remaining dates in January 2000 or on February 6, 2000 and according to plaintiff's medical records, plaintiff did not complain about his ears during any of those visits. *Id.;* Dkt. # 81, ¶ 26. Thereafter, plaintiff was transferred from Southport to Coxsackie Correctional Facility ("Coxsackie") on or about February 7, 2000. Dkt. # 81, ¶ 27. Plaintiff remained at Coxsackie until in or about May 2000 at which time he was returned to Southport. *Id.*

FN5. A discussion of the verbal abuse endured by defendant vonHagn on January 14, 2000 and the resulting Misbehavior Report issued by defendant vonHagn against plaintiff is discussed in detail in the section entitled Retaliation Claim. *See* pp. 19–21 *infra.*

**3. May–December 2000**

***5** For the period May 2000 through December 2000, plaintiff had thirty-eight encounters with medical staff.[FN6] Dkt. # 70, pp. 0754–0763 and pp. 0815–0817; Dkt. # 81, ¶¶ 28–49. Plaintiff was seen by defendant Brandt on May 25, 2000, at which time plaintiff demanded Eucerin cream. Dkt. # 70, p. 0817; Dkt. # 81, ¶ 28. Because no need for the cream was demonstrated, defendant Brandt denied plaintiff's request. *Id.* Plaintiff was seen by defendant vonHagn on July 6, 2000, at which time plaintiff requested a plastic basin and Epsom salts to soak his feet because his toes were bothering him. Dkt. # 70, p. 0763; Dkt. # 81, ¶ 30. Plaintiff did not show defendant vonHagn his toe nails and defendant vonHagn noted in plaintiff's medical records that there should be follow up with the block nurse to cut plaintiff's toe nails. *Id.* When plaintiff was seen by defendant vonHagn on September 29, 2000, he again requested Epsom salts, Sudafed and athlete's foot cream. Dkt. # 70, p. 0760; Dkt. # 81, ¶ 32. Defendant vonHagn noted that because there was no order from the doctor for a foot soak, she only provided plaintiff with Sudafed and athlete's foot cream. *Id.* On October 10, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested over-the-counter skin cream and he was provided with athlete's foot cream and Eucerin. Dkt. # 70, p. 0760; Dkt. # 81, ¶ 34. Plaintiff was also seen by defendant Brandt on October 23, 2000, wherein plaintiff requested a laxative; defendant Brandt provided plaintiff with Fleet enemas. Dkt. # 70, p. 0759; Dkt. # 81, ¶ 36. During November 2000, plaintiff was seen by both defendant vonHagn and defendant Brandt. Dkt. # 70, p. 0758; Dkt. # 81, ¶ 38–39. On November 3, 2000, plaintiff was seen by defendant vonHagn and requested Epsom salt, Sudafed and Eucerin cream. *Id.* Defendant vonHagn provided

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff with Sudafed. *Id.* Thereafter, plaintiff was seen by defendant Brandt on November 29, 2000 and requested Eucerin cream. *Id.* Defendant Brandt noted that plaintiff was provided with Eucerin cream on October 10, 2000 and was not due for a refill until January 10, 2001. *Id.* Defendant Brandt provided plaintiff with balm and Sudafed. *Id.*

FN6. Only those instances where plaintiff was seen by either defendant Brandt or defendant vonHagn are described in greater detail below.

Plaintiff was seen by defendant vonHagn on December 13, 20, 24 and 26, 2000. Dkt. # 70, pp. 0755–0757; Dkt. # 81, ¶¶ 42–45. On December 13, 2000, plaintiff again requested Eucerin and athlete's foot cream. Dkt. # 70, p. 0757; Dkt. # 81, ¶ 42. Plaintiff was provided with athlete's foot cream and balm and it was noted again in plaintiff's medical records that plaintiff was not due for more Eucerin until January 10, 2001. *Id.* On December 20, 2000, plaintiff requested and was provided with Sudafed. Dkt. # 70, p. 0756; Dkt. # 81, ¶ 43. Plaintiff requested Advil, a laxative and to have a toe nail removed on December 24, 2000 when he was seen by defendant vonHagn. Dkt. # 71, p. 0756; Dkt. # 81, ¶ 44. Defendant vonHagn provided plaintiff with Advil and Fleet enemas. *Id.* Again on December 26, 2000, plaintiff requested Advil and laxative and defendant vonHagn provided both to plaintiff. Dkt. # 70, p. 0755; Dkt. # 81, ¶ 45. Defendant Brandt saw plaintiff on December 27 and 28, 2000. Dkt. # 70, p. 0755; Dkt. # 81, ¶¶ 46–47. On December 27, 2000, plaintiff requested and was provided with Advil. *Id.* On December 28, 2000, plaintiff complained of a rash and was provided with hydrocortisone cream. *Id.* Plaintiff requested sick call on December 29, 2000 and when defendant vonHagn went to plaintiff's cell, plaintiff did not respond to defendant vonHagn's inquiries. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 48. Finally, on December 30, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested and was provided with laxative and Advil. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 49.

**4. January 2001**

***6** Plaintiff had twelve encounters with medical staff during January 2001. Dkt. # 70, pp. 0750–0754; Dkt. # 81, ¶ 50. Plaintiff was seen by defendant Brandt on January 2, 9, 10, 22, 23 and 24, 2001. Dkt. # 70, pp. 0752–0754; Dkt. # 81, ¶¶ 51–56. On January 2, 2001, plaintiff complained of his sinuses and requested band-aids for his toes. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 51. Defendant Brandt provided plaintiff with Sudafed and band-aids. *Id.* On January 9, 2001, plaintiff complained of a sore throat and of his toes; defendant Brandt provided plaintiff with throat lozenges and band-aids. Dkt. # 70, p. 0753; Dkt. # 81, ¶ 52. Plaintiff complained of a headache and a sore throat on January 10, 2000 and defendant Brandt provided him with Advil and throat lozenges. Dkt. # 70, p. 0753; Dkt. # 81, ¶ 53.

On January 14, 2001, plaintiff was seen by Nurse Whedon during morning sick call and requested Sudafed for sinus congestion, hydrocortisone cream and "mom." Dkt. # 70, p. 0753. On January 22, 2001, plaintiff complained of a rash and defendant Brandt provided him with athlete's foot cream and hydrocortisone cream. Dkt. # 70, p .0752; Dkt. # 81, ¶ 54. Plaintiff was seen by defendant Brandt on January 23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw hydrocortisone cream at defendant Brandt and stated, "next time I'll spit + shit on you." Dkt. # 70, p. 0752; Dkt. # 81, ¶ 55. The sick call was terminated and defendant Brandt issued a Misbehavior Report.[FN7] *Id.* The following day, on January 24, 2001, plaintiff was again seen by defendant Brandt and plaintiff requested over-the-counter medication for general use. Dkt. # 70, p. 0752; Dkt. # 81, ¶ 56. Defendant Brandt provided plaintiff with throat lozenges and Motrin. *Id.* On January 26, 2001, plaintiff was seen by defendant vonHagn and plaintiff requested hydrocortisone cream and Sudafed. Dkt. # 70, p. 0751; Dkt. # 81, ¶ 57. Defendant vonHagn noted in plaintiff's medical rec-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ords, "no ointment while on level 1" and further noted that plaintiff had received hydrocortisone cream on January 23, 2001 .[FN8] *Id.* Accordingly, defendant vonHagn provided plaintiff with Sudafed. *Id.*

FN7. The circumstances surrounding the issuance of the Misbehavior Report and plaintiff's claim of retaliation are discussed in greater detail below at pp. 27–28 *infra.*

FN8. New York State Department of Correctional Services Division of Health Services Policy 3.03 provides that registered nurses may distribute non-prescription medication under an established protocol to allow for distribution of limited supplies of non-prescription or over-the-counter medications by nurses at sick call. A list of the medications for distribution is attached to the policy as Exhibit A and hydrocortisone cream is not among the over-the-counter medications that may be distributed without prescription authorization. Dkt. # 81, ¶ 58 and Exhibit A.

Plaintiff was again seen by Nurse Whedon on January 27 and 28, 2001. Dkt. # 71, p. 0751; Dkt. # 81, ¶¶ 59–60. On January 27, 2001, plaintiff requested hydrocortisone ointment and laxative. *Id.* Nurse Whedon noted in plaintiff's medical records "no ointment on level 1" and provided plaintiff with a laxative. *Id.* On January 28, 2001, plaintiff requested analgesic balm for sore muscles and hydrocortisone ointment. *Id.* Nurse Whedon provided plaintiff with analgesic balm. *Id.* Plaintiff requested sick call on January 29 and 31, 2001 and defendant Brandt attempted to see plaintiff on both days, however on January 29, 2001, plaintiff refused to get out of bed and refused to answer defendant Brandt. *Id.* Similarly, on January 31, 2001, plaintiff refused to acknowledge defendant Brandt. *Id.*

**5. February 2001**

***7** During February 2001, plaintiff had fifteen encounters with medical staff. Dkt. # 70, pp. 0745–0750; Dkt. # 81, ¶ 63. Plaintiff was seen by defendant vonHagn on February 1, 4, 8, 9, and 13, 2001. Dkt. # 70, pp. 0748–0750; Dkt. # 81, ¶¶ 64 and 66–68. On February 1, 2001, plaintiff requested hydrocortisone ointment on the call out slip, however, plaintiff refused to answer defendant vonHagn and refused to get out of bed. Dkt. # 70, p. 0750; Dkt. # 81, ¶ 64. On February 3, 2001, plaintiff was seen by Nurse Whedon and requested hydrocortisone ointment and throat lozenges, plaintiff was provided with only throat lozenges. Dkt. # 70, p. 0749; Dkt. # 81, ¶ 65. Plaintiff requested hydrocortisone ointment for his scalp from defendant vonHagn on February 4, 2001. Dkt. # 70, p. 0749; Dkt. # 81, ¶ 66. Plaintiff's medical records reveal that plaintiff refused to answer defendant vonHagn and refused to show any medical need (by examination) for the ointment. *Id.* Plaintiff was again seen by defendant vonHagn on February 8, 2001 and plaintiff refused to answer when he was called for sick call. Dkt. # 70, p. 0749; Dkt. # 80, ¶ 67. According to the sick call request, plaintiff requested Eucerin, Sudafed and hydrocortisone cream. *Id.* Defendant vonHagn provided plaintiff with Sudafed and hydrocortisone cream. *Id.* According to plaintiff's medical records plaintiff was not eligible to receive additional Eucerin until March 13, 2001. *Id.* Finally, plaintiff was seen by defendant vonHagn on February 9, 2001 and requested hydrocortisone ointment and Eucerin. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 68. Defendant vonHagn once again noted that plaintiff was not due for Eucerin until March 13, 2001 and that plaintiff failed to respond to her requests to demonstrate a medical need for hydrocortisone ointment. *Id.*

On February 11, 2001, plaintiff was seen by Nurse Whedon who noted that plaintiff submitted a sick call slip threatening to sue Nurse Whedon if he wasn't provided with hydrocortisone ointment. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 69. Nurse Whedon noted in plaintiff's medical records that there was no medical

need shown for hydrocortisone ointment and that plaintiff would not acknowledge the sick call and remained in bed. *Id.* Plaintiff was seen by defendant vonHagn on February 13, 2001 and he requested balm, hydrocortisone ointment and Motrin. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 70. Defendant vonHagn noted in plaintiff's medical records that no tubes or envelopes were returned. [FN9] Plaintiff requested morning sick call on February 14, 2001, however, defendant Brandt noted in plaintiff's medical records that plaintiff refused to get up for sick call. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 71.

FN9. "Inmates are required to return to medical staff [sic] tube or envelope in which Motrin was originally provided to verify that inmate has completed [sic] dose of Motrin previously provided." Dkt. # 81, ¶ 70.

Plaintiff was seen on February 18, 2001 by Nurse Brink at which time he requested and was provided with athlete's foot cream and analgesic balm for sore muscles. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 72. Plaintiff was seen by Nurse Whedon on February 19, 2001 and complained of chronic constipation and requested a high fiber diet; Nurse Whedon recommended a fiber laxative, plaintiff refused stating that they don't work. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 73. Nurse Whedon also noted in plaintiff's medical records that plaintiff continues to request hydrocortisone ointment and plaintiff showed Nurse Whedon scaly patches on his scalp. *Id.* On February 22, 2001, plaintiff was seen by Nurse DeMeritt and requested minor surgery for his right toenail and noted that plaintiff had a left toenail removed in December 2000. Dkt. # 70, p. 0746; Dkt. # 81, ¶ 74. Nurse DeMeritt submitted a request for right toenail surgery. *Id.*

***8** Plaintiff was seen by Nurse Whedon on February 24, 2001, wherein plaintiff requested hydrocortisone ointment, Sudafed for congestion and a natural laxative. Dkt. # 70, p. 0746; Dkt. # 81, ¶ 75. Nurse Whedon noted in plaintiff's medical records that his request for hydrocortisone ointment was denied, plaintiff refused a fiber laxative and plaintiff was provided with Sudafed. *Id.* Plaintiff was seen again by Nurse DeMeritt on February 26 and 28, 2001. Dkt. # 70, p. 0745; Dkt. # 81, ¶¶ 76–77. On February 26, 2001, plaintiff requested foot cream and hydrocortisone cream and Nurse DeMeritt noted that plaintiff returned the empty tubes and also noted "tinea pedis/uticaria" (athlete's foot) to be treated with over-the-counter medication. *Id.* Plaintiff was provided with mycelex and hydrocortisone cream. *Id.* Plaintiff requested a laxative "to clean his system out" on February 28, 2001, however, Nurse DeMeritt did not note any distress and recommended treatment with over-the-counter medication and fluids and provided plaintiff with Fleet enemas. *Id.*

Dr. Alves, as the Facility Health Services Director of the Medical Services Unit at Southport, reviewed plaintiff's medical records and based upon his review, Dr. Alves concluded that defendants Brandt and vonHagn were not deliberately indifferent to plaintiff's medical complaints about ear pain in December 1999. Dkt. # 81, ¶ 78. Moreover, Dr. Alves concluded that neither defendant Brandt nor defendant vonHagn refused to treat plaintiff's complaints of ear pain. *Id.* Indeed, Dr. Alves further concluded that defendants Brandt and vonHagn treated plaintiff's complaints of ear pain, provided him with debrox, scheduled and performed ear examinations and referred plaintiff to the MD callout as necessary. *Id.* Although plaintiff at times refused the debrox, Dr. Alves found that plaintiff did not require any treatment other than debrox and that debrox was the appropriate medication to treat his complaints of ear pain. *Id.* at ¶ 80. Dr. Alves further opined that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to his treatment of ear pain during December 1999. *Id.* at ¶ 79. Notably, Dr. Alves stated that plaintiff did not complain of ear pain at any time after January 2000. *Id.* at ¶ 84. Finally, Dr. Alves determined that nothing in plaintiff's medical records indicated that either defendant vonHagn or defendant Brandt, either prior

to or after issuing a Misbehavior Report regarding plaintiff, refused or failed to provide plaintiff with medical care for the period December 1999 through February 2001. *Id.* at ¶¶ 82–83.

**B. Retaliation Claim**

The amended complaint alleges that on or about January 25, 2000 and on or about December 13, 2000, defendant vonHagn issued Misbehavior Reports against plaintiff in retaliation for his complaints about her. Dkt. # 9, pp. 5 to 5–A. Similarly, plaintiff further alleges in the amended complaint that on or about January 23, 2001, defendant Brandt issued a Misbehavior Report against plaintiff in retaliation for plaintiff's complaints about him. *Id* . at pp. 5–A to 5–B. With respect to the hearings held on the allegedly retaliatory Misbehavior Reports issued by defendants vonHagn and Brandt, plaintiff separately alleges that his due process rights were violated by the hearing officers who presided over the hearings. Dkt. # 9. Those claims of due process violations will be separately addressed below. *See generally* pp. 30–65 *infra.* Specifically, as against defendant vonHagn, plaintiff alleges:

> ***9** Additionally, on the date of 1–25–00, this defendant [vonHagn] 'retaliated' against me with a ticket after my *prior* inmate grievances against her on 'numerous' occasions for denying me proper medical care for many illness'es [sic] I suffered with/from. Furthermore, on the date of 12–13–00 (hearing date of 12–29–00), this same defendant [vonHagn] again retaliated upon [sic] me with a ticket *after* my inmate grievances against her.

Dkt. # 9, pp. 5–5A (emphasis in original). As against defendant Brandt, the amended complaint states:

> This defendant [Brandt] on the date on 1–23–01, inside of this Southport Prison, while acting under state color, in his individual and official [FN10] capacities, had knowingly, wilfully, and intentionally retaliated against me with a ticket after my inmate grievance against him on date of 1–22–01, after his violation of my right to proper medication.

> FN10. *See* footnote 2 *supra.*

Dkt. # 9, p. 5A.

**1. "January 25, 2000" Misbehavior Report—Defendant vonHagn**

Defendant vonHagn did not file a Misbehavior Report against plaintiff on January 25, 2000. Dkt. # 83, ¶ 19. Defendant vonHagn did, however, issue a Misbehavior Report against plaintiff on January 14, 2000 (Dkt.# 44, p. 0029) and the hearing with respect to the January 14, 2000 Misbehavior Report was held on January 25, 2000 (Dkt.# 44, p. 0026).[FN11] The January 14, 2000 Misbehavior Report charging violations of rules 107.10 (verbal interference) and 107.11 (verbal harassment) states:

> FN11. A review of defendant vonHagn's motion for summary judgment and supporting documentation submitted therewith, reveals that for purposes of the motion for summary judgment, defendant vonHagn has assumed that the Misbehavior Report to which plaintiff is endeavoring to refer in the amended complaint is in fact the January 14, 2000 Misbehavior Report for which the hearing was held on January 25, 2000. Nothing in plaintiff's opposition to defendants' motion for summary judgment suggests that defendants' assumption was incorrect. Accordingly, for purposes of deciding defendant vonHagn's motion for summary judgment, this Court will make the same assumption and treat plaintiff's allegation concerning a "January 25, 2000" Misbehavior Report as a reference to the January 14, 2000 Misbehavior Report.

> At approx 7:35/am the writer of this report [de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendant vonHagn] stopped at B–10–20 cell to deliver inmate Chavis, G 91A3261 glasses [sic] Before the writer of this report could say anything inmate Chavis G told the writer to move on. The writer of this report was able to convince inmate Chavis to sign for glasses so they could be delivered. He was asked not to tear copy away [sic] both needed to be returned to eye glass clinic coord. Patient asked if he wished a copy he could write the nurse adm. Inmate Chavis 91A3261 B–10–20 then said, "you are a stupid asshole." "You want 25¢ to give me a fucking copy of my glasses receipt." "I'll take your fucking money in court. I'll tear you apart in court" [sic] "I'm not as fucking stupid as you are." "You stupid fucking asshole." "Get the fuck away from my cell you asshole." This continued abuse made continuing [sic] sick call on B–10 gallery difficult to hear B–10–17 cell for sick call.

Dkt. # 44, p. 0029. The Tier 2 [FN12] disciplinary hearing was held on January 25, 2000 and conducted by defendant Lieutenant ("Lt.") Ryan.[FN13] During the disciplinary hearing, plaintiff advised Lt. Ryan that he believed that the January 14, 2000 Misbehavior Report was written by defendant vonHagn in retaliation for complaints plaintiff had previously filed against defendant vonHagn. Dkt. # 44, pp. 0032–0038; Dkt. # 83, ¶ 23. Specifically, plaintiff stated, "I'm objecting to the ticket and I'm objecting to the hearing. That ticket is retaliatory and uh let the record also reflect that uh this here uh write up [sic], who happens to be a medical female staff aid, uh has been violating my natural rights since I've entered this here facility." Dkt. # 44, pp. 0032–0038. In the amended complaint, plaintiff alleges that the January 14, 2000 Misbehavior Report issued by defendant vonHagn was in retaliation for the prior grievances filed by plaintiff against defendant vonHagn. Dkt. # 9, pp. 5–5A. On or about December 30, 1999, plaintiff filed a grievance against unspecified persons, Grievance No. SPT–17707–99. Dkt. # 65, pp. 0433–0444; Dkt. # 83, ¶ 36. Grievance No. SPT–17707–99 is discussed in greater detail below. *See* pp. 21–23 *infra*. Correction Officer R. Martino testified at the hearing that he was present on January 14, 2000 when defendant vonHagn attempted to give plaintiff his eyeglasses and when plaintiff was verbally abusive toward defendant vonHagn. Dkt. # 44, pp. 0032–0038. Notwithstanding plaintiff's claim of retaliation and relying upon the testimony of Officer Martino, Lt. Ryan found plaintiff guilty of verbal interference and verbal harassment. *Id.*

FN12. New York conducts three types of disciplinary hearings for its inmates. Tier 1 hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation. Tier 2 hearings address more serious infractions and may result in 30 days of confinement in a Special Housing Unit ("SHU"). Tier 3 hearings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and recommended loss of "good time" its. *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

FN13. Lt. Ryan is a named defendant in this action and how Lt. Ryan conducted the January 25, 2000 disciplinary hearing is the subject of a separate due process claim. The claims against defendant Ryan and defendant Ryan's motion for summary judgment will be separately discussed in greater detail below. *See* pp. 59–62 *infra*.

**a. Grievance No. SPT–17707–99**

***10** In Grievance No. SPT–17707–99, plaintiff asserts that:

(1) On this date above [Dec. 27, 1999] (after submitting a sick call slip last night (12–26–99), the same old white ill-minded white fool who denied

me emergency ear examination and ear drops for infection (12–14–99) had [sic] done nothing for my continual inability to hear when he visited my cell, and after I requested outside expert medical attention, he put (wrote) down “refusal” on his sick call log instead of provid [sic] me with proper medical help outside of this place!! (2) On that date of 12–25–99, the officer (KKK racist), in the control room had deliberately turned off the T.V. hole after that 10–g (illegible) had asked for NBA sports station!

Dkt. # 65, p. 0438. In support of defendants' motion for summary judgment, defendant vonHagn, in her affidavit, summarized the assertions in Grievance No. SPT–17707–99 as follows,

In Grievance No. SPT–17707–99, plaintiff asserted that on or about December 26, 1999, Nurse Brandt denied his request for outside medical treatment for his complaints of ear pain; that Nurse Brandt indicated that plaintiff refused treatment; that on December 14, 1999, Nurse Brandt denied him an emergency ear examination and ear drops; and that from December 14, 1999 to December 21, 1999, Nurse Brandt and I [defendant vonHagn] denied him medical treatment for an ear infection.

Dkt. # 83, ¶ 37.[FN14]

FN14. For purposes of deciding defendants' motion for summary judgment on plaintiff's retaliation claim, as it relates to grievances filed prior to the January 14, 2000 Misbehavior Report, the Court will rely on defendant vonHagn's summary of plaintiff's December 30, 1999 grievance, Grievance No. SPT–17707–99.

On December 13 and 14, 1999, plaintiff was seen by defendant Brandt during morning sick call. Dkt. # 70, p. 0844; Dkt. # 80, ¶ 12. Defendant Brandt noted in plaintiff's medical records that plaintiff requested a refill of hydrocortisone cream for a rash and lip balm and further that plaintiff complained about his sinuses and refused a PPD test. *Id.* Defendant Brandt provided plaintiff with hydrocortisone cream and Sudafed. *Id.* For a complete discussion of the medical treatment provided to plaintiff by defendants Brandt and vonHagn for the period December 16–31, 1999, please refer to pp. 4–8 *supra,* which is incorporated by reference herein.

In response to Grievance No. SPT–17707–99, Nurse Felker and defendant Brandt advised the Inmate Grievance Review Committee (“IGRC”) that defendant Brant delivered ear medication to the plaintiff; that plaintiff began verbally harassing defendant Brandt and refused to accept the medication. Dkt. # 65, p. 0444. Accordingly, the Superintendent dismissed plaintiff's grievance, finding that the medical staff had stated that medication was delivered to plaintiff for ear pain, however, plaintiff began to verbally harass the nurse [defendant Brandt] and refused the medication. The Central Office Review Committee (“CORC”) upheld the Superintendent's determination. Dkt. # 65, pp. 0433–0434. CORC advised plaintiff to follow the treatment plan outlined by health services staff and noted that there was no medical need for an outside consultant at that time. *Id.*

Thus, defendant vonHagn submits that she did not file the January 14, 2000 Misbehavior Report in retaliation for Grievance No. SPT–17707–99 filed by plaintiff on or about December 30, 1999, or any other grievance filed by plaintiff. Dkt. # 83, ¶ 42. Rather, defendant vonHagn submits she filed the January 14, 2000 Misbehavior Report because of plaintiff's harassing language on that date. Dkt. # 83, ¶ 43; *see* pp. 19–21 *supra.* Moreover, as discussed above, defendant vonHagn contends that notwithstanding plaintiff's claim of retaliation, which Lt. Ryan received, Lt. Ryan found plaintiff guilty of the violations (verbal interference and verbal harassment) based on the testimony of Officer Martino who was present during the January 14, 2000 incident.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. December 13, 2000 Misbehavior Report—Defendant vonHagn**

***11** Plaintiff further alleges in the amended complaint against defendant vonHagn that, "on the date of 12–13–00 (hearing date of 12–29–00), this defendant [vonHagn] again retaliated upon [sic] me with a ticket *after* my inmate grievances against her." Dkt. # 9, pp. 5–5A (emphasis in original).

**a. Grievance No. SPT–20137–00**

Plaintiff filed a grievance, Grievance No. SPT–20137–00, against both defendant Brandt and defendant vonHagn on or about December 11, 2000 alleging that defendants Brandt and vonHagn failed to provide plaintiff with a refill of skin cream and that defendants Brandt and vonHagn were racist and biased toward him. Dkt. # 44, pp. 0228–0239; Dkt. # 83, ¶¶ 50–51. Specifically, plaintiff alleged in Grievance No. SPT–20137–00 that:

> On the prior date of 12–6–00 I submitted a sick call slip, and on the next am morning no [sic] medical staff PA visited my cell (S.VonHagn), to inquire about my illnesses! This continual violation in total disregard by most medical staff of character vindictiveness [sic] and KKK corruption for forcing severe suffering on black SHU prisoner is still being allowed by Michael McGinnis, Dr. Alves, O'Bremski [sic], and you James Meck—and Sgt Decker in yourselves [sic] concealing inmate grievances of theft by officers/racism by medical staff (S. VonHagn [sic] Brandt and Ms. Peter).

Dkt. # 44, p. 0233.

In response to Grievance No. SPT–20137–00, Nurse Administrator Obremski advised the IGRC that plaintiff's medical records do not indicate that a sick call request was ever submitted by plaintiff on December 6, 2000. Dkt. # 83, ¶ 52. Plaintiff's medical records do indicate, however, that on December 13, 2000, plaintiff requested a skin cream refill but plaintiff was not due for a refill until January 1, 2001 and that plaintiff was advised of that fact. *Id.* Finally, Nurse Administrator Obremski stated that, absent any evidence, plaintiff's allegations of racism and corruption were unfounded. *Id.;* Dkt. # 44, p. 0237. The Superintendent denied plaintiff's grievance, and the CORC upheld the Superintendent's determination that the Nurse Administrator indicated that plaintiff received medication refills on the appropriate dates and received proper medical care. Dkt. # 44, pp. 0228–0229; Dkt. # 83, ¶ 53.

After the filing of the aforementioned grievance, defendant vonHagn next saw plaintiff on December 13, 2000, at which time she noted that plaintiff had received a 90 day supply of Eucerin on October 10, 2000 which was not to be refilled until after January 10, 2001. Moreover, on December 13, 2000, defendant vonHagn provided plaintiff with athlete's foot cream and balm. Dkt. # 83, ¶ 54. On that same date, defendant vonHagn issued a Misbehavior Report based on plaintiff's threats to her and to the male assists. Dkt. # 83, ¶ 29. The December 13, 2000 Misbehavior Report states,

> While making rounds on B Block 3 Gallery this nurse [defendant vonHagn] stopped to see Inmate Chavis, G. 91A3261 B–3–19 for sick call. He requested refills. He was asked about old containers. He immediately got an attitude and said, 'He wasn't every other inmate and just get him what he wanted.' As this nurse walked away from his cell, inmate Chavis, G. says [sic] 'I'm going to hit that white bitch in her head with a baseball bat.' C.O. Stamp told inmate Chavis, G 91A3261 that statement was not necessary. Inmate Chavis, G. then said, shut up you fuck ass white mother fucker, I'll kill you too after I kill her. Inmate Chavis, G. continued to threaten this nurse and Correctional Officer until we left gallery area.

***12** Dkt. # 44, p. 0104; Dkt. # 83, ¶ 31.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

A Tier 3 disciplinary hearing was held on December 26, 2000 (and continued on December 29, 2000) by Lt. Sheahan in relation to the December 13, 2000 Misbehavior Report.[FN15] Dkt. # 44, pp. 0160–0199. During the hearing, plaintiff advised Lt. Sheahan that defendant vonHagn wrote the December 13, 2000 Misbehavior Report in retaliation for grievances filed by plaintiff. Dkt. # 83, ¶ 32. Lt. Sheahan received plaintiff's evidence of complaints against defendant vonHagn, but nevertheless found plaintiff guilty of making threats against defendant vonHagn and other staff. *Id.* Indeed, Lt Sheahan found that the evidence submitted by plaintiff of past grievances against defendant vonHagn and other medical staff did not establish that the December 13, 2000 Misbehavior Report was retaliatory. *Id.* at ¶ 33. Moreover, Lt. Sheahan indicated that the disposition was given to plaintiff to impress upon him that threats to staff will not be tolerated. Dkt. # 44, p. 0102; Dkt. # 83, ¶ 33.

FN15. Lt. Sheahan is a named defendant in this action and how Lt. Sheahan conducted the December 26, 2000 (December 29, 2000) disciplinary hearing is the subject of a separate due process claim and will be separately discussed below. *See* pp. 62–65 *infra.*

Following the December 13, 2000 Misbehavior Report, and during the balance of December 2000, January and February 2001, defendant vonHagn saw plaintiff a total of ten times, December 20, 24, 26, and 29, 2000, January 26, 2001, February 1, 4, 8, 9, and 13, 2001. Dkt. # 81, ¶¶ 43–77. For a complete discussion of the medical treatment provided to plaintiff by defendant vonHagn on the preceding dates, *see* pp. 10–17 *supra.* At each time after the December 13, 2000 Misbehavior Report, defendant vonHagn continued to provide plaintiff with appropriate care and treatment. Dkt. # 81, ¶ 82; Dkt. # 83, ¶ 35.

**3. January 23, 2001 Misbehavior Report—Defendant Brandt**

In the amended complaint, plaintiff alleges that defendant Brandt, in retaliation for the grievances filed against him by plaintiff, issued a retaliatory Misbehavior Report on January 23, 2001. Dkt. # 9, p. 5–A. During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, December 30, 1999 (Grievance No. SPT–17707–99), May 24, 2000 (Grievance No. SPT–18746–00) and December 11, 2000 (Grievance No. SPT–20137–00). Plaintiff was seen by defendant Brandt on January 23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw hydrocortisone cream at defendant Brandt and stated, “next time I'll spit + shit on you.” Dkt. # 70, p. 0752; Dkt. # 81, ¶ 55. The sick call was terminated and defendant Brandt issued a Misbehavior Report. *Id.*

The Misbehavior Report charged plaintiff with violating rule 102.10 (threats) and states, “[w]hile conducting sick call rounds this writer [defendant Brandt] stopped at Inmate Chavis 91A3261 cell to deliver medication. He asked what it was I told him hydrocortisone cream. He got up slid it back under the door and stated ‘I want ointment and the next time you do this I'll spit on you + then throw shit on you.’ ” Dkt. # 44, p. 0115. A Tier 2 disciplinary hearing was held on January 29, 2001 and was conduced by Lt. Donahue.[FN16]

FN16. Lt. Donahue is a named defendant in this action and the claims against defendant Donahue, including a due process claim relating to the January 29, 2001 disciplinary hearing, will be discussed in greater detail below. *See* pp. 30–44 *infra.*

***13** During plaintiff's Tier 2 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the January 23, 2001 Misbehavior Report was written by defendant Brandt in retaliation for complaints which plaintiff filed against defendant Brandt and/or the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

medical staff at Southport. Dkt. # 44, pp. 0124–0128; Dkt. # 82, ¶ 27. Lt. Donahue received plaintiff's testimony and notwithstanding plaintiff's claim of retaliation, found plaintiff guilty of making threatening statements to defendant Brandt. *Id.*

**a. Grievance No. SPT–17707–99**

A thorough discussion of Grievance No. SPT–17707–99 is set forth in the preceding section at pp. 21–23 and is incorporated by referenced herein.

**b. Grievance No. SPT–18746–00**

With respect to Grievance No. SPT–18746–00 filed on or about May 24, 2000, plaintiff claimed that on or about May 21, 2000:(1) defendant Brandt refused to provide him with medical care; (2) defendants vonHagn and Brandt were racist; (3) defendant Brandt told other members of the nursing staff not to treat plaintiff; (4) plaintiff had previously grieved defendant Brandt's and defendant vonHagn's failure to treat his ear infection in December 1999; and, (5) defendant Brandt refused to provide plaintiff with skin cream. Dkt. # 82, ¶ 36; Dkt. # 83, ¶ 46.

With respect to Grievance No. SPT–18746–00, Nurse Felker advised the IGRC that plaintiff had been seen several times for his skin condition, that plaintiff does not have a skin condition that required the skin cream requested and that the medical staff advised that plaintiff is verbally abusive on a regular basis, *to wit*, whenever he is seen by the medical staff. Dkt. # 65, p. 0419; Dkt. # 83, ¶ 47. On or about May 26, 2000, the IGRC recommended that plaintiff's grievance be dismissed and on or about June 12, 2000, the Superintendent agreed. Dkt. # 65, p. 0414 and 0417; Dkt. # 83; ¶ 48. Upon the recommendation of the Division of Health, on or about August 2, 2000, CORC upheld the Superintendent's determination. Dkt. # 65, p. 0409; Dkt. # 83, ¶ 48. In so finding, CORC noted that plaintiff had been issued skin cream on June 5, 2000 and that his allegations against the staff had not been substantiated. *Id.*

**c. Grievance No. SPT–20137–00**

The third grievance filed by plaintiff against defendant Brandt during the time period relevant to the allegations in the amended complaint was filed on or about December 11, 2000 (Grievance No. SPT–20137–00). A thorough discussion of Grievance No. SPT–20137–00 is set forth in the preceding section at pp. 24–26 and is incorporated by reference herein.

**C. Due Process Claims—Hearing Officers**

The amended complaint alleges several causes of action against defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan premised on the theory that the defendants denied plaintiff his due process rights during ten disciplinary hearings under the Eighth and Fourteenth Amendments to the United States Constitution.

**1. Defendant Lieutenant Donahue**

***14** During the relevant time period alleged in the amended complaint, plaintiff claims that defendant Lt. Donahue conducted six Tier 2 disciplinary hearings concerning plaintiff: January 11, 2000 (December 31, 1999 Misbehavior Report); January 25, 2000 (this disciplinary hearing was in fact conducted by defendant Ryan, see pp .59–62 *infra.*); November 20, 2000 (November 12, 2000 Misbehavior Report); December 21, 2000 (December 12, 2000 Misbehavior Report); January 29, 2001 (January 23, 2001 Misbehavior Report); and, March 7, 2001 (February 29, 2001 Misbehavior Report). Dkt. # 9.

As against defendant Donahue, the amended complaint states as follows:

> This defendant [Donahue], on the dates of 3–7–01, 1–29–01, 12–21–00, 11–29–00, 1–25–00, and 1–21–00, inside of this Southport Prison, while acting under state color [sic], in his individual and official [FN17] capacities, had *violated* my 'due pro-

cess' rights *in each one* of these separate tier hearing [sic] by 'denying' me *all* witnesses in each hearing stated above. Additionally, my 'requested' need for 'assistance' during and prior to these separate hearings, had been *denied* by this defendant, *and each* separate *disposition* had [sic] sentenced me to 30–days cell confinement (30 x 6 = 180 days cell confinement), after knowingly and intentionally [sic]

FN17. *See* footnote 2 *supra.*

* * *

I suffered more 'extended' SHU-punative [sic] segregation time (see para # 5), for ticket, I *never* received but [sic] a hearing I attended with my right to due process *violated* due to deliberate indifference, and racism. Finally, I had appealed each disposition (stated), in bias—partiality, however, *each one* of my appeals were 'ignored' and these 'retaliatory' dispositions affirmed (by defendant W. Wilcox—see para # 9).
Dkt. # 9, pp. 6–D to 6–E (emphasis in original).

Additionally, plaintiff alleges that at the conclusion of the December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue issued a retaliatory Misbehavior Report for conduct that occurred as plaintiff was being transported back to his cell after the hearing. Dkt. # 9. Defendant Donahue contends that the December 21, 2000 Misbehavior Report was not issued for retaliatory reasons. Specifically, plaintiff alleges:

Furthermore, on the date of 12–21–00, immediately after conducting a tier hearing against me, after violating my due process rights knowingly and vindictively, this defendant had verbally discriminated against me this date after hearing completion [sic], and proceeded to retaliate against me with another misbehavior ticket on this 12–21–00 date, for alleged verbal threats I had [sic] *not* been guilty of; as this retaliatory ticket against me, by this defendant had resulted after my contacts in numerous official complaints against this defendant (after his direct orders to SHU escort officers to physically assault me, while I be [sic] in full restraints *un* able to protect myself and further his referring to me during several separate hearings as a 'piece of shit' and a 'boy') resulting in a *nine month* Albany investigation by the top DOCS officials *and* the Inspector Generals [sic] office!. I have valid official exhibits from Albanys [sic] DOCS top officials to prove this claim.

***15** Dkt. # 9, pp. 6–D to 6–E (emphasis in original)

Defendant Donahue, a Lieutenant at Southport, has held that position since 1998 and has been an employee of DOCS since 1984. Dkt. # 84, ¶ 1. From time to time, defendant Donahue's duties include conducting inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. *Id.* at ¶ 3.

**a. January 11, 2000 Tier 2 Disciplinary Hearing**

The January 11, 2000 Tier 2 disciplinary hearing was conducted following the issuance of a Misbehavior Report on December 31, 1999 by Sergeant Kerbein charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats). Dkt. # 84, ¶ 9. The Misbehavior Report states:

DSS Morse received a letter from you dated 12–29–99 and addressed to Supt. McGinnis or Deputy Superintendent in which you called them/state 'and the vindictiveness of your racist, bias and extremely prejudice/rotton [sic] character!!'. [sic] Another statement you state 'well, DOCS employee of redneck and corrupted character are you satisfied now!". [sic] Your final statement was 'I sincerely hope you're just as strong after you

do [sic] receive your New Years [sic] present from me, as I believe it'll be a suitable gift for you and you will receive [sic] it in soon [sic] time arriving [sic].'

Dkt. # 44, p. 0013; Dkt. # 84, ¶ 9. According to defendant Donahue, the regulations (7 N.Y.C.R.R. §§ 251–2.2(2); 251–4.1(a) and (b); 253.4) provide that where, as here, an inmate is charged with a violation warranting a Tier 2 disciplinary hearing, the inmate is not entitled to an employee assistant for purposes of that hearing. Dkt. # 84, ¶ 10. Rather, the hearing officer, in his discretion, may offer an inmate the opportunity to select an inmate assistant, where such assistance would enable the inmate to comprehend the case in order to respond to the charges. *Id.* at ¶ 11.

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the December 31, 1999 Misbehavior Report and on January 2, 2000, plaintiff requested and received a copy of DOCS Directive No. 4932, Chapter V, Standards, Behavior & Allowances (7 N .Y.C. R.R. Part 251 C). Dkt. # 44, p. 0016; Dkt. # 84, ¶ 13. The Tier Assistance Selection Form also indicates that no assistance is required for the hearing and further that plaintiff refused to sign the form. *Id.* At the outset of the hearing, plaintiff objected stating that he had not been served with a copy of the Misbehavior Report. Dkt. # 44, pp. 0002–0007; Dkt. # 84, ¶ 14. After defendant Donahue read the Misbehavior Report, defendant Donahue asked plaintiff to enter his plea to the charges; plaintiff refused, stating, “I told you I never received the ticket. I don't have anymore to say here.” Dkt. # 44, p. 0003. Accordingly, defendant Donahue entered a plea of not guilty on plaintiff's behalf and proceeded with the hearing. Dkt. # 44, p. 0003; Dkt. # 84, ¶ 14.

***16** In response to plaintiff's objection, defendant Donahue indicated that he was going to attempt to locate Officer Comfort who served plaintiff with a copy of the Misbehavior Report. Dkt. # 44, p. 0003. Plaintiff objected to Officer Comfort's anticipated testimony. *Id.* Due to Officer Comfort's unavailability, the disciplinary hearing was adjourned and continued on January 21, 2000. *Id.* Over plaintiff's objections, Officer Comfort did in fact testify that he served plaintiff with a copy of the Misbehavior Report. *Id.* at p. 0005; Dkt. # 84, ¶ 16. Thereafter, plaintiff indicated that he did not have any questions for Officer Comfort. *Id.* Plaintiff further objected to the hearing on the grounds that he was not provided with any assistance. Dkt. # 44, p. 0005; Dkt. # 84, ¶ 17. Defendant Donahue explained to plaintiff that pursuant to the applicable regulations, plaintiff was not entitled to any assistance on a Tier 2 disciplinary hearing. *Id.* Plaintiff continued to object to the hearing, insisting that he did not receive the Misbehavior Report and further, that defendant Donahue had previously threatened his life and health. Dkt. # 44, p. 0006; Dkt. # 84, ¶ 19. Specifically, plaintiff stated, “Let the record reflect that at, that at uh, uh at a previous time my life and health was threatened by this Lt. Donahue here. After he had flipper [sic] off the cassette he ordered the escort officer to uh escort this piece of shit back to his cell and bounce him on his head.” Dkt. # 44, p. 0006.

Thereafter, defendant Donahue asked whether plaintiff had any evidence to present related to the Misbehavior Report and plaintiff responded, “I don't know what you are talking about.” Dkt. # 44, p .0006. Stating that plaintiff was being uncooperative, defendant Donahue concluded the hearing to consider his decision. *Id.* Defendant Donahue based his decision on the Misbehavior Report which he found to be credible and on plaintiff's December 28, 1999 letter (the basis for the December 31, 1999 Misbehavior Report). Dkt. # 44, p. 0014; Dkt. # 84, ¶ 20. As reflected on the Disciplinary Hearing Disposition Rendered form, defendant Donahue relied upon “[t]he written report of Sgt Kerbein which I find to be credible. Also the threatening letter written by inmate Chavis which I have examined. This inmate makes harassing and threatening statements in a letter sent to the Supt or DSS.” Dkt. # 44, pp. 0008–0009; Dkt. # 84, ¶ 21. In addition, defendant Donahue noted that

the reasons for his disposition were to serve as a deterrent of future misconduct by plaintiff and others and further, defendant Donahue noted that this type of conduct will not be tolerated at Southport. *Id.* Defendant Donahue imposed a penalty of 30 days keeplock confinement (7/18/00–8/17/00) which was modified to run from January 21, 2000 through February 20, 2000. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 84, ¶ 23; Dkt. # 86, Exhibit A.

**b. November 29, 2000 Tier 2 Disciplinary Hearing**

***17** Defendant Donahue conducted a Tier 2 disciplinary hearing on November 29, 2000 in relation to a Misbehavior Report issued on November 12, 2000. Dkt. # 84, ¶ 26. The November 12, 2000 Misbehavior Report charged plaintiff with violating Rule 107.10 (interference with employee) and Rule 102.10 (threats). Dkt. # 44, p. 0072. The Misbehavior Report prepared by Sergeant ("Sgt.") Cleveland states:

> On the above date and time [11/12/00 6:45 a.m.], I received a copy of a letter that was authored by the above inmate (Chavis 91A3261 D–5–21) from Lt. Sheehan [sic]. Upon my review of this letter I identified that it had been sent from inmate Chavis to Dep. Commissioner L. LeClaire on 10/3/00. The content of this letter was harassing in nature and contained insolent and abusive language directed towards Mr. LeClaire and Commissioner Goord. Inmate Chavis also stated in his letter, "you respect me, and I'll respect you, because after release *you and whoever else WILL* be respecting me". [sic] I interpreted this comment to be an implied threat to Mr. LeClaire. A copy of this letter was placed in the Captains [sic] office contraband file as evidence.

Dkt. # 44, p. 0072; Dkt. # 84, ¶ 27. At the outset of the hearing, plaintiff was advised by defendant Donahue that he had the right to present witnesses on his own behalf and that he should present any oral or documentary evidence he wished to be considered during the hearing. Dkt. # 44, p. 0064–0068. Plaintiff responded that he understood his rights. *Id.* With respect to the service of the charges, plaintiff stated that he didn't know if he was served with a copy because he was asleep and when he woke up there was a Misbehavior Report on his gate. *Id.* Thereafter, defendant Donahue noted that there had been an extension granted to complete the hearing because plaintiff had been out to court and the extension was granted to complete the hearing within twelve days of plaintiff's return from court and plaintiff returned from court on November 27, 2000. *Id.*

In response to defendant Donahue's inquiry as to how he intended to plead to the charges, plaintiff stated "[a]t this particular time I'm going to object to the hearing." Dkt. # 44, p. 0066. Plaintiff objected on the following grounds, "[t]he fact that on the date of September 8th I had sent the letter to uh Commissioner Gord [sic] with a complaint against you and uh Lt. Ryan, for your misconduct during the tier hearing process while I been in the facility here." *Id.* Accordingly, defendant Donahue entered a plea of not guilty to the charges on plaintiff's behalf. *Id.* Plaintiff also voiced an objection to the entry of a plea of not guilty and requested that the hearing be adjourned and another hearing officer be assigned. *Id.* at pp. 0066–0067. Plaintiff's objections to the hearing and the hearing officer were noted on the record and plaintiff did not offer any evidence or any statement with respect to the Misbehavior Report. *Id.*

***18** Thereafter, defendant Donahue concluded the hearing and contemplated his decision. The plaintiff chose to return to his cell before defendant Donahue read his decision. *Id.* Defendant Donahue found plaintiff guilty of charge 107.10 (interference) and guilty of 102.10 (threats). *Id.* at p. 0068. Defendant Donahue imposed a penalty of 30 days keeplock confinement to run from September 5, 2001 to October 5, 2001. *Id.* In his statement of evidence relied upon, defendant Donahue stated that he relied upon the written report of Sgt. Cleveland and his examination of the letter in evidence and further that he found Sgt.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cleveland's report to be credible. Dkt. # 44, p. 0070. Defendant Donahue stated that the reasons for his disposition were to serve as a deterrent for future misconduct by the plaintiff and that “threats towards employees of this department will not be tolerated.” *Id.* On or about December 11, 2000, Captain Wilcox affirmed defendant Donahue's determination. Dkt. # 86, Exhibit A.

**c. December 21, 2000 Tier 2 Disciplinary Hearing**

Defendant Donahue conducted a Tier 2 disciplinary hearing involving plaintiff on December 21, 2000. Dkt. # 44, pp. 0081–0100; Dkt. # 84, ¶ 41. The December 21, 2000 disciplinary hearing related to a Misbehavior Report issued on December 12, 2000 by Correction Officer Gary Morse and charged plaintiff with a violation of Rule 102.10 (threats). Dkt. # 44, p. 0090; Dkt. # 84, ¶ 42. The December 12, 2000 Misbehavior Report states:

> On the above date [12–12–00], inmate Chavis, George 91A3261 sent a grievance to the Inmate Grievance office. This grievance contained a number of threatening statements. These statements include: ‘However, if he attempts to disregard my handicap again, I'll exit my cell and compel him to regard me the next shower time so he had better be prepared next shower. Sgt. Mulvern had been informed of this and P. Jayne needs to seriously beware.’ Chavis goes on to state, ‘Emergency ambulance after P. Jayne disregards my handicap again on scheduled shower day. The ambulance will be for him not me’. [sic] ‘I have surgical scars on my right wrist, and P. Jayne better realize it or suffer a penalty.’ These threats are aimed at C.O. P. Jayne who is a shower officer.
>
> Dkt. # 44, pp. 0090 and 0092.

At the outset of the hearing, defendant Donahue advised plaintiff that he had the right to have witnesses testify on his behalf, that plaintiff should present any oral or documentary evidence that he wishes to have considered at the hearing and that plaintiff should raise any procedural objections during the hearing. Dkt. # 44, pp. 0081–0086. Thereafter, plaintiff indicated that he understood his rights and that he had received a copy of the charges. *Id.* After defendant Donahue read the charges and asked plaintiff how he plead to the charges, plaintiff objected to defendant Donahue serving as the hearing officer on the grounds that there was a pending investigation into defendant Donahue's conduct as it related to plaintiff.[FN18] *Id.;* Dkt. # 44, ¶ 43. Moreover, plaintiff objected stating, “[l]et the record also reflect that uh that's a grievance. And uh Section uh 6 Letter B states that no inmate shall, shall suffer deprivals [sic] because of a grievance.” Dkt. # 44, p. 0083; Dkt. # 84, ¶ 45.

> FN18. With the exception of plaintiff's self-serving statements made throughout plaintiff's opposition to defendants' motion for summary judgment concerning “an investigation” into defendant Donahue, plaintiff offers no independent evidence (e.g. grievances or letters) to corroborate this assertion. Accordingly, this Court will not separately address these assertions.

***19** Defendant Donahue entered a plea of not guilty on plaintiff's behalf and asked whether plaintiff had any testimony or evidence to present. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 46. Plaintiff indicated that he wished to call Thomas C. Egan, CORC Director and Commissioner “Gordon” [Goord] as witnesses. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 47. On the grounds that neither Director Egan nor Commissioner Goord had any knowledge of the Misbehavior Report or of plaintiff's grievance, defendant Donahue denied plaintiff's request to call them as witnesses during the disciplinary hearing. Dkt. # 44, pp. 0084–0085; Dkt. # 84, ¶ 48. In response to this denial, plaintiff objected stating that defendant Donahue's denial illustrated that he is biased and racist. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 43.

Defendant Donahue noted that plaintiff was returned to his cell because he was being disruptive and for making threats. Dkt. # 44, p .0085; Dkt. # 84, ¶ 52. Thereafter, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed 30 days keeplock confinement as the penalty to run from October 5, 2001 to November 4, 2001. Dkt. # 44, p. 0085; Dkt. # 84, ¶ 53. According to the transcript of the hearing and the disposition record, in reaching his determination, defendant Donahue relied on the written report of Correction Officer Morse which he found to be credible and his examination of the threatening letter written by plaintiff to the Inmate Grievance Office. Dkt. # 44, pp. 0085 and 0088; Dkt. # 84, ¶ 53. Defendant Donahue stated the following as his reasons for the disposition, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Threats toward staff will not be tolerated at the facility, including in the form of written grievances." Dkt. # 44, p. 0088; Dkt. # 84, ¶ 53.

**d. December 21, 2000 Misbehavior Report**

Following the December 21, 2000 disciplinary hearing (*see* pp. 37–40 *supra* ), defendant Donahue issued a Misbehavior Report based on plaintiff's threatening and harassing language as he was being escorted back to his cell after the hearing. Dkt. # 84, ¶ 89. As discussed above, plaintiff was returned to his cell prior to hearing defendant Donahue's determination because he was being disruptive and was making threats. *Id.* at ¶ 90. A Tier 3 disciplinary hearing was held on January 4, 2001 concerning the December 21, 2000 Misbehavior Report and was conducted by defendant Irizarry. *Id.* at ¶ 91. A complete discussion of plaintiff's claims against defendant Irizarry concerning the January 4, 2001 disciplinary hearing, including a discussion of the charges, is set forth below. *See* pp. 49–53 *infra.*

**e. January 29, 2001 Tier 2 Disciplinary Hearing**

On January 29, 2001, defendant Donahue conducted a Tier 2 disciplinary hearing arising from a Misbehavior Report dated January 23, 2001. Dkt. # 84, ¶ 61. In the January 23, 2001 Misbehavior Report, Nurse Brandt charged plaintiff with violating Rule 102.10 (threats) stating, "[w]hile conducting sick call rounds this writer stopped at Inmate Chavis 91A3261 cell to deliver medication. He asked what it was I told him hydrocortisone cream. He got up slid it back under the door stated [sic] 'I want ointment and the next time you do this I'll spit on you + then throw shit on you.' " Dkt. # 44, p. 0115; Dkt. # 84, ¶ 62. Plaintiff refused to sign the Tier Assistance Selection Form, however, as discussed above, because this was a Tier 2 disciplinary hearing, plaintiff was not entitled to any assistance. Dkt. # 44, p. 0116; Dkt. # 84, ¶ 63. In addition, a review of the hearing transcript reveals that plaintiff did not request any assistance during the hearing. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 64.

***20** As reflected in the hearing transcript, defendant Donahue advised plaintiff that he was entitled to have witnesses testify on his behalf, that he should present any oral or documentary evidence that he wished to be considered during the hearing and that he should raise any procedural questions during the hearing so that they may be considered. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 65. Thereafter, plaintiff indicated that he understood his rights and plaintiff entered a plea of not guilty to the charges. *Id.* During the hearing, plaintiff did not request to have any witnesses testify on his behalf. Dkt. # 84, ¶ 66. Plaintiff testified during the hearing that the incident did not occur as recited in the Misbehavior Report. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 67. Specifically, plaintiff stated,

> Uh everything is totally uh different from what he has on the ticket. Uh I [sic] been down [sic] for thirteen years already and I've never done anything hy, unhygienic to anybody, whether officer or inmate, so he is basically lying there. I wrote up a grievance against him on um the 22nd. And on three prior separate occasions that grievance [sic], that recent grievance, I had uh written to Albany in complaint [sic] about the, the type of improper

> medical care that I'm receiving here. And uh D. [sic] Brandt came to my cell and he brought me the wrong medication. I suffer with uh, a severe uh psoriasis skin condition from my stem to uh my body. The reason why you don't see it too clear is because I have uh creams all over my head and all over my body and stuff like that. And uh this guy is just, is constantly not giving me what, what I need you know.... So this is a thing where they constantly [sic] not giving me what I need and, and my skin is just messing up. It it's just one ticket after another.

Dkt. # 44, p. 0126, Dkt. # 84, ¶ 67. Plaintiff further stated that he took the medication and shoved it through the door and that “he [Nurse Brandt] had me active a little bit but rather than take it and throw [sic] out to react this time, I just took it and shoved it under the door. I didn't want him to uh talk about [sic] I tried to attack him and stuff like that, so I just took it and slid it underneath the door.” Dkt. # 44, p. 0126; Dkt. # 84, ¶ 68. In addition, plaintiff stated that he had copies of the complaint letter that he had sent to Albany in his cell, defendant Donahue stated that he would accept plaintiff's testimony that he had filed several complaints against Nurse Brandt. Dkt. # 84, ¶ 69.

Plaintiff chose to return to his cell before defendant Donahue read his determination. Dkt. # 84, ¶ 70. Thereafter, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed the penalty of 30 days keeplock confinement to begin February 4, 2003 through March 6, 2003. Dkt. # 44, p. 0127. As set forth in the hearing transcript and the Hearing Disposition Sheet, defendant Donahue relied on the Misbehavior Report of Nurse Brandt which he found to be credible. Dkt. # 44, pp. 0113, 0125–0128; Dkt. # 84, ¶ 71. Defendant Donahue noted that the penalty imposed, 30 days keeplock confinement, was imposed to serve as a deterrent for future misconduct by plaintiff and other inmates. *Id.* Finally, defendant Donahue noted that plaintiff had been found guilty of threats on many previous occasions. *Id.*

**f. March 7, 2001 Tier 2 Disciplinary Hearing**

***21** On March 7, 2001, defendant Donahue conducted a Tier 2 disciplinary hearing in relation to a February 28, 2001 Misbehavior Report. Dkt. # 44, pp. 0129–0131; Dkt. # 84, ¶ 78. The February 28, 2001 Misbehavior Report charged plaintiff with violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) stating:

> On the above date and approximate time [2–28–01 7:15 p.m.] while making rounds I observed water on B–1 Gallery. As I continued the rounds I observed Chavis # 91A3261 repeatedly flushing his toilet. I ordered Chavis to stop and he refused by continuing to flush his toilet. I then left the gallery and went to the pipe chase to turn his water off. I then contact [sic] the area sergeant.

Dkt. # 44, pp. 0129–0131. Defendant Chavis refused to attend the March 7, 2001 disciplinary hearing and refused to sign the Waiver Form. Accordingly, the disciplinary hearing was conducted in his absence and at the outset of the hearing, defendant Donahue entered a plea of not guilty on plaintiff's behalf. *Id.;* Dkt. # 84, ¶¶ 80 and 83. According to the hearing transcript, when Sgt. Gagliardi went to plaintiff's cell to bring him to the hearing, plaintiff was sleeping and when Sgt. Gagliardi woke him and informed him that he had a disciplinary hearing and that defendant Donahue was conducting the hearing, plaintiff said “I'm not going, I'm not going to attend the hearing with him [defendant Donahue].” Dkt. # 44, pp. 0129–0131. Defendant Donahue conducted the hearing, considered the evidence (the Misbehavior Report of Correction Officer Kamas) and determined that plaintiff had indeed violated Rules 118.33 (flooding) and 106.10 (refusing a direct order). Dkt. # 44, pp. 0129–0131; Dkt. # 84, ¶ 84. Defendant Donahue imposed a penalty of 30 days keeplock confinement as a deterrent of future misconduct on the part of plaintiff and other inmates. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

**2. Defendant Lieutenant Gilmore**

Plaintiff claims that defendant Lt. Gilmore conducted a Tier 2 disciplinary hearing on July 18, 2000 with respect to a July 9, 2000 Misbehavior Report and during the course of that hearing, Lt. Gilmore denied plaintiff due process. Dkt. # 9. Specifically, in the amended complaint, plaintiff alleges against defendant Gilmore:

> This defendant [Gilmore], on the date of 7–18–00, inside of this Southport Prison, while acting under state color in his individual and official [FN19] capacities, had conducted a hearing, and in his doing so had intentionally, knowingly, and wilfully *violated* my due process rights by finding me guilty [sic] for a violation that I had not been charged with on the retaliatory ticket. Additionally, no other officer had endorsed the retaliatory ticket nor had any testified against me of the several SHU-officers present at the incident of which I had not been the aggressor (my two eye witness'es [sic] had confirmed my defense however, this defendant had found me guilty anyway, than [sic] sentenced me to a 10–day sentenced [sic]. Soon after, I did appeal on 7–18–00. However, the defendant W. Wilcox (para—# 9), had affirmed the sentence in bias against me.

FN19. *See* footnote 2 *supra.*

***22** Dkt. # 9, pp. 6–F to 6–G. During the time period alleged in the amended complaint, defendant Gilmore was a Lieutenant at Southport and had held that position from June 1999 to June 2001. Dkt. # 86, ¶ 1. As part of his duties, defendant Gilmore conducted inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. Dkt. # 85, ¶ 3.

The July 9, 2000 Misbehavior Report, authored by Correction Officer Burgett and endorsed by Sgt. Parish, charged plaintiff with violating Rule 107.10 (interference), Rule 107.11 (harassment) and Rule 106.10 (refusal to obey a direct order). Dkt. # 85, ¶ 6. In the Misbehavior Report, Officer Burgett described that plaintiff aggressively questioned the duration of his shower at the two minute warning and again at the termination of his shower. Dkt. # 44, p. 0042; Dkt. # 85, ¶ 6. Officer Burgett further stated that he informed plaintiff that his shower was the required duration, plus one minute and that plaintiff accused Officer Burgett of lying. *Id.* As Officer Burgett began to counsel plaintiff about harassing employees, plaintiff became extremely loud and verbally aggressive, stating “you aint [sic] telling me nothing [sic] because youre [sic] an asshole, I'll have you in a penitentiary wearing handcuffs in a week, bet that, you aint [sic] scaring nobody with your ticket.” *Id.* Thereafter, Officer Burgett stated that he issued a direct order for wrist restraints to be applied in order to escort plaintiff and plaintiff refused to come out of the shower. *Id.* Officer Burgett then issued two more orders for plaintiff to put out his hands for wrist restraints and plaintiff again refused and stated he would not come out of the shower. *Id.* After Sgt. Parish responded to the scene, plaintiff complied with the wrist restraints and was escorted to his cell. *Id.*

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on July 10, 2000 and did not request a copy of DOCS Directive No. 4932, Chapter V, Standards, Behavior & Allowances and that plaintiff refused to sign the form. Dkt. # 44, p. 0043; Dkt. # 85, ¶ 7. Notwithstanding the foregoing, at the disciplinary hearing, plaintiff claimed that he had requested and never received a copy of DOCS Directive No. 4932, Chapter V. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 8. Defendant Gilmore immediately gave plaintiff a copy of DOCS Directive No. 4932, Chapter V. However, plaintiff declined defendant Gilmore's offer of a few minutes to review the document. *Id.* Plaintiff was advised at the outset of the hearing that he may have witnesses testify on his behalf, that nothing said by plaintiff would be used against him in a criminal proceeding, that plaintiff should present any oral or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

documentary evidence he wished defendant Gilmore to consider during the hearing and that any procedural objection or claims should be made during the hearing. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 9. Plaintiff indicated that he understood his rights. *Id.* Thereafter, plaintiff plead not guilty to the charges and requested to have inmates Lopez and Wilson testify as witnesses. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 10.

***23** As a threshold matter, plaintiff objected to the Misbehavior Report on the grounds that the copy he had received had not been endorsed by Sgt. Parish. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 11. Defendant Gilmore showed plaintiff the original July 9, 2000 Misbehavior Report which contained the endorsement by Sgt. Parish and noted plaintiff's objection for the record. *Id.* Thereafter, plaintiff further objected to the Misbehavior Report on the grounds that it was fabricated by Officer Burgett. Dkt. # 44, pp. 0045–0063; Dkt. 85, ¶ 12. Plaintiff denied calling Officer Burgett an asshole and stated that it was Officer Burgett who called him an asshole. *Id.* Plaintiff further asserted that he had requested the presence of Sgt. Parish because Officer Burgett threatened him and that he had refused to come out of the shower because of Officer Burgett's threatening behavior, including brandishing a night stick. *Id.* Plaintiff admitted that he told Officer Burgett that if he hit him with a baton, plaintiff would have Officer Burgett arrested. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 13. Plaintiff further admitted to calling Officer Burgett a scumbag. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 14. Finally, plaintiff stated that after Sgt. Parish came to the shower, he cooperated with the wrist restraints and was escorted back to his cell. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 15.

Since plaintiff's requested witnesses Lopez and Wilson were confined to SHU, they could not be in the same room as plaintiff. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 16. Accordingly, defendant Gilmore advised plaintiff that plaintiff could instruct defendant Gilmore as to what questions to ask each witness and that he, Gilmore, would question the witnesses and then play the testimony back for plaintiff. *Id.* Plaintiff requested that defendant Gilmore ask inmates Lopez and Wilson whether plaintiff called Officer Burgett an asshole?, how long plaintiff was in the shower?, and why plaintiff requested Sgt. Parish to come to the shower area?. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 17. Thereafter, both inmates Lopez and Wilson testified outside the presence of plaintiff, stating, in part, that Officer Burgett had called plaintiff an asshole, that the shower had lasted less than ten minutes and that plaintiff had requested the Sergeant because the officers were brandishing their night sticks/holding their batons in their hands. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶¶ 19–26. Following the testimony of inmates Lopez and Wilson, the recorded testimony was played for plaintiff and plaintiff stated that he was satisfied with their testimony and that he could hear and understand their testimony. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 28.

Plaintiff then presented a copy of a grievance he filed against Officer Burgett and stated that there were numerous other grievances that had been filed by other inmates against Officer Burgett. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 29. Defendant Gilmore reviewed the consolidated grievance written on July 9, 2000 by plaintiff and filed on July 10, 2000 listing problems with the shower officer. At plaintiff's request, defendant Gilmore read the grievance into the record. *Id.* Thereafter, plaintiff reiterated his objection to the Misbehavior Report and stated that he had nothing further to offer in response to the charges. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 30. Defendant Gilmore, relying on the Misbehavior Report authored by Officer Burgett, as well as plaintiff's testimony, found plaintiff not guilty of violating Rule 107.10 (interference) and not guilty of violating Rule 106.10 (refusing a direct order). Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 31. Defendant Gilmore did, however, find plaintiff guilty of violating Rule 107.11 (harassment) because he concluded that the plaintiff had participated in a verbal confrontation with Officer Burgett (plaintiff admitted to calling Officer Burgett a scum-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

bag) and imposed a penalty of 10 days keeplock confinement. *Id.* Plaintiff appealed defendant Gilmore's determination and Captain Wilcox affirmed the determination on or about July 30, 2000. Dkt. # 85, ¶ 33; Dkt. # 86, Exhibit A.

**3. Defendant Hearing Officer Irizarry**

***24** Defendant Hearing Officer Irizarry conducted a Tier 3 disciplinary hearing on January 4, 2001 with respect to a December 21, 2000 Misbehavior Report issued by defendant Donahue following a Tier 2 disciplinary hearing conducted by defendant Donahue on December 21, 2000. Dkt. # 9. Plaintiff claims that defendant Irizarry denied him due process by denying him assistance prior to the hearing, denying plaintiff his right to call expert witnesses during the hearing, denying plaintiff the right to present evidence during the hearing and threatening to reprimand plaintiff during the hearing for making objections. Dkt. # 9, pp. 6–B to 6–D. Moreover, plaintiff claims that because defendant Selsky modified the hearing determination, that his due process rights were violated.[FN20] *Id.* In addition, plaintiff claims that he never received a copy of the December 21, 2000 Misbehavior Report. *Id.* Specifically, as against defendant Irizarry, the amended complaint states, in part,

FN20. Director Selsky is a named defendant in this action and the claims against defendant Selsky will be separately discussed in greater detail below. *See* pp. 66–74 *infra.*

This defendant [Irizarry], on the date of 12–21–00 (note: this defendant had *personally dated* his hearing disposition 1–4–00), inside of this Southport Prison, while acting under state color, in his individual and official [FN21] capacities, had knowingly, wilfully, and intentionally *violated* my right to due process, by denying me ‘assistance’ prior to himself conducting the hearing, by also denying my right to call expert witness'es [sic] of which I had only two, and verbally threatening to reprimand me, due to my *un* ceasing ‘objections' to this defendants [sic] misconduct durring [sic] this hearing, and *no* threat to institutional safety or correctional goals, had been stated in this defendants [sic] disposition of 1–4–00. I ‘suffered’ a finding in [sic] guilt, and sentenced to nine (9) months extended SHU-punative [sic] segregation ...

FN21. *See* footnote 2 *supra.*

Dkt. # 9, pp. 6–B to 6–C (emphasis in original). Defendant Irizarry (incorrectly identified as Irrizarry in the amended complaint) is the Food Service Administrator at Southport and has held that position since 1990. Dkt. # 86, ¶ 1. From time to time, defendant Irizarry's duties included conducting inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.

On December 21, 2000, following a Tier 2 disciplinary hearing, defendant Donahue issued a Misbehavior Report charging plaintiff with violating Rules 102.10 (threats) and 107.11 (harassment). Dkt. # 65, p. 0664; Dkt. # 86, ¶ 6. The Misbehavior Report states:

While exiting B-block first floor hearing room from a Tier 2 hearing on the above date and time, inmate Chavis, 91A3261 became verbally abusive. Chavis stated, ‘you're a bitch Lt. Donahue. I'll have you in handcuffs and leg irons and I'll fuck you up, you bitch.’ Inmate Chavis continued to yell obscenities and make threats as he was escorted back to his cell. These threats included Chavis stating, ‘I'll murder your ass, you punk ass mother fucker.’ Inmate Chavis was secured in his cell without further incident.

***25** Dkt. # 65, p. 0664. As a threshold matter, plaintiff claims that defendant Irizarry denied him an assistant to prepare for the hearing. Dkt. # 9. On December 23, 2000, plaintiff was served with a copy of the Misbehavior Report and indicated on the Tier Assistance Selection Form that he waived his right to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

an assistant and plaintiff refused to sign the Tier Assistance Selection Form. Dkt. # 65, p. 0667; Dkt. # 98, pp. 5–18. During the hearing, plaintiff claimed that despite what is reflected on the Tier Assistance Selection Form, he did not refuse an assistant. Rather, plaintiff stated during the hearing that he was sleeping when the Misbehavior Report was delivered to him. Dkt. # 98, pp. 5–18. Defendant Irizarry found plaintiff's claim not to be true because the officer who served plaintiff with a copy of the Misbehavior Report, Officer McIntosh, testified that plaintiff was awake when he was served and simply refused to sign or pick an assistant. *Id;* Dkt. # 86, ¶ 12.

Plaintiff further alleges that defendant Irizarry refused to allow him to call witnesses to testify during the hearing. Dkt. # 9. During the hearing, plaintiff requested that DOCS' Commissioner Goord and Associate Commissioner W. Chapman testify as witnesses on his behalf. Dkt. # 65, p. 0666; Dkt. # 98, pp. 5–18. In response to defendant Irizarry's question concerning why plaintiff requested Commissioner Goord and Associate Commissioner Chapman as witnesses, plaintiff stated, "[b]ecause they have everything to do with this ticket. And they have everything to do with the conduction of that [sic] hearing." Dkt. # 98, p. 16. Plaintiff's request was denied by defendant Irizarry on the grounds that their testimony was not relevant to the hearing as neither Commissioner Goord nor Associate Commissioner W. Chapman were present or in the facility at the time of the alleged incident. Dkt. # 65, p. 0666; Dkt. # 86, ¶ 15; Dkt. # 98, p. 16. Defendant Irizarry maintains that according to policy, an inmate's request for administrative, supervisory or staff personnel to testify does not mean that the staff member is automatically called to testify. Dkt. # 86, ¶ 16. If, according to defendant Irizarry, every inmate was granted the right to call every staff member selected, it would be extremely disruptive of facility operations, especially where, as here, an inmate requests Commissioner Goord and Associate Commissioner Chapman to testify. *Id.* In addition, 7 N.Y.C.R.R. § 254.5(a) provides that where the testimony of a requested witness would be immaterial, duplicative or unnecessary, as defendant Irizarry determined Commissioner Goord's and Associate Commissioner Chapman's testimony would be, the hearing officer may exercise his/her discretion to deny the request. *Id.*

After hearing the testimony and based on the Misbehavior Report, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment). Dkt. # 65, pp. 0661–0662; Dkt. # 86, ¶ 19. Defendant Irizarry imposed a penalty of nine months confinement in SHU commencing June 27, 2001 through March 23, 2002. *Id.* In reaching the determination, defendant Irizarry noted on the Hearing Disposition Sheet that he had relied upon the written Misbehavior Report of Lt. Donahue and the testimony of Officer Bennett who was present at the time of the incident. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 20. Defendant Irizarry further noted that a review of plaintiff's disciplinary record revealed that plaintiff had been charged and found guilty of sixteen charges of threats and twelve charges of harassment. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 22. In addition, defendant Irizarry noted that none of the previous sanctions imposed upon plaintiff as a result of those determinations had helped to modify plaintiff's behavior. *Id.* Thus, defendant Irizarry noted that the penalty of nine months confinement in SHU was a just disposition. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 23. Thereafter, defendant Selsky modified the penalty to six months SHU confinement. Dkt. # 86, ¶ 24 and Exhibit A. As will be discussed in greater detail below, plaintiff contends that because defendant Selsky modified the penalty imposed, defendant Irizarry denied plaintiff due process. Dkt. # 86, ¶ 18.

**4. Defendant Lieutenant Quinn**

***26** In the amended complaint, plaintiff alleges that on February 5, 2001, defendant Lt. Donald Quinn violated his due process rights by denying him assistance prior to a Tier 3 disciplinary hearing, denied him the right to have witnesses testify on his behalf and

denied plaintiff the right to attend the hearing to its conclusion. Dkt. # 9. Specifically, plaintiff's claim against defendant Quinn states, in part:

> This defendant—Quinn, on the date of February 5, 2001, while acting under state color, inside of this Southport Prison, in his individual and official [FN22] capacities, had knowingly violated my right to due process, intentionally and wilfully by denying me assistance prior to this hearing, and furthermore my witness'es [sic]. Also, I was denied my right to attend this hearing upon [sic] it's [sic] conclusion, and the right to [sic] disposition. I was found guilty, sentenced to 12–months SHU punative [sic] segregation suffering [sic] ...

FN22. *See* footnote 2 *supra.*

Dkt. # 9, p. 6. At all times relevant to the allegations in the amended complaint, defendant Quinn was a Lieutenant at Southport and held that position from December 14, 2000 to February 8, 2001. Dkt. # 87, ¶ 1. From time to time, defendant Quinn's responsibilities included conducting disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.

Defendant Quinn conducted a disciplinary hearing beginning on January 31, 2001 and continuing on February 5, 2001, arising from a January 27, 2001 Misbehavior Report charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats). Dkt. # 87, ¶ 6. The Misbehavior Report, authored by Officer Hodge stated,

> I was given a letter by Lt. Sheahan, the watch commander to review. This letter, dated January 8, 2001, was written to Mr. Anthony Annucci, Deputy Commissioner, by Inmate George Chavis 91A3261. In this letter, Inmate Chavis uses several obscene words and phrases, calling several staff members, including but not limited to Supt. McGinniss [sic], Lt. Donahue, and RN S. VonHagn, 'KKK bitches." He also takes Mr. Annucci to task for 'believing all the lying bullshit your prison staff feeds you.' He also complains that Mr. McGinnis 'doesn't do a gatdamn (sic) things,' and promises to 'sue all you KKK asses.' He closes with a statement that he is 'tired of the KKK bullshit, and sooner or later I'll terminate all of it.' Inmate Chavis also states that 'then, the personal retaliation occurs ... no one is getting away with violating me in life (?) and assume I'll be your good ole nigger. I'll teach a lot of the KKK in uniform here respect.'

Dkt. # 68, p. 0710. According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on January 17, 2001 and indicated on the form that he requested an employee assistant for the Tier 3 disciplinary hearing. Dkt. # 68, p .0712; Dkt. # 87, ¶ 7. The form reveals that plaintiff identified G. Powers as his first choice for an assistant and J. Morton and P. Nardi as his second and third choices respectively. Dkt. # 68, p. 0712. It appears, however, that plaintiff refused to sign the form. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 8.

***27** The disciplinary hearing began on January 31, 2001 at which time plaintiff objected to the hearing claiming that he had not received assistance. Dkt. # 87, ¶ 9. At the outset of the hearing, plaintiff stated that he had chosen G. Powers as his assistant and that despite the fact that G. Powers was available, Sgt. Morton was assigned to serve as his assistant. Dkt. # 98, pp. 20–33. During the hearing, plaintiff insisted that notwithstanding what is indicated on the Tier Assistance Selection Form, he did not select J. Morton and P. Nardi as his second and third choices for an assistant, plaintiff claimed that he chose *only* G. Powers. Dkt. # 68, p. 0712; Dkt. # 98, pp. 20–33. Indeed, plaintiff stated during the hearing that he had witnesses who would testify concerning G. Powers' availability to serve as his assistant. Dkt. # 98, pp. 20–33. Defendant Quinn advised plaintiff during the hearing that G. Powers was not available to serve as

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

his assistant. *Id.* In fact, there is a notation on the Tier Assistance Selection Form next to G. Powers' name stating, “off list”. Dkt. # 68, p. 0712. Thereafter, plaintiff and defendant Quinn discussed at length whether plaintiff had in fact refused J. Morton's assistance to prepare for the hearing. Dkt. # 98, pp. 20–33.

Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci called as witnesses. *Id.* Plaintiff continuously objected to the hearing because he claimed he had not received assistance. Dkt. # 98, pp. 20–33. Thereafter, defendant Quinn adjourned the hearing so that he could verify with Sgt. Morton that plaintiff had been offered assistance and that plaintiff had refused that assistance. *Id.* The hearing was reconvened on February 5, 2001 and plaintiff refused to attend the hearing.[FN23] Dkt. # 87, ¶ 10. The hearing was conducted outside of plaintiff's presence. Dkt. # 98, pp. 20–33. Moreover, Sgt. Morton testified telephonically that plaintiff had refused his assistance. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 15. Defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding that Deputy Commissioner Annucci's testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 11. As with previous administrative, supervisory or staff personnel witnesses identified by plaintiff to testify at other disciplinary hearings, Deputy Commissioner Annucci is located in Albany, New York and to have Deputy Commissioner Annucci testify in every hearing as requested would be extremely disruptive. Dkt. # 87, ¶ 12. Moreover, because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner Annucci during the hearing, he was able to make a determination as to the threatening, obscene and abusive language therein. *Id.* at ¶ 14. Based on the foregoing, defendant Quinn determined that Deputy Commissioner Annucci's testimony was not necessary. *Id.* Accordingly, defendant Quinn maintains that it was in the exercise of his discretion that he denied plaintiff's request to have Deputy Commissioner Annucci testify at the hearing. *Id.* at ¶ 13. Notwithstanding the fact that plaintiff refused to attend the hearing and did not avail himself of the opportunity to present a defense at the hearing, plaintiff claims that Deputy Commissioner Annucci would have testified that “no such letter of alleged threat existed” and further, that no letter was physically produced during the hearing. Dkt. # 96, p. 8. It should be noted that at no time when plaintiff was present at the January 31, 2001 commencement of the disciplinary hearing did he deny that he wrote the January 8, 2001 letter to Deputy Commissioner Annucci. Dkt. # 98, pp. 20–33.

> FN23. In opposition to defendants' motion for summary judgment, plaintiff claims that he did not refuse to attend the hearing, rather, plaintiff claims that no one came to escort him to the hearing. Dkt. # 96, p. 9. The hearing transcript, Dkt. # 98, pp. 20–33, reflects the testimony of Sgt. Mulhearn and Correction Officer Manzo who testified that they attempted to escort plaintiff to the February 5, 2001 continuation of his disciplinary hearing and plaintiff refused. Moreover, Sgt. Mulhearn testified that he requested plaintiff to sign the Waiver of Right to Attend Disciplinary Hearing advising plaintiff that a disposition of the charges would be made in his absence and plaintiff refused. Dkt. # 68, p. 0713; Dkt. # 87, ¶ 10; Dkt. # 98, pp. 20–33.

***28** At the conclusion of the hearing, defendant Quinn rendered his determination and found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months keeplock confinement in SHU beginning September 27, 2002 and continuing through September 27, 2003. *Id.* at ¶ 16. In reaching this determination, defendant Quinn noted that he relied on the Misbehavior Report and the handwritten letter from plaintiff, wherein plaintiff made harassing statements to Deputy Commissioner Annucci. *Id.* at ¶ 17. Defendant Quinn further noted that the penalty was im-

posed to serve as a deterrent to plaintiff and others and to reinforce that threatening and harassing employees will not be tolerated. *Id.*

Thereafter, plaintiff alleged that he never received a copy of the hearing disposition and he commenced an Article 78 proceeding in New York State Supreme Court, Chemung County challenging the February 5, 2001 disposition. Dkt. # 87, ¶ 18. In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but maintained that he did not refuse to attend the hearing. *Id.* Plaintiff further claimed that he did not learn of the disposition until June 26, 2001 when he reviewed a copy of the SHU readout sheet. *Id.* On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id.* at ¶ 19.

By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id.* at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant, denied him the right to attend the hearing and refused to call Deputy Commissioner Annucci as a witness. *Id.* Plaintiff further alleged that defendant Quinn was biased, refused to let plaintiff see the January 8, 2001 correspondence (the letter authored by plaintiff that formed the basis for the January 27, 2001 Misbehavior Report) and that because he never received a copy of the disposition, he was unaware of the penalty imposed. *Id.* On April 26, 2002, defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because defendant Quinn failed to interview a requested witness who may have provided relevant testimony. *Id.* at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination several months before plaintiff was ordered to serve his penalty. *Id.* at ¶ 22. As discussed above, the penalty of twelve months confinement in SHU was to commence on September 27, 2002 and continue through September 27, 2003. *Id.* at ¶ 23.

**5. Defendant Lieutenant Ryan**

Plaintiff alleges that defendant Lieutenant Ryan denied him due process during a Tier 2 disciplinary hearing held on January 25, 2000 with respect to a January 14, 2000 Misbehavior Report. Specifically, plaintiff alleges that:

> ***29** This defendant [Ryan], on the date of 1–25–00, inside of this Southport State Prison, while acting under state color, in his individual and official [FN24] capacities, had knowingly, wilfully, and intentionally *violated* my due process, while his [sic] conducting a hearing. This defendant had personally used his own ink pen (*prior* to turn on the recorder), for ‘signing’ (endorsing), the retaliatory ticket against me (forgery), on behalf of the medical escort officer who showed ‘reluctance’ to sign the ticket himself, and further had *never* cared to appear at the hearing personally—*no* assistance [sic] been issued [sic] me prior to the hearing though I stated the ticket was *not* understood by me on several occasions. Furthermore, a voice phone had been used, over my *un* ceasing ‘objections'. I had been forced from the partial hearing and than [sic] found guilty, and sentenced to 30–days keeplock cell confinement. Soon after, I did appeal on 1–25–00, however, the defendant W. Wilcox (para—# 9), had affirmed the due process violation against me, of a charge *not* even part of the incident and clearly *not* written in the retaliatory ticket!

FN24. *See* footnote 2 *supra.*

Dkt. # 9, pp. 6–G to 6–H (emphasis in original). At all times relevant to the allegations in the amended complaint, defendant Ryan was a Lieutenant at Southport and held that position from 1987 to 2000. Dkt. # 93, ¶ 1. From time to time, defendant Ryan's duties included conducting disciplinary hearings as

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. *Id.* at ¶ 3.

The Tier 2 disciplinary hearing conducted by defendant Ryan was held on January 25, 2000 and was in relation to a January 14, 2000 Misbehavior Report which charged plaintiff with violating Rules 107.10 (verbal interference) and 107.11 (verbal harassment). Dkt. # 44, p. 0026. The Misbehavior Report was written by defendant Nurse vonHagn for an incident that took place when she attempted to deliver eyeglasses to plaintiff. A complete discussion of the incident that gave rise to the Misbehavior Report is set forth at pp .19–21 *supra.*

At the outset of the hearing, defendant Ryan advised plaintiff that he may have witnesses testify on his behalf and that nothing he said during the course of the hearing could be used against him in a criminal proceeding. Dkt. # 44, pp. 0032–0038; Dkt. # 93, ¶ 11. Plaintiff indicated that he understood his rights. *Id.* Thereafter, plaintiff objected to the Misbehavior Report as retaliatory and noted for the record that he had, at that time, approximately fifteen grievances filed against defendant vonHagn, as well as an Article 78 pending against her. Dkt. # 44, pp. 0032–0038; Dkt. # 93, ¶ 17. Plaintiff did not, however, contrary to the claims made in the amended complaint, claim during the hearing that defendant Ryan denied him an assistant or denied him the ability to have witnesses testify on his behalf. *Id.;* Dkt. # 93, ¶ 7. Moreover, as is reflected in the hearing transcript, over plaintiff's objection, Officer Martino, who endorsed the Misbehavior Report, testified by telephone at the hearing and unequivocally stated that he had witnessed the incident involving defendant vonHagn and plaintiff. Dkt. # 44, pp. 0032–0038.

***30** Just prior to Officer Martino's testimony, plaintiff became increasingly disruptive, objecting to the hearing because it was "bias and partial." *Id.* Accordingly, plaintiff requested to return to his cell for the balance of the hearing and was, therefore, not present for the remainder of the hearing. *Id.* Following Officer Martino's testimony, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30 days keeplock confinement beginning July 18, 2000 and continuing until August 17, 2000. *Id.* In reaching his determination, defendant Ryan relied on the January 14, 2000 Misbehavior Report and the testimony of Officer Martino who witnessed the incident. Dkt. # 93, ¶ 29. Defendant Ryan further stated that he imposed the penalty to serve as a reminder that the type of behavior exhibited towards defendant vonHagn will not be tolerated. *Id.* Plaintiff appealed defendant Ryan's determination and Captain Wilcox affirmed defendant Ryan's determination finding that there was no evidence of retaliatory acts committed by defendant vonHagn, that defendant Ryan properly called Officer Martino to testify, that plaintiff was not confined pending the hearing, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan and that a witness may testify by telephone. Dkt. # 44, p. 0024; Dkt. # 92, ¶ 31. Following plaintiff' appeal, defendant Ryan's determination was affirmed by defendant Wilcox on or about January 28, 2000. Dkt. # 86, Exhibit A.

**6. Defendant Captain Sheahan**

Finally, plaintiff alleges in the amended complaint that defendant Captain Sheahan denied plaintiff due process in connection with a Tier 3 disciplinary hearing that began on December 26, 2000 and was continued on December 29, 2000 concerning a December 13, 2000 Misbehavior Report. Dkt. # 9. In short, plaintiff alleges that defendant Sheahan denied plaintiff his right to witnesses, improperly found him guilty at the conclusion of the hearing, and was biased against plaintiff. *Id.* As against defendant Sheahan, plaintiff specifically alleges:

> This defendant [Sheahan], on the date of 12–29–00, inside of this Southport prison, while acting under state color in his individual and official [FN25] capaci-

ties, had conducted a hearing, and knowingly, intentionally, and wilfully violated my due process rights repeatedly by 'denying' my right [sic] witness'es [sic] (only one expert witness having a full indepth [sic] and personal knowledge of my situations [sic] in [sic] suffering with the defendant—author of the retaliatory ticket—para # 1), over my repeated 'objections'. [sic] Additionally, this defendant (Shehan [sic] ), had stated no valid reason on [sic] disposition, in [sic] respect to the threat of any institutional or correctional goals as is necessary to deny witness'es [sic]. I suffered a finding in [sic] guilt, and sentenced to six (6) months further SHU-punative [sic] segregation, an [sic] I appealed on 12–31–00, however, the defendant (D. Selskey [sic] ), affirmed the bias, partial disposition against me, in further violation of my due process rights.

FN25. *See* footnote 2 *supra.*

***31** Dkt. # 9, pp. 6–A to 6–B (emphasis in original). During the time period relevant to the allegations in the amended complaint, defendant Michael Sheahan was a Captain at Southport and has held that position since June 2003. Dkt. # 88, ¶ 1. As with the other hearing officers named as defendants, defendant Sheahan's duties included conducting inmate disciplinary hearings as the Superintendent's designee. Dkt. # 88, ¶ 3. The underlying facts relating to the December 13, 2000 Misbehavior Report issued by defendant vonHagn are discussed at length above. *See* pp. 23–27 *supra.*

Plaintiff was advised at the outset of the hearing that he had the right to have witnesses testify on his behalf, that nothing plaintiff said would be used against him in a criminal proceeding, that plaintiff should present any oral or documentary evidence during the hearing and that any procedural objections or claims should be made promptly during the hearing. Dkt. # 44, pp. 00160–0199; Dkt. # 88, ¶ 7. Plaintiff responded that he understood his rights. *Id.* Plaintiff objected that he did not receive the employee assistant that he had requested and had not received copies of the grievances he requested to support his claim that defendant vonHagn issued the December 13, 2000 Misbehavior Report in retaliation for complaints plaintiff filed against her. Dkt. # 88, ¶ 8. After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the hearing to further investigate plaintiff's assertions. *Id.* at ¶ 9. The Tier 3 disciplinary hearing reconvened on December 29, 2000. *Id.* During the continuation of the hearing, plaintiff agreed that he had been provided with an assistant, Officer Carpenter, that Officer Carpenter had met with plaintiff on December 26, 2000 and further, that the assistance he had received was acceptable. *Id.* Although plaintiff testified that he had not received all of the grievances that he had requested, plaintiff stated that the data he had received was satisfactory for the hearing. *Id.* at ¶ 10. Finally, although plaintiff agreed that when he met with Officer Carpenter he had not requested any witnesses, plaintiff advised defendant Sheahan that he did want Thomas Egan, Director of CORC to testify with respect to "certain verifications concerning the grievances." *Id.* at ¶ 11.

Plaintiff plead not guilty to the charges in the Misbehavior Report and objected to the Misbehavior Report on the grounds that: it was retaliatory; he had written at least twenty to twenty-five complaints against defendant vonHagn; he had one witness who would testify that plaintiff never threatened defendant vonHagn; Officer Stamp threatened plaintiff; defendant vonHagn had been violating plaintiff's right to medical care since March 1999; defendant vonHagn is racist, biased and unprofessional; and defendant vonHagn had written retaliatory Misbehavior Reports against plaintiff on prior occasions. *Id.* at ¶ 12. In support of some of his objections, plaintiff submitted copies of the grievances for defendant Sheahan's consideration. *Id.* Defendant Sheahan advised plaintiff that he accepted the grievances as evidence of his claim that defendant vonHagn had submitted the December 13, 2000 Misbehavior Report in retaliation for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff's grievances. *Id.* at ¶ 13.

***32** As noted above, plaintiff requested that Director Egan testify that the grievances submitted by plaintiff were "exhausted." *Id* . at ¶ 14. Defendant Sheahan denied plaintiff's request to have Director Egan testify because, as noted above, he accepted the grievances submitted by plaintiff and determined that any testimony by Director Egan would have been redundant. *Id.* Following defendant Sheahan's denial of plaintiff's request to have Director Egan testify, plaintiff's objection was noted for the record and plaintiff indicated that he had nothing further to submit with respect to the Misbehavior Report. *Id.* at ¶ 17. Thereafter, defendant Sheahan rendered his determination. *Id.*

Defendant Sheahan found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of six months confinement in SHU. *Id.* at ¶ 18. In reaching this determination, defendant Sheahan relied upon the December 13, 2000 Misbehavior Report and stated that in his opinion, the evidence of past grievances submitted by plaintiff did not establish that the Misbehavior Report issued by defendant vonHagn was retaliatory in nature. *Id.* Further, defendant Sheahan stated that the disposition was rendered to impress upon plaintiff that threats to staff would not be tolerated. *Id.* Plaintiff appealed defendant Sheahan's determination and defendant Selsky affirmed the determination on or about February 9, 2001. *Id.* at ¶ 20.

**D. Due Process Claims—Appeals**

The amended complaint alleges a cause of action against defendants Selsky and Wilcox premised on the theory that the defendants denied plaintiff his due process rights in connection with plaintiff's appeals of certain disciplinary hearing determinations. Dkt. # 9. According to plaintiff, because the hearing officers violated plaintiff's constitutional rights, defendants Wilcox and Selsky must also be liable for violating plaintiff's constitutional rights because they affirmed the determinations of the hearing officers. Dkt. # 9, pp. 6–H to 6–I. Similarly, plaintiff claims that where defendant Selsky modified a hearing officer's determination, such modification also constituted a violation of plaintiff's constitutional rights. *Id.* at p. 6–I.

Against defendant Wilcox, plaintiff alleges, "on the separate date's [sic] of 1–21–00, 1–25–00, 7–18–00, 7–30–00, 11–29–00, 12–31–00, 12–22–00, 3–8–01, 1–30–01 [FN26], inside of this Southport State Prison, while acting under state color in his individual and official [FN27] capacities, had intentionally, knowingly, and wilfully *violated* my right to 'due process' ..." Dkt. # 9, p. 6–H (emphasis in original). Based on a review of plaintiff's disciplinary history, a copy of which is attached as Exhibit A to defendant Irizarry's affidavit (Dkt.# 86), defendant Wilcox decided appeals involving plaintiff on the following dates: January 28, 2000 (January 25, 2000 determination); July 30, 2000 (July 18, 2000 determination); December 11, 2000 (November 29, 2000 determination); December 28, 2000 (December 21, 2000 determination) and February 5, 2001 (January 29, 2001 determination). Dkt. # 86, Exhibit A.

FN26. It is unclear from the language in the amended complaint whether the dates alleged are the dates when plaintiff's appeals were decided, the dates of the hearing determinations, or some other unknown date. Notwithstanding the dates enumerated in plaintiff's amended complaint, in support of their motion for summary judgment, defendants addressed the following determination/appeal dates: January 11, 2000 determination (December 29, 1999 Misbehavior Report); November 20, 2000 determination; December 21, 2000 determination; January 29, 2001 determination; March 7, 2001 determination; July 18, 2000 determination; January 4, 2001 determination; February 5, 2001 determination; January 25, 2000 determination; and December 29, 2000 deter-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

mination. In those instances where the dates alleged in the amended complaint do not match with either the hearing date, the appeal date, or the date addressed by defendants, the Court will note the discrepancy and identify the approximate date.

FN27. *See* footnote 2 *supra.*

***33** Similarly, as against defendant Selsky, plaintiff claims on February 21, 2001, defendant Selsky "knowingly, intentionally, and wilfully *violated* my right under [sic] 'due process' by "modifying a disposition dated 1–4–00 (not 1–4–01), and I suffered a 6–month SHU-punative [sic] segregation sentence ..." Dkt. # 9, p. 6–I (emphasis in original). Additionally, plaintiff claims that on February 9, 2001, defendant Selsky violated his due process rights by "affirming a bias [sic] disposition, where I suffered *no* witnesses, *nor* had all of my evidence been allowed at the partial *un* fair hearing. I suffered *another* 6–months SHU-punative [sic] segregation sentence." Dkt. # 9, p. 6–I (emphasis in original). At all times relevant to the allegation in the amended complaint, Donald Selsky was the Director of the Special Housing/Inmate Disciplinary Program (Dkt.# 80, ¶ 123) and defendant Wilcox was a Captain at Southport.

**1. "1–21–00"—Defendant Wilcox**

As discussed at length above, a disciplinary hearing was held on January 11, 2000 concerning an incident that occurred on December 31, 1999. *See* pp. 32–35 *supra.* Defendant Lt. Donahue presided over the January 21, 2000 Tier 2 disciplinary hearing wherein he found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of 30 days keeplock confinement. *Id.* Contrary to plaintiff's allegations, plaintiff did not appeal defendant Lt. Donahue's January 21, 2000 determination. Dkt. # 86, Exhibit A.

**2. "1–25–00"—Defendant Wilcox**

On January 25, 2000, defendant Lt. Ryan presided over a Tier 2 disciplinary hearing concerning a January 14, 2000 Misbehavior Report by defendant vonHagn alleging that plaintiff violated Rules 107.10 (interference) and 107.11 (harassment). As discussed above, defendant Ryan found plaintiff guilty and imposed a penalty of 30 days keeplock confinement and 30 days loss of packages, commissary and phone privileges. *See* pp. 59–62 *supra.* Plaintiff appealed Lt. Ryan's determination alleging that: the Misbehavior Report was retaliatory in nature; defendant Ryan "manipulated" the Misbehavior Report by endorsing it; plaintiff was improperly confined in connection with the Misbehavior Report for eleven days without an extension; defendant Ryan exhibited "partiality, bias, racism, vindictiveness and Klu [sic] Klux Klan mentality" in the conduct of the disciplinary hearing; and, defendant Ryan improperly received testimony over the telephone. Dkt. # 44, p. 0025. On January 28, 2000, defendant Wilcox affirmed defendant Ryan's determination stating,

> 1. There is no evidence of any retaliatory acts committed by RN VonHagn [sic]. 2. Hearing Officer properly called the Escort Officer to the Hearing as a witness. 3. You were not confined pending this Hearing. 4. There is no evidence of any partiality, biasness [sic], racism, vindictiveness, threats, or official misconduct by the Hearing Officer at this Hearing. The Hearing Officer may receive testimony from a witness via speaker phone when that person cannot report to the Hearing to testify in person.

***34** Dkt. # 44, p. 0024.

**3. "7–18–00"—Defendant Wilcox**

According to plaintiff's disciplinary history, on July 30, 2000, defendant Wilcox affirmed defendant Gilmore's July 18, 2000 determination. Dkt. # 86, Exhibit A. As discussed above, on July 18, 2000, defendant Lt. Gilmore found plaintiff not guilty of violating Rules 107.10 (interference with employee)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and 106.10 (refusing direct order) and guilty of violating Rule 107.11 (harassment) and imposed a penalty of 10 days keeplock confinement. *See* pp. 44–49 *supra.*

**3. “7–30–00”—Defendant Wilcox**

A review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not reveal a separate disciplinary hearing that occurred on July 30, 2000, except for the appeal of the July 18, 2000 determination that was decided on July 30, 2000, as discussed above. Accordingly, for purposes of deciding defendants' motion for summary judgment, the Court will treat plaintiff's allegations concerning a July 30, 2000 disciplinary hearing as a second, duplicative reference to the July 18, 2000 hearing determination.

**5. “11–29–00”—Defendant Wilcox**

A Tier 2 disciplinary hearing was conducted by defendant Donahue on November 29, 2000. Dkt. # 44, p. 0069; Dkt. # 86, Exhibit A. Following the hearing, defendant Donahue found plaintiff guilty of violating Rules 107.10 (interference) and 102.10 (threats) and imposed a penalty of 30 days keeplock confinement. *Id.* Plaintiff filed an appeal of defendant Donahue's determination on November 29, 2000 stating that, (1) he had objected to the hearing being conducted by “this discriminiata [sic]/bias officer due to his previous verbal threats upon me back in January, and also, due to a prior grievance exhaustion [sic] against him for both these valid reasons” and (2) defendant Donahue was the subject of an official complaint by plaintiff to the DOCS Commissioner. Dkt. # 44, pp. 0378–0379. On December 11, 2000, defendant Wilcox affirmed defendant Donahue's determination stating, “No evidence Hearing Officer was bias [sic]. Hearing Officer was appropriately assigned to conduct Hearing.” Dkt. # 44, p. 0377.

**6. “12–31–00”—Defendant Wilcox**

A review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing or appeal that was held, filed or decided on or about December 31, 2000. As will be discussed below, the record before the Court does, however, reveal that plaintiff appealed a December 29, 2000 determination of a Tier 3 disciplinary hearing and that determination was affirmed by defendant Selsky on February 9, 2001.

**7. “12–22–00”—Defendant Wilcox**

On December 22, 2000, plaintiff appealed a December 21, 2000 determination by defendant Donahue. Dkt. # 44, pp. 0365–0366. In his December 22, 2000 appeal, plaintiff stated that: (1) he objected to defendant Donahue as the hearing officer because of plaintiff's prior grievances filed against defendant Donahue; (2) he objected to defendant Donahue's “misconduct” by entering a plea on plaintiff's behalf over plaintiff's objections; (3) plaintiff objected to the Misbehavior Report as being retaliatory in nature; and, (4) defendant Donahue erroneously denied plaintiff's request for two expert witnesses (“Mr. Glen Goord/Thomas G. Eagen [sic]”). *Id.* Thereafter, on December 28, 2000, defendant Wilcox affirmed defendant Donahue's December 21, 2000 determination stating, “Hearing Officer was appropriate. No evidence Misbehavior Report was retaliatory in nature. Witnesses appropriately denied and reasons documented. No evidence Hearing Officer acted improperly .” Dkt. # 44, p. 0364.

**8. “3–8–01”—Defendant Wilcox**

***35** Plaintiff alleges that defendant Wilcox violated his due process rights on March 8, 2001. However, a review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing or appeal that was held, filed or decided on or about March 8, 2001. To the contrary, plaintiff's disciplinary history reveals that a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tier 2 disciplinary hearing was conducted on March 7, 2001 by defendant Donahue with respect to a Misbehavior Report issued by Correction Officer Kamas on February 28, 2001. Dkt. # 86, Exhibit A. Plaintiff did not appeal this determination.

**9. "1–30–01"—Defendant Wilcox**

On January 30, 2001, plaintiff appealed the determination of a Tier 2 disciplinary hearing held on January 29, 2001. The January 29, 2001 disciplinary hearing was conducted by defendant Donahue and at the conclusion of the hearing, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed a penalty of 30 days keeplock. Dkt. # 44, p. 0112. In his appeal, plaintiff stated that: (1) the Misbehavior Report was retaliatory in nature because it was written by defendant Brandt against whom plaintiff had filed a grievance; (2) "the hearing officers [sic] disposition in [sic] bias/partiality, due to *no* evidence *nor* endorsement ..."; (3) defendant Donahue had been "under investigation" by DOCS officials; and, (4) defendant Donahue's actions were retaliatory in nature. Dkt. # 44, pp. 0121–0123 (emphasis in original). Defendant Wilcox reviewed the January 29, 2001 determination and affirmed it stating, in part, "HO [Hearing Officer] was appropriate and not biased. No evidence Misbehavior Report was retaliatory." Dkt. # 44, p. 0120.

**10. "2–21–01"—Defendant Selsky**

On or about February 21, 2001, defendant Selsky modified the penalty imposed by defendant Irizarry following a Tier 3 disciplinary hearing conducted on January 4, 2001. Dkt. # 86, Exhibit A. Following the January 4, 2001 disciplinary hearing, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU. Dkt. # 65, p. 0661. Defendant Selsky modified the penalty to six months SHU confinement. Dkt. # 86, Exhibit A. Defendant Selsky did not, however, overturn defendant Irizarry's determination nor did defendant Selsky find that the hearing was procedurally improper. Dkt. # 80, ¶¶ 246 and 304–306.

**11. "2–9–01"—Defendant Selsky**

Following the disciplinary hearing which commenced on December 26, 2000 and concluded on December 29, 2000, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (interference) and 102.10 (threats) and imposed a penalty of six months SHU confinement. Dkt. # 44, p. 101. On February 9, 2001, defendant Selsky affirmed the December 29, 2000 hearing determination of defendant Lt. Sheahan.[FN28] Dkt. # 44, p. 100; Dkt. # 86, Exhibit A.

FN28. Plaintiff's disciplinary record (Dkt. # 86, Exhibit A) erroneously indicates that the hearing officer who presided over the hearing was defendant Donahue. According to all other documents relating to the December 26 and 29, 2000 hearing, it was defendant Sheahan who presided over the Tier 3 disciplinary hearing.

**E. Denial of Religious Correspondence Course Claim**

***36** In his amended complaint, plaintiff alleges that in or about November and December 1999, defendant, Deane M. Gardner, "knowingly and intentionally *violated* my legal right to study religeon [sic] from a Christian order in my own Catholic faith. However, after deliberately violating my right, soon after, this very same bible study course in [sic] correspondence is now implemented here in Southport prison, and still I have been denied a right to take this correspondence course in Christian belief." Dkt. # 9, p. 5–C (emphasis in original). At all times relevant to the allegations in the amended complaint, defendant Gardner was employed as the Senior Mail and Supply Clerk at Southport. Dkt. # 94, ¶ 1.

In connection with his claim that defendant Gardner denied him his right to take a religious correspondence course, plaintiff filed Grievance No.

SPT–17423–99 on or about November 16, 1999. Dkt. # 44, p. 0250. In this grievance, plaintiff states in part, "on the date of Nov. 2nd, I received an information packet concerning religeous [sic] training or studies, however, the senior mailroom clerk—D. Gardner, informed me that I could not take any correspondences [sic] courses either religeous [sic] or college!" Dkt. # 44, p. 0250. Moreover, plaintiff alleges that an item paid for by plaintiff and sent to plaintiff by an outside vendor had been stolen by the mail room staff. *Id.* Finally, plaintiff claims that he had been denied level 3 phone call privileges. *Id.* In response to the grievance, the IGRC recommended,

> [p]er recent CORC decisions, the grievant may not participate in any correspondance [sic] courses/programs while at Southport. Grievant is advised to contact the educational supervisor once he is transferred to a general confinement facility. Regarding the item from an outside vendor which the grievant alleges was stolen by mailroom staff, no facts have been submitted. The grievant needs to provide proof of this claim. Finally regarding his telephone call, he is advised to address this issue with his area supervisor.

Dkt. # 44, p. 0251. As noted above, Southport is an all SHU facility and all inmates housed at Southport are assigned to SHU confinement. Dkt. # 94, ¶ 9.

On December 1, 1999, the Superintendent concurred with the recommendation of the IGRC and stated, in part, "[t]here are no provisions in either the facility policy or departmental directive # 4933 that allows SHU inmates to participate in any correspondence courses. Any desire to learn more about religious practices should be directed to staff in religious services." Dkt. # 44, p. 0254. Thereafter, plaintiff appealed to CORC on December 6, 1999 stating that he has a constitutional right to study religion in prison. Dkt. # 44, p. 0255. CORC issued its determination on or about January 19, 2000 wherein it concurred with the Superintendent's determination. Dkt. # 44, p. 0246. In support of its determination, CORC cited to its prior decision in SPT–14519–98 dated August 26, 1998 wherein CORC stated, in part, "[t]here are no outside correspondence courses allowed in this facility." *Id.* Moreover, CORC further cited its decision in SPT–7594–94 rendered on September 15, 1994, which states, in part, "CORC concurs with the Superintendent in that the grievant may not participate in any correspondence course due to the logistical problems related to housing in Southport C.F." *Id.*

***37** With respect to plaintiff's claim of stolen property, CORC indicated that it had not been presented with sufficient evidence to support his allegation that staff stole his property. *Id.* CORC advised that plaintiff nevertheless retained his right to pursue such a claim through the inmate claims mechanism as set forth in Departmental Directive # 2733, Inmate Personal Property Claim. *Id.* Finally, with respect to plaintiff's appeal, CORC advised plaintiff to address his concerns regarding religious study to the facility chaplain. *Id.*

In support of her motion for summary judgment, defendant Gardner claims that in her position as Senior Mail and Supply Clerk, she had no authority to set any policy for DOCS or Southport and further, had no authority to determine whether an inmate may take a correspondence course or otherwise engage in educational or religious activities. Dkt. # 94, ¶ 16. Defendant Gardner further states that she made no determination with regard to plaintiff's desire to take a religious correspondence course. *Id.* at ¶ 17. Moreover, defendant Gardner states that she did not interfere with any of plaintiff's constitutional rights or deny plaintiff the right to exercise any constitutional right. *Id.*

**F. Interference with Legal Mail Claim**

In addition to his claim that defendant Gardner denied him the right to take a religious correspondence course, plaintiff further claims that defendant Gardner interfered with his legal mail. Dkt. # 9, p. 5–B. Spe-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 35

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

cifically, plaintiff alleges: "[t]his defendant [Gardner], in the months of November and December of 1999, inside of this Southport Prison, while acting under state color, in her individual and official [FN29] capacities, had knowingly, wilfully, and intentionally violated my incoming legal mail ... (my legal mail had been opened, examined and censored out of my presence and had arrived to my SHU-punative [sic] segregation cell opened ..." Dkt. # 9, p. 5–B to 5–C.

FN29. *See* footnote 2 *supra.*

On or about October 28, 1999, plaintiff filed Grievance No. SPT–17276–99 alleging that his incoming legal mail had been opened by the mail room clerk and censored, despite the fact that, according to plaintiff, the envelope was clearly marked "Legal Mail ." Dkt. # 44, p. 0262. In the grievance, plaintiff requested that the following action be taken, "the request is clearly obvious (no employee of D.O.C.S. is supposed to violate federal law by opening a prisoners [sic] incoming legal mail!), and a legal retaliation [sic] will be activated soon enough." Dkt. # 44, p. 0262. On or about October 29, 1999, K. Washburn, Mailroom Clerk, submitted a response to Grievance No. SPT–17276–99 to the IGRC stating,

> Grievant is only partially correct by stating that legal mail which is clearly marked as such, and is from an attorney, is not to be opened by the mailroom. However, this was not the case. The letter in question arrived in an envelope which was completely handwritten, unlike normal mail from attorneys. The senders [sic] name was also illegible. Since the senders [sic] name could not be verified as a legitimate, legal entity, the mail was opened. Mailroom staff have also stated that whenever legal mail is opened in error, the enveloped is stamped by the mailroom to let the addressee know it was opened in error.

***38** Dkt. # 44, p. 0268. Thereafter, the IGRC advised plaintiff of the results of the investigation by reiterating K. Washburn's response. *Id.* at p. 0263. The Superintendent concurred with the IGRC recommendation and advised plaintiff that despite his allegations, facility staff acted within Department policy. *Id.* at p. 0266. CORC sustained the Superintendent's determination and concurred with the IGRC recommendation, stating that facility staff acted within department policy and "[c]ontrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employees referenced in this instant complaint." *Id.* at p. 0259.

As set forth in Grievance No. SPT–17276–99 and as provided in 7 N .Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2), legal mail which is clearly marked as such and is from an attorney is not to be opened by the mailroom outside the presence of the inmate. If privileged correspondence is opened in error outside the presence of the inmate, documentation of such error should be maintained. Dkt. # 94, ¶ 26; 7 N.Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2). General correspondence, however, between an inmate and someone other than a person approved for legal correspondence, will be opened, outside the presence of the inmate, and inspected for cash, checks, money orders, printed or photocopied materials or contraband. Dkt. # 94, ¶ 27; 7 N.Y.C.R.R. 720.2(b) and 720.4(a). Here, because, as described above, plaintiff's correspondence was not readily identified as legal mail, it was opened and thereafter stamped as opened in error. Dkt. # 94, ¶ 28.

**G. Access to the Courts Claims**

Plaintiff claims that on or about September 13, 2000, Superintendent Corcoran violated his constitutional right of access to the courts when he denied plaintiff access to vouchers and certified mailed receipts contained in plaintiff's sealed property bags. Dkt. # 9, p. 5–D. As a result, plaintiff further alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

about December 20, 2000. *Id.* During the time period alleged in the amended complaint, Michael P. Corcoran was the Deputy Superintendent for Administrative Services at Southport. Dkt. # 90, ¶ 1.

Plaintiff also claims that on or about June 12, 2001, Deputy Superintendent Weingartner violated his constitutional right of access to the courts when he denied plaintiff's "advanced certified mailing request" for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims. Dkt. # 9, p. 5–E. In addition, plaintiff further claims that the manilla envelope containing the material had been kept from him "until the expiration of my time to respond by certified mail—return receipt—requested to the Attorney General." *Id.* As a result, plaintiff alleges that his claim was dismissed. *Id.* During the time period alleged in the amended complaint, defendant Lawrence W. Weingartner was the Assistant Deputy Superintendent for Program Services at Southport. Dkt. # 91, ¶ 1.

**1. Defendant Michael P. Corcoran**

***39** As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags. Dkt. # 90, ¶ 7. With respect to plaintiff's claim against defendant Corcoran, plaintiff was transferred from Southport to Coxsackie in or about February 2000 and plaintiff remained at Coxsackie until in or about May 2000, at which time he was transferred back to Southport. Dkt. # 90, ¶ 9. A Personal Property Transferred Form was completed on or about May 16, 2000 listing plaintiff's personal property transferred from Coxsackie to Southport. Dkt. # 90, ¶ 12 and Exhibit A. As set forth on the Personal Property Transferred Form (which plaintiff refused to sign), plaintiff was advised not to leave active legal case material behind and was instructed to include all active legal material in his 4–bag limit. *Id.* Upon transfer to Southport, the property bags of SHU inmates are reviewed with the incoming inmate. *Id.* at ¶ 17. The incoming inmate is advised that if he has any active legal matters, he should take all active legal material with him to his cell. *Id.* "Due to the restrictions on the amount of property which SHU inmates are allowed to have in their cells, any personal property of SHU inmates that exceeds the SHU cell property limits are placed in storage, to be returned to the inmate upon his release from SHU confinement. *Id.*

On or about May 25, 2000, plaintiff completed an Inmate Claim Form concerning certain property that plaintiff alleged had been stolen. Dkt. # 90, ¶ 10 and Exhibit A. Notably, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing. *Id.* at ¶ 11. On or about June 16, 2000, defendant Corcoran advised plaintiff that he had received his claim, that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that a failure to establish proof of ownership may result in denial of his claim. *Id.* at ¶ 13. Moreover, defendant Corcoran advised plaintiff that his claim would be sent to Security staff for investigation and that he would be notified of a decision upon completion of the investigation. *Id.* at ¶ 14. On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected. Dkt. # 90, ¶ 16 and Exhibit A.

Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000. Dkt. # 90, ¶ 19 and Exhibit B. Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated in pertinent part, "I have again received another demeaning and insolent note from you. This is the last time that I will respond to [sic]. I will not authorize you access to your property bags, since you've already determined that we have broken

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

into your bags to destroy your receipts." *Id.*

***40** As described above, plaintiff claims that as a result of defendant Corcoran's conduct, Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. Dkt. # 9, p. 5–D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001.[FN30] Dkt. # 90, ¶ 21 and Exhibit B. As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility. *Id.* The Judgment further noted that the matter came on to be heard by Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs [sic] and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim," Claim No. 98329 was dismissed. *Id.* Thus, in support of his motion for summary judgment, defendant Corcoran argues that "to the extent plaintiff's Claim No. 98329 was dismissed, as established by the Judgment in Claim No. 98329, such dismissal was had after the Court heard the proofs and allegations of the parties, and not, as plaintiff claims, because I prevented him access to receipts or vouchers or otherwise prevented him from accessing the Court of Claims." Dkt. # 90, ¶ 22.

FN30. In opposition to defendants' motion for summary judgment, plaintiff concurs that his claim was dismissed on January 2, 2001. Dkt. # 96, p. 63.

**2. Defendant Lawrence W. Weingartner**

As a threshold matter, defendant Weingartner states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims. Dkt. # 91, ¶ 6. Defendant Weingartner states that counsel for defendants received a packet of documents from plaintiff in connection with discovery in this matter and that included in those documents was a copy of a letter from Mark C. Davison, Court Clerk Specialist, New York State Supreme Court, Appellate Division, Fourth Department to plaintiff dated July 27, 2001. *Id.* at ¶ 7. In his July 27, 2001 letter, Mr. Davison advised plaintiff that in response to plaintiff's July 2, 2001 letter, there was nothing that Mr. Davison could do with respect to the alleged failure of Southport to forward papers to the Attorney General in connection with Claim No. 99509. *Id.* at ¶ 8. Mr. Davison advised plaintiff that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion under CPLR 5520. *Id.*

Also included in the documents supplied by plaintiff was a Notice dated June 18, 2001 to plaintiff from the Southport mailroom. *Id.* at ¶ 9. In that Notice, plaintiff was advised that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program and that plaintiff should see the item checked on the Notice and where applicable, correct and resubmit the item for processing. *Id.* at ¶ 10. In the box designated "other," plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the guidelines for special handling as outlined in DOCS Directive No. 4421. *Id.* at ¶ 11. DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence. *Id.* at ¶ 12. DOCS Directive No. 4421 provides that advances for "special handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order. *Id.* at ¶ 13. Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling "may not be used to pay for any special handling charges such as for certified, return-receipt, express mail, etc., unless such mail services are required by statute or court order. Advances for special handling for filing a Claim or Notice of Intention on the Attorney General [sic] Office must be specified on

the approved Advance Request form for postage. You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421)." *Id.* at ¶ 14.

***41** According to defendant Weingartner, because plaintiff's request for special handling did not meet the guidelines for special handling, his request was denied. *Id.* at ¶ 15. Indeed, defendant Weingartner further stated that plaintiff's request for special handling for mailing a notice of appeal to the Attorney General did not meet the guidelines for special handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office. *Id.* There is nothing in the record to suggest that after plaintiff received the June 18, 2001 Notice, he submitted to the mailroom staff any court order or statute showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested. *Id.* at ¶ 16. Lastly, in further support of his motion for summary judgment, defendant Weingartner states that to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by Mr. Davison that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely notice pursuant to CPLR 5520. *Id.* at ¶ 17. There is nothing in the record to suggest that plaintiff submitted any such motion pursuant to CPLR 5520. *Id.* at ¶ 18.

***DISCUSSION AND ANALYSIS***

Defendants argue that they are entitled to summary judgment because plaintiff has failed to establish violations of the First, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, with respect to his deliberate indifference claim, plaintiff failed to establish that he suffered from a sufficiently serious medical condition and that defendants Brandt and vonHagn were deliberately indifferent to his medical needs. With respect to plaintiff's retaliation claim against defendants Brandt and vonHagn, plaintiff is unable to establish retaliatory motive. Even if plaintiff could establish such retaliatory motive, the record before the Court clearly establishes that there were proper, non-retaliatory reasons for the punishment imposed on plaintiff.

Plaintiff's claims of deprivation of due process against defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky fail as a matter of law because plaintiff received all the process he was due during the course of each disciplinary hearing and appeal. With respect to plaintiff's denial of right to take a religious correspondence course claim against defendant Gardner, that claim must fail because contrary to plaintiff's assertions, defendant Gardner was not personally involved in the decision. Plaintiff's second claim against defendant Gardner, interference with legal mail, also fails as a matter of law because plaintiff cannot under any circumstances demonstrate that he suffered actual injury. Finally, plaintiff's claims of interference with access to the Courts claims against defendants Corcoran and Weingartner fail as a matter of law because with respect to defendant Corcoran, plaintiff cannot demonstrate that he suffered any injury and with respect to defendant Weingartner, plaintiff cannot establish that any conduct on the part of defendant Weingartner caused the dismissal of Claim No. 99509 pending before the Court of Claims. Because, for the reasons set forth below, the Court agrees that defendants are entitled to judgment as a matter of law, the Court need not reach the issue of whether defendants are entitled to qualified immunity.

***Summary Judgment***

***42** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable infer-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

***Deliberate Indifference to Serious Medical Needs Claims Against Defendants vonHagn and Brandt***

In *Estelle v. Gamble,* the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the United States Constitution. 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish an unconstitutional denial of medical care that rises to the level of an Eighth Amendment violation, a plaintiff (prisoner) must prove, beyond mere conclusory allegations, that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle,* 429 U.S. at 104. More specifically, the prisoner must demonstrate both that the alleged deprivation is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Both the objective and subjective components must be satisfied in order for a plaintiff to prevail on his claim. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

***Objective Component***

***43** Under the objective component, in assessing whether a medical condition is "sufficiently serious," the Court considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and, the severity and persistence of pain. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id.* Indeed, the Second Circuit has held that the alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 40

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

The types of conditions which have been held to meet the constitutional standard of serious medical need include: the failure to treat a painful and disfiguring facial keloid, *Brock v. Wright,* 315 F.3d 158, 160 (2d Cir.2003); refusal to treat a cavity at risk of "acute infection [ ], debilitating pain and tooth loss" unless prisoner consented to extraction of another diseased tooth, *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000); untreated dental problems that resulted in chronic pain for a period of six months resulting in tooth degeneration, *Chance,* 143 F.3d. at 702; failure to treat a ruptured Achilles tendon which resulted in swelling and pain, *Hemmings,* 134 F.3d at 106–07; confiscation of prescription eyeglasses necessary to correct serious vision problem and subsequent denial of medical treatment resulting in loss of vision in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87–88 (2d Cir.1996); failure to remove broken hip pins from prisoner's hip for over three years despite prisoner's complaint of persistent pain, *Hathaway,* 37 F.3d at 64–65; and, loss of an ear where doctor threw away prisoner's ear and stitched up the stump, *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir.1974).

Here, plaintiff's chief complaint, that he suffered from an "extremely painful ear infection resulting in my total loss of hearing ability in my ear for a time period of two weeks" is far from resembling the foregoing serious medical problems. Dkt. # 9, p. 5. In opposition to defendants' motion for summary judgment on his deliberate indifference claim, plaintiff offers nothing more than bald, conclusory allegations that he suffered from an extremely painful ear infection and further, that the ear infection resulted in a temporary (two week) loss of hearing. Dkt. # 96. Plaintiff's claims are belied by the medical records which unmistakably demonstrate that plaintiff was repeatedly seen by defendants Brandt and vonHagn, as well as others on the medical staff and further, that plaintiff received proper and adequate medical treatment. Moreover, there is nothing whatsoever in plaintiff's medical records that supports plaintiff's claim of hearing loss.

***44** Beginning on December 16 and continuing through December 31, 1999, plaintiff was seen by the medical staff at Southport nine times. Plaintiff was seen by defendant Brandt on December 16, 17, 23, 27 and 29, 1999. Plaintiff was seen by defendant vonHagn on December 18, 19, 20 and 31, 1999. On December 16, 1999, defendant Brandt noted some wax in ear and some mild irritation of the canal due to plaintiff inserting foreign objects into his ear. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. Plaintiff was also seen by defendant Brandt on December 17, 1999, wherein plaintiff again demanded ear drops and defendant Brandt again advised plaintiff against cleaning his ears with foreign objects. Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. Plaintiff was seen by defendant vonHagn on December 18, 1999 during morning sick call and plaintiff demanded a second ear check and claimed he could not hear out of both ears. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. At that time, defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves. *Id.* Although plaintiff was seen by defendant vonHagn on December 19, 1999, he did not complain of ear pain at that time. *Id.*

On December 20, 1999, defendant vonHagn examined plaintiff's left ear and noted "left ear cereum impaction seen, right ear some impaction seen, no visualization of tampanic [sic] membrane seen in either ear." Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12 Thus, defendant vonHagn saw no signs of infection and provided plaintiff with debrox (ear drops) and ear wash to be used for seven days. *Id.* Plaintiff's next complaint concerning his ears was not until December 27, 1999, when he requested sick call and he was to be seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 17; Dkt. # 82, ¶ 12. When defendant Brandt went to see plaintiff, plaintiff refused and was extremely verbal, nasty and confrontational. *Id.* As a result, defendant Brandt terminated the sick call. *Id.* Plaintiff again complained of his ears on December 29, 1999 and plaintiff was to be seen by de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 18; Dkt. # 82, ¶ 13. Plaintiff refused to have defendant Brandt check his ears, stating, “fuck you white homoboy.” *Id.* Thereafter, despite his complaints, plaintiff repeatedly refused to allow anyone, including Dr. Alves, to check his ears. After January 4, 2000 (when plaintiff refused to see Dr. Alves on an MD callout) and continuing until his transfer to Coxsackie in May 2000, plaintiff made no complaints whatsoever about his ears. Dkt. # 81, ¶¶ 21–26.

At most, plaintiff asserts that he suffered from “extreme pain.” However, plaintiff's amended complaint and opposition to defendants' motion for summary judgment fail to offer any specificity with respect to the “extreme pain” that he claims he suffered. Moreover, the record before the Court is utterly devoid of any mention by plaintiff of any impact on his daily activities, or the severity or persistence of pain. Indeed, neither plaintiff nor defendants make any mention that plaintiff's alleged hearing loss affected his ability to communicate with the medical staff. Conversely, defendant vonHagn noted on December 18, 1999 that plaintiff heard her statements. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. Upon his review of plaintiff's medical records, Dr. Alves concluded that there was nothing to support plaintiff's assertion that he suffered hearing loss. Dkt. # 81, ¶ 79. Absent any evidence to support a conclusion that plaintiff suffered a serious medical condition as a result of defendant Brandt's and defendant vonHagn's alleged failure to provide medical care and treatment in December 1999, other than plaintiff's allegations that he suffered from extreme pain, plaintiff fails to satisfy the objective element of his deliberate indifference claim.

***Subjective Component***

***45** The subjective component for the establishment of a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the defendant acted with a “sufficiently culpable state of mind” so as to violate the Eighth Amendment's cruel and unusual punishment clause. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). “[A] prison official does not act in a deliberately indifferent manner unless that official ‘knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.’ ” *Hathaway,* 37 F.3d at 66, *quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In *Estelle,* the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment. *Estelle,* 429 U.S. at 104–05.

“The subjective element of deliberate indifference ‘entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.’ ” *Hathaway,* 99 F.3d at 553, *citing Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005). The Supreme Court further stated in *Estelle* that, “an inadvertent failure to provide adequate medical care cannot be said to constitute ‘an unnecessary and wanton infliction of pain’ or to be ‘repugnant to the conscience of mankind .’ ” *Estelle,* 429 U.S. at 105–06. Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Id.* at 106; *see also Chance,* 143 F.3d at 703 (stating "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").

Where, as here, the prisoner has received some (extensive) medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment. Rather, "[p]rison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates [and] courts have repeatedly held that a prisoner does not have the right to the treatment of his choice." *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (internal citations omitted).

***46** In their motion for summary judgment, defendants Brandt and vonHagn assert that, "[p]laintiff's allegations ... is [sic] at most negligence or malpractice and does [sic] not rise to the level of a constitutional violation." Dkt. # 92, p. 15. Nevertheless, defendants Brandt and vonHagn maintain that the record establishes that they were neither negligent nor that their conduct could be characterized as medical malpractice. *Id.* Accordingly, they ask this Court to find, as a matter of law, that plaintiff is unable to establish that, (1) he suffered from a serious medical condition and (2) that defendants Brandt and vonHagn were deliberately indifferent to plaintiff's medical needs. The Court agrees with the defendants that the record is devoid of any evidence to support a finding that plaintiff suffered from a serious medical condition as a result of the care and treatment he received in or about December 1999. Moreover, the Court agrees with the defendants that plaintiff also fails to satisfy the subjective component of the deliberate indifference standard.

Plaintiff claims that defendant vonHagn "knowingly, intentionally, and wilfully denied [plaintiff] 'emergency' medical care ..." and that defendant Brandt "knowingly, wilfully and intentionally 'aided' in the denial of [plaintiff's] 'emergency' medical care...." Dkt. # 9. However, there is nothing in the record to establish any intent on the part of either defendant vonHagn or defendant Brandt. To the contrary, the undisputed record unequivocally establishes that defendant vonHagn and Brandt made every effort to comply with plaintiff's requests and to provide plaintiff with appropriate treatment, medications and examinations. Moreover, Dr. Alves, the Facility Health Services Director of the Medical Services Unit at Southport, concluded that defendants properly treated plaintiff's complaints with the appropriate medication and referred plaintiff to Dr. Alves for examination and further, that defendant vonHagn appropriately scheduled and performed ear examinations on plaintiff. In addition, Dr. Alves' review of plaintiff's medical records indicates that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to the treatment of his complaints of ear pain during December 1999. Finally, Dr. Alves calculates that during the period, December 1999 through January 2001, plaintiff had approximately 92 encounters with medical staff concerning a multitude of complaints, including, ear pain. Notably, however, plaintiff made no complaints of ear pain after January 2000.

The record clearly establishes that defendants vonHagn and Brandt made every effort to treat plaintiff's complaints of ear pain with an appropriate course of treatment and medication, and that despite their efforts, plaintiff refused several of their attempts to examine his ears and refused to be seen by Dr. Alves. Additionally, there is nothing in the record to support plaintiff's claim that he suffered from a total loss of hearing for a period of two weeks or that the care and treatment provided to plaintiff by defendants was in any way related to plaintiff's claim of hearing loss. Finally, the Court agrees with the defendants that plaintiff's allegations are, at most, claims of negli-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

gence or medical malpractice and thus, do not create a cause of action that rises to the level of a constitutional violation. Therefore, the Court finds that plaintiff's claim of deliberate indifference by the defendants is without merit.

***Retaliation Claims Against Defendants vonHagn and Brandt***

***47** In support of their motion for judgment as a matter of law on plaintiff's retaliation claim, defendants vonHagn and Brandt argue that plaintiff cannot satisfy his burden and establish that the actions of defendants vonHagn and Brandt were the result of a retaliatory motive. Dkt. # 92, p. 18. In response to defendants' motion, plaintiff summarily states, without elaboration, that "defense counsel continually makes claims of *un* disputed facts pge # 6, no. # 22, however, plaintiff notes that *no* undisputed facts, can be evident by counsel when what [sic] no truth is in them such as the case here in 90 to 95% of counsels [sic] compilation." Dkt. # 96, p. 75 (emphasis in original). Moreover, plaintiff asserts in conclusory fashion that defendants vonHagn and Brandt retaliated against him by issuing Misbehavior Reports following the filing of plaintiff's grievances against them. Plaintiff's conclusory allegations, without more, are insufficient to create a material issue of fact.

> An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (internal quotations and citations omitted). For the reasons set forth below, plaintiff cannot meet his heavy burden of establishing retaliatory motive on the part of defendants vonHagn and Brandt. However, even assuming retaliatory motive, defendants vonHagn and Brandt are entitled to summary judgment because there are "proper, non-retaliatory reasons for his punishment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

Here, plaintiff alleges that defendants vonHagn and Brandt wrote Misbehavior Reports against him in retaliation for his complaints (grievances) about them.

**January 23, 2001 Misbehavior Report**

Plaintiff alleges that defendant Brandt, in retaliation for plaintiff's filing of grievances, issued a retaliatory Misbehavior Report on January 23, 2001. Dkt. # 9, p. 5–A. As the undisputed record before the Court demonstrates, defendant Brandt saw plaintiff at sick call on January 23, 2001, at which time plaintiff refused hydrocortisone cream and told defendant Brandt, "next time I'll spit + shit on you." Thereafter, defendant Brandt issued a Misbehavior Report. Dkt. # 82, ¶¶ 23–25. A Tier 2 disciplinary hearing was conducted by Lt. Donahue on January 29, 2001. *See generally,* Dkt. # 44, pp. 0112–0128. During the January 29, 2001 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the Misbehavior Report was written by defendant Brandt in retaliation for complaints plaintiff filed and defendant Brandt and/or the medical staff at Southport. *Id.* Notwithstanding plaintiff's claims of retaliation, Lt. Donahue found plaintiff guilty of making threatening statements directed to defendant Brandt. *Id.*

***48** During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, Grievance No.

SPT–17707–99 (December 30, 1999), Grievance No. SPT–18746–00 (May 24, 2000) and Grievance No. SPT–20137–00 (December 11, 2000). Thus, the first grievance filed by plaintiff against defendant Brandt was filed over thirteen months *before* the alleged retaliatory Misbehavior Report was issued on January 23, 2001. Although, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation," the significant passage of time between the last grievance filed by plaintiff against Brandt and the allegedly retaliatory Misbehavior Report stretches even the most liberal construction of the applicable case law beyond its limits. *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002), *citing Colon,* 58 F.3d at 872.

In Grievance No. SPT–17707–99, filed on or about December 30, 1999, plaintiff asserted that, (1) on or about December 26, 1999, defendant Brandt denied his request for outside medical treatment for his complaints of ear pain, (2) defendant Brandt indicated that plaintiff refused treatment, (3) on December 14, 1999, defendant Brandt denied him an emergency ear examination and ear drops and (4) from December 14–21, 1999, defendants Brandt and vonHagn denied him medical treatment for an ear infection. Dkt. # 65, p. 438; Dkt. # 82, ¶ 30; Dkt. # 83, ¶ 37. The Superintendent dismissed plaintiff's grievance finding that medication was delivered to plaintiff for ear pain, but plaintiff began to verbally harass the nurse and thereafter, refused the medication. Dkt. # 65, p. 0434; Dkt. # 82, ¶ 32; Dkt. # 83, ¶ 39. CORC upheld the Superintendent's determination on or about March 8, 2000 and advised plaintiff to follow the treatment plan outlined by health services staff and noted there was no medical need for an outside consultant at that time. Dkt. # 65, p. 0433; Dkt. # 82, ¶ 32; Dkt. # 83, ¶ 39.

In Grievance No. SPT–18746–00, filed on or about May 24, 2000, plaintiff asserted that, (1) on or about May 21, 2000, defendant Brandt refused to provide him with medical care, (2) defendants Brandt and vonHagn were racist, (3) defendant Brandt told other nursing staff not to treat plaintiff, (4) plaintiff had previously grieved defendant Brandt's and vonHagn's alleged failure to treat his ear infection in December 1999 and (5) defendant Brandt refused to provide plaintiff with skin cream. Dkt. # 65, p. 0415; Dkt. # 82, ¶ 36; Dkt. # 83, ¶ 46. The IGRC recommended dismissal of plaintiff's grievance and the Superintendent concurred. Dkt. # 65, pp. 0416–0417; Dkt. # 82, ¶ 38; Dkt. # 83, ¶ 48. On or about August 2, 2000, based upon the recommendation of Division of Health Services, the Superintendent's determination was upheld by CORC. Dkt. # 65, p. 0409; Dkt. # 82, ¶ 38; Dkt. # 83, ¶ 48. Indeed, CORC noted that plaintiff was issued skin cream on June 5, 2000 and that his allegations against staff had not been substantiated. *Id.*

***49** Finally, in Grievance No. SPT–20137–00 filed on or about December 11, 2000, plaintiff asserted that defendants vonHagn and Brandt failed to provide him with a refill of skin cream and were racist and biased towards him. Dkt. # 44, p. 0225, Dkt. # 82, ¶ 41; Dkt. # 83, ¶ 51. The Superintendent denied plaintiff's grievance and CORC upheld the Superintendent's determination on or about February 14, 2001, finding that the Nurse Administrator indicated that plaintiff had received medication refills on the appropriate dates and had received proper medical care. Dkt. # 44, p. 0228–0229; Dkt. # 82, ¶ 43; Dkt. # 83, ¶ 53.

**"January 25, 2000" Misbehavior Report and December 13, 2000 Misbehavior Report**

Specifically, plaintiff alleges that defendant vonHagn issued a retaliatory Misbehavior Report on January 25, 2000 because of the grievances plaintiff had filed against her. Defendant vonHagn did not issue a Misbehavior Report on January 25, 2000, rather, she issued one on January 14, 2000. Defendant vonHagn maintains, however, that the January 14, 2000 Misbehavior Report was issued as a result of plaintiff's threatening and harassing language. The

Misbehavior Report states in pertinent part, "[p]atient asked if he wished a copy [receipt for glasses] he could write the Nurse Adm. Inmate Chavis 91A3261 B–10–20 then said 'you are a stupid asshole.' 'You want 25¢ to give me a fucking copy of my glasses receipt.' 'I'll take your fucking money in court. I'll tear you apart in Court.' 'I'm not as fucking stupid as you are.' "You stupid fucking asshole.' 'Get the fuck away from my cell you asshole.' " Dkt. # 44, p. 0029.

A Tier 2 disciplinary hearing was conducted by Lt. Ryan on January 25, 2000. Dkt. # 44, pp. 0024–0038; Dkt. # 83, ¶ 22. Plaintiff advised Lt. Ryan during the hearing that he believed the January 14, 2000 Misbehavior Report was written by defendant vonHagn in retaliation for complaints filed by plaintiff. Dkt. # 44, pp. 0032–0038; Dkt. # 83, ¶ 23. Following the hearing, Lt. Ryan found plaintiff guilty of using harassing language against defendant vonHagn. Dkt. # 44, pp. 0024–0038; Dkt. # 83, ¶ 24. On January 28, 2000, the guilty determination was affirmed by Captain Wilcox. Dkt. # 44, p. 0024.

On December 13, 2000, defendant vonHagn issued a Misbehavior Report stating,

> While making rounds on B Block Gallery this nurse [defendant vonHagn] stopped to see Inmate Chavis, G. 91A3261 B–3–19 for sick call. He requested refills. He was asked about old containers. He immediately got an attitude and said, 'He wasn't every other inmate and just get him what he wanted.' As this nurse walked away from his cell, inmate Chavis, G. says 'I'm going to hit that white bitch in her head with a baseball bat.' C.O. Stamp told inmate Chavis, G 91A3261 that statement was not necessary. Inmate Chavis, G. Then said, Shut up you fuck ass white mother fucker, I'll kill you too after I kill her. Inmate Chavis, G. continued to threaten this nurse and correctional officer until we left gallery area.

***50** Dkt. # 44, p. 0104; Dkt. # 83, ¶ 31. A Tier 3 disciplinary hearing was conducted on December 26, 2000 by Lt. Sheahan. During the hearing, plaintiff advised Lt. Sheahan that defendant vonHagn had written the December 13, 2000 Misbehavior Report in retaliation for complaints filed by plaintiff against defendant vonHagn. Dkt. # 83, ¶ 32. Thereafter, Lt. Sheahan found plaintiff guilty of using threatening and harassing language towards defendant vonHagn and Lt. Sheahan's determination was affirmed by defendant Donald Selsky, Director, Special Housing/Inmate Disciplinary Program. Dkt. # 44, pp. 0100–0111 and 0160–0199. Indeed, Lt. Sheahan found that the evidence submitted by plaintiff of past grievances against defendant vonHagn and other medical staff did not establish that the December 13, 2000 Misbehavior Report was retaliatory. Moreover, Lt. Sheahan indicated that the disposition was given to plaintiff to impress upon him that threats will not be tolerated. Dkt. # 44, p. 0102.

With respect to the "January 25" (January 14), 2000 and December 13, 2000 Misbehavior Reports, during the time period relevant to the allegations in the amended complaint (December 1999 through January 2001), plaintiff filed three grievances against defendant vonHagn, Grievance No. SPT–17707–99 (filed December 30, 1999), Grievance No. SPT–18746–00 (filed May 24, 2000) and Grievance No. SPT–20137–00 (filed December 11, 2000). Each of the aforementioned grievances were filed against defendants Brandt and vonHagn and have been discussed above in connection with the January 23, 2001 Misbehavior Report. *See* pp. 21–29 *supra*.

The January 23, 2001 Misbehavior Report issued by defendant Brandt allegedly in retaliation for the grievances (Grievance Nos. SPT–17707–99, SPT–18746–00 and SPT–20137–00) filed by plaintiff was issued as a result of plaintiff's threatening language, "next time I'll spit + shit on you," and not in retaliation for any grievance filed by plaintiff. Significantly, plaintiff was found guilty of the violation

charged in the Misbehavior Report. Moreover, plaintiff's medical record unequivocally establishes that defendant Brandt properly treated all of plaintiff's medical complaints and provided plaintiff with the appropriate care.

The January 14, 2000 and December 13, 2000 Misbehavior Reports issued by defendant vonHagn were likewise issued as a result of plaintiff's harassing and threatening language and not in retaliation for any grievance submitted by plaintiff. As with the January 23, 2001 Misbehavior Report, plaintiff was found guilty of the violations enumerated in the January 14, 2000 and December 13, 2000 Misbehavior Reports. Moreover, plaintiff's medical records establish that at no time did defendant vonHagn refuse to treat plaintiff, in fact, the records reveal that defendant vonHagn treated plaintiff's medical complaints and provided him with proper care and treatment.

Thus, the Court agrees with defendants Brandt and vonHagn that plaintiff cannot meet his heavy burden of establishing retaliatory motive on the part of defendants vonHagn and Brandt. Additionally, even if plaintiff could establish a retaliatory motive, there is nothing in the record before this Court to suggest that there was anything improper about the Misbehavior Reports generated by defendants Brandt and vonHagn. With respect to each of the Misbehavior Reports, the hearing officer found that plaintiff engaged in harassing and threatening behavior and each such determination was later upheld. Accordingly, there were "proper, non-retaliatory reasons for his punishment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

***Deprivation of Due Process Claims Against Defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky***

***51** To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996). Each of the defendants assert that plaintiff received all the process he was due during the course of each of the ten disciplinary hearings addressed in the amended complaint. Dkt. # 92, pp. 25–48.

***Liberty Interest***

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004), *quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id., quoting Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.* at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 WL 22327110, at * 6 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer v. Richards,* 364 F.3d 60 (2d Cir.2004); *Smith v. Taylor,* No. 03–0202, 2005 WL 2019547 (2d Cir. Aug.23, 2005) (determining that 45 days disciplinary

Page 47

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

confinement in SHU, absent evidence of conditions more onerous than those generally present in the SHU, was insufficient to establish a protected property interest); *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4 1/2 month period, Sims was sentenced to SHU for a total of nearly 3 1/2 years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003), *quoting, Tookes v. Artuz,* No. 00CIV4969, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"); *cf. Prince v. Edwards,* No. 99CIV8650, 2000 WL 633382 (S.D.N.Y. May 17, 2000) (suggesting that any period of segregation of one year or less affords no protected liberty interest).

***Procedural Safeguards***

***52** In *Wolff v. McDonnell,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety. *Id.* at 563–66. Moreover, although not specifically required by *Wolff,* plaintiff was provided with an opportunity to appeal each determination and he did in fact exercise that right to appeal on several occasions and with respect to each appeal taken, enumerated specific grounds for his appeal.

Plaintiff claims that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan violated his Fourteenth Amendment right to due process during the disciplinary hearings each conducted with respect to Misbehavior Reports issued against plaintiff. For each defendant, plaintiff alleges a multitude of reasons why the defendants violated his due process rights. Plaintiff claims that in connection with the five Tier 2 disciplinary hearings conducted by defendant Donahue, he was: denied assistance to prepare for the hearings; denied production of certain witnesses to testify at those hearings; erroneously found guilty of the charges; improperly subject to a sentence of 30 days cell confinement at the conclusion of those hearings; and was prejudiced by defendant's bias and issuance of a retaliatory Misbehavior Report following one of the disciplinary hearings. Dkt. # 9, pp. 6–D to 6–F.

As against defendant Gilmore, plaintiff claims that at his July 18, 2000 Tier 2 disciplinary hearing, defendant Gilmore improperly found him guilty of a violation for which he had not been charged, the Misbehavior Report was not endorsed by a witness; there was no testimony against plaintiff during the hearing and plaintiff's witnesses confirmed plaintiff's defense. Dkt. # 9, pp. 6–F to 6–G. Plaintiff claims that at his Tier 3 disciplinary hearing conducted on January 4, 2001 by defendant Irizarry, defendant Irizarry denied him assistance to prepare for the hearing, denied his request to have certain witnesses testify at the hearing, and improperly found him guilty of the charges since defendant Selsky later modified the hearing determination. Dkt. # 9, pp. 6–B to 6–C. Plaintiff alleges that defendant Quinn denied him due process at his Tier 3 disciplinary hearing conducted on February 5, 2001 by denying: his request for assistance to prepare for the hearing; his request to have Deputy Commissioner Annucci testify at the hearing; his right to attend the hearing; and by failing to provide plaintiff with a copy of the hearing disposition,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 48

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

and improperly finding him guilty of the charges following the hearing. Dkt. # 9, pp. 6 to 6–A.

***53** Plaintiff claims that defendant Ryan denied him due process at his January 25, 2000 Tier 2 disciplinary hearing because he improperly endorsed the Misbehavior Report; denied plaintiff an assistant to prepare for the hearing; allowed a witness to testify telephonically; and forced plaintiff to leave the hearing. Dkt. # 9, pp. 6–G to 6–H. Finally, plaintiff claims that defendant Sheahan denied him due process at his December 26, 2000 (December 29, 2000) Tier 3 disciplinary hearing because he denied plaintiff his right to witnesses; incorrectly found him guilty at the conclusion of the hearing; and was biased against plaintiff. Dkt. # 9, pp. 6–A to 6–B.

**Employee Assistance—The Tier 2 and 3 Disciplinary Hearings**

As discussed above, *Wolff* requires that an inmate be provided with at least 24 hours advance written notice before the hearing "to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Wolff,* 418 U.S. at 563–64. Institutional concerns have generally operated as a bar to inmates obtaining retained or appointed counsel. *Wolff,* 418 U.S. at 570; *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1999). Inmates do, however, have a "limited" right to assistance. *Silva,* 992 F.2d at 22. Indeed, the Second Circuit has held that "in certain circumstances an inmate will be unable to 'marshal evidence and present a defense' without some assistance." *Id.* (internal citations omitted). "[A] prison inmate facing a disciplinary hearing is only entitled to assistance from a fellow inmate or a prison employee under certain circumstances. For example, when the inmate is illiterate or the issues extremely complex." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988).

7 N.Y.C.R.R. § 251–4.1 provides that an inmate shall be entitled to employee assistance for purposes of a disciplinary hearing if: "(1) the inmate is either illiterate or non-English speaking; (2) the inmate is sensorially disabled ...; (3) the inmate is charged with drug use as a result of a urinalysis test; or (4) the inmate is confined pending a disciplinary hearing to be conducted pursuant to Part 254 of this Title." Thus, according to DOCS' disciplinary procedure, an inmate charged with a violation for which a Tier 2 disciplinary hearing is warranted is not entitled to an employee assistant. 7 N.Y.C.R.R. § 251–4.1. In addition, DOCS' regulations provide that a hearing officer may, in his or her "absolute discretion," offer an inmate the opportunity to select an assistant where the assistance would enable the inmate to adequately comprehend the case in order to respond to the charges. 7 N.Y.C.R.R. § 251–4.1(b).

As a threshold matter, there is no dispute that plaintiff is neither illiterate nor sensorially disabled. Moreover, none of the disciplinary hearings that are the subject of plaintiff's claims charged plaintiff with drug use as a result of a urinalysis test. Similarly, none of the issues considered at the Tier 2 disciplinary hearings discussed in plaintiff's amended complaint were so complex that plaintiff was unable to "marshal evidence and prepare a defense." To the contrary, the record before the Court establishes that in each of the Tier 2 disciplinary hearings discussed above, plaintiff was indeed able to present evidence (and often did), both oral and documentary, in his own defense. Accordingly, plaintiff's claims that he was denied an employee assistant to prepare for any of the aforementioned Tier 2 disciplinary hearings must fail because such assistance was neither required nor necessary. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

***54** Both the Second Circuit case law and DOCS' regulations provide for an inmate to receive employee assistance when that inmate is charged with an offense warranting SHU confinement. *Silva,* 992 F.2d at 22; *Eng,* 858 F.2d at 898; 7 N.Y.C.R.R. § 251–4.1(b). In the amended complaint, plaintiff complains that with respect to three Tier 3 disciplinary hearings conducted by defendants Sheahan (December 26 and 29, 2000),

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Irizarry (January 4, 2001), and Quinn (February 5, 2001) each defendant denied him his right to assistance. For the following reasons, plaintiff's claims that he was denied assistance in connection with the December 26 and 29, 2000, January 4, 2001 and February 5, 2001 Tier 3 disciplinary hearings must fail as a matter of law.

**Defendant Sheahan—December 26, 2000 Tier 3 Hearing**

Plaintiff alleges that defendant Sheahan denied him due process at his December 26, 2000 Tier 3 disciplinary hearing because defendant Sheahan, *inter alia,* denied him an employee assistant and because he did not receive copies of the grievances he had requested. Dkt. # 9, pp. 6–A to 6–B. Plaintiff's claims are wholly unsupported by the record before this Court. After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the December 26, 2000 hearing to further investigate plaintiff's assertions of denial of an assistant, and the Tier 3 disciplinary hearing reconvened on December 29, 2000. *Id.* at ¶ 9. During the continuation of the hearing, plaintiff agreed that he had been provided with an assistant, Officer Carpenter; that Officer Carpenter had met with plaintiff on December 26, 2000; and further that the assistance he had received was acceptable. *Id.* Although plaintiff testified that he had not received all of the grievances that he had requested, he stated that the data he had received was satisfactory for the hearing. *Id.* at ¶ 10. Based on plaintiff's statements, defendant Sheahan proceeded with the disciplinary hearing. Thus, the undisputed record before this Court reveals that plaintiff did receive assistance prior to the December 29, 2000 continuation of the Tier 3 disciplinary hearing commenced on December 26, 2000. Moreover, with respect to plaintiff's claim that he did not receive copies of the grievances he requested for the hearing, the record before the Court is clear. Although plaintiff did not receive all of the requested grievances, he unequivocally stated during the hearing that the data he did receive was satisfactory.

**Defendant Irizarry—January 4, 2001 Tier 3 Hearing**

As part of his claim against defendant Irizarry, plaintiff alleges that defendant Irizarry denied his request for a staff assistant to help him prepare for the January 4, 2001 Tier 3 disciplinary hearing. Dkt. # 9, pp. 6–B to 6–D. The record before the Court establishes that on December 23, 2000, plaintiff was served with a copy of the Misbehavior Report wherein it was indicated that he waived his right to an assistant and refused to sign the Tier Assistance Selection Form. Dkt. # 65, p. 0667. However, the Superintendent's & Disciplinary Hearings—Witness Interview Sheet dated January 4, 2000 indicates that plaintiff claimed during the hearing that he did not refuse an assistant. Dkt. # 65, p. 0665. Moreover, the hearing transcript reveals that plaintiff claimed that he was sleeping when the Misbehavior Report was served on him and further, that he did not refuse an assistant. Dkt. # 98, pp. 5–18. Defendant Irizarry, found, however, that plaintiff's claims that he was sleeping and that he did not refuse an assistant were not true because the officer who served plaintiff with a copy of the Misbehavior Report (Officer McIntosh) testified during the disciplinary hearing that plaintiff was awake when he was served and simply refused to sign the form or select an assistant. *Id.;* Dkt. # 86, ¶ 12.

**Defendant Quinn—January 31, 2001 Tier 3 Hearing**

***55** Plaintiff also claims in his amended complaint that defendant Quinn denied him his right to a staff assistant during his Tier 3 disciplinary hearing that began on January 31, 2001 and continued on February 5, 2001. Dkt. # 9, pp. 6 to 6–A. According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on January 27, 2001 and indicated on the form that he requested an employee assistant for the Tier 3 disciplinary hearing. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 7. The form reveals that plaintiff identified G. Powers as his first choice for an assistant and J. Morton and P. Nardi

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

as his second and third choices respectively. Dkt. # 68, p. 0712. It appears, however, that plaintiff refused to sign the form. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 8. Notwithstanding the foregoing, in support of his motion for summary judgment, defendant Quinn maintains that the Tier Assistance Selection Form indicates that plaintiff refused to have Sgt. Morton act as his employee assistant. Dkt. # 87, ¶ 8.

The disciplinary hearing began on January 31, 2001 at which time plaintiff objected to the hearing and plead not guilty to both charges. Dkt. # 87, ¶ 9; Dkt. # 98, pp. 20–33. Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci to be called as witnesses. *Id.* Thereafter, defendant Quinn adjourned the hearing so that the witnesses could be located. *Id.* The hearing was reconvened on February 5, 2001 and plaintiff refused to attend the hearing. Dkt. # 87, ¶ 10; Dkt. # 98, pp. 20–33. Plaintiff also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising plaintiff that a disposition of the charges would be made in his absence. Dkt. # 68, p. 0713; Dkt. # 87, ¶ 10. The hearing was conducted outside of plaintiff's presence and Sgt. Morton testified at the hearing. Dkt. # 87, ¶ 15; Dkt. # 98, pp. 20–33. Defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding that Deputy Commissioner Annucci's testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 11; Dkt. # 98, pp. 20–33. Moreover, because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner Annucci during the hearing and was able to make a determination as to the threatening, obscene and abusive language therein, defendant Quinn determined that Deputy Commissioner Annucci's testimony was not necessary. Dkt. # 87, ¶ 14. Accordingly, defendant Quinn maintains that it was in the exercise of his discretion that he denied plaintiff's request to have Deputy Commissioner testify at the hearing. *Id.* at ¶ 13.

In opposition to defendant Quinn's motion for summary judgment, plaintiff argues that because he was not provided with assistance prior to the Tier 3 disciplinary hearing, he was unable to obtain evidence from two witnesses prior to the hearing and therefore unable to prepare a defense to the charges. Dkt. # 96, p. 6. Plaintiff further insists that he had selected Mr. G. Powers to serve as his assistant, however, according to plaintiff defendant Quinn "repeatedly badger[ed]" him to select another member of the prison staff, for example, Sgt. Morton, to serve as his assistant for purposes of the hearing. *Id.* at p. 7. Plaintiff's arguments in opposition to defendant Quinn's motion for summary judgment are belied by the clear record before the Court. Specifically, plaintiff claims that because he was not provided with assistance, he was unable to obtain evidence from the two witnesses he requested at the outset of the hearing, Sgt. Morton, who he allegedly refused to have serve as his assistant, and Deputy Commissioner Annucci.[FN31] Despite this claim, defendant Quinn adjourned the hearing on January 31, 2001 in order to locate the witnesses. When the hearing reconvened on February 5, 2001, plaintiff refused to attend and as a result was not present when Sgt. Morton testified.

FN31. As discussed above, defendant Quinn exercised his discretion and denied plaintiff's request to have Deputy Commissioner Annucci testify during the hearing.

***56** Thus, the record before the Court unmistakably establishes that with respect to the Tier 3 disciplinary hearings, plaintiff either received the required assistance, refused the assistance or refused to attend the hearing. With respect to the Tier 2 hearings, plaintiff was not entitled to assistance and the circumstances presented in the hearings were not so complex that plaintiff was not able to marshal evidence and prepare a defense. Accordingly, it was unnecessary for the hearing officers in the Tier 2 disciplinary hearings to exercise their discretion and offer plaintiff the opportunity to select an assistant. For the foregoing reasons, defendants' motion for summary

insofar as it relates to plaintiff's claims that he was denied employee assistance during his disciplinary hearings is granted.

**Impartiality of Hearing Officer**

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff v. McDonnell* 418 U.S. 539, 570–71, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is "some evidence in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

**Defendant Donahue**

As alleged in the amended complaint, defendant Donahue conducted disciplinary hearings in connection with Misbehavior Reports issued to plaintiff on the following dates: January 11, 2000; November 29, 2000; December 21, 2000; January 29, 2001 and March 7, 2001. Dkt. # 9, pp. 6–D to 6–F. The Court's review of the transcripts of each disciplinary hearing conducted by defendant Donahue does not reveal any evidence of bias. Dkt. # 44, pp. 0001–0007 (January 11, 2000); Dkt. # 44, pp. 0064–0068 (November 29, 2000); Dkt. # 44, pp. 0081–0086 (December 21, 2000); Dkt. # 44, pp. 0124–0128 (January 29, 2001); Dkt. # 44, pp. 0129–0131 (March 7, 2001). Specifically, with respect to the disciplinary hearing commenced on January 11, 2000 and continued on January 21, 2000, defendant Donahue permitted plaintiff to voice his objections to the hearing, afforded plaintiff the opportunity to testify or to present evidence in his defense, and set forth sufficient evidence in his disposition to support his determination of guilt, including a copy of the letter to Deputy Superintendent Morse from plaintiff. Dkt. # 44, pp. 0001–0007. Defendant Donahue stated that he relied upon the report of Sgt. Kerbein which he found to be credible and on the threatening letter written by plaintiff. *Id.* Defendant Donahue further stated that his reasons for the disposition were that it was to serve as a deterrent of future misconduct by plaintiff and others and that the conduct exhibited by plaintiff would not be tolerated. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

***57** Similarly, during the disciplinary hearing conducted by defendant Donahue on November 29, 2000, defendant Donahue afforded plaintiff the same opportunity to present testimony or evidence and plaintiff repeatedly exercised his right to object to the hearing. Dkt. # 44, pp. 0064–0068. Plaintiff waived his right to testify or to present evidence and returned to his cell before defendant Donahue rendered his determination. *Id.* At the close of the hearing, defendant Donahue set forth the evidence on which he relied to support his determination of guilt. *Id.* Specifically, he relied upon the Misbehavior Report which he found to be credible, as well as the letter written by plaintiff to Deputy Commissioner LeClaire. *Id.* Similar to the January 11, 2000 (continued on January 21, 2000) disciplinary hearing presided over by him, de-

fendant Donahue stated that his reasons for his disposition were that it was to serve as a deterrent of future misconduct by plaintiff and others and to reiterate that threats towards employees would not be tolerated. *Id.*

Defendant Donahue conducted a third disciplinary hearing concerning plaintiff on December 21, 2000. The Misbehavior Report related to a December 11, 2000 grievance authored by plaintiff and received by the Inmate Grievance Office. As set forth in the Misbehavior Report, the grievance contained a number of threatening statements. As with the prior two disciplinary hearings conducted by defendant Donahue, plaintiff was given and did exercise his right to object to the hearing. Dkt. # 44, pp. 0081–0086. Moreover, defendant Donahue provided plaintiff with the opportunity to call witnesses to testify during the hearing, other than CORC Director Egan and DOCS Commissioner Goord. *Id.* Defendant Donahue found that neither Director Egan nor Commissioner Goord would have any information bearing on the allegations in the Misbehavior Report. *Id.* Notably, at no time during the hearing did plaintiff deny that he wrote the December 11, 2000 grievance. *Id.* In reaching his determination, defendant Donahue set forth sufficient evidence in his disposition to support his determination of guilt. *Id.* Specifically, he relied upon the Misbehavior Report by Officer Morse which he found to be credible and his examination of the grievance containing threats by plaintiff and submitted to the Inmate Grievance Office. *Id.* Again, defendant Donahue stated, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Threats towards staff will not be tolerated at this facility, including in the form of written grievances." *Id.*

Defendant Donahue next conducted a disciplinary hearing involving plaintiff on January 29, 2001. Dkt. # 44, pp. 0124–0128. During the hearing, he honored plaintiff's request to testify and accepted plaintiff's testimony that he had filed several complaints against Nurse Brandt. As in previous hearings, plaintiff chose to return to his cell before defendant Donahue rendered his decision. *Id.* As set forth in the hearing transcript and on the Hearing Disposition Sheet, defendant Donahue relied on the written report of Nurse Brandt which he found to be credible. *Id.* In addition, he noted that during the hearing, plaintiff admitted that he got "active" because Nurse Brandt did not bring him the medication that he wanted. *Id.* Defendant Donahue again noted that "[t]he [d]isposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Inmate Chavis has been found guilty of threats many times previously." *Id.* Defendant Donahue's determination was affirmed by defendant Wilcox on February 5, 2001. Dkt. # 86, Exhibit A.

***58** Finally, on March 7, 2001, defendant Donahue conducted a hearing with respect to a Misbehavior Report issued to plaintiff on February 28, 2001. Plaintiff refused to attend the hearing. Thereafter, defendant Donahue noted that plaintiff waived his right to attend the hearing, entered a plea of not guilty on plaintiff's behalf and conducted the hearing in plaintiff's absence. Dkt. # 44, pp. 0129–0131. At the conclusion of the disciplinary hearing, defendant Donahue found plaintiff guilty of violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) and imposed the penalty of 30 days keeplock confinement. *Id.* In reaching his determination, he relied upon the Misbehavior Report of Officer Kamas which he found to be credible and noted that the disposition was given to serve as a deterrent of future misconduct by plaintiff and others. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

**Defendant Gilmore**

Defendant Gilmore conducted one Tier 2 disciplinary hearing involving plaintiff on July 18, 2000. Plaintiff testified at length during the hearing and defendant Gilmore honored plaintiff's request to call two inmate witnesses to testify during the hearing. Dkt. # 44, pp. 0045–0063. In addition, defendant

Gilmore honored plaintiff's request and read into the record a grievance filed by plaintiff against the Correction Officer involved in the incident that precipitated the Misbehavior Report. *Id.* At the conclusion of the hearing, defendant Gilmore found plaintiff not guilty of violating Rules 107.10 (interference) and Rule 106.10 (refusing a direct order) and guilty of violating Rule 107.11 (harassment). *Id.* Defendant Gilmore imposed a penalty of 10 days keeplock confinement. *Id.*

Defendant Gilmore noted both on the record and on the Hearing Disposition Sheet that in reaching his determination, he relied upon the written report of Officer Burgett as well as the testimony of plaintiff provided during the hearing. Dkt. # 44, p. 0040 and p. 0062. In addition, defendant Gilmore stated among his reasons for the disposition, that plaintiff deserved credit for "the cooperative spirit he displayed during [the] hearing." Dkt. # 44, pp. 45–63. Moreover, defendant Gilmore explained to plaintiff that he found plaintiff not guilty of the charge of disobeying a direct order because he did not believe that plaintiff disobeyed a direct order without just cause, since plaintiff felt threatened and chose not to come out of the shower. *Id.* Thereafter, defendant Gilmore noted that plaintiff requested a sergeant and once the sergeant was present, plaintiff obeyed the direct order and came out of the shower. *Id.* In addition, defendant Gilmore found plaintiff not guilty of the charge of interference because he felt that plaintiff did what he had to do to protect himself and that he did not interfere with an employee. *Id.* Defendant Gilmore did, however, find plaintiff guilty of harassment because plaintiff admitted during the hearing that he called Officer Burgett "a scum bag." *Id.* at p. 0051.

***59** In opposition to defendants' motion for summary judgment, plaintiff argues that defendant Gilmore prejudged the evidence because he found plaintiff guilty of harassment based on a fact that was not alleged in the Misbehavior Report, rather, defendant Gilmore found plaintiff guilty based on an admission plaintiff made during the hearing. Dkt. # 96, p. 30. Specifically, plaintiff argues that the Misbehavior Report alleges that plaintiff called Officer Burgett "an asshole" whereas during the hearing plaintiff testified that he called Officer Burgett "a scum bag." Dkt. # 44, p. 0042 and p. 0051. Accordingly, plaintiff contends that he should not have been found guilty and that defendant Gilmore's finding of guilt must have been based on "predetermination, bias and undeniably [sic] favoritism for a coworker." Dkt. # 96, p. 30. As reflected in the disciplinary hearing transcript, defendant Gilmore explained at length the evidence he relied upon and the reasons for his disposition and this Court finds that the record is devoid of any evidence of bias or predetermination. Defendant Gilmore's determination was affirmed by defendant Wilcox on July 30, 2000. Dkt. # 86, Exhibit A.

**Defendant Irizarry**

Defendant Irizarry conducted a Tier 3 disciplinary hearing on January 4, 2001 concerning a Misbehavior Report issued to plaintiff following the December 21, 2000 disciplinary hearing conducted by defendant Donahue. Dkt. # 98, pp. 5–18. Defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU. Dkt. # 65, p. 0661; Dkt. # 98, pp. 5–18. In reaching this determination, defendant Irizarry relied on the Misbehavior Report of defendant Donahue and the testimony of Officer Bennett. Dkt. # 65, p. 0662. Defendant Irizarry stated that the reason for the disposition was, "[ ] after finding you guilty, I reviewed your Disciplinary Record and found that you have been charged with, and found guilty, of 16 charges of Threats and 12 charges of Harassment. None of these sanctions helped to modify your behavior. And [ ] feel this to be a just Disposition." Dkt. # 98, pp. 5–18. Thereafter, on or about February 21, 2001, defendant Selsky modified the penalty imposed to six months SHU confinement. Dkt. # 86, Exhibit A. In opposition to defendants' motion for summary judgment, plaintiff

states, without elaboration, that defendant Irizarry was not impartial. This Court finds that there is simply nothing in the record before it to support such a conclusion and without more, plaintiff's opposition does not create a material issue of fact for trial.

**Defendant Quinn**

Defendant Quinn commenced a Tier 3 disciplinary hearing on January 31, 2001 involving a Misbehavior Report issued to plaintiff by Officer Hodge. Dkt. # 68, p. 0710; Dkt. # 98, pp. 20–33. The hearing was adjourned and reconvened on February 5, 2001, but plaintiff refused to attend the hearing. Dkt. # 68, p. 0709; Dkt. # 98, pp. 20–33. Plaintiff also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising plaintiff that a disposition of the charges would be made in his absence. Dkt. # 68, p. 0713. Thereafter, the hearing was conducted in plaintiff's absence and as set forth on the Hearing Disposition Sheet, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of 12 months SHU confinement. Dkt. # 68, p. 0708; Dkt. # 98, pp. 20–33. In reaching his determination, defendant Quinn relied on the written report of Officer Hodge and the handwritten letter from plaintiff to Deputy Commissioner Annucci wherein defendant Quinn found that plaintiff made harassing statements. *Id.* As his reasons for the disposition, defendant Quinn stated, "[t]his Disposition is given to serve notice that threatening employees and harassing them will not be tolerated. This Disposition is given to punish this inmate for threatening employees and should also act as a deterrent to others." Dkt. # 98, pp. 20–33. Plaintiff's opposition to defendants' motion for summary judgment states, in conclusory fashion, that defendant Quinn's failure to interview witnesses with relevant information is illustrative of defendant Quinn's undeniable bias, racism and partiality. Dkt. # 96.

***60** During the disciplinary hearing, plaintiff requested to have inmate Smith and Deputy Commissioner Anthony J. Annucci testify on his behalf. Dkt. # 98, pp. 20–33. Plaintiff claimed that Inmate Smith would testify concerning his selection of an assistant and that plaintiff did not refuse an assistant, rather, he did not select J. Morton as his assistant. *Id.* Plaintiff also testified on January 31, 2001 that he requested to have Deputy Commissioner Anthony J. Annucci as a witness. Deputy Commissioner Annucci was the intended recipient of the January 8, 2001 letter authored by plaintiff that was the subject of the January 27, 2001 Misbehavior Report. As the hearing transcript reveals, because plaintiff was being uncooperative at the outset of the hearing and was insisting on an assistant despite the fact that he had purportedly refused the assistant prior to the hearing, the hearing was adjourned. Thereafter, plaintiff refused to attend the hearing which resumed on February 5, 2001. During the February 5, 2001 continuation of the hearing, Sgt. Morton testified that he had been assigned to assist plaintiff and plaintiff refused. Because plaintiff refused to attend the hearing, although he had previously indicated he had two witnesses to testify, there were no other witnesses to interview, thus, plaintiff's claim that defendant Quinn's failure to interview witnesses was illustrative of his bias, racism and partiality is wholly without merit.

**Defendant Ryan**

Defendant Ryan conducted a Tier 2 disciplinary hearing on January 25, 2000 in connection with a January 14, 2000 Misbehavior Report issued by defendant vonHagn. Dkt. # 44, p. 0026. At the conclusion of the hearing, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30days keeplock confinement, 30 days loss of packages, commissary and phone privileges. *Id.* In reaching his determination, defendant Ryan relied on the Misbehavior Report and the testimony of Officer Martino who witnessed the January 14, 2000 incident. *Id.* at p. 0027. Defendant Ryan explained that he had imposed the penalty to serve as a reminder that the type of behavior plaintiff exhibited towards defendant vonHagn would not be tolerated. Dkt. # 44, pp.

0153–0159. In support of his motion for summary judgment, defendant Ryan notes that plaintiff did not deny that he used abusive language toward defendant vonHagn or that he threatened defendant vonHagn. Dkt. # 44, pp. 0032–0038. Plaintiff argues in opposition to defendants' motion for summary judgment that defendant Ryan endorsed (forged) the name of the officer (Officer Martino) on the Misbehavior Report because, plaintiff alleges, Officer Martino refused to do so. Dkt. # 96, pp. 30–34. In stark contrast to plaintiff's allegation, Officer Martino testified via telephone at the disciplinary hearing that he had indeed witnessed the incident and at no time did Officer Martino state that he had refused to endorse the Misbehavior Report. Dkt. # 44, pp. 0153–0159. Defendant Captain Wilcox affirmed defendant Ryan's determination, finding that there was no evidence of retaliatory acts committed by defendant vonHagn; that defendant Ryan properly called Officer Martino to testify; that plaintiff was not confined pending the hearing; that a witness may testify by telephone; and most notably, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan. Dkt. # 44, p. 0024; Dkt. # 92, ¶ 31. Thus, plaintiff's assertions that defendant Ryan was biased or impartial because he had allowed Officer Martino to testify via telephone and that defendant Ryan endorsed the Misbehavior Report because Officer Martino had refused are unsupported by the record before this Court.

**Defendant Sheahan**

***61** The Tier 3 disciplinary hearing conducted by defendant Sheahan began on December 26, 2000 and continued on December 29, 2000. Dkt. # 44, pp. 0160–0199. At the outset of the hearing, plaintiff plead not guilty and objected to the Misbehavior Report on the ground that it was issued in retaliation for the 20 to 25 grievances he had filed against defendant vonHagn. *Id.* During the hearing, plaintiff submitted copies of the grievances he filed against defendant vonHagn, as well as copies of correspondence to Superintendent McGinnis, Deputy Commissioner Annucci and Commissioner Goord. *Id.* Defendant Sheahan accepted the grievances as evidence of plaintiff's allegations of retaliation and accordingly, found that the testimony of Director Egan, as requested by plaintiff, would have been redundant. *Id.* At the conclusion of the hearing, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (harassment) and Rule 102.10 (threats) and imposed a penalty of six months SHU confinement. Dkt. # 44, p. 0101. In reaching this determination, defendant Sheahan relied upon the December 13, 2000 Misbehavior Report and determined that the evidence submitted by plaintiff did not establish that the Misbehavior Report issued by defendant vonHagn was retaliatory. Dkt. # 44, pp. 0160–0199. Defendant Sheahan imposed a penalty of six months confinement in SHU and stated that the penalty was imposed to impress upon plaintiff that threats to staff would not be tolerated. Dkt. # 44, pp. 0160–0199. Thereafter, defendant Selsky affirmed defendant Sheahan's determination. Dkt. # 86, Exhibit A. In support of his motion for summary judgment, defendant Sheahan states that plaintiff did not deny that he used abusive language toward defendant vonHagn. *Id.* In opposition to defendant's motion for summary judgment, plaintiff claims that defendant Sheahan's denial of his requested witness, CORC Director Egan and defendant Sheahan's finding that the grievances submitted by plaintiff did not establish a retaliatory motive are illustrative of defendant Sheahan's bias. Dkt. # 96, pp. 18–24. As the record before this Court unmistakably demonstrates, defendant Sheahan accepted the grievances submitted by plaintiff as evidence of his claim of retaliation and found that the proposed testimony of Director Egan, that the grievances submitted by plaintiff were “exhausted,” would have been redundant. Thus, plaintiff's claim that defendant Sheahan's denial of plaintiff's witness demonstrates defendant Sheahan's bias is wholly without any basis in fact.

Here, plaintiff's bare, conclusory allegations of bias and prejudgment, without more, are insufficient

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

to defeat defendants' motion for summary judgment. As reflected in the Hearing Disposition Sheets and hearing transcripts, each of the hearing officers based their determinations on the Misbehavior Reports, testimony of plaintiff, testimony of witnesses present during the incidents, and the documentary evidence, often including letters written by plaintiff. Additionally, as noted above, the hearing officers' determinations were frequently based on plaintiff's admissions made during the hearing or plaintiff's failure to deny that he had used the abusive, threatening or harassing language charged in the Misbehavior Reports.

***62** The record before the Court unequivocally establishes that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were neither biased nor prejudged the evidence. To the contrary, each hearing officer based his finding of guilt on the credible evidence presented during the hearing and each made an objectively reasonable determination based on the evidence. Thus, the Court agrees with defendants that plaintiff has failed to meet his burden of demonstrating that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were so partial so as to violate plaintiff's due process rights. Accordingly, defendants' motion for summary judgment on plaintiff's due process claims based on bias, prejudgment and impartiality is granted.

**Denial of Witness Testimony**

In *Wolff v. McDonnell,* the Supreme Court of the United States determined that,

> [an] inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.

418 U.S. at 566. In reaching this conclusion, the Court recognized that,

> [p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

*Id.* In exercising that discretion, prison officials must be able to,

> explain, in a limited manner, the reason why witnesses were not allowed to testify, ... either by making the explanation a part of the ‘administrative record’ in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a ‘liberty’ interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it ‘later.’

*Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). A hearing officer may rationally exclude witnesses or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). The burden is on the prison official to demonstrate “the rationality of his position.” *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990).

During several of the disciplinary hearings discussed above, plaintiff claims that he was denied due process because his requests to have certain witnesses testify during the hearings were denied. Specifically, plaintiff claims that: (1) defendant Donahue during the December 21, 2000 disciplinary hearing denied plaintiff's requests to have CORC Director Thomas Egan and DOCS' Commissioner Goord testify; (2) during the December 26, 2000 disciplinary hearing, defendant Sheahan denied plaintiff's request to have CORC Director Egan testify; (3) during the January 4, 2001 disciplinary hearing, defendant Irizarry denied plaintiff's requests to have DOCS' Commissioner Goord and Associate Commissioner Chapman testify;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and, (4) defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify during a February 5, 2001 disciplinary hearing.

**Defendant Donahue**

***63** During plaintiff's December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue denied plaintiff's request to call CORC Director Thomas Egan and DOCS' Commissioner Goord as witnesses. The hearing transcript does not provide any insight as to why plaintiff requested to have Director Egan and Commissioner Goord testify, because plaintiff refused to elaborate on his statements that both witnesses had "a lot or everything to do with the ticket." Dkt. # 44, pp. 0081–0086. The gravamen of the Misbehavior Report was statements made in a grievance filed by plaintiff. Neither Director Egan nor Commissioner Goord were mentioned in the grievance; neither were present at Southport when the grievance was received nor had any knowledge of plaintiff's grievance. Dkt. # 92, p. 29. Accordingly, defendant Donahue denied plaintiff's request and properly prepared a Witness Interview Sheet noting the reason for denying the request, "Mr. Egan [and] Commissioner Goord denied as not having material testimony." Dkt. # 44, p. 0091.

**Defendant Sheahan**

Defendant Sheahan conducted a Tier 3 disciplinary hearing that began on December 26, 2000 and continued on December 29, 2000. During the hearing, plaintiff requested to have Director Egan testify that the grievances submitted by plaintiff were "exhausted." Dkt. # 44, p. 0105. Defendant Sheahan denied plaintiff's request because he had previously accepted the grievances submitted by plaintiff as evidence and acknowledged that some of the grievances had been exhausted and based on the foregoing, determined that Director Egan's testimony would be redundant. *Id.* Defendant Sheahan properly prepared a Witness Interview Sheet detailing plaintiff's request and the reasons for his denial. *Id.* Specifically, the Witness Interview Sheet states,

> T. Eagen [sic] IGRC—Albany—(Requested by Inmate). For verification of past submitted Grievances that he he [sic] has submitted concerning inadequate medical care by the facility and requests to have RN S. VonHagn kept away from [sic]. This hearing officer accepted the inmates [sic] evidence (grievances) that he brought to the hearing as being submitted and determined that Mr. Eagans [sic] testimony would be redundant as I have already accepted what the correlation [sic] that the (illegible) was received in retaliation of these grievances.

Dkt. # 44, p. 0105.

**Defendant Irizarry**

During the Tier 3 disciplinary hearing conducted on January 4, 2001, defendant Irizarry denied plaintiff's request to have Commissioner Goord and Associate Commissioner Chapman testify on his behalf. The hearing resulted from a Misbehavior Report issued by defendant Donahue following the December 21, 2000 disciplinary hearing. Dkt. # 65, p. 0664. Defendant Irizarry denied plaintiff's request because neither Commissioner Goord nor Associate Commissioner Chapman were present at Southport at the time of the incident and accordingly, their testimony was not relevant to the hearing. *Id.* at p. 0666. Defendant Irizarry properly prepared a Witness Interview Sheet setting forth his reasons for denying plaintiff's request, "[y]our witnesses, G. Goord Commissioner and W. Chapman Asso. Comm. were denied because their testimony is not relevant to this hearing they were neither present nor in this facility at the time of this [sic] charges was [sci] written or when this incident happened." Dkt. # 65, p. 0666.

**Defendant Quinn**

***64** Defendant Quinn conducted a Tier 3 disciplinary hearing concerning plaintiff on February 5, 2001. Dkt. # 98, pp. 20–33. During the hearing, plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci testify. *Id.* Sgt. Morton testified telephonically. However, as discussed above,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 58

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

plaintiff refused to attend the hearing. *Id.; see also* pp. 55–59 *supra.* With respect to Deputy Commissioner Annucci, defendant Quinn denied plaintiff's request to have him testify because, according to defendant Quinn, his testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711. Prior to rendering his decision, defendant Quinn reviewed the correspondence from plaintiff to Deputy Commissioner Annucci which was the subject of the Misbehavior Report. Dkt. # 68, pp. 0716–0718. After reviewing the letter, defendant Quinn determined that the letter indeed contained threatening, obscene and abusive language and that testimony from Deputy Commissioner Annucci was not necessary to determine whether plaintiff's correspondence contained threats, abusive or harassing language. Dkt. # 87, ¶ 14.

In the instant case, as detailed above, defendants Donahue, Sheahan, Irizarry and Quinn informed plaintiff of their respective decisions for denying plaintiff's requests for testimony. The decisions by defendants Donahue, Sheahan, Irizarry and Quinn to deny the requested testimony were reasonable. With respect to defendant Donahue and defendant Quinn, the issue to be decided at the disciplinary hearing was whether plaintiff wrote the grievance/letter and whether they contained threats, abusive and/or harassing language. Thus, in the case of defendant Donahue, unspecified testimony from Director Egan and Commissioner Goord, who were neither mentioned in the grievance nor present at Southport when the grievance was received, is irrelevant. Similarly, with respect to defendant Quinn, testimony from Deputy Commissioner Annucci, the intended recipient of the letter, is equally irrelevant.

Plaintiff's complaint against defendant Sheahan, that his request to have Director Egan testify that the grievances submitted by plaintiff were exhausted was improperly denied, must also fail. As reflected in the Witness Interview Sheet completed by defendant Sheahan, defendant Sheahan found that such testimony would be redundant because he had accepted the grievances submitted by plaintiff as evidence and acknowledged that some of the grievances had been exhausted. Finally, defendant Irizarry properly denied plaintiff's request to have Commissioner Goord and Associate Commissioner Chapman testify because such testimony would not be relevant. Neither Commissioner Goord nor Associate Commissioner Chapman were at Southport at the time of the incident alleged in the Misbehavior Report. Accordingly, plaintiff's claim that because defendants Donahue, Sheahan, Irizarry and Quinn improperly denied his requests to have certain witnesses testify during the disciplinary hearings, his due process rights were violated must fail as a matter of law.

**Ejection from Hearing**

***65** An inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings. *Wolff,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). Thus, "[p]rison inmates do not possess a constitutional right [FN32] to be present during the testimony of witnesses during a disciplinary proceeding." *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989); *Bogle v. Murphy,* No. 98–CV–6473 CJS, 2003 WL 22384792 (W.D.N.Y. Sep.9, 2003) (plaintiff's ejection from his disciplinary hearing was not a due process violation). On more than one occasion as discussed above, plaintiff was removed from a disciplinary hearing, voluntarily requested to leave a disciplinary hearing before its conclusion or refused to attend a disciplinary hearing. To the extent that buried within one of plaintiff's many claims is a claim that his voluntary or involuntary removal from a disciplinary hearing constituted a denial of his due process rights, that claim must fail. On those occasions when plaintiff was involuntarily removed from the disciplinary hearing by the hearing officer because he was being disruptive and uncooperative during the hearing, such a circumstance does not give rise to a due process claim. On the other occasions where plaintiff either refused to attend the disciplinary hearing or elected to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

leave the hearing before its conclusion that likewise does not give rise to a due process claim. Thus, this Court finds that to the extent plaintiff is claiming that his absence from a disciplinary hearing, whether voluntary or involuntary, violated his right to due process, such a claim must fail as a matter of law.

FN32. Although N.Y.Comp.Codes R. & Regs. tit. 7, § 254.5 affords inmates the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals," state rules and regulations do not necessarily support viable due process claims under § 1983. *See* *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995); *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987); *Dawes v. Leonardo,* 885 F.Supp. 375, 377–78 (N.D.N.Y.), *aff'd* 71 F.3d 406 (1995).

**Reversal of Determination Not Indicative of Due Process Violation**

Plaintiff has alleged that he was denied due process by defendant Quinn at his February 5, 2001 Tier 3 disciplinary hearing because defendant Quinn's determination was later overturned by defendant Selsky. Dkt. # 9, p. 6–I. The February 5, 2001 Tier 3 disciplinary hearing, discussed at length above, *see* pp. 55–59 *supra,* was a continuation of a hearing that commenced on January 31, 2001. Dkt. # 87, ¶ 9. After entering a plea of not guilty to both charges, plaintiff requested to have two witnesses testify and the hearing was adjourned to locate one of the witnesses. *Id.* When the hearing was reconvened on February 5, 2001, plaintiff refused to attend the hearing and refused to sign the Waiver of Right to Attend Disciplinary Hearing Form which advised him that a disposition of the charges would be made in his absence. *Id.* at ¶ 10. Thereafter, the hearing was conducted outside of plaintiff's presence. *Id.* at ¶ 11.

Following the hearing, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months SHU confinement to run from September 27, 2002 to September 27, 2003. *Id.* at ¶ 16. In reaching this determination, defendant Quinn relied on the Misbehavior Report and on the hand-written letter from plaintiff, wherein he made harassing statements to Deputy Commissioner Annucci. *Id.* at ¶ 17. As discussed above, plaintiff alleged that he never received a copy of the hearing disposition and commenced an Article 78 proceeding in New York Supreme Court, Chemung County challenging the February 5, 2001 disposition. *Id.* ¶ 18. In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but stated that he did not refuse to attend the hearing and did not learn of the disposition until June 26, 2001. *Id.* On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id.* at ¶ 19.

***66** By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id.* at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant; denied him the right to attend the hearing; and refused to call Deputy Commissioner Annucci as a witness. *Id.* Plaintiff further alleged that defendant Quinn was biased and refused to let plaintiff see the January 8, 2001 correspondence. Since he never received a copy of the disposition, he was unaware of the penalty imposed. *Id.* On April 26, 2002, Defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because of defendant Quinn's failure to interview a requested witness who may have provided relevant testimony. *Id.* at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination

several months *before* plaintiff was ordered to begin serving his penalty. *Id.* at ¶ 22. Thus, plaintiff did not serve a single day of the penalty imposed by defendant Quinn.

It is well-settled that where, as here, a disciplinary determination has been reversed and expunged before an inmate begins to serve the penalty imposed, the inmate's due process rights have not been violated. *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992) (*per curiam* ), *cert. denied,* 510 U.S. 837, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993). Following a disciplinary hearing, Young had been found guilty of violating certain prison rules and a penalty of 180 days SHU confinement, suspension of commissary and package privileges was imposed by the hearing officer and the hearing officer further recommended a loss of six months good time. Young appealed the hearing officer's determination and Director Selsky reversed the determination, vacated the penalty and recommended loss of good time and ordered the hearing records be expunged. Thereafter, Young commenced a section 1983 suit against the hearing officer alleging a denial of due process because he was (1) barred from his disciplinary hearing; (2) prevented from calling witnesses on his behalf; and (3) denied an impartial hearing officer. The District Court found that plaintiff had been denied his right to call witnesses at a disciplinary hearing and awarded plaintiff nominal damages of one dollar. In addition, the District Court granted the hearing officer's motion for summary judgment with respect to Young's claims that he was improperly excluded from the hearing and that the charges were not heard by an impartial hearing officer. The Second Circuit reversed finding that the determination rendered at the disciplinary hearing had been reversed and expunged before Young had even begun to serve his penalty. In making this finding, the Second Circuit reasoned that, "on account of the administrative reversal of [the hearing officer's] decision, Young was never penalized on the charges .... Therefore, he suffered no interference with a liberty interest and has no valid claim for relief." *Id.*

***67** Accordingly, following the same reasoning set forth in *Young,* because defendant Quinn's determination was reversed and expunged before plaintiff began serving the penalty imposed, plaintiff suffered no interference with a liberty interest and any claim that defendant Quinn denied him due process must fail as a matter of law.

**Administrative Appeal**

In his amended complaint, plaintiff claims that defendants W. Wilcox and D. Selskey [sic], violated his due process rights under the Fourteenth Amendment to the United States Constitution. Dkt. # 9, pp. 6–H to 6–I. Specifically, plaintiff claims that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 22, 2000, December 31, 2000, January 30, 2001 and March 8, 2001, defendant Wilcox violated his due process rights in connection with his appeal of each of the hearing officer's determinations. Plaintiff claims that as a result he suffered 270 days of cell confinement and a loss of $45 ($5 each for each finding of guilt). Similarly, as against defendant Selsky, plaintiff alleges that on February 21, 2001, defendant Selsky violated his due process rights by "modifying a disposition dated 1–4–00 (*not* 1–4–01)" and as a result, plaintiff suffered "a 6–month SHU-punative [sic] segregation sentence." Dkt. # 9, pp. 6–H to 6–I. In addition, plaintiff alleges that defendant Selsky violated his due process rights on February 9, 2001 because he affirmed a "bias [sic] disposition, where [plaintiff] suffered *no* witnesses, *nor* had all of my evidence been allowed at partial (*un* fair) hearing." *Id.*

In the amended complaint, plaintiff alleges that in connection with his administrative appeals of eleven hearing determinations, defendants Wilcox and Selsky violated his federal constitutional right to due process. Specifically, plaintiff alleges that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 31, 2000, December 22, 2000, March 8, 2001 and January 30, 2001, defendant

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Wilcox violated his due process rights. As discussed above, a review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not reveal a disciplinary hearing or appeal that was held, filed or decided on July 30, 2000, December 31, 2000, and March 8, 2001 [FN33]. Each of the other dates correspond to either a hearing date or an appeal date, January 21, 2000 (hearing date) (hearing commenced on January 11, 2000), (defendant Donahue); January 25, 2000 (hearing date, defendant Ryan); July 18, 2000 (hearing date, defendant Gilmore); November 29, 2000 (hearing date, defendant Donahue); December 22, 2000 (appeal date), (December 21, 2000 hearing date, defendant Donahue); and January 30, 2001 (appeal date), (January 29, 2001 hearing date, Donahue). Each of the aforementioned hearings was discussed at length above and none of the defendant hearing officers violated plaintiff's constitutionally protected due process rights. Accordingly, because none of the hearing officers violated plaintiff's due process rights in conducting the Tier 2 and Tier 3 disciplinary hearings, the Court agrees with defendants that there can be no basis for concluding that defendant Wilcox violated plaintiff's due process rights by affirming the hearing determinations.

> FN33. As discussed above, a disciplinary hearing did take place on March 7, 2001, however, plaintiff did not appeal that determination.

***68** With respect to defendant Selsky, plaintiff claims that on February 9, 2001, defendant Selsky violated his due process rights by affirming a December 29, 2000 determination by defendant Sheahan. Dkt. # 9, p. 6–I. For the reasons stated above concerning plaintiff's claims against defendant Wilcox and because there is nothing in the record to support the conclusion that defendant Sheahan violated plaintiff's due process rights in conducting the December 26 and 29, 2000 disciplinary hearing, plaintiff's claim against defendant Selsky simply because he affirmed the determination issued by defendant Sheahan fails as a matter of law. Similarly, plaintiff's claim against defendant Selsky because he modified the penalty imposed following a January 4, 2001 disciplinary hearing conducted by defendant Irizarry must also fail. The disciplinary hearings conducted by defendants Sheahan and Irizarry have been discussed at length above. There is nothing in the record before this Court to support the conclusion that either defendant Sheahan or defendant Irizarry violated plaintiff's due process rights. Accordingly, defendant Wilcox's decisions affirming the hearing officers' determinations and defendant Selsky's decisions affirming or modifying the results of the disciplinary hearings do not, standing alone, establish a federal constitutional violation. *See Hameed v. Mann,* 57 F.3d 217, 224 (2d Cir.1995) (Selsky entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing).

***Denial of Right to Take Religious Correspondence Course Claim***

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873, *citing Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

Page 62

Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)
**(Cite as: 2009 WL 236060 (W.D.N.Y.))**

In the instant case, plaintiff alleges that on or about November 2, 1999, he received an information packet concerning religious training and that defendant Gardner informed him that he could not take any correspondence courses. Dkt. # 9, pp. 5–B to 5–C; Dkt. # 94, ¶ 7. As a result, plaintiff filed Grievance No. SPT–17423–99 on or about November 16, 1999. Dkt. # 44, p. 0250. In response to the Grievance, the IGRC advised plaintiff that pursuant to recent decisions by CORC, plaintiff may not participate in any correspondence courses/programs while at Southport and further advised plaintiff to contact the education supervisor once he is transferred to a general confinement facility. Dkt. # 94, ¶ 8; Dkt. # 44, p. 0251. Thereafter, the Superintendent concurred with the IGRC recommendation stating that there are no provisions in either the facility policy or DOCS Directive No. 4933 that allow SHU inmates to participate in any correspondence courses. Dkt. # 44, p. 0254; Dkt. # 94, ¶ 10. Plaintiff appealed to CORC which issued its decision concurring with the Superintendent on or about January 19, 2000. Dkt. # 44, p. 0246; Dkt. # 94, ¶ 11. In its determination, CORC cited its prior decision in SPT–14519–98 dated August 26, 1998 which stated in part, "[t]he present policy will remain [sic] effect. There are no outside correspondence courses allowed in this facility." Dkt. # 44, p. 0254; Dkt. # 94, ¶ 12. CORC also cited its decision in SPT–7594–94 issued September 15, 1994, which states in part, "CORC concurs with the Superintendent in that the grievant may not participate in any correspondence course due to the logistical problems related to housing in Southport C.F." *Id.*

***69** Thus, defendant Gardner did not deny plaintiff the right to take a religious correspondence course. Rather, any such denial was the result of DOCS policy as set forth by the Superintendent and CORC. As the Senior Mail and Supply Clerk, defendant Gardner "had no authority to set any policy for DOCS or Southport and no authority to determine whether an inmate may take any correspondence course or otherwise engage in educational or religious activities." Dkt. # 92, p. 53. Accordingly, because defendant Gardner did not make any policy preventing plaintiff from taking a religious correspondence course, plaintiff's claim against her must fail as a matter of law.

***Interference with Legal Mail Claim***

DOCS Directive Nos. 4421 (Privileged Correspondence), 7 N.Y.C.R.R. Part 721 and 4422 (Inmate Correspondence Program), 7 N.Y.C.R.R. Part 720, set forth DOCS' policy regarding inmate mail correspondence. Dkt. # 94, ¶ 25. Legal mail which is clearly marked as such and is from an attorney is not to be opened by the mailroom outside the presence of the inmate. If, however, privileged correspondence is opened in error outside the presence of the inmate, documentation of the error should be maintained. 7 N.Y.C.R.R. §§ 721.2(2), 721.3(b)(1) and (2). Pursuant to 7 N.Y.C.R .R. §§ 720.2(b), 720.4(a), general correspondence between an inmate and someone other than a person approved for legal correspondence will be opened and inspected for cash, checks, money orders, printed or photocopied materials or contraband. An inmate is not required to be present during the inspection of incoming general mail. 7 N.Y.C.R.R. §§ 720.2(b), 720.4(a).

> It is accepted that a prisoner must be present when, for whatever reason, legal mail (clearly marked as such) is opened by prison officials ... and th[e] Constitution guarantees a prisoner [ ] 'reasonable access to the courts.' *Standley v. Lyder,* 99 Civ 4711, 2001 WL 225035, at *2 (S.D.N.Y. March 6, 2001) (internal citation omitted) *(citing Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986)) (*citing Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In order '[t]o prevail on a claim of interference with legal mail, a plaintiff must show that a pending or anticipated legal action was prejudiced by the alleged ence.' *Standley,* 2001 WL 225035, at *2 (*quoting Morgan v. Montanye,* 516 F.2d 1367, 372 (2d Cir.1975) and *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Govan v. Campbell,* 289 F.Supp.2d 289, 297 (N.D.N.Y.2003). Moreover, the Second Circuit has dismissed claims where only sporadic interference with mail was alleged and further, where a plaintiff does not allege actual prejudice to his ability to vindicate his legal claim. *Standley v. Lyder,* 99 Civ 4711, 2001 WL 225035, at *2 (S.D.N.Y. Mar.7, 2001); *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

Plaintiff claims that in or about November 1999 and December 1999, defendant Gardner interfered with and opened his legal mail. Dkt. # 9, pp/5–B to 5–C. Plaintiff filed Grievance No. SPT–17276–99 alleging that his incoming legal mail was censored and opened by the mail room clerk even though the envelope was marked “Legal Mail.” Dkt. # 44, p. 0262. In response, K. Washburn, Mailroom Clerk, informed the IGRC that legal mail which is clearly marked and from an attorney, is not to be opened by the mailroom. Dkt. # 44, p. 0268; Dkt. # 94, ¶ 20. As explained by Ms. Washburn, the letter that is the subject of Grievance No. SPT–17276–99 was in an envelope that was completely handwritten (unlike mail from attorneys), the sender's name was illegible and that because the sender's name could not be verified as a legitimate legal entity, the mail was opened. *Id.* Ms. Washburn further stated that whenever legal mail is opened in error, the envelope is stamped by the mailroom to let the inmate know that it was opened in error. *Id.* The Superintendent denied plaintiff's grievance and CORC concurred with the Superintendent's determination, stating that contrary to plaintiff's allegations, facility staff had acted consistent with department policy. Dkt. # 44, p. 0259; Dkt. # 94, ¶ 23.

***70** Plaintiff's amended complaint is devoid of any claim that he suffered actual injury as a result of alleged interference with his legal mail. Thus, in the absence of any facts to demonstrate that his access to the courts was impaired or that he was otherwise prejudiced by the opening of a single envelope, plaintiff's claim against defendant Gardner must fail as a matter of law.

***Interference with Access to the Courts Claim***

Although prisoners retain the constitutional right to meaningful access to the courts, prisoners alleging a violation of this right in the context of a section 1983 action must demonstrate actual harm, e.g., that a “nonfrivolous legal claim had been frustrated or was being impeded.” *Lewis v. Casey,* 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (footnotes omitted); *see Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Here, plaintiff claims that on September 13, 2000 and June 12, 2001, defendants Corcoran and Weingartner respectively, violated his constitutional right of access to the courts. Dkt. # 9, pp. 5–D to 5–E. Plaintiff alleges that defendant Corcoran denied plaintiff access to vouchers and certified mail receipts contained in plaintiff's sealed property bags. *Id.* at p. 5–D. As a result, plaintiff alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed. *Id.* As against defendant Weingartner, plaintiff alleges that he was denied an “advanced certified mailing request” for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims. *Id.* at p. 5–E. Plaintiff further claims that a “manilla envelope containing the material” had been kept from him “until the expiration of my time to respond by certified mail-return receipt-requested to the Attorney General.” Dkt. # 9, p. 5–E.

**Defendant Michael P. Corcoran**

As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags. Dkt. # 90, ¶ 7. In his affidavit in support of his motion for summary judgment, defendant Corcoran recounts an incident where, after plaintiff's transfer to Southport from Coxsackie in May 2000, plaintiff submitted a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

claim concerning certain property that was missing. Dkt. # 90, ¶¶ 8–19. On or about May 25, 2000, plaintiff submitted a claim that certain property had been stolen. Dkt. # 90, ¶ 10 and Exhibit A. The record before this Court establishes that plaintiff made no claim that any legal papers or receipts were missing from his property bags when plaintiff was transferred to Southport from Coxsackie in or about May 2000. *Id.* at ¶ 11. Notably, however, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing. *Id.* at ¶ 11. Defendant Corcoran advised plaintiff that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that failure to establish proof of ownership may result in denial of his claim. *Id.* at ¶ 13.

***71** On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected. *Id.* at ¶ 16. Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000. Dkt. # 90, ¶ 19 and Exhibit B. Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated, in pertinent part, "I have again received another demeaning and insolent note from you. This is the last time that I will respond to [sic]. I will not authorize you access to your property bags, since you've already determined that we have broken into your bags to destroy your receipts." *Id* .

At the time of plaintiff's transfer, plaintiff was advised not to leave active case material behind and plaintiff was further instructed to include all active legal material in his 4–bag limit. Dkt. # 90, ¶ 12 and Exhibit A. Plaintiff refused to sign the Personal Property Transferred Form. *Id.* Plaintiff claims that as a result of defendant Corcoran's conduct, Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. Dkt. # 9, p. 5–D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001. Dkt. # 90, ¶ 21 and Exhibit B. As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility. *Id.* The Judgment further notes that the matter came on to be heard by the Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim", Claim No. 98329 was dismissed. *Id.* Thus, the Judgment dismissing Claim No. 98329 makes clear that the matter was dismissed after the parties had submitted "proofs and allegations" and makes no mention whatsoever of dismissal because of plaintiff's failure to submit certain vouchers or receipts. Accordingly, because plaintiff has failed to establish that he suffered any injury, his claim against defendant Corcoran must fail as a matter of law.

**Defendant Lawrence W. Weingartner**

Similar to defendant Corcoran, defendant Weingartner, in support of his motion for summary judgment, states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims. Dkt. # 91, ¶ 6. Based on a review of the documents produced by plaintiff in connection with this action, defendant Weingartner has concluded that plaintiff's claim relates to a June 18, 2001 Notice advising plaintiff that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program. *Id.* at ¶ 10. The Notice directed plaintiff's attention to the item checked and where applicable, advised plaintiff to correct and resubmit the item for processing. *Id.* In the box designated "other", plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the

guidelines for special handling as outlined in DOCS Directive No. 4421. *Id.* at ¶ 11. DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence. *Id.* at ¶ 12. DOCS Directive No. 4421 provides that advances for "special Handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order. 7 N.Y.C.R.R. 3(a)(3)(v). Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling,

> ***72** may not be used to pay for any special handling charges such as for certified, return-receipt, express mail, etc., unless such mail services are required by statute or court order. Advances for special handling for filing a Claim or Notice of Intention on the Attorney General [sic] Office must be specified on the approved Advance Request form for postage. You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421).

*Id.* at ¶ 14.

According to defendant Weingartner, because plaintiff's request for special handling did not meet the applicable guidelines, his request was denied. *Id.* at ¶ 15. Indeed, defendant Weingartner further states that a request for special handling for mailing a notice of appeal to the Attorney General does not meet the guidelines for special handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office. *Id* . In addition, there is nothing in the record to suggest that after he received the June 18, 2001 Notice, that plaintiff submitted any court order or statute to the mailroom showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested. *Id.* at ¶ 16. Lastly, in further support of his motion for summary judgment, defendant Weingartner states that to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by the Court (Mr. Davison) that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely notice pursuant to CPLR 5520. *Id.* at ¶ 17. There is nothing in the record to suggest plaintiff submitted any such motion pursuant to CPLR 5520. *Id.* at ¶ 18. Thus, because plaintiff cannot establish that defendant Weingartner interfered with his right of access to the Court of Claims or that any conduct on the part of defendant Weingartner caused the dismissal of Claim No. 99509 or prevented plaintiff from appealing the dismissal of Claim No. 99509, plaintiff's claim against defendant Weingartner must fail as a matter of law.

***CONCLUSION***

For the foregoing reasons, defendants' motion for summary judgment (Dkt.# 79) is in all respects **GRANTED.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

W.D.N.Y.,2009.
Chavis v. vonHagn
Not Reported in F.Supp.2d, 2009 WL 236060 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Roberto CIAPRAZI, Plaintiff,
v.
Glenn S. GOORD; et al. Defendants.

No. Civ.9:02CV00915(GLS/.
Dec. 22, 2005.

Roberto Ciaprazi, Clinton Correctional Facility, Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New York, The Capitol, Albany, New York, for the Defendants.

Patrick F. MacRae, Assistant Attorney General, of counsel.

*MEMORANDUM-DECISION AND ORDER*
SHARPE, J.

I. *Introduction*

***1** Plaintiff *pro se* Roberto Ciaprazi brings this action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges that the defendants violated his First, Eighth, and Fourteenth Amendment rights. Pending are Ciaprazi's objections to Magistrate Judge David E. Peebles' Report-Recommendation. Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirety. [FN1]

FN1. The Clerk is hereby directed to attach the Report-Recommendation to constitute a complete record of the court's decision in this matter.

II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002. *Dkt. No. 1.* On February 27, 2003, the defendants moved for summary judgment. *Dkt. No. 39.* On March 14, 2004, Judge Peebles issued a Report-Recommendation which recommended that the defendants' motion for summary judgment be granted in part, and denied in part. *Dkt. No. 47.* Ciaprazi objected. *Dkt. No. 48.* His objections are now before this court.

III. *Discussion* [FN2]

FN2. The court adopts the factual summary in Magistrate Judge Peebles' Report-Recommendation and assumes familiarity with the facts alleged in Ciaprazi's Complaint. *Dkt. Nos. 47,1.*

A. *Standard of Review*

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the court may "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate judge." *Id.* Having reviewed the unobjected to portions of the Report-Recommendation, the court adopts them in their entirety because they are not clearly erroneous.

B. *Report-Recommendation*

Although Judge Peebles examined the merits of the case and found that many of Ciaprazi's claims were meritless, this court only conducts *de novo* review of the objected to portions of the Re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

port-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal involvement claim against defendant Goord. *Id. at 41, 43-4.* [FN3]

FN3. Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by FRCP 11. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and this court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

C. *Objections*

1. *First Amendment Claim*

First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right to be free from false misbehavior reports. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the defendants' actions. Accordingly, Ciaprazi's retaliation claim is dismissed.

2. *Eighth Amendment*

***2** Next, Ciaprazi objects to Judge Peebles' finding that he did not have standing to challenge the disciplinary authority of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.* This objection is without merit. As Judge Peebles noted, since the length of Ciaprazi's disciplinary confinement was within the bounds of constitutionally acceptable levels, he has no standing to sue. Second, as Judge Peebles further noted, any generalized complaints Ciaprazi has against the Tier III system are more appropriately addressed as part of his due process claims. Accordingly, Ciaprazi's claims against the Tier III system are dismissed.

3. *Human Rights Claims*

Ciaprazi also objects to Judge Peebles' finding that he did not have claims under the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICCPR). Ciaprazi's contention is without merit. As Judge Peebles noted, Ciaprazi has failed to establish that these treaties provide private causes of action. *See Report Recommendation p. 41, Dkt. No. 47.* Accordingly, Ciaprazi's claims under international law are dismissed.

4. *Personal Involvement*

Ciaprazi also objects to Judge Peebles' dismissal of his personal involvement claim against defendant Goord. As Judge Peebles noted, Ciaprazi merely made allegations against Goord in his supervisory capacity. Accordingly, the personal involvement claim against Goord was properly dismissed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

IV. *Conclusion*

Having reviewed the objected-to portions of the Report and Recommendation *de novo,* the remainder under a clearly erroneous standard, and Ciaprazi's objections, this court accepts and adopts the recommendation of Judge Peebles for the reasons stated in the March 14, 2004 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, the defendants' motion be DENIED.

IT IS SO ORDERED.

REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison inmate who by his own account has frequently lodged complaints against prison officials and been openly critical of their practices, has commenced this proceeding against the Commissioner of the New York State Department of Correctional Services (“DOCS”) and several of that agency's employees pursuant to 42 U.S.C. § 1983, complaining of constitutional violations occurring during the course of his confinement. In his complaint, Ciaprazi alleges that 1) a misbehavior report was filed against him in retaliation for his having previously engaged in protected activity; 2) he was deprived of procedural due process during the course of the hearing and resulting adverse finding associated with that misbehavior report; and 3) the conditions which he faced while in disciplinary confinement, following that hearing, were cruel and unusual. Plaintiff asserts claims pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as under certain international human rights accords.

***3** Currently pending before the court is a motion by the defendants seeking summary judgment dismissing plaintiff's complaint in its entirety. Having carefully reviewed the record in light of Ciaprazi's claims and defendants' arguments, I find that many of plaintiff's causes of action are devoid of merit, as a matter of law, and thus subject to dismissal. Because I find the existence of genuinely disputed issues of material fact surrounding certain of plaintiff's claims, however, including notably his due process claim against defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers, I recommend denial of defendants' motion seeking dismissal of plaintiff's claims against them.

I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred into the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well as other “deprivations” of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occur-

ring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10). [FN1] Defendants' Motion (Dkt. No. 39) Exh. A.

FN1. Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,* 7 N.Y.C.R.R. 251-2.2.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152.[FN2] Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie, was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal, Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

FN2. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

***4** At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed.[FN3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

FN3. Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

On August 20, 1999, plaintiff was transferred into

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to “loud and non-stop noise from other frustrated prisoners yelling and banging on the doors,” as well as the denial of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests “were ignored”; and he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No. 1) ¶ 54..

II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis,* commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights (“UDHR”) and the International Covenant on Civil and Political Rights (“ICCPR”); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's prison system. Complaint (Dkt. No. 1) at 14-16. Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

***5** Following the filing of an answer on behalf of

the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[FN4] Dkt. No. 39. Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[FN5] Dkt. No. 46. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

FN4. There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure to prove that defendant Fitzpatrick had in fact been served. *See* Dkt. No. 35.

FN5. In his papers in opposition to defendants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. *See, e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed.

Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word “unknown” in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil

Page 7

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

§ 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a)(1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FN6 Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

FN6. A material fact is genuinely in dispute

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

B. *Plaintiff's First Amendment Retaliation Claim*

***6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action. Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could conclude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 81-83. Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison offi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

***7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [FN7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

> FN7. Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions.[FN8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g., Flaherty,* 713 F.2d at 13.

> FN8. The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011-12 (2d Cir.1986).

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993). Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

***8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions, defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims, including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters were motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in temporal proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick and Rogers. At best, plaintiff has argued that prior to July 31, 1999 he “filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant Fitzpatrick.” *Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint “may be and apparently is a relative of defendant Fitzpatrick.” *Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of “gross abuse of power”, requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

***9** While there is some appeal to finding the req-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

uisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary hearing.[FN9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

FN9. Prior to the Second Circuit's recent decision in *Gill*, defendants perhaps could have effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g., Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992). In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged “would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.” *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi, in somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment. [FN10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

FN10. That amendment provides, in pertinent part, that “[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” U.S. Const. amend. VIII.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the “unnecessary and wanton infliction of pain” and are incompatible with “the evolving standards of decency that mark the progress of a maturing society.” *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

***10** Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates; 5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, defendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement.[FN11]

> FN11. In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello,* No. 90-CV-382, 1996 WL 863518, at *8-*9 (W.D.N.Y. June 10, 1996) (Tier III regulations pass

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

constitutional muster).

D. *Plaintiff's Procedural Due Process Claim*

In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

***11** To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

1. *Liberty Interest*

Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons, arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14. The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g., Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995) (involving revocation of assignment to "shock incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976) (no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N .Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin.* Atypicality in a *Sandin* inquiry normally presents a question of law.[FN12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[FN13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

FN12. In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

FN13. While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin.* *Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day “bright line” test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

***12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

2. *Due Process*

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report.[FN14]

FN14. Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993). Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v. Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding in light of his submissions, I find that this standard has been met.

***13** Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.[FN15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

FN15. Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. *Eng,* 858 F.2d at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

F. *Equal Protection*

In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

***14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others." *Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts.[FN16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ... learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29. Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his part as to this premise, arguing that "discrimination based on national origin *may* ... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN16. Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

G. *United Nations Resolutions*

***15** Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. *Standt v. City of New York,* 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S. No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent that the defendants argue otherwise, and contend that treaties-as distinct from constitutional and other types of federal statutory provisions-cannot support a claim for section 1983 liability, *see* Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not.[FN17] *See, e.g., Poindexter v. Nash,* 333 F.3d 372, 379 (2d Cir.2003); *Murray v. Warden, FCI Raybrook,* No. 9:01-CV-255, 2002 WL 31741247, at *11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing *U.S. ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002) and *Reaves v. Warden,* No. Civ. A3:01-CV-1149, 2002 WL 535398, at *9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-binding." *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 167-68 (2d Cir.2003).

FN17. Even in one of the cases relied heavily upon by the plaintiff, *Maria v. McElroy,* 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has since been effectively overruled on other grounds, *see Restrepo v. McElroy,* 369 F.3d 627 (2d Cir.2004)-the court recognized that the ICCPR was not "self-executing". 68 F.Supp.2d at 231.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

***16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

H. *Personal Involvement*

Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32. This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under section 1983, and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's complaint, I recommend that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); "mere 'linkage in the prison chain of command' is insufficient to implicate a state

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

IV. *SUMMARY AND RECOMMENDATION*

***17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon the lack of his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

N.D.N.Y.,2005.
Ciaprazi v. Goord
Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven Correctional Facility, R. Pflueger, A. Glemmon, Sgt. Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T. Healey, and John Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

***1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does “not contest the dismissal of this action”, it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services (“DOCS”), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint (“Am.Compl.”) ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 (“Schneider Aff.”)

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

***2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" ' *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

***3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

***4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2014 WL 1247992 (D.Conn.)
**(Cite as: 2014 WL 1247992 (D.Conn.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Darrell FRIEDLAND, Plaintiff,
v.
Yadira OTERO, et al., Defendants.

Civil No. 3:11cv606 (JBA).
Signed March 25, 2014.

Darrell Friedland, pro se.

Deann S. Varunes, Attorney General's Office, Hartford, CT, for Defendants.

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

JANET BOND ARTERTON, District Judge.

***1** Plaintiff Darrell Friedland, was incarcerated at Corrigan–Radgowski Correctional Institution, in Uncasville, Connecticut,[FN1] when he commenced this civil rights action pro se pursuant to 42 U.S.C. § 1983 against Lieutenant Yadira Otero, Counselor John Kay, District Administrator Wayne Choinski and Director of Offender Classification and Population Management Fred Levesque (collectively, “Defendants”). Plaintiff alleges multiple violations of his Fourteenth Amendment right to due process arising from his security designation and the discipline to which he was subjected after an alleged escape attempt. Defendants have filed an amended motion [Doc. # 39] for summary judgment, arguing that Plaintiff has failed to establish a legal or factual basis for his claims, and that in any event, they are entitled to qualified immunity on each of his claims. For the reasons that follow, Defendants' motion is granted in part and denied in part.

FN1. Plaintiff is currently confined at the Massachusetts Correctional Institution in Norfolk, Massachusetts.

**I. Background**[FN2]

FN2. This summary of the undisputed facts is taken from Defendants' Local Rule 56(a)1 Statements [Doc.20–18, 40–1] along with the attached exhibits, Plaintiff's Local Rule 56(a)2 Statement [Doc. # 50–2], and Plaintiff's Affidavit [Doc. # 25–3].

Plaintiff previously served a prison sentence in Ohio. After he was released on parole, the Ohio parole officers transferred Plaintiff's parole to Connecticut. On December 30, 2005, the Connecticut Board of Pardons and Paroles began supervising Plaintiff's parole.

On August 4, 2006, a Connecticut parole officer remanded Friedland to the custody of the Connecticut Department of Correction on a violation of the terms of his parole in connection with the Vernon Police Department's investigation of allegations that Plaintiff had been involved in an assault with a dangerous weapon in July 2006. Department of Correction officials remanded Plaintiff to Hartford Correctional Center at that time. Vernon Police Officers subsequently arrested Plaintiff in September 2006 on charges of assault in the second degree, reckless endangerment in the first degree, and carrying a dangerous weapon.

On August 10, 2006, prison officials at Hartford Correctional Center issued a disciplinary ticket charging Friedland with a Security Risk Group affili-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ation based on his membership in the Aryan Brotherhood and also notified Plaintiff that he would have a classification hearing to determine if he should be designated as a Security Risk Group Member or Security Risk Group Safety Threat Member.

On August 10, 2006, Plaintiff participated in a classification hearing. At the conclusion of the hearing, prison officials informed Plaintiff in writing that he had been designated as a Security Risk Group Member of the Aryan Brotherhood and that he had been placed on punitive segregation status. On September 26, 2006, prison officials transferred Plaintiff to Northern Correctional Institution in Somers, Connecticut ("Northern") and placed him in a Close Monitoring Unit. At the time, Northern was a designated facility for managing inmates who had been designated as Security Risk Group Members.

On April 16, 2008, two State of Connecticut Judicial Marshals transported Friedland from Northern to the Connecticut Superior Court for the Judicial District of Rockville in connection with the assault, reckless endangerment, and weapon possession charges pending against him. *See State v. Friedland,* Docket Nos. T19R–CR06–088011–S, T19R–CR06–0088012–S. At this court appearance, Plaintiff pleaded guilty to two counts of assault in the second degree in violation of Connecticut General Statutes § 53a–60, one count of reckless endangerment in the first degree Connecticut General Statutes § 53a–63 and one count of carrying a dangerous weapon in violation of Connecticut General Statutes § 53–206.[FN3] He was not sentenced that day.

FN3. Information pertaining to these criminal cases may be found by searching under Plaintiff's last name or case number athttp://www.jud.ct.gov/crdockets/SearchByDefDisp.aspx.

***2** The van that transported Plaintiff back from Rockville Superior Court, driven by two State of Connecticut Judicial Marshals had the driver and front passenger area divided from the back of the van by a partition, and the back of the van was divided in half by a partition. Plaintiff was sitting on one side of this partition with one inmate from Osborn Correctional Institution, one inmate from Cheshire Correctional Institution and one inmate from MacDougall–Walker Correctional Institution ("MacDougall–Walker"). There were seven inmates from Hartford Correctional Center on the other side of the partition.

During the ride to MacDougall–Walker, some of the inmates in the van argued about a baseball cap worn by an inmate sitting across the partition from Friedland. One or more of the inmates covered the van's cameras used to monitor what was happening in the rear of the van. When one of the inmates on the other side of the partition called Plaintiff a name, Plaintiff kicked out part of the partition for access to the other side of the van.[FN4] At that point, at least one of the cameras in the van was uncovered. Plaintiff then moved to the other side of the van and spoke with the inmate who had called him a name. The Judicial Marshals were able to hear what the inmates were saying during the entire incident.

FN4. Plaintiff admits in his affidavit that he kicked out the partition, but denies that his actions were part of an attempt to escape. (*See* Pl.'s Aff. ¶¶ 18, 20.)

The Judicial Marshals radioed their supervisor about the incident, who advised them to remain in the area until the Connecticut State Police arrived at their location. After State Police Officers arrived approximately twenty minutes later, the officers and the Marshals' supervisor decided to keep the inmates in the van and to transport them to MacDougall–Walker. Upon arrival, MacDougall–Walker officials unloaded all of the other inmates, and Plaintiff was then transported to Northern.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

On April 17, 2008, a prison official issued Friedland a disciplinary report charging him with the Class A Offense of Attempted Escape related to the April 16, 2008 van incident. On May 14, 2008, Defendant Otero presided over the hearing held on the disciplinary charge, finding Plaintiff guilty of attempted escape and imposing sanctions. Defendant Choinski upheld the disciplinary finding on appeal. On May 13, 2008, correctional officials at Northern issued an order that Plaintiff be placed on High Security Status. Plaintiff was not afforded a hearing prior to this High Security Status designation.

On August 15, 2008, prison officials transported Friedland back to Rockville Superior Court for sentencing on the charges to which he had pled guilty on April 16, 2008. During that court proceeding, Plaintiff was sentenced to a total effective sentence of five years' imprisonment, followed by two years of special parole. On March 4, 2009, Plaintiff appeared in state court pursuant to his guilty pleas to one count of disorderly conduct and one count of criminal mischief in connection with his involvement in the incident in the prison van on April 16, 2008. *See State v. Friedland,* Docket No. T19RCR08–0092492–S. He was sentenced to thirty days' imprisonment on both counts to be served concurrently to each other and to his sentence on the Vernon charges, and was ordered to pay restitution in the amount of $585.00 for destruction to the prison van.

**II. Discussion**[FN5]

FN5. Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir.2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed.R.Civ.P. 56(c). Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

***3** Plaintiff alleges that Defendants violated his Fourteenth Amendment right to due in several respects in connection with his discipline arising the alleged escape attempt from the prison van. Specifically, Plaintiff claims that: (1) "[t]he 'description of violation' on the Disciplinary Report was too vague and/or conclusory to provide meaningful notice;" (2) "[t]he advocate failed to investigate and to help [ ] Plaintiff prepare a defense when [ ] Plaintiff was unable to do so on his own; (3) "[t]he guilty finding [on the attempted escape charge] was not supported by some evidence;" (4) "[t]he evidence used to support

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2014 WL 1247992 (D.Conn.)
**(Cite as: 2014 WL 1247992 (D.Conn.))**

the charge [of attempted escape] was not disclosed to [ ] Plaintiff;" (5) "Plaintiff was not afforded a hearing of any type before being placed on High Security;" and (6) "[b]ecause he was not in [Department of Correction] custody at the time of the incident on the van, consistent with due process the [Department of Correction] could not sanction him for the incident." FN6 (*See* 2d Am. Compl. [Doc. # 35] ¶ 45.) Friedland seeks injunctive relief requiring Defendants to remove him from High Security Status and to expunge the April 17, 2008 disciplinary report from his record, as well as compensatory damages. Defendants move for summary judgment on five grounds. They argue that: (1) Plaintiff has no liberty interest in his classification to High Security Status; (2) they did not deny him due process in connection with the disciplinary charge of attempted escape; (3) Plaintiff has not alleged the personal involvement of Defendants Choinski and Levesque in the deprivation of his constitutional rights and thus they are not proper defendants in this action; (4) Plaintiff's claims for injunctive relief are moot; and (5) Defendants are entitled to qualified immunity on each of Plaintiff's claims.

FN6. Defendants failed to address this claim in their amended motion for summary judgment.

As a preliminary matter, for the purposes of this action, the parties do not dispute that Plaintiff was a pretrial detainee from at least April 16, 2008 through August 15, 2008, when he was sentenced to five years of imprisonment on the Vernon criminal charges. Because all of the relevant events in this case, such as the incident in the prison van, Friedland's disciplinary hearing, and his High Security designation, took place during this time period, Friedland's due process claims will be evaluated by the standards governing pretrial detainees.

The claims of a pretrial detainee confined in a state correctional facility are reviewed under the Due Process Clause of the Fourteenth Amendment. *See* *Bell v. Wolfish,* 441 U.S. 520, 535 & n. 16 (1979). Because "[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime," the Fourteenth Amendment dictates that he or she may not be punished in any manner-neither cruelly and unusually nor otherwise. *Id.* at 536–37. To state a claim for violation of procedural due process, a plaintiff must demonstrate that he "possessed a protected liberty or property interest, and that ... [the defendants] deprived [him] of that interest without due process of law." *McMenemy v. City of Rochester,* 241 F.3d 279, 285–86 (2d Cir.2001) (citation omitted). "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466 (1983).

***4** A pretrial detainee has a liberty interest under the Due Process Clause in avoiding conditions of pretrial confinement that amount to punishment. *See* *Bell,* 441 U.S. at 535–37. "Not every disability imposed during pretrial detention," however, "amounts to 'punishment' in the constitutional sense." *Id.* at 537. In the absence of an allegation that "the defendant verbally expressed an intent to punish, punitive intent may be inferred from the nature of the conditions or restraints." *Turkmen v. Ashcroft,* 915 F.Supp.2d 314, 338 (E.D.N.Y.2013). A court may consider " 'whether an alternative purpose to which [the sanction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' " *Bell,* 441 U.S. at 538 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69 (1963)). Thus, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' " *Id.* at 539. "[E]nsuring a detainee's presence at trial," maintaining security and order within the prison facility and operating the facility in a manageable fashion are all examples of valid governmental objectives that could justify the imposition of restrictive conditions of confinement on pretrial de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tainees. *See id.* at 540. Courts "ordinarily defer to [the] expert judgment" of prison officials "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response" to administrative considerations. *Id.* at 540 n. 23. Even if restrictions placed on a pretrial detainee are not punitive in violation of a protected liberty interest under the Fourteenth Amendment, a court must also inquire whether the state by "statute or regulation prescribes mandatory procedures that ... create a liberty interest." *Covino v. Vermont Dep't Corrections,* 933 F.2d 128, 129 (2d Cir.1991) (citing *Hewitt,* 459 U.S. 460). If the pretrial detainee is able to establish a liberty interest either under the Fourteenth Amendment itself or under state law, the court must then determine what process is due the detainee.

In determining the type of process due a pretrial detainee, courts have focused on the purpose and need for the restraint on the protected liberty interest. The Court of Appeals for the Second Circuit has held that a pretrial detainee who has been subjected to disciplinary sanctions or punitive restraints is entitled to the due process protections set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974). *See Benjamin v. Fraser,* 264 F.3d 175, 190 (2d Cir.2001) (affirming district court's application of *Wolff* to pretrial detainees and noting that the required *Wolff* procedures were applicable to a restraint on the detainee's liberty that was "imposed for disciplinary reasons" or constituted punishment due to its painful and injurious nature). Thus, if the purpose of the restraint on liberty is punitive in nature, the procedural protections set forth in *Wolff* apply. However, if the purpose of the restraint on liberty is administrative, then the minimal procedures outlined in *Hewitt v. Helms,* 459 U.S. 460 (1983) are all that is required. *See Benjamin,* 264 F.3d at 190. Administrative purposes include restraints that are employed to achieve a legitimate governmental interest in protecting the safety of the individual, prison staff or the general prison population.

**A. Procedural Due Process—Disciplinary Charge**

***5** On May 14, 2008, following the van incident, Defendant Otero found Plaintiff guilty of attempted escape and sanctioned him to fifteen days of punitive segregation, ninety days' loss of telephone privileges and ninety days' loss of commissary privileges. The parties do not dispute that these sanctions were punitive in nature, and thus Plaintiff was entitled to the due process protections set forth in *Wolff.* Pursuant to *Wolff,* a pretrial detainee charged with a disciplinary violation is entitled to: a disciplinary hearing and written notice of the charges at least twenty-four hours in advance of that hearing; the opportunity to present witnesses and documentary evidence before an impartial hearing officer or committee as long as doing so will not jeopardize prison safety and security; and a written statement including evidence relied on by the hearing officer in reaching his or her decisions and the reasons for the disciplinary action. *See Wolff,* 418 U.S. at 564–66. While a pretrial detainee has no right to retained or appointed counsel at a disciplinary hearing, in some circumstances, he or she may be entitled to the appointment of an advocate or assistance from a fellow inmate. *Id.* at 570. Plaintiff claims that Defendants Otero, Kay, and Choinski violated his procedural due process rights in connection with the discipline imposed for his attempted escape in that the notice of disciplinary charge was vague; Plaintiff's advocate did not provide effective assistance at the hearing; Defendants failed to disclose to Plaintiff the evidence against him; and Defendants' finding of guilt was not supported by any evidence.

*1. Notice of Disciplinary Charge*

Plaintiff does not dispute that he received a disciplinary report in connection with the attempted escape charge more than twenty-four hours before his disciplinary hearing, as required by *Wolff.* Rather, Plaintiff argues that the report was too vague to provide him with meaningful notice of the charge against him. In *Taylor v.. Rodriguez,* 238 F.3d 188 (2d Cir.2001), the Second Circuit, considering the minimum requirements for notice to an inmate in the context of a disciplinary or administrative segregation

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

hearing, held that notice is more than a “mere formality;” it must “be sufficiently specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.” *Id.* at 192–93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)).

The April 17, 2008 disciplinary report issued to Friedland by Lieutenant Bernard Loubier charged Plaintiff with the Class A Offense of Attempted Escape. [FN7] The description of the violation reads as follows:

> FN7. Escape is defined in the State of Connecticut Administrative Directive 9.5 as: “Leaving a correctional facility without authorization; leaving escorted custody without permission; exceeding assigned limits of community release without permission; or failing to properly return from furlough.” (*See* April 16, 2008 Incident Report at 8.) Attempt is defined as “[c]onduct which is likely to result in an act prohibited by this Directive.” A prison official is not required to charge an inmate with the separate offense of attempt because it is “deemed to be included in the substantive offense.” The offense of attempt “shall be punishable in the same degree as if the substantive offense was committed.” (*See id.* at 7.)

> On Thursday, April 17, 2008, following additional investigation conducted by the Security Division, it was determined that the actions taken by Inmate Friedland, Darrell # 336916 while being transported by the Judicial Marshals from Rockville Court (JD19) to the MacDougall–Walker Correctional Institution on Wednesday, April 16, 2008 at approximately 3:05 PM did constitute an attempted escape. Additionally, based on the fact that Connecticut State Police involvement was necessary and because Friedland is expected to be charged by C.S.P. on the charge of Attempted Escape, this disciplinary report is warranted.

***6** (*See* May 14, 2008 Disciplinary Process Summary Report, Ex 4 to Blais Aff. [Doc. # 20–8].)

Plaintiff complains that the disciplinary report did not include specific facts as to what conduct constituted an attempted escape. The report includes the specific location, date, and time period during which the alleged attempted escape occurred, April 16, 2008 at approximately 3:05 P.M. in the transportation van on the way back from state court to MacDougall–Walker. The Court concludes that the lack of details as to the specific actions taken by Friedland in the van at approximately 3:05 P.M. does not render the report deficient.

During the investigation of the disciplinary report and at the hearing, Friedland's defense was that he was sitting at the end of the van, did not participate in knocking down the dividing partition and did not attempt to escape. In addition, he claimed that the other inmates in the van could corroborate that he had not attempted to escape from the van. Thus, the specific information as to time, date, and location and the nature of the charge provided minimally adequate notice to Friedland of the conduct at issue and enabled him to attempt to prepare his defense to the charge. *See Kalwasinski v. Morse,* 201 F.3d 103, (2d Cir.1999) (“discrepancy as to the precise nature of the threatened harm did not represent a failure of specificity that would impair [plaintiff's] ability to prepare his defense, especially since his defense was simply that the ... report was a fabrication”); *Wright v. Dixon,* 409 F.Supp.2d 210, 214 (W.D.N.Y.2006) (although disciplinary report included misstatement as to the time of the misconduct alleged to have been committed by the plaintiff, “the report was otherwise sufficiently detailed to put the plaintiff on notice of the conduct at issue”). Therefore, Plaintiff's advance receipt of the disciplinary report was not constitutionally

defective and Defendants' motion for summary judgment is granted as to this claim.

*2. Advocate's Assistance*

Plaintiff states that a prison official assigned Defendant Kay to be his advocate to assist him in preparing for the hearing on the disciplinary report. He contends that Defendant Kay failed to investigate the allegations against him or assist him in preparing a defense by securing witnesses to offer testimony or written statements at the hearing.

Plaintiff acknowledges that on April 21, 2008, Defendant Kay discussed the disciplinary report with him and that he informed Kay that he had not attempted to escape from the van. Friedland avers that he asked Kay to find out the names of the inmates who were on the transportation van with him and to arrange to have them testify on his behalf in support of his claim that he had not tried to escape from the van. Friedland contends that Kay informed him that the inmates could not be transported to Northern for the hearing. When Friedland asked Kay to obtain written statements from the inmates to be submitted at the hearing, he refused to do so. The parties dispute whether Kay was present at the hearing. (*See* Pl .'s Aff. ¶ 35; Otero Aff. [Doc. # 20–9] ¶ 13.) Defendants argue that Kay adequately performed his role as Friedland's advocate.

***7** Although an inmate is not entitled to appointed counsel at a disciplinary hearing, in certain circumstances an inmate who is illiterate, confined in a restrictive housing unit, transferred to another correctional institution or unable to grasp the complex nature of the issues, may be entitled to an assigned advocate to assist him in preparing for the hearing. *See Wolff,* 418 U.S. at 570, *Ayers v.* Ryan, 152 F.3d 77, 80–81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). The assigned advocate, "act[s] as [the inmate's] surrogate in doing "what the inmate would have done were he able, but is not required "to go beyond the specific instructions of the inmate" in rendering assistance. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (per curiam).

Here, Plaintiff states that he was in a restrictive housing unit at the time of the hearing, was only able to ascertain the name of one of the ten other inmates who were present on the prison van on April 16, 2008, and was unaware of the whereabouts of any of the inmates in order to secure their presence at his hearing. He instructed Kay to either arrange to have the inmates testify or get written statements from them, but Kay refused to do so and no witnesses were present nor were any witness statements introduced at the hearing. (*See* Pl.'s Aff. ¶¶ 27–32, 35.) Kay's Advocate Investigation Report is unclear regarding any requests for witness statements or testimony requested by Friedland as those sections were left blank and no mention was made of witnesses in the Conclusion and Recommendation section of the report. (*See* May 14, 2008 Disciplinary Process Summary Report at 8–9.)

Defendants contend that Kay's report suggests that Plaintiff did not ask to present witnesses at the hearing. Since Kay has not submitted an affidavit, there is conflicting evidence as to whether Friedland asked Kay to secure witness testimony or statements to be submitted at the hearing and whether the lack of access to these statements or testimony deprived Plaintiff of the opportunity to marshal evidence and present a defense. Thus, Defendants have not met their burden of demonstrating that there are no issues of material fact in dispute regarding the adequacy of the assistance provided to Plaintiff by Kay in preparation for the hearing, and their motion for summary judgment is therefore denied as to this procedural due process claim.

*3. Written Statement of Reasons*

Plaintiff claims that Defendant Otero's Disciplinary Summary Process Report was deficient because it did not set forth the evidence that she relied on to support her finding of Friedland's guilt on the attempted escape charge. Defendants contend that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Otero's Summary Process Report provided a sufficient description of the evidence that she may have relied on and her reasons for reaching her decision.

However, a review of Otero's Disciplinary Summary Process Report reflects that it does not include or describe any specific evidence relied on or the reasons for her disciplinary finding. Rather, the Summary Process Report simply refers generally to "documentation submitted" in support of the decision. It is only Defendant Otero's affidavit that says "documentation submitted" means the Incident Report Package prepared in connection with the disturbance that occurred on the prison van driven by Judicial Marshals, a Medical Incident Report and a Use of Force Report. (*See* Otero Aff. ¶ 16; *see also* May 14, 2008 Disciplinary Process Summary Report; April 16, 2008 Incident Report, Ex. 3 to Blais Aff.) Thus, in the absence of Otero's Affidavit, submitted in support of Defendants' motion for summary judgment, a reasonable jury could conclude that the Summary Report did not identify the documents that constituted the evidence Otero relied on in reaching her decision on the disciplinary charge against Friedland.

***8** It is well-established that a pretrial detainee has a due process right to a written statement describing the evidence upon which a hearing officer relied in finding the detainee guilty of a disciplinary infraction. *See Wolff,* 418 U.S. at 564–65; *Sira v. Morton,* 380 F.3d 57, 74 (2d Cir.2004); *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1981). There are limits, however, on this disclosure requirement for evidence supporting a disciplinary decision. The Supreme Court has held that institutional safety concerns may provide a sufficient reason to exclude a description of certain evidence in the written statement of reasons. *See Wolff,* 418 U.S. at 565. If a prison official wishes to exclude details about particular evidence on which he or she relied in finding guilt for safety and security reasons, that justification must be set out in the written report documenting the basis for the disciplinary decision. *See id.*

Defendant Otero's Summary Process Report provided no description of the evidence that she relied on to support her guilty finding and she offered no security justification for the omission. Without either, a reasonable jury could conclude that Defendant Otero's Summary Process Report fails to meet the requirement in *Wolff* that the hearing officer provide a written statement of the evidence relied on and the reasons for her disciplinary action. *See Davidson v. Capuano,* No. 78 CIV. 5724(RLC), 1988 WL 68189, at *12 (S.D.N.Y. June 16, 1988) (holding that hearing officer's report that simply listed a reference to a source of information—a "Misbehavior Report"—as the evidence relied did not satisfy the requirements of *Wolff* ); *Powell v. Ward,* 487 F.Supp. 917, 930 (S.D.N.Y.1980) (finding limited statements listing only a source or sources of information related to charges were inadequate and failed to comply with *Wolff* ), *modified on other grounds,* 643 F.2d 924 (2d Cir.1980), *cert. denied,* 454 U.S. 832 (1981). The Court concludes that Plaintiff has presented a viable due process claim with respect to Otero's failure to identify the specific evidence upon which she relied in her disciplinary decision, and Defendants' motion for summary judgment is therefore denied as to this procedural due process violation.

*4. Some Evidence To Support Guilty Finding*

Plaintiff argues that there was no evidence to support Defendant Otero's decision that he was guilty of attempted escape. The Due Process Clause of the Fourteenth Amendment requires that a hearing officer's determination be supported by "some evidence." *Superintendent v. Hill,* 473 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' " the hearing officer's disciplinary determination. *Sira,* 380 F.3d at 69 (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000)) (analyzing evidence in summary judgment record although the defendants failed to identify or describe this evidence in the disciplinary decision).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

***9** The documentation relied on by Defendant Otero in support of her guilty finding included an Incident Report. (*See* Otero Aff. ¶ 16.) That Report included statements from the Judicial Marshal who was driving the prison van and the Judicial Marshal who was sitting in the passenger seat. One of the Marshals indicated that she overheard inmates in the back of the van talking about escaping, heard Plaintiff kicking the partition and observed Plaintiff walk through the broken partition to the other side of the van and then begin to kick the partition that divided the back of the van from the front of the van where she and the other Judicial Marshal were sitting. She related that she heard Plaintiff and the other inmates say that they were trying to get through to the driver's side of the van which caused her to fear for her life. (*See* May 14, 2008 Disciplinary Process Summary Report at 35–38.) Thus, although the basis for Defendant Otero's decision may not have been clear in her Summary Report, the documents upon which she avers that she relied constitute some reliable evidence to support Defendant Otero's determination that Plaintiff was guilty of attempted escape by trying to leave escorted custody without permission, and therefore Defendants' motion for summary judgment is granted as to this procedural due process claim. *See Sira,* 380 F.3d at 82–83 (holding that the defendants were not entitled to qualified immunity with respect to the plaintiff's claim that they had not disclosed the evidence upon which they relied in their written statement of reasons, but that they were entitled to qualified immunity on the question of whether the disciplinary decision was supported by "some evidence" in the summary judgment record).

**B. Personal Involvement of Defendant Choinski**

Defendants contend that the claims against Defendant Choinski should be dismissed because he lacked personal involvement in the alleged violation of Plaintiff's due process rights in that he did no more than deny Plaintiff's appeal of Defendant Otero's guilty determination. Plaintiff counters that the denial of his appeal constitutes sufficient personal involvement to impose supervisory liability on Defendant Choinski.

As a supervisory official, Defendant Choinski cannot be held liable under section 1983 solely for the acts of his subordinates. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). Plaintiff may show supervisory liability by demonstrating one or more of the following criteria: (1) the defendant actually and directly participated in the alleged unconstitutional acts; (2) the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) the defendant was grossly negligent in supervising the correctional officers who committed the constitutional violation; and (5) the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted). In addition, Plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury. *See Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

***10** In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Supreme Court found that a supervisor can be held liable only "through the official's own individual actions." *Id.* at 676. This decision arguably casts doubt on the continued viability of some of the categories for imposing supervisory liability enunciated in *Colon.* The Second Circuit, however, has not revisited the criteria for supervisory liability following *Iqbal. See DeJesus v.. Albright,* No. 08 Civ. 5804(DLC), 2011 WL 814838, at *6 n. 4 (S.D.N .Y. Mar. 9, 2011). Because it is unclear whether *Iqbal* overrules or limits *Colon* the Court will continue to apply each of the categories for supervisory liability set forth in *Colon.*

After Defendant Otero found Plaintiff guilty of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

attempted escape, Plaintiff filed an appeal of the decision and the sanctions imposed by Defendant Otero. In response, Defendant Choinski engaged in an extensive review of the appeal and concluded there was sufficient evidence to support the guilty finding and that no serious due process failure had occurred prior to or during the disciplinary hearing. (*See* Appeals Decision, Ex. 5 to Blais Aff.)

The Second Circuit has held that a supervisory official in charge of a correctional facility may be personally involved in depriving an inmate of his due process rights during a hearing on a disciplinary charge if he or she affirmed the appeal of the hearing officer's decision. *See* *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (concluding that the plaintiff had "sufficiently alleged that Superintendent Smith was personally involved in depriving him of his due process right to call witnesses" at the hearing on the misbehavior report when Smith affirmed the guilty finding on appeal); *Wright v. Smith,* 21 F.3d 496, 502 (2d Cir.1994) (concluding that Superintendent "Smith was [a] supervisory official [who], after learning of the violation through a report or appeal, ... failed to remedy the wrong"). Furthermore, in situations where the supervisory official has actively considered the issues raised by the inmate in reviewing and responding to the appeal rather than simply rubber-stamping the underlying decision of the hearing officer, personal involvement on the part of the supervisory official has been found. *See* *Molano v.. Bezio,* No. 10–CV–6481L, 2012 WL 1252630, at * 5 (W.D.N.Y. Apr. 13, 2012) (holding that a supervisory official was involved in a due process violation because he considered deficiencies underlying the hearing as well as exculpatory evidence in modifying the sentence imposed by the hearing officer); *Thomas v. Calero,* 824 F.Supp.2d 488 (S.D.N.Y.2011) (concluding that the Director of Special Housing/Inmate Disciplinary Programs' decision to affirm the Hearing Officer's "determination of guilt with only a modification of the penalty [was] sufficient to demonstrate involvement and could lead a trier or fact to impose liability under the second *Colon* factor").

***11** The evidence submitted supports Plaintiff's contention that Defendant Choinski became aware of the alleged procedural due process deprivations in reviewing the written appeal of the disciplinary finding before the sanctions imposed by Defendant Otero had expired, but failed to remedy the violations. *See* *Rodriguez v. Selsky,* Civil Action No. 9:07–CV–0432(LEK/DEP), 2011 WL 1086001, at *6 (N.D.N.Y. Jan. 25, 2011) (prison supervisor's decision to affirm "constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated by the Second Circuit for informing the supervisory liability analysis"), *report & rec. adopted,* No. 07–CV–0432, 2011 WL 830639 (N.D.N.Y. Mar. 3, 2011); *Garcia v. Selsky,* 680 F.Supp.2d 479, 481 (W.D.N.Y.2010) ("[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeal[ ] as opposed to merely rubber-stamping the results.") (internal quotation marks and citations omitted)).

Thus, Defendant Choinski's investigation of Plaintiff's due process claims in connection with the issuance of the disciplinary report and the hearing to dispose of the disciplinary report constituted sufficient involvement under the second *Colon* factor, and Defendant's motion for summary judgment is therefore denied as to claims against Defendant Choinski relating to his alleged failure to remedy the underlying procedural defects associated with the disciplinary hearing.

**C. Procedural Due Process—High Security Placement**

Plaintiff claims that Defendant Levesque's decision to place him on High Security Status before he had been found guilty of attempted escape violated his due process rights. Defendant Levesque counters that

because the placement on High Security Status was not punitive, and rather was as a result of legitimate safety and security concerns, Plaintiff's security designation did not violate his due process rights.

The parties do not dispute that on April 29, 2008, Warden Jeffrey McGill sent a letter to Director of Offender and Classification and Population Management Levesque recommending that Plaintiff be placed on High Security Status pursuant to State of Connecticut Administrative Directive 9.4(14) due to his conduct in kicking the partition in the transport van on April 16, 2008. Warden Murphy determined that Friedland met the criteria for high security placement because he was an inmate who has engaged in "an instant serious escape [or] attempted serious escape." (*See* Admin. Dir. 9.4, Ex. 2 to Cruickshank Aff. [Doc. # 40–3] at 10.) In response, on May 8, 2008, Director Levesque sent a letter to Warden McGill indicating that he concurred with the recommendation of Plaintiff's placement on High Security Status and directed Warden McGill to hold a Classification Hearing to inform Plaintiff of his designation to this status. (*See* Levesque Letter, Ex. 2 to Milling Aff. [Doc. # 20–10].) However, no such hearing was held, and on May 13, 2008, Counselor Suse issued Friedland a document entitled High Security Placement, advising him that he had been placed on High Security Status pursuant to State of Connecticut Administrative Directive 9.4, and explaining the restrictions under which he would be managed during his placement on High Security Status. (*See* High Security Placement, Ex. 3 to Milling Aff.) Friedland signed the High Security Placement document on May 19, 2008. Friedland states that he was confined on High Security Status until his release on parole.

*1. Personal Involvement of Defendant Levesque*

***12** Defendants argue that Defendant Levesque is named only because of his role as a supervisory official within the Department of Correction, and that he lacked any personal involvement in Plaintiff's case. However, based on the Amended Complaints and the exhibits in the record, it is clear that Defendant Levesque was directly involved in the decision to place Plaintiff on High Security Status as the Director of Inmate Classification and Population Management. Thus, Defendants' motion for summary judgment on the ground that Defendant Levesque lacked the personal involvement necessary to establish supervisory liability is denied.

*2. Protected Liberty Interest—Due Process Clause*

A pretrial detainee has a liberty interest in being free from punishment "prior to an adjudication of guilt in accordance with due process of law." *Bell,* 441 U.S. at 535. Defendant Levesque argues that Plaintiff has no protected liberty interest under the Due Process Clause of the Fourteenth Amendment because he was placed High Security Status not for punitive reasons, but rather for the legitimate governmental purpose of safety and security as a result of his attempted escape from the prison van on April 16, 2008. (*See* Aldi Aff. [Doc. # 40–4] ¶ 33.) Plaintiff has presented no evidence based on which a jury could reasonably conclude that his designation to High Security Status was punitive in any way.

Connecticut Department of Correction Security Risk Coordinator Aldi avers that an inmate's placement on High Security Status permits Department of Correction staff to engage in increased supervision of an inmate who might be a threat to the security of the prison facility, staff, inmates, or the public. (*See id.* at ¶ 13.) There is nothing in the Administrative Directives that prohibits a prison official from designating an inmate to High Security Status prior to a disciplinary finding of guilt as to an attempted escape charge. (*See id.* at ¶¶ 32–34.) Plaintiff's placement on High Security Status was based on his involvement in the incident in the prison van on April 16, 2008 and was documented in the Incident Report prepared by Department of Correction officials later that day. (*See* April 16, 2008 Incident Report.) Although Plaintiff avers that he did not attempt to escape from the prison van, he concedes that he kicked out the partition in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

van, walked over the broken partition to the other side of the van and confronted an inmate sitting there. (*See* Pl .'s Aff. ¶¶ 16–20.)

Defendant Levesque further contends that Plaintiff's High Security Status designation was not an exaggerated response to Plaintiff's behavior, but was reasonably related to the legitimate penological objective of maintaining the safety and security of the prison staff and the public as well as monitoring and managing Plaintiff's custody. In light of the Department of Correction's consideration of the conversations overheard by the State Judicial Marshals who were driving the van, as well as their observations of Plaintiff's behavior, and Plaintiff's concession that he did kick out the partition in the van, the decision to place Plaintiff on High Security Status was not an unreasonable or excessive response to Plaintiff's conduct in the van. *See Bell,* 441 U.S. at 540 n. 23 (determination whether particular restriction or limitation is reasonably related to the function of pretrial confinement requires courts to remember that the implementation of such restrictive measures is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.")

***13** Plaintiff has submitted no evidence to demonstrate that the decision to place him on High Security Status was done for a punitive purpose rather than for the legitimate administrative purpose of maintaining safety, security, and order in the prison. Therefore, the Court concludes that Plaintiff's designation to High Security Status did not constitute punishment, and thus the Fourteenth Amendment does not provide a protected liberty interest in his avoidance of that classification. *See Taylor v. Comm'r New York Dep't Corrections,* 317 F. App'x 80, 82 (2d Cir.2009) (affirming district court's determination that inmate's confinement in punitive segregation unit for approximately two months did not constitute punishment because "there was no evidence in the record demonstrating prison officials intended to punish inmate and confinement not excessive in relation to purpose of maintaining safety"); *Covino v. Vermont Dep't of Corrections,* 933 F.2d 128, 129 (2d Cir.1991) ( "[T]he transfer of an inmate to less amendable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself."); *Adams v. Galletta,* No. 96 CIV. 3750(JGK), 1999 WL 959368, at *4 (S.D.N.Y. Oct. 19, 1999) (concluding pretrial detainee had not been deprived of a liberty interest under the Due Process Clause of the Fourteenth Amendment because his designation as a Central Monitoring Case was due to his being an escape risk and his "subsequent housing in maximum security was not punitive").

*3. Liberty Interest Under State Law*

The Second Circuit has held that even if a restraint or restriction placed on a pretrial detainee is not punitive, a Court must also determine whether the state by "statute or regulation prescribes mandatory procedures that ... create a liberty interest." *Covino,* 933 F.2d at 129 (citing *Hewitt,* 459 U.S. 103). In *Hewitt,* the Supreme Court analyzed Pennsylvania laws governing placement of prisoners in administrative segregation and concluded that these laws created a liberty interest because they included "language of unmistakably mandatory character, requiring that certain procedures be employed ... and that administrative segregation will not occur absent specified substantive predicates ...." identified as "the need for control" and "the threat of a serious disturbance." *Id.* at 471–72 & n. 6 (internal quotation marks omitted).

Defendant Levesque neglects to engage in any examination or discussion of whether the State of Connecticut's Administrative Directives governing Classification and Restrictive Housing placement include mandatory language that might be construed to require procedural due process protections prior to or after a pretrial detainee's placement on or designa-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion to High Security Status. Instead, without discussion, he simply concludes that Plaintiff has no liberty interest in his classification to High Security Status under state law because the Department of Correction has discretion to determine prisoner classifications.

***14** The language in Administrative Directive 9.4 governing the imposition of restrictive conditions of confinement on inmates suggests that a hearing might be required in connection with an inmate's placement on High Security Status. (*See* Admin. Dir. 9 .4.) Specifically, Administrative Directive 9.4(14) provides that "[a]n investigation shall be conducted by the Unit Administrator or designee to determine if an inmate may be considered for a High Security Monitoring Hearing, if such inmate meets one of the criteria listed in this section." (*Id.*) It requires "each [prison] facility to establish procedures to review each inmate, consistent with classification practices, to determine if an inmate shall be considered for a High Security Monitoring Hearing." (*See id.* at 9.4(14)(A)). Furthermore, Administrative Directive 9.4(14) includes language that suggests that High Security placement will not occur unless an inmate meets certain listed criteria. (*See* Admin. Dir. 9.4.) This language could be construed to require specific substantive predicates prior to an inmate's placement on High Security Status. Additionally, the August 8, 2008 letter from Defendant Levesque to Warden Jeffrey McGill confirms that Defendant Leveque understood that a hearing was required or would be held in connection with the recommendation that Plaintiff be placed on High Security Status. (*See* Levesque Letter.) Thus, an examination of the evidence presented by Defendants reflects that there are issues of fact as to whether Plaintiff satisfied the criteria to be entitled to a High Security Monitoring Hearing pursuant to Administrative Directive 9.4, such that he had a protected liberty interest under state law to such a hearing.

*4. Process to Which Plaintiff Was Entitled*

Assuming that Plaintiff has demonstrated a liberty interest in his security status designation, Plaintiff was entitled to at least "the minimal procedures outlined in *Hewitt.*" *Benjamin,* 264 F.3d at 190. In *Hewitt,* the Supreme Court held that "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation," and the "proceeding must occur within a reasonable time following the inmate's transfer." *Id.* at 476 & n. 8.

Defendant Levesque has not addressed whether Plaintiff's receipt of written notice of his placement on High Security Status met the requirements of *Hewitt.* After Defendant Levesque approved Plaintiff's designation to High Security Status on May 9, 2008, Counselor Supervisor Mark R. Suse prepared a notice of High Security Placement dated March 13, 2008. On May 19, 2008, Plaintiff signed the notice indicating that he had been informed of his placement on High Security Status. The notice advised Plaintiff that he had been placed on High Security Status pursuant to Administrative Directive 9.4 and described the restrictions that would accompany the placement. The notice did not include the basis for the designation. Thus, although the notice was provided to Plaintiff within a reasonable time after Defendant Levesque's decision to place him on High Security Status, it did not include the charges against him or the basis for his designation to High Security Status. Furthermore, there is no evidence to suggest that the mere delivery of the notice to Plaintiff by Counselor Suse met the requirement that Plaintiff be given an opportunity to present his views to either Defendant Levesque or Warden McGill as to the decision to place him on High Security Status. Based on the modicum of evidence presented by parties, Defendant Levesque has failed to show that he is entitled to judgment as a matter of law on the claim relating to the process afforded to Plaintiff in connection with his placement on High Security Status in May 2008. Accordingly, Defendants' motion for summary judgment is denied with respect to this claim.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**D. Injunctive Relief**

***15** Plaintiff requests injunctive relief in the form of an order that Defendants remove him from High Security Status and expunge the disciplinary report charging him with attempted escape. Defendants argue that these requests are now moot because Plaintiff has been discharged from the Department of Correction.

The Second Circuit has held that an inmate's request for injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. *See Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976). *See also Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."). Other courts concur with this result. *See, e.g., McAlpine v. Thompson,* 187 F.3d 1213, 1215 (10th Cir.1999) (noting that an inmate's claim for prospective injunctive relief regarding conditions of confinement is rendered moot upon his release from confinement).

Plaintiff has informed the Court that he is no longer incarcerated within the Connecticut Department of Correction. In his response to Defendants' argument that the injunctive relief is moot, Plaintiff indicated that after his release on special parole from his Connecticut sentence on September 28, 2012, he was taken into custody by Massachusetts Department of Corrections and is confined in a Massachusetts Correctional Institution in South Walpole, Massachusetts. He acknowledged that the term of special parole from the Connecticut sentence expired on September 15, 2013. Thus, at this point, Plaintiff is currently no longer on parole or within the custody of the Connecticut Department of Correction. As such, he is no longer on High Security Status. The Court therefore concludes that Plaintiff's request for injunctive relief pertaining to his removal from High Security Status by Connecticut prison officials is moot.

With regard to Plaintiff's request that the disciplinary report for attempted escape be expunged, the Court concludes that this request is not moot. If a jury were to determine that Defendants denied Plaintiff due process in connection with the issuance of the disciplinary report, the Court might award relief in the form of expungement of the report. Therefore, Defendants' motion for summary judgment is granted as to the request for injunctive relief regarding Plaintiff's removal from High Security Status and denied as to the request for injunctive relief pertaining to the expungement of the disciplinary report.

**E. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity on all of Plaintiff's claims. Defendants have the burden of proving the affirmative defense of qualified immunity in a motion for summary judgment or at trial. *See Vincent v. Yelich,* 718 F.3d 157, 166 (2d Cir.2013).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To determine if an official is entitled to qualified immunity, a court considers whether (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official and (2) the right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd,* 563 U.S. ––––, ––––, 131 S.Ct. 2074, 2080 (2011) (citation omitted). A negative answer to either question means that immunity from monetary damages claims is appropriate. *Pearson,* 555 U.S. at 236. The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to decide first in view of the particular circumstances surrounding the case to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

be decided. *See id.* at 236.

***16** Under the second prong, a right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.' " *al-Kidd,* 563 U.S. at ––––, 131 S.Ct. at 2083 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "A broad general proposition" does not constitute a clearly established right. *See Reichle v. Howards,* ––––U.S. ––––, 132 S.Ct. 2088, 2094 (2012). Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson,* 483 U.S. at 640).

In support of their qualified immunity argument, Defendants state that:

> [i]n the claim at hand, the most expeditious means of disposing this lawsuit should be utilized and that would be to address whether the defendant violated the plaintiff's constitutional rights, pursuant to the Due Process Clause of the Fourteenth Amendment. It is clear from the evidence that this is not the case as to these defendants.

Defs.' Mem. Supp. [Doc. # 40] at 25–26. Defendants offer no further discussion. It is apparent that Defendants are arguing that they are entitled to qualified immunity under the first prong of the standard.

In summary, the Court has determined that there are outstanding issues of material fact with regard to Plaintiff's due process claims relating to the disciplinary hearing and the decision to place Plaintiff on High Security Status that preclude summary judgment. Specifically, there are material facts in dispute as to the adequacy of the assistance provided to Plaintiff by Defendant Kay in preparation for the disciplinary hearing, including securing witness testimony or witness statements and whether Defendant Otero's Summary Process Report provided an adequate written statement of the evidence relied on and the reasons for the disciplinary action.

With regard to the claim that Defendant Levesque denied Plaintiff procedural due process in connection with his placement on High Security Status, the Court has concluded that there are issues of material fact as to whether a liberty interest was created under the circumstances of this case by the language of the Administrative Directives governing an inmate's placement on High Security Status. Furthermore, the evidence presented by Defendant Levesque precludes a finding that he is entitled to judgment as a matter of law on the issue of whether Plaintiff received all the process that he was due in connection with Plaintiff's placement on High Security Status. Thus, Defendants are not entitled to summary judgment on the first prong of the qualified immunity standard.

Although summary judgment might still be appropriate if Defendants could prove that the constitutional rights in questions were not "clearly established" at the time of the violations, Defendants do not address the second prong of the qualified immunity standard. At the time of the disciplinary hearing and Plaintiff's placement on High Security Status, it was well established under *Bell* that a pretrial detainee could not be punished prior to being sentenced for a criminal conviction, that the requirements in *Wolff* applied to the disciplinary hearing of a pretrial detainee involving punitive sanctions or restraints, and that a liberty interest could be created under state law that would require the procedural due process protections set forth in *Hewitt* before a pretrial detainee could be designated to a restrictive classification status for administrative purposes. *See Wolff,* 418 U.S. 539; *Bell,* 441 U.S. 520; *Hewitt,* 459 U.S. 469; *Benjamin,* 264 F.3d 175; *Covino,* 933 F.2d 128. Because

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants do not offer any argument with regard to the second prong of the qualified immunity standard, the Court will not consider the issue any further at this time.

***17** Disputed issues of material fact preclude a finding that Plaintiff's procedural due process rights were not violated such that the Defendants are entitled to judgment as a matter of law. Furthermore, Defendants have not met their burden of demonstrating that Plaintiff's rights to due process in connection with the disciplinary report and placement on High Security Status were not clearly established such that a reasonable officer would not have known that his conduct was unlawful. Accordingly, Defendants' motion for summary judgment on the ground that they are entitled to qualified immunity is denied on this record.

**III. Conclusion**

Defendants' Amended Motion [Doc. # 39] for Summary Judgment is GRANTED as to Plaintiff's request for injunctive relief removing him from High Security Status; as to Plaintiff's claim that he received insufficient notice of the disciplinary charge against him; and as to Plaintiff's claim that there was no evidence to support the guilty finding on the escape charge; and is DENIED as to the due process claims relating to Defendant Levesque's decision to place Plaintiff on High Security status; the adequacy of Defendant Kay's assistance in preparing Plaintiff for the hearing on the escape charge; Defendant Otero's failure to identify or describe the evidence relied on to support the guilty finding as to the escape charge; and Defendant Choinski's decision not to remedy the due process violations of Defendants Kay and Otero after becoming aware of them on appeal.

As discussed in Note six on page six, Defendants failed to address Plaintiff's claim that Defendants lacked the authority to discipline him because he was not in the custody of the Department of Correction at the time of his alleged escape. Therefore, this claim also will be included in the trial of this case.

This case is now ready for trial. It will be administratively closed to permit the process for appointment of pro bono counsel for trial to proceed. This case will be reopened ten days from the date of pro bono counsel's appearance, at which time an expeditious trial schedule will be set.

IT IS SO ORDERED.

D.Conn.,2014.
Friedland v. Otero
Not Reported in F.Supp.2d, 2014 WL 1247992 (D.Conn.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

H
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth Carl GROVES, Sr., Plaintiff,
v.
Brett DAVIS, Secure Care Treatment Aid; David W. Sill, Secure Care Treatment Aid; Thomas Nicolette, RN, Ward Nurse; Charmaine Bill, Treatment Team Leader; Jill E. Carver, Social Worker, Primary Therapist; Edwin Debroize, Psychologist Assist; Jeff Nowicki, Chief of Mental Health Treatment Serv.; Terri Maxymillian, Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet, Security Services, CNYPC; Michael Hogan, Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
Feb. 28, 2012.

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

***1** Currently before the Court, in this *pro se* civil rights action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against numerous employees of New York State or the Central New York Psychiatric Center ("Defendants"), are Plaintiff's motion to proceed *in forma pauperis,* his motion for a temporary restraining order and preliminary injunction, and his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.) [FN1] For the reasons set forth below, Plaintiff's motion to proceed *in forma pauperis* is granted; his motion for a preliminary injunction is denied; his motion for appointment of counsel is denied; Plaintiff's claims of deliberate indifference to his mental health needs against Defendants Bill, Carver and DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 assault are *sua sponte* dismissed without prejudice and with leave to amend in this action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed without prejudice as a Defendant in this action; the Clerk is directed to issue summonses, and the U.S. Marshal is directed to effect service of process on Defendants Davis, Sill, and Nicolette.

FN1. This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.) FN2 Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and DeBroize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

FN2. At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

**II. MOTION TO PROCEED *IN FORMA PAUPERIS***

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

**III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT**

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).FN3

FN3. The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

**A. Governing Legal Standard**

***2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

***3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [FN4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[FN6]

FN4. *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN5. *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN6. It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

victed criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). FN7

FN7. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ––––8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

***4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

***5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[FN8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[FN9]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN8. Relevant factors informing this determination include whether the plaintiff suffers from an injury that a “reasonable doctor or patient would find important and worthy of comment or treatment,” a condition that “significantly affects” a prisoner's daily activities, or “the existence of chronic and substantial pain.” *Chance,* 143 F.3d at 702.

FN9. Thus, a physician who “delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs” does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is “adequate.” *Chance,* 143 F.3d at 703. The word “adequate” reflects the reality that “[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is ‘reasonable.’ “ *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, “disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim.” *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition “as punishment or for other invalid reasons,” such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should “grow up,” even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (“[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .”).

***6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[FN10] Rather, this claim is hereby dismissed with prejudice.

FN10. The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

**3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan**

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN11]

FN11. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997).[FN12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).[FN13]

FN12. *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

FN13. *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

***7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

**IV. MOTION FOR INJUNCTIVE RELIEF**

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

***8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

**V. MOTION FOR APPOINTMENT OF COUNSEL**

***9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[FN14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

> FN14. For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, “this factor alone is not determinative of a motion for appointment of counsel,” *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

***10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is ***GRANTED;***[FN15] and it is further

FN15. Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is ***DENIED*** **without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* ***DISMISSED*** **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* ***DISMISSED*** **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* ***DISMISSED*** **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

N.D.N.Y.,2012.
Groves v. Davis
Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Patrick GUILLORY, Plaintiff,
v.
Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB).
Signed Aug. 29, 2014.

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The Capitol, Gregory J. Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

***1** Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action, pursuant to 42 U.S.C. § 1983, on May 31, 2011. *See* Dkt. No. 1. The remaining claims are that Defendants violated Plaintiff's constitutional rights under the First Amendment's Free Exercise Clause, as well as his rights under the Religious Land Use and Institutionalized Person's Act ("RLUIPA"), and subsequently retaliated against him for attempting to exercise these rights by destroying Plaintiff's mail and thus denying him access to the courts. *See* Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July 23, 2014, Magistrate Judge Baxter recommended that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint in its entirety. *See* Dkt. No. 210. Specifically, Magistrate Judge Baxter first found that in relation to the December 7, 2010 incident, Defendant Ready acted within the bounds of his employment and according to the documentation before him and thus, his inadvertent denial that caused Plaintiff to miss one religious service did not substantially burden Plaintiff's free exercise of his religion. *See id.* at 14. With regards to the March 20, 2011 incident, Magistrate Judge Baxter found that Defendant Ellis was not responsible for the shortened duration of the Purim celebration, and that while the delay may have been an inconvenience, Plaintiff was still able to participate in the service, thus satisfying the requirements of the First Amendment and RLUIPA. *See id.* at 19–20. Magistrate Judge Baxter also found that neither Defendant Ellis, nor Defendant Ready engaged in the conduct mentioned above as a way to retaliate against Plaintiff for any grievances that he had previously filed either against them or any other correctional officer. *See id.* at 39–40. Moreover, Magistrate Judge Baxter found that Defendant Kupiec did not interfere with Plaintiff's mail as a means to either retaliate against him or to deny him access to the courts. *See id.* 35–36. Finally, Magistrate Judge Baxter found that Plaintiff failed to establish that he suffered an adverse action as a result of Defendant Kupiec's alleged conduct. On August 4, 2014, the Court received objections to the Report–Recommendation from Plaintiff. *See* Dkt. No. 211.

**II. DISCUSSION**

**A. Plaintiff's objections**

In his objection to Magistrate Judge Baxter's Report–Recommendation, Plaintiff states that he objects to the Report in its entirety. *See id.* Plaintiff relays his astonishment at Magistrate Judge Baxter's choice to "excuse Def [endant] Kupiec's conduct" and at his finding that Plaintiff's position is "unfounded." *See id.* Plaintiff further objects to Magistrate Judge

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Baxter's Report on the grounds that he looked outside the pleadings and "only to the Defendants Affidavits" when making his determination to grant Defendants' motion for summary judgment. *See id.*

**B. Standard of review**

***2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

**C. Application**

***3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Report–Recommendation, the objections that are given

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

are mostly conclusory and “merely recite the same arguments” that were originally presented to Magistrate Judge Baxter. *See O'Diah,* 2011 WL 933846, at *1; *see generally* Dkt. No. 211. Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting “the Defendants [r]eckless lies.” *See* Dkt. No. 211 at 1 (“I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are ‘ignorant of the law’ ”). Nearly all of Plaintiff's “objections” lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that “neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an ‘adverse action’ under the case law”). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an “investigation” into the status of Plaintiff's grievance and a reminder that the “Inmate Grievance Program was instituted to handle issues such as yours.” Dkt. No. 202–6 at Exhibit “A.” Defendant Boll then stated that “[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision.” *Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

***4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

**I. *Procedural History***

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. [FN1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

FN1. Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also disposed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his “Motion for Reconsideration,” (Dkt. No. 122), and ordered a response to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to “stop transfer” and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

***5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel. (Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was “so ordered” by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining defendants' motion for summary judgment, together

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

**II. *Facts***

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

**III. *Summary Judgment***

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

**IV. *Religion Claims***

**A. Legal Standards**

**1. First Amendment**

***6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

**2. Religious Land Use and Institutionalized Persons Act**

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

***7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest ***and*** that it is the ***least restrictive*** means of achieving that interest. *Id* . The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia*, *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the "time-honored maxim *'de minimis non curat lex' "* ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See* *Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

**B. Application**

**1. December 7, 2010 Incident:**

Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings.[FN2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

FN2. Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the pleadings, filed by defendants. (Pl.'s Mem. at ¶ ¶ 1–7) (Dkt. No. 205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See* *Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v.. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514 (S.D.N.Y.2002)). *See also* *Rodriguez v. It's*

> *Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[fJollowing discovery proceedings and multiple motions to dismiss.")

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

***8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet. (*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class." (*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [FN3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah. (*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ." (*Id.* at 7). Although Father Weber states that a copy of the call-out is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

> FN3. Father Weber is not a defendant in this action.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility." (Weber Decl. ¶ 8). "Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day." (*Id.* ¶ 9). Although plaintiff's name certainly appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's investigation of plaintiff's grievance resulted in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

same finding:

> ***9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50).[FN4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him,[FN5] and he would not even have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready.[FN6]

> FN4. Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's electronic filing system. (CM/ECF).

> FN5. Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–2). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk." (Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

> FN6. Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is ***a*** *Program Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7,[FN7] and the fact that the building in which the religious services were actually held had the call-out,[FN8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building.[FN9]

> FN7. (Ready Decl. ¶¶ 5).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN8. This court makes no such finding.

FN9. Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to ***report to Bldg # 101*** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going." (*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at * 15 (S.D.N.Y. Oct. 15, 1999)). In granting ***summary judgment,*** the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for ***a valid reason."*** *Id.* (emphasis added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial did not substantially burden the plaintiff's free exercise of his religion. In denying plaintiff the opportunity to attend his call-out, defendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service.[FN10] Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

FN10. To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?" (Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, could constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLIUPA) (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

**2. The March 20, 2011 Incident**

***10** The second incident occurred on March 20, 2011, when plaintiff claims that defendant Ellis in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [FN11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

> FN11. Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at Mid-State with some members of the Lubavitch organization. (*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out. (*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service." Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id* .)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library. (*Id.* ¶ 11).

***11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m." (*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in calling inmates for the Purim Service, nor did he at-

tend the Service on March 20, 2011.[FN12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

FN12. The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

Defendants have also submitted the declaration of Rabbi Theodore Max, [FN13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State. (*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶ ¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m., and that the Purim celebration ended at that time. (*Id.* ¶ 12).

FN13. Rabbi Max is not a defendant in this action.

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

***12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49). "Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant,* and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish inmates back to their cells because Rabbi Max had not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

arrived—plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that ***he*** was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service.[FN14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

FN14. In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ... 'The Rabbi is not here so go back to the law library.' " (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived." (*Id.* & Ex. Z). The issue in the grievance appeared to be that the inmates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. ***As a result, the Jewish Services were shortened*** and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

**V. *Mail/Access to Courts/Retaliation***

**A. Legal Standards**

**1. Mail**

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

***13** Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail.' " *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern.' " *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*) An isolated incident is generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail.' " *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*) As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest and ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received. *Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. Access to Courts**

***14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). *See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

**3. Retaliation**

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

***15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**B. Application**

**1. Defendant Kupiec**

**a. Relevant Facts—Interference/Retaliation**

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [FN15] began to lose and/or destroy plaintiff's packages that were received in the mail room.[FN16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school." (*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [FN17] (*Id.* & Ex. M).

FN15. Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipulation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

FN16. The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

FN17. The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II)(A)(2) (citing 7 NYCRR § 721.2).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011." (Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the plaintiff) files a grievance against the defendant's [sic]—retaliation takes place." (*Id.*)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." FN18 (*Id.*)

FN18. The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. FN19

FN19. A plaintiff may not amend his complaint in a memorandum of law or other filing. *Bryant v. Greater New Haven Transit Dist.*, No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer*, No. 9:12–CV–280. Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13–16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

***16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready." (*Id.* ¶¶ 11–12). Defendant Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing [FN20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

FN20. A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *Castillo v. Rodas,* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail.[FN21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope.[FN22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ....“ (*Id.* ¶ 20).

FN21. A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service. (*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

FN22. The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing." (*Id.*) She noted that this was the "normal procedure for mail received in packages." (*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

**b. Discussion**

***17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food.[FN23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25, 2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

FN23. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery.[FN24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed.[FN25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail.[FN26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

FN24. Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

FN25. To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

FN26. Plaintiff's response makes much of the fact that the "package" went to defendant

Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011.[FN27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that Inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with." (Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when plaintiff's explanation is not even plausible); *Haust v. United States,* 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

FN27. (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

***18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him.[FN28] As stated above, defendant Kupiec does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

FN28. It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The connection between defendant Kupiec and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

defendant Ready is non-existent.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). *See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

***19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against defendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against *her.*[FN29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law,[FN30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room.[FN31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate from asserting his rights.[FN32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

FN29. Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

FN30. *Gill, supra.*

FN31. Contrary to plaintiff's assertion, this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was ***not*** a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it, and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

FN32. Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error." (*Id.*)

**b. Access to Courts**

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action.[FN33] Plaintiff's allegation has no basis whatsoever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it." (Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent. (*Id.* at 80–82). Plaintiff then stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

FN33. Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage." (*Id.* at 83). Plaintiff then reasserted that the "Court" ***would have*** stricken his "motion" [FN34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

FN34. It is not clear what "motion" would have been stricken.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stating that a mistake was made in mailing the item. There

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

**2. Defendants Ready and Ellis**

***20** Plaintiff alleges that the actions taken by defendants Ready and Ellis were taken in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston.[FN35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts." (Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

FN35. CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken." [FN36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter." (Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident.[FN37] Thus, he would not have been disciplined or even "advised" of the incident. The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

FN36. The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

FN37. In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received." (*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to show that defendant Ready was aware of plaintiff's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at *4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated to plaintiff from asserting his rights.[FN38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates.[FN39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

FN38. In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

FN39. During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last minute, so we all just hanging out outside the chapel because Ellis won't open the door." (*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

## VII. *Personal Involvement*

### A. Legal Standards

***21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The mere receipt of a letter or similar complaint is

insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

**B. Application**

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were “rather sparse.” (Dkt. No. 148 at 24). Notwithstanding these “sparse” allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants. (*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could “flood the docket.” (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

***22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to interrogatories that her “office” became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was “forwarded to my office.” (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id* . at 355–56). Defendant Boll also states that “upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto).” (*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she “admits” that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case.[FN40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response.[FN41] However, defendant Boll has included the letter as an attachment to her declaration in support of the summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

FN40. Plaintiff's interrogatory asks when defendant Boll became “aware” of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN41. Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." FN42 (*Id.* ¶ 9).

FN42. The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

***23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." (*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

> The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with an explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told “to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary.” (*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the “reoccurrence,” stating that Superintendent William Hulihan had investigated the incident, “and advised you of his findings and actions on January 14, 2011.” (*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he “should continue to follow the Directive for any further incidences that [h]e may have.” (*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll merely advised plaintiff that her office had contacted the staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

***24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

N.D.N.Y.,2014.
Guillory v. Ellis
Slip Copy, 2014 WL 4365274 (N.D.N.Y.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 28

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2011 WL 4390220 (N.D.N.Y.)
**(Cite as: 2011 WL 4390220 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Keith JEFFREY, Plaintiff,
v.
Waleed AHMED, Catherine Wells, John Maly, Greg Palen, Defendants.

No. 9:09–CV–0327 (NAM/GHL).
Aug. 22, 2011.

Keith Jeffrey, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Justin C. Levin, Esq., of Counsel, Albany, NY, for Defendants.

***ORDER and REPORT–RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 39.) Plaintiff has opposed the motion. [FN1] (Dkt. No. 41.) For the reasons discussed below, I recommend that Defendants' motion be granted in part and denied in part.

FN1. Although the opposition was not timely filed, the Court will consider it out of special solicitude to Plaintiff, who is proceeding *pro se.* Plaintiff's letter motion (Dkt. No. 43) is therefore granted.

**I. OUTSTANDING DISCOVERY ISSUES**

On October 4, 2010, I issued an order granting in part and denying in part Plaintiff's motion to compel discovery. (Dkt. No. 33.) In that order I directed Defendants to make proposed redactions to three documents (the Meier Memorandum, the Genovese Memorandum, and the Burgos Transcript) in order to protect the identify of a confidential informant. *Id.* at 7–9. Thereafter, Defendants submitted proposed redactions under seal. I have reviewed the proposed redactions and find that none of the redacted information is relevant to Plaintiff's claims in this litigation. Although I am hesitant to issue a Report–Recommendation on the motion for summary judgment without Plaintiff first receiving the documents, I have reviewed the documents thoroughly and have considered every fact in them in the light most favorable to Plaintiff. Facts from the documents are included in the statement of facts below. I direct the Clerk to mail copies of the redacted documents to Plaintiff along with this Report–Recommendation so that Plaintiff may, if he wishes, cite the documents in any objections he files.

**II. FACTUAL AND PROCEDURAL SUMMARY**

Plaintiff Keith Jeffrey has been a paraplegic since 1994. (Dkt. No. 1 at 7 ¶ 12 [FN2]; Dkt. No. 39–4 at 40:16–25.[FN3]) Plaintiff can feel hot and cold in his upper back, but he loses sensation in the middle of his back and from there down he can feel only pressure, not temperature. (Dkt. No. 39–4 at 39:19–40:15.) He has been incarcerated at Shawangunk Correctional Facility since September 2005. *Id.* at 13:23–14:4. In late 2006, Plaintiff was referred to physical therapy because of pain below his right shoulder blade. (Dkt. No. 39–4 at 14:20–15:8, 56:10–18.) In physical therapy, Plaintiff would do leg stretches and a therapist would apply a hot pack to his back. *Id* at 18:11–14.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2011 WL 4390220 (N.D.N.Y.)
**(Cite as: 2011 WL 4390220 (N.D.N.Y.))**

FN2. Page numbers in citations to the complaint refer to the page numbers assigned by the Court's electronic filing system.

FN3. Page numbers in citations to Plaintiff's deposition refer to the page numbers assigned by the Court's electronic filing system.

Before February 15, 2007, Plaintiff did not feel that hot packs were helping him and, as a result, he started refusing physical therapy. *Id.* at 54:3–22. Defendant Physical Therapist Waleed Ahmed "seemed to not like the fact" that Plaintiff did not want physical therapy. *Id.* at 55:5–8. Other than that, there were no altercations or hostilities between Plaintiff and Defendant Ahmed before February 15, 2007. *Id.* at 55:5–12.

On February 15, 2007, Plaintiff had an afternoon appointment with Defendant Ahmed. *Id.* at 22:20–23:22. Defendant Ahmed applied a hot pack to Plaintiff's back. *Id.* at 27:4–10. The hot pack was rectangular and measured about fourteen inches long by about seven inches wide. *Id.* at 51:24–52:5. Plaintiff testified that Defendant Ahmed wrapped it in a towel. (Dkt. No. 39–4 at 33:9–17. Defendant Ahmed declares that he also used a thick hot pad cover. (Dkt. No. 39–5 ¶ 13.) The fact that Plaintiff does not have sensation in his middle and lower back is noted in his treatment records, but he cannot remember whether he ever personally told Defendant Ahmed of this. (Dkt. No. 39–4 at 42:24–43:24.) Defendant Ahmed declares that he checked Plaintiff's sensation, both superficial and deep, before applying the hot pack and found that it was intact. (Dkt. No. 39–5 ¶ 11.) Defendant Ahmed applied the pack to Plaintiff while Plaintiff was still seated in his wheelchair. (Dkt. No. 39–4 at 27:23–28:3.) In order to keep the hot pack in place, Plaintiff had to lean back on it, which "put a little more pressure than it would normally be." *Id.* at 30:23–31:7. The hot pack was large and touched both the part of Plaintiff's back where he can sense hot and cold and the part where he cannot. *Id.* at 42:11–17. There were three other inmates [FN4] receiving physical therapy while Plaintiff was there. *Id.* at 28:4–8. The other inmates complained that their packs were too hot and Defendant Ahmed wrapped those packs in an additional towel. *Id* . at 32:3–6. Plaintiff did not complain about his pack. *Id.* Defendant Ahmed asked him if the hot pack was uncomfortable or too hot and Plaintiff "indicated that he had sensation in the area and that the hot pack was not uncomfortable or too hot." (Dkt. No. 39–5 ¶¶ 16–17.)

FN4. Inmates Poochie, Burnside, and Fitzgerald. (Dkt. No. 39–4 at 36:5–37:9.)

***2** Plaintiff testified at his deposition that the pack:

> was hot. It was a little sore, but the pain that I felt ... it was like a good pain to me. It's like, I don't know if I can—it was like my back was bothering me. I had a hot pack applied on it. So it was discomfort, but I was enjoying the hot pack on my back. So I didn't—and it's funny because I was also making fun of the other guys, like calling them wussy, you know, messing around with them when they were saying it was too hot, and my back was being burned and I didn't know.

(Dkt. No. 39–4 at 39:3–15.) At the time, Plaintiff did not feel that the hot pack was burning his skin. *Id.* at 41:20–25.)

Plaintiff testified at his deposition that the hot pack was on his back for about a half hour. *Id.* at 33:21–23. In his opposition to the motion for summary judgment, he declares that the pack was on his back for between forty minutes and one hour. (Dkt. No. 41 at 21.[FN5]) Inmates Burnside and Fitzgerald, who received treatment from Defendant Ahmed with Plain-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tiff, declare that their hot pack treatments lasted between forty-five minutes and one hour. *Id.* at 25–26. Defendant Ahmed declares that the pack was on Plaintiff's back for approximately ten minutes. (Dkt. No. 39–5 ¶ 14.) Plaintiff and Inmate Burnside maintain that Defendant Ahmed did not check Plaintiff's back when he removed the hot pack. (Dkt. No. 39–4 at 35:8–9; Dkt. No. 41 at 21.) Defendant Ahmed declares that he observed Plaintiff's back when he removed the hot pack and that there was no redness and no burn. (Dkt. No. 39–5 ¶¶ 19–20.)

FN5. Page numbers in citations to Plaintiff's opposition refer to the page numbers assigned by the Court's electronic filing system.

When Plaintiff got back to his living area, he took a shower. (Dkt. No. 39–4 at 44:16–21.) He did not notice a burn at that time. *Id.* at 41:22–23. When he got undressed for bed, he noticed a clear oil-like stain on the back of his shirt. *Id.* at 44:23–45:10. He generally puts baby oil on his back and assumed that the stain was the result of applying too much. *Id.*

The next day when Plaintiff took off his shirt to shower, he noticed a large yellowish-gray stain on the back of his shirt. *Id* . at 46:7–12. He looked at his back in a mirror and noticed "a little chunk of area where it was just raw skin." *Id.* at 46:17–21. The burn was in the middle right part of his back where he cannot feel hot or cold. *Id.* at 47:3–17, 48:7–49:3. It looked blistered and the skin was gone. *Id.* at 50:5–19. The burn was round and about the size "of a palm of a hand." *Id.* at 51:10–13, 52:6–9.

Plaintiff immediately reported the burn to a correction officer. *Id.* at 57:3–58:14. The officer called the medical department, but they could not see Plaintiff right away. *Id.* at 58:18–25. Plaintiff got to the medical department at about 7:00 p.m. *Id.* at 59:3–10. A member of the medical staff cleaned the burn and put a bandage on it. *Id.* at 59:11–20.

On February 17, 18, and 19, 2007, Registered Nurse L. Barringer treated the burn on Plaintiff's back by applying clean dressings, saline solution, and ointment to the wound. (Dkt. No. 1 at 7 ¶ 9; Dkt. No. 39–4 at 60:2–14.)

***3** On February 19, 2007, a security sergeant came to see Plaintiff. (Dkt. No. 39–4 at 66:8–14.) Plaintiff asked the sergeant to take a picture of the wound, but he said he would need to talk to someone in the medical department first. *Id.* at 68:2–5. After the sergeant talked to the medical department, he told Plaintiff that Defendant Nurse Administrator Catherine Wells wanted to see Plaintiff's wound. *Id.* at 68:5–8.

At his deposition, Plaintiff testified that when he went to the medical department, Defendant Wells, Nurse Barringer, and Nurse Vogel were waiting. *Id.* at 68:11–15. Plaintiff asked Nurse Barringer if he could have a photograph of his back. *Id.* at 68:25–69:2. Defendant Wells looked at Plaintiff's wound. *Id.* at 68:17–19. In his verified complaint, Plaintiff alleges that when Defendant Wells saw the burn she said, "Oh no, not again. This is the second time Physical Therapist Ahmed severely burned a patient." (Dkt. No. 1 at 7 ¶ 10.) Plaintiff asked Defendant Wells to take a picture of the burn but she refused, stating that "we don't need this on the record." [FN6] *Id.* Thereafter, the three nurses left the room and talked so that Plaintiff could not hear. (Dkt. No. 39–4 at 68:17–24.) Nurse Barringer returned and told Plaintiff that he did not need a photograph taken of his back. *Id.* at 69:6–7.) No photographs were ever taken of Plaintiff's back. *Id.* at 69:8–15.

FN6. Plaintiff did not testify as to either of these statements at his deposition.

On February 20, 2007, Plaintiff went to the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

medical department to have blood drawn. *Id.* at 71:22–24. The phlebotomist coughed on Plaintiff and he could feel the spit hit his forehead. *Id.* at 71:24–72:6. When Plaintiff asked her to cover her mouth, she told him to leave the room. *Id.* at 72:7–11. Plaintiff did. *Id.* at 72:10–13. A misbehavior report was issued charging Plaintiff with attempted assault, verbal harassment, and disobeying a direct order. *Id.* at 71:16–22, 73:9–13. Plaintiff believes that Defendant Wells directed a correction officer to write the report. *Id.* at 76:16–24. Plaintiff was found guilty of verbal harassment and disobeying a direct order, but not of attempted assault. *Id.* at 73:14–19. Plaintiff was sentenced to twenty days in keeplock. *Id.* at 74:9–13.

On February 21, 2007, Plaintiff filed a grievance that mentioned Defendant Wells by name. (Dkt. No. 41 at 28–29.) Plaintiff alleged that he was forced to have physical therapy against his wishes, that he had been burned when a physical therapist applied a heating pad to his back, that Defendant Wells refused to have photographs taken of Plaintiff's burn, and that "Nurses Wells, Baringer, and Roebuck are attempting to cover themselves and the therapist by not taking a picture of the sore and suggesting that another inmate did me harm." *Id.* The grievance did not mention Defendant Ahmed's name, referring to him only as "the physical therapist." *Id.* at 28. A stamp in the upper right-hand corner of the grievance form shows that it was received on February 21, 2007. *Id.*

***4** On February 22, 2007, Plaintiff went to the infirmary at about 1:00 p.m. (Dkt. No. 39–4 at 61:5–14.) Defendant Ahmed was there with a doctor, a correction officer, and a dressing nurse. *Id.* at 61:15–23. Plaintiff lifted up his shirt so that Defendant Ahmed could see the burn, "but before the actual bandage was taken off my back, there was a whole bunch of people coming into the room that didn't have no business being in the room." *Id.* at 62:6–63:3. Plaintiff felt that it was an invasion of his privacy for that many people to be in the room and refused to have his bandage removed. *Id.* at 79:15–23. As a result, Defendant Ahmed saw only the bandage over the wound, not the wound itself. *Id.* at 63:12–14. Defendant Ahmed asked Plaintiff when he noticed the wound and Plaintiff replied that he noticed it the day after his physical therapy appointment. *Id.* at 63:17–20.

Defendant Ahmed declares that the "area that was bandaged on [P]laintiff's back was not the area of his back to which I had applied the hot pack on February 15 ... Accordingly, the burn on [P]laintiff's back could not have been caused by the hot pack that I applied on February 15." (Dkt. No. 39–5 ¶¶ 26–27.)

After that appointment, Nurse Childress completed a form stating that Plaintiff had refused treatment. It stated that "[b]y refusing treatments you may get an infection which may worsen and cause a systemic infection or worse [you] may die." (Dkt. No. 41 at 31.)

On February 22, 2007, Defendant Wells wrote a misbehavior report charging Plaintiff with self mutilation and making a false statement. (Dkt. No. 39–6 at 7.) Plaintiff was served with a copy of the report on February 23, 2007, at 3:40 p.m. *Id.* at 10.

The disciplinary hearing regarding Defendant Wells' misbehavior report began on February 26, 2007. (Dkt. No. 39–6 at 10–11.) Defendant Lieutenant Greg Palen conducted the hearing.[FN7] (Dkt. No. 39–7 ¶ 8; Dkt. No. 39–6 at 10.) Plaintiff pleaded not guilty. (Dkt. No. 39–6 at 11.) Plaintiff testified, giving the same version of the facts that he asserts in this litigation. *Id.* at 12–16. Plaintiff made his grievance against Defendant Wells part of the hearing record. (Dkt. No. 39–7 ¶ 15.) Plaintiff requested two witnesses: Defendant Ahmed and Inmate Burnside. (Dkt. No. 39–6 at 13–14.) Inmate Burnside testified that Defendant Ahmed did not check Plaintiff's back when he removed the hot pack on February 15, 2007, but rather "just took the pack off and ... pulled his shirt down."

[FN8] *Id.* at 17. Defendant Ahmed testified by telephone. *Id.* at 18. Defendant Ahmed testified that he had looked at Plaintiff's back after he removed the hot pack on February 15, 2007. *Id.* at 19–20. He testified that when he observed Plaintiff on February 22 he saw that the burn was in a different spot than the hot pack had been. *Id.* at 20. After Defendant Ahmed testified and hung up the phone, Plaintiff produced a dirty t-shirt that showed the location of his burn. *Id.* at 22. Plaintiff asked why no pictures had been taken of his burn. *Id.* at 22. Defendant Palen said that he did not know. *Id.* at 23. Defendant Palen asked Plaintiff if he had burned his own back. *Id.* at 24–25. Plaintiff said he had not. *Id.* at 25.

FN7. The complaint lists Defendant Palen as a defendant (Dkt. No. 1 at 3), but does not include any allegations about him or any description of the disciplinary hearing. The facts regarding Defendant Palen's role as hearing officer are taken entirely from the evidence that Defendants submitted in support of their motion for summary judgment.

FN8. When Plaintiff stated in his closing comments that Inmate Burnside had been "standing right there" on the day of the incident and had seen that Defendant Ahmed did not check Plaintiff's back, Defendant Palen characterized Inmate Burnside's testimony as: "he said he didn't observe." (Dkt. No. 39–6 at 26.)

***5** Defendant Palen found Plaintiff guilty of both charges in the February 22 misbehavior report. *Id.* at 28. His written disposition stated that he relied on:

> R.N. Wells' written report indicating [that Plaintiff] falsely reported he had incurred a burn on his back as a result of treatment which included a heating pack being placed on his back by [Defendant] Ahmed on February 15, 2007. R.N. Wells' report also indicated that following an examination of [Plaintiff] both Dr. Genovese and [Defendant] Ahmed feel the burn on [Plaintiff]'s back was self inflicted and not the result of [p]hysical [t]herapy treatment ... [Defendant] Ahmed's testimony that following the removal of the hearing pack from [Plaintiff]'s back during treatment on February 15, 2007, he did check the area of [Plaintiff]'s back where the heating pack was applied and did not observe any injury and on 2/22/07 during an examination of [Plaintiff] observed that the area of the burn located on [Plaintiff]'s back was not the same area he treated with the heat pack. Also [Plaintiff]'s testimony that he did not realize he was injured for ... 24 hour [s] ... following his physical therapy treatment and that no other person other than the physical therapist could have inflicted the burn. Also that he could physically reach the area of the injury and has no other viable explanation of ... how the injury occurred that would rule out self injury.

*Id.* at 33. Defendant Palen sentenced Plaintiff to thirty days in keeplock and loss of privileges. *Id.* at 28.

Defendant John Maly is the Deputy Superintendent of Security at Shawangunk. (Dkt. No. 39–6 ¶ 4.) As the Superintendent's designee, he reviewed Plaintiff's appeal of Defendant Palen's decision. *Id.* ¶ 25. He found that Plaintiff had received written notice of the charges against him, that Plaintiff was afforded the opportunity to appear at the hearing and present witnesses and evidence, that Defendant Palen provided Plaintiff with a written statement explaining the decision and the reasons for the decision, and that the decision was based on "some evidence." *Id.* ¶¶ 26, 28. Specifically, Defendant Maly found that the misbehavior report and Defendant Ahmed's testimony supported Defendant Palen's conclusion that Plaintiff made false statements and burned his own back. *Id.* ¶ 29. Defendant Maly thus affirmed Defendant Palen's decision. (Dkt. No. 39–4 at 80:10–16.)

On March 13, 2007, Plaintiff filed a grievance

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

against Defendant Wells, Defendant Ahmed, Lab Tech Cannella, and Kay Knott alleging that they falsified records, harassed him, engaged in unprofessional conduct and unethical medical treatment, subjected him to cruel and unusual punishment, and engaged in a cover up. (Burgos Transcript at 6–7.)

In late February or early March 2007, Defendant Wells "became aware of confidential information confirming that [P]laintiff had burned his own back." (Dkt. No. 39–8 ¶ 15.) On March 12, 2007, a sergeant wrote to Defendant Maly summarizing the informant's allegations. (Meier Memo.) The informant said that Inmate Burgos altered his hot pot so that it would boil, placed a rag in the boiling water, removed the rag, placed it in plastic, and applied it to Plaintiff's bare back. *Id.* After receiving this report, the sergeant ordered a search of Inmate Burgos' cell. *Id.* An altered hot pot was confiscated in the search. *Id.* The sergeant issued a misbehavior report charging Inmate Burgos with inflicting bodily harm on another inmate, action detrimental to the order of the facility, and accessory to self-mutilation. *Id.*

***6** The disciplinary hearing for Inmate Burgos was held on March 27, 2007. (Burgos Transcript at 1.) Plaintiff asserts that he attended the hearing but was prevented from testifying. (Dkt. No. 41 at 7.) The sergeant testified regarding the information he had learned from the confidential informant and the cell search. Burgos Transcript at 1–4. The sergeant noted that the confidential informant stated that Inmate Burgos burned Plaintiff during a cell cleanup and that there was a cell cleanup on February 18. *Id.* at 4–5. The hearing officer noted that Plaintiff was "seen by the physical therapist who indicate[d] there [was] no injury" on February 15. *Id.* at 6. Based on that information, the hearing officer and the sergeant concluded that it "would put it in the right time frame" if Inmate Burgos burned Plaintiff on February 18 and Plaintiff sought pictures of his back on February 19. *Id.* at 7. The sergeant testified that other than the confidential informant's statement, he had no "other information, documents, material, statements, investigative reports, observations, [or] anything like that" to support the charges against Inmate Burgos. *Id.* at 6. The confidential informant then testified that he saw Plaintiff go into Inmate Burgos' cell on February 11 and 15 so that Inmate Burgos could burn him using the altered hot pot. *Id.* at 8–9. The informant testified that on February 11, Inmate Burgos showed Plaintiff how to put the rag in the hot pot and then put it in a plastic bag and told him to put it on his back the day after physical therapy. *Id.* at 10. He applied the rag to Plaintiff for a while to "get the skin softened up." *Id.* at 11. Either right before or right after the physical therapy appointment, the confidential informant heard Inmate Burgos instructing Plaintiff again. *Id.* at 10–11. The confidential informant testified that he heard Inmate Burgos and Plaintiff planning to blame the physical therapist for burning Plaintiff so that Plaintiff could sue the therapist. *Id.* at 12.

Inmate Bergos was found not guilty of burning Plaintiff's back. (Dkt. No. 39–4 at 97:20–23.)

Plaintiff filed this action on March 23, 2009. (Dkt. No. 1.) Plaintiff claims that Defendant Ahmed violated his Eighth Amendment rights, that Defendant Wells violated Plaintiff's First Amendment rights by retaliating against him, and that Defendant Maly violated his right to due process. (Dkt. No. 1 at 8–9 ¶¶ 17–20.) As noted above, the complaint does not include any allegations regarding Defendant Palen other than listing him in the caption. Plaintiff seeks compensatory damages. (Dkt. No. 1 at 10.)

## III. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2011 WL 4390220 (N.D.N.Y.)
**(Cite as: 2011 WL 4390220 (N.D.N.Y.))**

the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN9] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN9. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

***7** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of ac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2011 WL 4390220 (N.D.N.Y.)
**(Cite as: 2011 WL 4390220 (N.D.N.Y.))**

tion, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**IV. ANALYSIS**

**A. Eighth Amendment Claim Against Defendant Ahmed**

Plaintiff alleges that Defendant Ahmed violated his Eighth Amendment rights. (Dkt. No. 1 at 8 ¶ 17.) Defendants argue that the claim should be dismissed because Plaintiff did not suffer a serious injury and because Defendant Ahmed did not act with a sufficiently culpable state of mind. (Dkt. No. 39–3 at 6–9.[FN10]) Defendants are correct.

FN10. Page numbers in citations to Defendants' Memorandum of Law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

***8** The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

Defendants argue that Plaintiff cannot establish the objective prong of his Eighth Amendment claim against Defendant Ahmed because the burn was not a sufficiently serious medical condition to warrant Eighth Amendment protection. (Dkt. No. 39–3 at 7–8.) Defendants rely on *Cole v. Fischer,* No. 08CV512, 2009 U.S. Dist. LEXIS 85683, 2009 WL 3734343 (W.D.N.Y. Nov.4, 2009).[FN11] Defendants are correct.

FN11. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 39–4 at 121–126.)

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

In *Cole,* the court found that the second-degree burn a prisoner suffered when a nurse applied a makeshift heating pad to his back was not sufficiently serious to raise constitutional concerns. *Cole,* 2009 WL 3734343, at *3–4. *See also Pressley v. Green,* No. 02 Civ. 5261, 2004 U.S. Dist. LEXIS 25632, 2004 WL 2978279 (S.D.N.Y. Dec.21, 2004) (delay of several hours in treating prisoner's first and second degree

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

burns was not serious because there was insufficient evidence that the prisoner had been in severe pain).[FN12] There is no evidence here that the burn on Plaintiff's back significantly affected his daily activities or caused him chronic and substantial pain. Plaintiff states that he still has a scar from the burn and that when he leans back on the wound while sitting in his wheelchair it creates a painful pressure on the entire scarred area. (Dkt. No. 39–4 at 60:15–61:4, 87:2–13.) However, this is not the type of urgent condition or extreme pain protected by the Eighth Amendment. Nurse Childress' warning that “[b]y refusing treatments you *may* get an infection which *may* worsen and cause a systemic infection” (Dkt. No. 41 at 31, emphasis added) does not suggest otherwise. The warning referred to possible outcomes if Plaintiff continued to refuse to allow staff to change his bandage, not to the seriousness of the initial injury. Therefore, I find that Plaintiff cannot establish the objective prong of his Eighth Amendment claim against Defendant Ahmed.

FN12. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

***9** Even if one assumes that the burn was sufficiently serious to satisfy the objective prong of Plaintiff's Eighth Amendment claim against Defendant Ahmed, Plaintiff has not raised a triable issue of fact as to the subjective prong. Medical mistreatment rises to the level of deliberate indifference only when it “involves culpable recklessness, i.e., an act or a failure to act ... that evinces ‘a conscious disregard of a substantial risk of serious harm.’ “ *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An “inadvertent failure to provide adequate medical care” does not constitute “deliberate indifference.” *Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Stated another way, “medical malpractice does not become a constitutional violation merely because the victim is a prisoner.” *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (“Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.”)

Here, although a reasonable juror could conclude that Defendant Ahmed was negligent, there is no evidence from which a reasonable juror could conclude that Defendant Ahmed acted with deliberate indifference. Defendant Ahmed declares that he has never “attempted to intentionally injure [P]laintiff or any other patient .” (Dkt. No. 39–5 ¶ 28.) He further declares that he has never “act[ed] or fail[ed] to act for the purpose of causing [P]laintiff harm” and that he never “act[ed] or fail[ed] to act with knowledge that my actions or omissions would result in harm to [P]laintiff.” *Id.* ¶¶ 29–30. Plaintiff admits that Defendant Ahmed did not intend to harm him. Plaintiff testified at his deposition that there “was a time when I believed [Defendant Ahmed] did it on purpose, but I would say it was an accident.” (Dkt. No. 39–4 at 54:23–55:2.) He further testified that “I don't believe he actually did it deliberately ... I think it was more negligent where he wasn't paying attention enough.” *Id.* at 89:12–17.

In his opposition to the motion for summary judgment, Plaintiff notes that Defendant Ahmed previously burned an inmate at Clinton Correctional Facility with a hot pack. (Dkt. No. 41 at 23.) Indeed, in interrogatory responses, Defendant Ahmed admitted that “[i]n October or November 2004, inmate claimant John Farrar filed a claim ... in the New York State Court of Claims ... In that case, the claimant alleged that, during a physical therapy session at Clinton Correctional Facility, I applied a heating pad to his left shoulder which ultimately burned and blistered his left shoulder.” (Dkt. No. 30 at 11.) After a court trial, the court found Defendant Ahmed liable for medical

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

negligence under a *res ipsa loquitur* theory and awarded Mr. Farrar damages of $1,750.00. *Farrar v. New York,* No.2008–041–513, Claim No. 110074, Motion No. M–75280 (N.Y.Ct.Cl. Sept. 5, 2008). Plaintiff argues that Defendant Ahmed thus should have known to be more careful when treating Plaintiff. (Dkt. No. 41 at 23.) This fact suggests medical negligence, at the most. Therefore, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim against Defendant Ahmed.

**B. Claims Against Defendant Wells**

***10** Construed broadly, Plaintiff's complaint asserts three claims against Defendant Wells: (1) retaliation; (2) denial of due process; and (3) cruel and unusual punishment in violation of the Eighth Amendment. I will address each of these theories.

1. *Retaliation*

Plaintiff claims that Defendant Wells filed a false misbehavior report against him "in retaliation for the grievance complaint filed against [Defendant Ahmed] [FN13] for subjecting [Plaintiff] to severe burns, pains, and scarring" and "[i]n an attempt to cover up the injury inflicted" by Defendant Ahmed. (Dkt. No. 1 at 7 ¶ 11, 8 ¶ 18.) Defendants move for summary judgment of this claim. (Dkt. No. 39–3 at 9–12.)

FN13. Plaintiff apparently refers to his February 21, 2007, grievance. As discussed above, that grievance complained of the burn caused by "the physical therapist" but did not mention Defendant Ahmed by name. (Dkt. No. 41 at 28–29.) The grievance did, however, mention Defendant Wells by name. *Id.*

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983." Courts must, however, scrutinize retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendant took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

Defendants argue that Plaintiff "cannot demonstrate the first essential element of a First Amendment retaliation claim" because Plaintiff "has no constitutional right to access an institutional grievance system or to be free from a false misbehavior report." (Dkt.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Page 11

Not Reported in F.Supp.2d, 2011 WL 4390220 (N.D.N.Y.)
**(Cite as: 2011 WL 4390220 (N.D.N.Y.))**

No. 39–3 at 11.) Defendants cite *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). That case involves procedural due process and does not apply to retaliation claims. *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988) ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances) (citations omitted). In the retaliation context, the filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Here, Plaintiff filed a grievance against Defendant Wells. (Dkt. No. 41 at 28–29.) Therefore, Plaintiff has established the first element of his retaliation claim against Defendant Wells.[FN14]

> FN14. Any claim that Defendant Wells retaliated against Plaintiff by directing an officer to issue a misbehavior report after the incident with the phlebotomist fails because Plaintiff did not file his grievance naming Defendant Wells until the day after the officer issued the report. He was thus not engaged in any protected conduct until *after* that alleged adverse action.

***11** Regarding the second element, the Second Circuit defines " 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb.10, 2003)) (emphasis in original). The filing of a misbehavior report is an adverse action. *Id.* at 384. Here, Defendant Wells filed a misbehavior report that resulted in Plaintiff being sentenced to disciplinary keeplock. Therefore, Plaintiff has established the second element of his retaliation claim against Defendant Wells.

The question then is whether there is a triable issue of material fact that Plaintiff's grievance was a substantial or motivating factor in Defendant Wells' decision to write a misbehavior report charging Plaintiff with self-mutilation and lying. Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

Regarding temporal proximity, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citations omitted). No bright line test has been drawn " 'to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.' " *Id.* (quoting *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001)). The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Id.* (citing *Gorman–Bakos,* 252 F.3d at 555 (suggesting the lapse of five months between protected activity and retaliation may show a causal connection). Here, Defendant Wells wrote the misbehavior report charging Plaintiff with burning his own back one day after he filed a grievance that men-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tioned her by name. (Dkt. No 39–6 at 7; Dkt. No. 41 at 28–29.) Thus, this factor suggests the existence of a causal connection between Plaintiff's conduct and the adverse action.

***12** The parties have not referenced, and the Court has not found through an independent review, any evidence in the record regarding Plaintiff's prior disciplinary record. Thus, this factor neither weighs in favor of nor against the existence of a causal connection between Plaintiff's conduct and the adverse action.

Regarding the third factor, vindication of the inmate after a hearing may constitute circumstantial evidence of a defendant's retaliatory motive. *Gayle,* 313 F.3d at 683 ("A false reason for the report's issuance would support the inference that the real reason was the improper one: retaliation."). Here, Plaintiff was not vindicated at the disciplinary hearing. Rather, he was found guilty. (Dkt. No. 39–6 at 28.) Thus, this factor does not suggest the existence of a retaliatory motive for Defendant Wells' actions.

The fourth factor involves analyzing any statements by the defendant concerning his or her motivation. The verified complaint alleges that three days before she filed the misbehavior report, Defendant Wells stated "we don't need this on the record" when Plaintiff asked her to take pictures of the burn. (Dkt. No. 1 at 7 ¶ 10.) Construing this allegation very liberally and drawing all inferences in favor of Plaintiff as the non-moving party, this evidence could be viewed as a veiled threat to take adverse action if Plaintiff attempted to create a record regarding his claims against Defendant Ahmed. Thus, construed very broadly, this factor suggests the existence of a retaliatory motive for Defendant Wells' actions.

In sum, one of the four factors a court must weigh to determine whether there was a causal connection between Plaintiff's protected activity and Defendant Wells' actions strongly suggests that there was such a causal connection. One factor, if broadly construed, slightly suggests a causal connection. One of the factors weighs against the existence of a causal connection. Finally, one factor is inconclusive. Affording Plaintiff the special solicitude to which he is entitled as an unrepresented *pro se* litigant, I find that he has raised a triable issue of fact that he was engaged in protected activity when Defendant Wells took adverse action against him and that there was a causal connection between his activity and Defendant Wells' adverse action.

This conclusion does not, however, end the analysis. Even where an inmate plaintiff meets his burden under this three-pronged test, a defendant is entitled to summary judgment if he or she can demonstrate that he or she would have taken the same action against the plaintiff absent any retaliatory motivation. *See Gayle,* 313 F.3d at 682. Courts employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995)), cert. denied, 525 U.S. 907 (1998). Thus, " '[t]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage.' " *Hynes,* 143 F.3d at 657 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999) (per curiam). Often defendants accused of filing false misbehavior reports meet their burden by showing that "there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle,* 313 F.3d at 682.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

***13** Here, Defendant Wells declares that she wrote the misbehavior report because:

> during an investigation into [P]laintiff's allegations concerning the burn, I determined that [P]laintiff had burned his own back. [That] conclusion was based on, among other things, my personal observation of the burn on [P]laintiff's back. When I saw the burn, I noticed the shape of the burn was not consistent with the hot pack utlized by [Defendant Ahmed]. In addition to my own observation of the burn, [D]efendant Ahmed determined that the burn was in a different location than where he had provided hot pack treatment. Further, Dr. Genovese concurred that [P]laintiff had burned his own back because of the unusual position of the burn and the fact that the burn's shape was not consistent with the hot pack.

(Dkt. No. 39–8 ¶¶ 10–14, citations omitted.)

Defendant Wells' explanation appears reasonable and credible on its face. But "it is not enough that [the defendants] allege that the allegedly retaliatory actions *could* have been taken absent a retaliatory animus ... Rather, the defendants must establish that the actions *would* have been taken, even absent impermissible motives. The fact that two charges were affirmed at the misbehavior hearing does not, standing alone, entitle the defendants to summary judgment ... [T]he parties have presented sharply contrasting accounts of the events ..., either of which could be accepted as true by reasonable jurors." *Davis v. Rhoomes,* No. 07 Civ. 6592, 2010 U.S. Dist. LEXIS 103579, at *21, 2010 WL 3825728, at *7 (S.D.N.Y. Sept.10, 2010) (emphasis in original, citations omitted).[FN15] Plaintiff continues to hotly dispute that he burned himself or lied about it as charged by Defendant Wells. His story that Defendant Ahmed burned him has remained remarkably consistent from February 2007 to the present. Such questions of "credibility and weight of the evidence ... are matters for the jury." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996). The present case is thus distinguishable from cases where the plaintiff himself admitted to committing some of the charged misconduct or the undisputed facts showed that the plaintiff violated a prison policy. *See Miller v. Loughren,* 258 F.Supp.2d 61 (N.D.N.Y.2003) (granting summary judgment to the defendant on the basis of the plaintiff's admission in letter to the defendant that his misconduct was sufficient to justify his housing reassignment.); *Battice v. Phillip,* No. CV–04–669, 2006 U.S. Dist. LEXIS 53407, 2006 WL 2190565 (E.D.N.Y. Aug. 2, 2006) (granting summary judgment to the defendant because the plaintiff admitted violating prison policy by storing contraband in his cell); *Pilgrim v. Artus,* No. 9:07–CV–1001, 2010 U.S. Dist. LEXIS 97978, 2010 WL 3724883 (N.D.N.Y. Mar.18, 2010) (granting summary judgment to the defendant because the plaintiff would have been disciplined for wearing dreadlocks in violation of DOCCS policy regardless of allegedly retaliatory motive).[FN16] Therefore, I recommend that the Court deny Defendants' motion for summary judgment of Plaintiff's retaliation claim against Defendant Wells.

FN15. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN16. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

2. *Due Process*

***14** At his deposition, Plaintiff classified his allegations against Defendant Wells as a due process claim. (Dkt. No. 39–4 at 88:9–12.) Defendants argue that this claim should be dismissed because Plaintiff received all of the process to which he was due. (Dkt.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 39–3 at 11 n. 1.) Defendants are correct.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman,* 808 F.2d at 951. Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953–54. As discussed below in Section IV(C), Plaintiff received all of the due process required by *Wolff.* Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Wells.

3. *Eighth Amendment*

At his deposition, Plaintiff stated that Defendant Wells inflicted cruel and unusual punishment on him because he was deprived of his ability to go to programs and socialize when he was placed in keeplock. (Dkt. No. 39–4 at 90:5–21.) Defendants have not addressed Plaintiff's Eighth Amendment claim against Defendant Wells.

To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Here, Plaintiff has not alleged, and the evidence does not show, that he was denied the minimal civilized measure of life's necessities. Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's Eighth Amendment claim against Defendant Wells for failure to state a claim. 28 U.S.C. § 1915(e)(2).

**C. Claim Against Defendant Palen**

As discussed above, the complaint names Defendant Palen as a defendant but does not include any allegations against him. (Dkt. No. 1.) The evidence submitted in support of Defendants' motion for summary judgment shows that Defendant Palen conducted the disciplinary hearing regarding Defendant Wells' misbehavior report. (Dkt. No. 39–6 at 10–30; Dkt. No. 39–7.) Although Defendants argue that Defendant Palen should be dismissed due to Plaintiff's failure to allege any facts about him (Dkt. No. 39–3 at 17–18), they also make arguments on the merits of the disciplinary hearing. *Id.* at 12–17. Specifically, they argue that any claim regarding the disciplinary hearing must be dismissed because (1) Plaintiff was not deprived of any liberty interest; and (2) Defendant Palen provided Plaintiff with all of the process he was due. *Id.* Although I agree that the complaint on its face fails to state a claim against Defendant Palen because it does not allege any facts about him, I will address the merits of the claim.

***15** In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). Defendants argue that Plaintiff was not deprived of a liberty interest. (Dkt. No. 39–3 at 14.) Defendants are correct.

Plaintiff was sentenced to thirty days of keeplock confinement in his own cell. (Dkt. No. 39–6 at 28.) Courts in the Second Circuit routinely find that no liberty interest is implicated where an inmate is sentenced to serve an "exceedingly short" disciplinary sentence and there is no indication that he or she endured any "unusual" conditions. *Palmer v. Richards,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

364 F.3d 60, 65–66 (2d Cir.2004); *Cabassa v. Smith,* No. 9:08–CV–0480 (LEK/DEP), 2009 WL 1212495, at *10 (N.D.N.Y. Apr.30, 2009) (prisoner's thirty day keeplock sentence did not implicate liberty interest) [FN17]. Here, Plaintiff's keeplock sentence was of a sufficiently short duration to be considered "exceedingly short" and there is no indication that Plaintiff suffered any unusual conditions. Therefore, Plaintiff was not deprived of any liberty interest.

FN17. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 39–4 at 141–158.)

Defendants argue that even if Plaintiff was deprived of a liberty interest, he received all of the process to which he was due. (Dkt. No. 39–3 at 14–17.) Defendants are correct.

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004).[FN18] The undisputed evidence shows that Plaintiff received all of the procedural protections required by *Wolff.*

FN18. In some circumstances, such as where the inmate is illiterate or where the complexity of an issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, an inmate may also be entitled to assistance from another inmate or from prison staff in preparing his defense. *Wolff,* 418 U.S. at 570. Here, Plaintiff does not argue that he was entitled to an assistant. (Dkt. No. 39–6 ¶ 27.)

First, Plaintiff received advanced written notice of the charges against him. Fair notice requires the charging officer "to be sufficiently specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (punctuation and citation omitted). Here, Plaintiff received a copy of Defendant Wells' misbehavior report on February 23, 2007—one day after the report was written and three days before the disciplinary hearing began. (Dkt. No. 39–6 at 10.) The misbehavior report was quite specific and informed Plaintiff thoroughly of the charges against him.

Second, Plaintiff was allowed to present documentary evidence and call witnesses. Plaintiff introduced his grievance naming Defendant Wells as documentary evidence. (Dkt. No. 39–7 ¶ 15.) Plaintiff requested two witnesses-Defendant Ahmed and Inmate Burnside. Both testified. (Dkt. No. 39–6 at 13, 16–21.) Although Plaintiff was upset that Defendant Ahmed testified by telephone, he agreed to the procedure. *Id.* at 21. Moreover, the fact that disciplinary hearing testimony is taken over the telephone rather than in person does not implicate any due process right. *Greaves v. New York,* No. 95 Civ. 9725(SAS), 1997 U.S. Dist. LEXIS 7225, 1997 WL 278109, at *3 (S.D.N.Y. May 22,1997).[FN19]

FN19. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

***16** Third, Defendant Palen was a fair and im-

partial hearing officer. It is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord,* 180 F.Supp.2d 532, 539 (S.D.N.Y.2002) (citing *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff,* 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (emphasis in original) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000)). Here, Defendant Palen's decision was supported by Defendant Ahmed's testimony and Defendant Wells' misbehavior report.

Fourth and finally, Defendant Palen provided Plaintiff with a written statement of the disposition. (Dkt. No. 39–6 at 33.) Therefore, Plaintiff has not raised a triable issue of fact that he was denied due process. Accordingly, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Palen.

**D. Claims Against Defendant Maly**

Plaintiff essentially claims that Defendant Maly violated his rights in two ways: (1) by affirming Defendant Palen's disciplinary disposition despite being aware of Plaintiff's claims that the charges were the product of retaliation by Defendant Wells; and (2) by being involved in the investigation of allegations that it was Inmate Burgos who burned Plaintiff's back, a position that Plaintiff finds inconsistent with Defendant Maly's affirming a disposition that Plaintiff burned himself. (Dkt. No. 1 at 7–8 ¶ 13; Dkt. No. 39–4 at 91:14–94:6; Dkt. No. 41 at 6–8.)

Defendants move for summary judgment of Plaintiff's claims against Defendant Maly, arguing that "inmates do not enjoy a constitutional right to an investigation of any kind by government officials." (Dkt. No. 39–3 at 17.) Defendants are correct.

Regarding Plaintiff's first theory of Defendant Maly's liability, courts have held that "merely affirming [a] hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309, at *2–3 (W.D.N.Y. Dec.7, 2009).[FN20] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN21], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2–3. Here, Defendant Maly simply affirmed the disciplinary disposition imposed on Plaintiff by Defendant Palen. In fact, one of Plaintiff's chief complaints about Defendant Maly is that he "affirmed Plaintiff's [disciplinary sentence] without any investigation of [P]laintiff's claim." (Dkt. No. 41 at 13.) There is no evidence that Defendant Maly "proactively participated." Therefore, I recommend that the Court reject Plaintiff's first theory.

FN20. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN21. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). Plaintiff cites *Williams* in his opposition to the motion for summary judgment. (Dkt. No. 41 at 12.)

***17** Regarding Plaintiff's second theory of Defendant Maly's liability, it is difficult to discern how

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff has standing to challenge the disciplinary investigation regarding Inmate Burgos. Although Plaintiff's injury was the issue in that case, none of the charges was directed at Plaintiff. The claim fails even if construed broadly as a claim that Defendant Maly failed to thoroughly investigate the incident as a whole because prisoners do not have a due process right to a thorough investigation of grievances. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003). Therefore, I recommend that the Court dismiss the claim against Defendant Maly.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' proposed redactions to the Meier Memorandum, the Genovese Memorandum, and the Burgos transcript are accepted. The Clerk is directed to provide Plaintiff with copies of the redacted documents; and it is further

**ORDERED** that Plaintiff's letter motion (Dkt. No. 43) requesting that the Court accept his untimely response to the motion for summary judgment is ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Pressley v. Green,* No. 02 Civ. 5261, 2004 U.S. Dist. LEXIS 25632, 2004 WL 2978279 (S.D.N.Y. Dec.21, 2004); *Greaves v. New York,* No. 95 Civ. 9725(SAS), 1997 U.S. Dist. LEXIS 7225, 1997 WL 278109 (S.D.N.Y. May 22, 1997); *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309 (W.D.N.Y. Dec.7, 2009), *Davis v. Rhoomes,* No. 07 Civ. 6592, 2010 U.S. Dist. LEXIS 103579, 2010 WL 3825728 (S.D.N.Y. Sept.10, 2010); *Battice v. Phillip,* No. CV–04–669, 2006 U.S. Dist. LEXIS 53407, 2006 WL 2190565 (E.D.N.Y. Aug. 2, 2006); and *Pilgrim v. Artus,* No. 9:07–CV–1001, 2010 U.S. Dist. LEXIS 97978, 2010 WL 3724883 (N.D.N.Y. Mar.18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be ***GRANTED IN PART and DENIED IN PART.*** I recommend that the Court dismiss all of Plaintiff's claims except the retaliation claim against Defendant Wells.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.
Jeffrey v. Ahmed
Not Reported in F.Supp.2d, 2011 WL 4390220 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Derek Jason LECOMPTE, Plaintiff,
v.
Michelle R. RICCI, et al., Defendants.

Civil No. 11–1639 (JAP).
Dec. 7, 2011.

Derek Jason Lecompte, Trenton, NJ, pro se.

**OPINION**

PISANO, District Judge.

***1** Plaintiff, Derek Jason LeCompte, a state inmate confined at the New Jersey State Prison in Trenton, New Jersey, at the time he submitted the above-captioned Complaint for filing, seeks to bring this action *in forma pauperis.* Based on his affidavit of indigence, the Court will grant Plaintiff's application to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file the Complaint. Plaintiff later filed an Amended Complaint, on or about May 16, 2011, with a request for appointment of counsel. (Docket entry no. 2)

At this time, this Court must review the Complaint and Amended Complaint, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, to determine whether the pleadings should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because they seek monetary relief from a defendant who is immune from such relief. For the reasons set forth below, the Court concludes that Plaintiff's claims should be dismissed.

I. *BACKGROUND*

Plaintiff, Derek Jason LeCompte ("Plaintiff" or "LeCompte"), brings this civil action, pursuant to 42 U.S.C. § 1983, against the following defendants: Michelle R. Ricci, Administrator at the New Jersey State Prison ("NJSP"); Investigator Raphael Dolce, Special Investigations Division ("SID"); Salvatore Maniscalco, Court–Line Officer at NJSP; Greg Bartkowski, former Administrator of NJSP; Charles Warren, Jr., current Administrator of NJSP; and the New Jersey Department of Corrections ("NJDOC"). (Complaint, Caption and ¶¶ 4b-f). The following factual allegations are taken from the Complaint and Amended Complaint, and are accepted for purposes of this screening only. The Court has made no findings as to the veracity of plaintiff's allegations.

Plaintiff alleges that, sometime before 2006, he and a few other inmates decided to assist family members to start their own Islamic non-profit organization named "Baseemah's Ray of Hope, Inc." (Complaint, ¶ 6). The organization was intended to assist at-risk women and at-risk incarcerated women. Plaintiff helped draft the by-laws and signed them as secretary of the organization. Plaintiff's mother incorporated the organization, applied for her Federal Employer Identification Number and planned on registering the organization with the Charities Registration Bureau. Plaintiff began to study how to write proposals and templates for his mother. (*Id.*).

In August 2006, a firearm was discovered within the security perimeter of NJSP, and in response, a lockdown ensued and NJSP officers conducted searches of inmate cells. SID officers found paperwork regarding the non-profit organization and defendant Dolce issued Plaintiff two institutional infractions, .705 and .706. Plaintiff was placed in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

pre-hearing detention and another infraction, .704, was issued against Plaintiff a few days later. At the same time, defendant Ricci temporarily banned Plaintiff's mother from all visitation. (*Id.*).

***2** With his Amended Complaint, Plaintiff attaches the institutional documents representing the disciplinary charges, and the adjudication of the disciplinary charges. It appears that Plaintiff was charged with violating .704, .705 and .706, but only .704 (perpetrating a fraud) was adjudicated. In a memo to the Institutional Hearing Officer from Investigator Dolce, dated September 12, 2006, Dolce recites his investigation of the fraud charges as follows:

> Through the course of an investigation, information was developed that indicated that several inmates who are or were housed in the recent past at New Jersey State Prison (NJSP) initiated a business operation. The investigation led to the discovery of a large cache of documents in the property of inmate LeCompte. These documents indicated that a business identified as Baseemah's Ray of Hope Incorporated had been established without the approval of the administration of NJSP. The documents also showed that each of the inmates identified had corresponding civilians visitors/family members identified as ‘officers' within the corporation. Further, the inmates in concert with their civilian counterparts had filed paperwork with both the State of New Jersey as well as the United States government to receive tax exempt status as well as copyright protections for the corporation.
>
> The inmates involved had also provided fraudulent information through the filing of the tax documents as they represented that they could be contacted through a post office box in Trenton. This act was designed to conceal the fact that these ‘principals' were incarcerated. The inmates additionally authored correspondence soliciting funding and represented that they had facilities and staff to initiate this venture.
>
> Through the course of interviewing inmate Harris as he was listed as the CEO of this corporation, it was determined that the inmates involved had initiated the plan with the full intention that they would be compensated for their ‘work.’ This was to occur through the creation of dedicated bank accounts where by their civilian counterpart would actually receive the compensation. These funds would then be laundered and placed into dedicated accounts for use by the individual inmates.

(Amended Compl., Exhibit E, Docket entry no. 2–1). A copy of a Disciplinary Report, dated September 11, 2006, by Dolce, was delivered to Plaintiff on September 12, 2006. (*Id.,* Ex. C). The Disciplinary Report described the infraction as follows: “An investigation has determined that I/M LeCompte has engaged in a pattern of fraud in concert with other inmates at NJSP. Specifically, this inmate along with his mother did cause a business to be incorporated with the State and Federal government. This business would solicit funds that would be laundered through family members and ultimately placed into an account for use by the inmate.” (*Id.*).

The NJDOC form E. Adjudication of Disciplinary Charge also was attached to the Amended Complaint. (*Id.,* Ex. D). The report shows that a hearing date of September 12, 2006 was postponed to allow Plaintiff to review the charges and non-confidential evidence against him. The evidence included incorporation documents, charitable registration forms, tax forms, development plan, copyright work, employee contracts, solicitation letters, the organizational by-laws, post office box application, proposals, memos, power-of-attorney forms, and website information that had been seized from Plaintiff's cell during the aforementioned cell search, as well as the inmate statement from inmate Harris. The hearing was rescheduled and held on September 15, 2006. (*Id.*).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

***3** At the September 15, 2006 hearing, Plaintiff stated that the organization was not intended to solicit money for his mother's non-profit, legal organization. Inmate Harris also testified that the business was started to help a female friend. Plaintiff's inmate counsel substitute Burton requested a hearing if Plaintiff was found guilty. (*Id.*). At the conclusion of the hearing, the Disciplinary Hearing Officer ("DHO") found that Plaintiff was guilty, and gave a summary of evidence relied upon to reach his decision, as follows:

> HO relies on report from Inv. Dolce stating that during the search of the property belonging to inmate LeCompte he discovered several documents that reveals that inmate LeCompte, Harris, Crumbley and Cooper had formed and maintained a corporation named "Baseemah's Ray of Hope" without the authorization of the administration of NJSP. HO also notes a–1, Inv. Dolce, stating that an investigation revealed that the inmates had conspired along with civilian counterparts to provide false and misleading information to various State and Federal agencies while attempting to obtain "non profit" status. The inmate involved provided a PO box (# 5921) in Trenton, NJ in an attempt to conceal that they were incarcerated at the time. HO notes a–1 through a24, documents seized, providing numerous communications with each other as well as State and Federal agencies using the PO Box at the contact locale. Additionally, the documentation designates that salary of staff employed as well as the establishment of pof bank accounts for the use of those individuals listed as officers of the corporation including inmate [LeCompte], Harris and Crumbley. The inmate argued that the corporation was operated by his mother, however, as described in a–11 (page 4) [inmate LeCompte] is listed as a board member. Additionally, contained in a–15 [inmate] LeCompte is listed as an executive board member of that corporation.
>
> It is also noted that in a–11 (tax forms) inmate LeCompte is listed as a board member. Therefore, based on the evidence presented it is reasonable to conclude that inmate LeCompte conspired with other inmates as well as civilian counterparts to establish a business and provide false information to government agencies to conceal that they were incarcerated at the time.

(*Id.,* Ex. D). Plaintiff was sanctioned to "15 days detention CTS, 365 days ad/seg refer to CC, 365 LOCT refer to Supt. Confiscation." (*Id.,* Ex. D at ¶ 19).

Plaintiff disputes the disciplinary reports and findings. He also alleges that he never met with his inmate paralegal before the hearing, and that they only had five minutes to review the documents taken from his cell. He further claims that he was removed from the hearing after he asked to call his mother as a witness to confront Dolce. Plaintiff alleges that his inmate paralegal signed the adjudication form without Plaintiff's knowledge or authorization. In addition, the inmate paralegal did not notify Plaintiff about the sanctions until six days later, and Plaintiff had to have someone else file his administrative appeal. (Amended Compl., ¶ 6 at pg. 6).

***4** Plaintiff alleges that he appealed all of the administrative decisions, and that they were perfunctorily denied without further hearings or fact findings. (*Id.*).

Plaintiff asserts the following claims: (1) that defendant Dolce violated Plaintiff's First Amendment right "by using my religion of Islam as a negative act to allege a fraud that he cannot prove I had involvement in, and using a legitimate religious non-profit organization which is protected by the R.L.U.I.P.A. being it complies with my religious right to help in a cause which is charitable (Zakat), and since not based inside the facility, prior approval is not required nor does it violate any security perimeters"; (2) that de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendant Maniscalco deprived Plaintiff of his due process rights under the Fourteenth Amendment by not giving Plaintiff ample time to spend with his inmate counsel substitute before the hearing, by not allowing Plaintiff to call his mother as a witness to confront Dolce, and by allowing the counsel substitute to sign the adjudication form without Plaintiff's authorization; (3) that Maniscalco violated Plaintiff's rights under the First, Fifth, Eighth and Fourteenth Amendments by relying solely on Dolce's opinion rather than the evidence itself; (4) that defendant Ricci violated Plaintiff's rights under the First, Fifth, Eighth and Fourteenth Amendments by perfunctorily denying Plaintiff's appeal from the DHO decision without conducting an independent investigation, and by enacting a "permanent" visitation ban on Plaintiff's mother; (5) that Dolce violated Plaintiff's Fifth and Fourteenth Amendment rights by not interviewing Plaintiff in Dolce's investigation of the charges, and by verbally harassing Plaintiff's mother in an interview, which caused her to walk out of the interview; (6) that defendant Warren violated Plaintiff's rights under the First, Eighth and Fourteenth Amendments by perfunctorily denying Plaintiff's letter of appeal from the visitation ban against Plaintiff's mother without proof of her involvement; (7) that Bartkowski violated Plaintiff's rights under the First, Eighth and Fourteenth Amendments by upholding the visitation ban against Plaintiff's mother after the matter was remanded; and (8) that the NJSP Administration violated Plaintiff's rights under the First, Fifth, Eighth and Fourteenth Amendments and the provisions of R.L.I.U.P.A. by adjudicating a legitimate Islamic non-profit organization as a fraud based on allegedly "specious" allegations. (Amended Compl., pp. 10–11).

Plaintiff seeks an adjudication of his innocence with regard to the fraud disciplinary charge and asks that his prison record in this regard be expunged. He also seeks to have his mother's visitation privileges reinstated. Finally, he seeks compensatory and punitive damages in excess of $100,000.00. (Amended Compl., ¶ 7, pp. 8–9).

II. *STANDARDS FOR A SUA SPONTE DISMISSAL*

The Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, §§ 801–810, 110 Stat. 1321–66 to 1321–77 (April 26, 1996), requires a district court to review a complaint in a civil action in which a prisoner is proceeding *in forma pauperis* or seeks redress against a governmental employee or entity. The Court is required to identify cognizable claims and to *sua sponte* dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. This action is subject to *sua sponte* screening for dismissal under both 28 U.S.C. § 1915(e)(2)(B) an § 1915A.

***5** In determining the sufficiency of a *pro se* complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. *See Erickson v. Pardus,* 551 U.S. 89, 93–94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (following *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). *See also United States v. Day,* 969 F.2d 39, 42 (3d Cir.1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997). The Court need not, however, credit a *pro se* plaintiff's "bald assertions" or "legal conclusions." *Id.*

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)). The standard for evaluating whether a complaint is "frivolous" is an objective one. *Deutsch v. United States,* 67 F.3d 1080, 1086–87 (3d Cir.1995).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

A *pro se* complaint may be dismissed for failure to state a claim only if it appears " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Haines,* 404 U.S. at 521 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). *See also Erickson,* 551 U.S. at 93–94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights. *Id.* The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R.Civ.P.* 8(a)(2).[FN1] Citing its recent opinion in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> FN1. Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct. No technical form is required." *Fed.R.Civ.P.* 8(d).

First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.... Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." *Fed. Rule Civ. Proc.* 8(a)(2).

***6** *Iqbal,* 129 S.Ct. at 1949–1950 (citations omitted).

The Court further explained that

a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1948. The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible. *Id.* at 1949–50;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*see also Twombly,* 505 U.S. at 555, & n. 3; *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210(3d Cir.2009).

Consequently, the Third Circuit observed that *Iqbal* provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that applied to federal complaints before *Twombly. Fowler,* 578 F.3d at 210. The Third Circuit now requires that a district court must conduct the two-part analysis set forth in *Iqbal* when presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [ *Iqbal,* 129 S.Ct. at 1949–50]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [*Id.*] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Phillips,* 515 F.3d at 234–35. As the Supreme Court instructed in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.' " *Iqbal,* [129 S.Ct. at 1949–50]. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*Fowler,* 578 F.3d at 210–211.

This Court is mindful, however, that the sufficiency of this *pro se* pleading must be construed liberally in favor of Plaintiff, even after *Iqbal.* See *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. *See Grayson v. Mayview State Hosp.,* 293 F.3d 103, 110–111 (3d Cir.2002); *Shane v. Fauver,* 213 F.3d 113, 117 (3d Cir.2000).

III. *SECTION 1983 ACTIONS*

***7** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255–56 (3d Cir.1994).

Here, Plaintiff names the NJDOC as a defendant in this matter. However, the NJDOC must be dismissed from this action pursuant to the Eleventh Amendment. The Eleventh Amendment to the United States Constitution provides that, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." As a general proposition, a suit by private parties seeking to impose a liability which must be paid from public funds in a state treasury is barred from federal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

court by the Eleventh Amendment, unless Eleventh Amendment immunity is waived by the state itself or by federal statute. *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Eleventh Amendment protects states and their agencies and departments from suit in federal court regardless of the type of relief sought. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Similarly, absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Section 1983 does not override a state's Eleventh Amendment immunity. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

Additionally, the NJDOC and the NJSP must be dismissed from this lawsuit because they are not a "persons" subject to liability under § 1983. *See Grabow v. Southern State Correctional Facility,* 726 F.Supp. 537, 538–39 (D.N.J.1989) (correctional facility is not a person under § 1983).; *Mitchell v. Chester County Farms Prison,* 426 F.Supp. 271, 274 (D.C.Pa.1976).

IV. *ANALYSIS*

A. *First Amendment and RLUIPA Claims*

Plaintiff generally alleges that defendants violated his First Amendment rights and his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), by punishing him for his limited involvement with an Islamic non-profit organization, and by banning visitation with his mother.

1. *Religious Exercise Claim*

***8** The First Amendment, made applicable to the states by the Fourteenth Amendment, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Here, Plaintiff appears to claim that the disciplinary charge of fraud and resulting sanctions violate his right to free exercise of religion.

To establish a denial of religious freedom claim in this instance, Plaintiff must demonstrate that the restriction on religious practice was not reasonably related to a legitimate, penological interest. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349–50, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). This reasonableness standard involves the examination of the following four factors: (1) whether the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at the cost of less liberty and safety for guards and other prisoners; and (4) whether an alternative exists which would fully accommodate the prisoners' rights at *de minimis* cost to valid penological interests. *See Thornburgh v. Abbott,* 490 U.S. 401, 415–18, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. at 89–91.

In this case, Plaintiff's bare allegations are not sufficient to state a First Amendment free exercise claim. He fails to allege that he was restricted from participation in a legitimate religious practice or from practicing his faith. Rather, his allegations pertain to a non-profit organization, which he inconsistently claims he was involved in for purposes of this claim but was not involved in for purposes of denying the charges against him. Additionally, Plaintiff baldly alleges, without any factual support, that defendants used the Islamic religion as a negative act to allege a fraud by Plaintiff. Such bare allegations must be dismissed because they are no more than threadbare legal conclusions not entitled to the assumption of truth.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Iqbal,* 129 S.Ct. at 1949–50. Therefore, this bald allegation of a First Amendment violation regarding free exercise of religion does not rise to the level of a violation of constitutional dimension, and the claim will be dismissed with prejudice accordingly for failure to state a claim upon which relief may be granted.

2. *RLUIPA Claim*

Next, Plaintiff asserts that defendants' actions in punishing him with regard to an allegedly legitimate Islamic non-profit organization violates the provisions of RLUIPA. RLUIPA governs the religious rights of incarcerated individuals at federally funded prisons. RLUIPA bars federally funded prisons from "impos[ing] a substantial burden on the religious exercise of a person ... unless the government demonstrates that imposition of the burden on that person ... (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000cc–1(a). To state a claim under RLUIPA, a prisoner must establish that his religious exercise has been "substantially burdened." Once a claimant satisfies this element, the burden shifts to the government to show that the burden on the prisoner's religious exercise furthers a "compelling governmental interest" and "is the least restrictive means of achieving that interest." *Washington v. Klem,* 497 F.3d 272, 277 (3d Cir.2007).

***9** In order to be considered a "substantial burden", the plaintiff must demonstrate that the government's action pressured him to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Muhammed v. City of New York Dep't of Corrections,* 904 F.Supp. 161, 188 (S.D.N.Y.1995) (citations omitted). The burden must be more than an inconvenience; it must be substantially interfere with a tenet or belief that is central to the religious doctrine. *Id.* (citations omitted); *see also Jones v. Shabazz,* 2009 WL 3682569, at *2 (5th Cir.2009) (holding that a government action or regulation only creates a "substantial burden" on a religious exercise if it truly pressures an adherent to significantly modify his religious behavior and significantly violate his religious beliefs).

Here, the Complaint fails to allege sufficient facts to support a claim that defendants' actions substantially burdened his Islamic religious practices. Plaintiff's allegations that defendants used his Islamic religion in a negative way to allege a fraud against him are simply conclusory and unsupported by specific facts. Therefore, the Court finds that the allegations of the Complaint are inadequate to state a claim for relief under RLUIPA that is plausible on its face, and his claim will be dismissed with prejudice.

3. *Visitation Claim*

"In the First Amendment context, ... a prison inmate retains those First Amendment rights [of freedom of speech and association] that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *Pell v. Procunier,* 417 U.S. 817, 822 (1974) (evaluating constitutionality of limiting one channel of communication with those outside of prison through review of adequacy of alternative channels of communication). *See also Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (evaluating regulations governing receipt of subscription publications by federal prison inmates). *Cf., Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (there is no substantive due process right to "unfettered visitation"); *Neumeyer v. Beard,* 301 F.Supp.2d 349, 351 (M.D.Pa.2004), *aff'd,* 421 F.3d 210 (3d Cir.2005) (convicted prisoners and their families and spouses have no "absolute constitutional right to visitation" other than with legal counsel); *Young v. Vaughn,* No. CIV. A. 98–4630, 2000 WL 1056444 (E.D.Pa. Aug.1, 2000); *Flanagan v. Shively,* 783 F.Supp. 922, 934 (M.D.Pa.1992) ("Inmates have no constitutional right to visitation. Prison authorities have discretion to curtail or deny visitation if they deem appropriate, and no due process right is implicated in the exercise of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2011 WL 6130596 (D.N.J.)
**(Cite as: 2011 WL 6130596 (D.N.J.))**

that discretion"), *aff'd,* 980 F.2d 722 (3d Cir.1992), *cert. denied,* 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993).

Thus, to the extent not inconsistent with their status as prisoners or with legitimate penological objectives, inmates have a First Amendment right to communicate with "friends, relatives, attorneys, and public officials by means of visits, correspondence, and telephone calls." *Owens–El v. Robinson,* 442 F.Supp. 1368, 1386 (W.D.Pa.) (citation omitted). Moreover, free citizens possess a coextensive First Amendment right to reach out to those who are incarcerated. *Thornburgh,* 490 U.S. at 410 n. 9; *Rowe v. Shake,* 196 F.3d 778, 783 (7th Cir.1999). However, the institution may place limits on visitation if such limits are necessary to meet legitimate penological objectives, such as rehabilitation and the maintenance of security and order. *See Overton v. Bazzetta,* 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (withdrawing visitation privileges for a period of time to effect prison discipline "is not a dramatic departure from accepted standards for conditions of confinement"). When a prison regulation or practice impinges on inmates' or free citizens' speech and association rights, "the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The reasonableness standard is applied, using the four factors as set forth in *Turner:*

> ***10** (1) There must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one.
>
> (2) Whether there are alternative means of exercising the right that remain open to prison inmates.
>
> (3) The impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.
>
> (4) The absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test.

*Turner,* 482 U.S. at 89–90 (citations omitted).

Here, Plaintiff alleges that the permanent ban on visitation by his mother is unconstitutional in violation of his First Amendment rights. However, Plaintiff provides documentation that plainly contradicts his allegations. In a memo dated February 2, 2011, from Administrator Bartkowski to Plaintiff, Bartkowski addresses Plaintiff's request for restoration of visiting privileges with Plaintiff's mother. Bartkowski stated the following reasons for upholding the visitation ban: (1) Plaintiff's mother was identified by the NJSP SID as the corporation registered agent of the fraudulent business; (2) Plaintiff's mother had declined to cooperate with the SID investigation after an initial interview and thus, SID could not evaluate the totality of her involvement in the unauthorized business; (3), (4) and (5) Plaintiff's visiting privileges were not suspended or terminated permanently under *N.J.A.C.* 10A:4–5.1(g)(7); rather, his mother's visitation privileges were suspended pursuant to *N.J.A.C.* 10A:18–6.3(c),[FN2] because it was determined that she posed a substantial risk to the safety and security of NJSP based on her actions in conjunction with Plaintiff as shown in the confidential SID report and the substantial documentary evidence provided; and (6) finally, the ban on visitation by Plaintiff's mother "does not impact on [Plaintiff's] ability to maintain

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

community ties with her through letters and phone calls. In addition, the loss of the aforementioned visiting privileges does not affect the visiting privileges for the remainder of [Plaintiff's] family and community ties to include" Plaintiff's father, stepmother, sister, two aunts, five cousins, and three friends. Further, Bartkowski advised Plaintiff that his mother could take the following steps to have her visiting privileges restored, namely, to reschedule an interview with the NJSP SID and cooperate in their evaluation of her role in the unauthorized business, and to thereafter reapply for reinstatement of visitation. (Amended Compl., Ex. J).

FN2. Section 10A:18–6.3(c) provides that "persons determined, by substantial evidence, to have a harmful influence upon the inmate or to constitute a threat to the security of the correctional facility shall be banned from visiting an inmate committed to the custody of the Department of Corrections for a minimum of 365 days and the visitor shall be required to apply in writing to the Administrator for approval/disapproval of the reinstatement of visit privileges."

***11** Based on these admitted facts, Plaintiff has not established any of the four *Turner* factors, as set forth above, necessary to show that the restriction on his mother's visitation was unreasonable or unrelated to a legitimate penological interests. *Turner,* 482 U.S. at 89. Specifically, based on the February 2, 2011 Bartkowski memo, defendants have shown a "valid, rational connection" between the visitation ban against Plaintiff's mother and the security needs of the NJSP, given the evidence of her involvement as a corporate officer in the unauthorized business for which Plaintiff was disciplined. Plaintiff also has alternative means of maintaining his ties with his mother through written correspondence and telephone calls. Likewise, there are no visitation restrictions with his other, numerous family members and friends. Additionally, there is no ready alternative to the visitation restriction to address the NJSP's security concerns, as the restriction has a minimal impact on its staff and allocation of prison resources without unduly harming Plaintiff's ties with his mother.

Therefore, this Court finds no constitutional violation under these circumstances, and Plaintiff's First Amendment claim regarding visitation privileges will be dismissed with prejudice, as against all named defendants, for failure to state a claim.

B. *Due Process Claims*

The Due Process Clause of the Fifth and Fourteenth Amendments provides that liberty interests of a constitutional dimension may not be rescinded without certain procedural protections. U.S. CONST. amend. XIV. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court set forth the requirements of due process in prison disciplinary hearings. An inmate is entitled to (1) written notice of the charges and no less than 24 hours to marshal the facts and prepare a defense for an appearance at the disciplinary hearing; (2) a written statement by the fact finder as to the evidence relied on and the reasons for the disciplinary action; and (3) an opportunity "to call witnesses and present documentary evidence in his defense when to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563–71. An inmate is also entitled to an inmate representative in some cases, and a written decision by the factfinder as to evidence relied upon and findings. *See Von Kahl v. Brennan,* 855 F.Supp. 1413, 1418 (M.D.Pa.1994) (citing *Wolff,* 418 U.S. at 563–72). However, in *Wolff,* the Supreme Court held that, while prisoners retain certain basic constitutional rights, including procedural due process protections, prison disciplinary hearings are not part of criminal prosecution, and an inmate's rights at such hearings may be curtailed by the demands and realities of the prison environment. *Id.* at 556–57; *Young v. Kann,* 926 F.2d 1396, 1399 (3d Cir.1991).

Here, Plaintiff alleges that his right to due process

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

under the Fourteenth Amendment was denied when defendant Maniscalco would not allow Plaintiff "ample time to spend with [his] Counsel Substitute Ian Burton and have ample time to go through the 200+ documents he requested to review." Plaintiff also contends that he was denied his Fifth Amendment right to confront witnesses against him when Maniscalco would not allow Plaintiff to call his mother as a witness at his disciplinary hearing. Finally, Plaintiff claims that Maniscalco deprived Plaintiff of his due process rights by allowing Burton to sign the adjudication form without Plaintiff's knowledge and permission. (Amended Compl., Claim 2).

***12** This Court finds no due process violations under *Wolff* on the facts as alleged by Plaintiff. As to his first claim that he did not have ample time to review the documents before the hearing, the Court observes that these documents were Plaintiff's own documents seized from his cell. Consequently, he was familiar with their contents. As to his claim that he could not call his mother as a witness, the Court finds no constitutional deprivation. Plaintiff's mother was not a witness against him, thus there was no violation of the Fifth Amendment's confrontation clause. Moreover, the testimony of Plaintiff's mother would have been cumulative if she did indeed intend to testify as Plaintiff did; namely, that the business was a nonprofit organization.

Finally, there is no indication on the adjudication form that Plaintiff refused to sign it, or that he did not authorize Burton to sign it. Burton was Plaintiff's Counsel Substitute, and his signature on the form merely acknowledges what took place at the disciplinary hearing, and was not an acquiescence of guilt. Moreover, this allegation is not an enumerated due process requirement under *Wolff.*

Plaintiff also asserts a deprivation of due process claim against defendant Raphael Dolce, the SID investigator who reported and investigated the disciplinary charges. Plaintiff alleges that Dolce violated his due process rights by not interviewing Plaintiff to obtain the facts of the case, and by verbally harassing Plaintiff's mother in an interview during the investigation.

The Court finds no due process violations based on these allegations against Dolce. There is no requirement that Plaintiff first be interviewed before his hearing. He had the opportunity to challenge the disciplinary charges and refute any allegations at the hearing. Further, the allegation that Dolce verbally harassed Plaintiff's mother in an interview such that her Fifth Amendment rights were violated is not a constitutional deprivation with regard to Plaintiff. Therefore, Plaintiff's due process claims against Maniscalco and Dolce will be dismissed with prejudice for failure to state a claim.

Lastly, Plaintiff appears to be challenging the disciplinary finding itself by claiming that Maniscalco relied "solely on Investigator Dolce's opinion rather than the evidence itself and did not investigate the evidence, as he stated was complex, independently. He did not meet the burden of proof to find guilty of fraud because he did not show first the intent, and second the action." (Amended Compl., Claim 3). The Court finds Plaintiff's purported claim for damages is subject to dismissal because Plaintiff is actually challenging the result of the disciplinary proceeding.

In a series of cases beginning with *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court has analyzed the intersection of 42 U.S.C. § 1983 and the federal habeas corpus statute, 28 U.S.C. § 2254. In *Preiser,* state prisoners who had been deprived of good-conduct-time credits by the New York State Department of Correctional Services as a result of disciplinary proceedings brought a § 1983 action seeking injunctive relief to compel restoration of the credits, which would have resulted in their immediate release. 411 U.S. at 476. The prisoners did not seek compensatory damages for the loss of their credits.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

411 U.S. at 494. The Court held that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500.

***13** In *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Court addressed a corollary question to that presented in *Preiser*, *i.e.*, whether a prisoner could challenge the constitutionality of his conviction in a suit for damages only under § 1983 (a form of relief not available through a habeas corpus proceeding). The Court rejected § 1983 as a vehicle to challenge the lawfulness of a criminal judgment.

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

512 U.S. at 486–87 (footnote omitted). The Court further instructed district courts, in determining whether a complaint states a claim under § 1983, to evaluate whether a favorable outcome would necessarily imply the invalidity of a criminal judgment.

> Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 487 (footnotes omitted). The Court held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489–90.

Later, in *Edwards v. Balisok*, 510 U.S. 641 (1997), the Supreme Court applied the lessons of *Preiser* and *Heck* to a state prisoner action, seeking compensatory and punitive damages, challenging the constitutionality of procedures used in a prison disciplinary proceeding that resulted in the loss of good-time credits, but not necessarily challenging the result and not seeking the restoration of the good-time credits. The Court emphasized that such a claim is not cognizable under § 1983 if a favorable outcome would necessarily imply the invalidity of the challenged judgment, which in that case was the disciplinary finding and punishment. 520 U.S. at 646–8.

Here, Plaintiff plainly is challenging the disciplinary finding itself, and thus, this claim is barred under *Heck* and *Balisok* because a favorable outcome in this case would necessarily imply the invalidity of his prison disciplinary finding. Plaintiff's sole federal remedy in this instance would be a writ of habeas corpus.

***14** To the extent that Plaintiff is challenging the result of the disciplinary proceedings, such claim must be dismissed. Plaintiff has not exhausted his administrative and state court remedies challenging the disciplinary finding. In fact, Plaintiff admits that the matter is currently pending on appeal in state court. Therefore, he is precluded at this time from asserting such a claim here. Accordingly, Plaintiff's claim challenging

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the results of his disciplinary proceedings must be dismissed without prejudice at this time.

## V. CONCLUSION

For the reasons set forth above, the Complaint will be dismissed with prejudice, in its entirety, as against defendants, NJDOC and NJSP, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 1915A(b)(1), for failure to state a claim upon which relief may be granted. In addition, Plaintiff's First Amendment free religious exercise and visitation claims, his RLUIPA claim, and his Fourteenth Amendment denial of due process claim under *Wolff v. McDonnell, supra,* will be dismissed with prejudice as against all named defendants, for failure to state a claim. Finally, Plaintiff's due process claim challenging the results of his disciplinary hearing will be dismissed without prejudice for failure to state a claim at this time. Plaintiff's application for appointment of counsel (Docket entry no. 2–3) will be denied as moot. An appropriate order follows.

D.N.J.,2011.
LeCompte v. Ricci
Not Reported in F.Supp.2d, 2011 WL 6130596 (D.N.J.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O. Bouyea, Defendants.

FN1. Defendant John Doe has not been identified and therefore has not been served with the Amended Complaint or otherwise appeared in this action. *See* Dkt No 12.

FN2. Plaintiff mistakenly spells Defendant Bennett's name as "Bennet." *See* Dkt. No. 23, Answer at n. 1. The Court will refer to this Defendant by the proper spelling.

No. 9:03-CV-1128 (NAM/RFT).
Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New York, Senta B. Siuda, Esq., Assistant Attorney General, Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

***1** Presently before this Court is defendants' motion (Dkt. No. 105) for summary judgment dismissing the complaint in this civil rights action pursuant to 42 U.S.C. § 1983. In his amended complaint (Dkt. No. 8), plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment.

Defendants' motion was referred to United States Magistrate Judge Randolph F. Treece for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). In a thorough Report and Recommendation (Dkt. No. 110), Magistrate Judge Treece recommends that the Court grant the motion for summary judgment. Plaintiff objects (Dkt. No. 112). After the Court extended time for plaintiff to file additional objections to the Report-Recommendation (Dkt. No. 113), plaintiff filed a second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review of those parts of a magistrate judge's Report and Recommendation to which a party specifically objects. Where only general objections are filed, the Court reviews for clear error. *See Brown v. Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without op.*, 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a Report and Recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

Plaintiff's objections include a variety of allegations. A number of them revisit issues which are the subject of the Report and Recommendation. They do not, however, demonstrate the existence of material questions of fact which would warrant denial of summary judgment. Other allegations concern events allegedly occurring subsequent to the filing of the amended complaint herein; these are not properly the subject of this action. Upon thorough *de novo* review, the Court accepts and adopts the Report and Recom-

Page 2

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

mendation.

It is therefore

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.

RANDOLPH F. TREECE, Magistrate Judge.

***REPORT-RECOMMENDATION and ORDER***

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

## I. FACTS[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

***2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] *Id.* at ¶¶ 26 & 28. On April 26, 2003,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.,* Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] *Id.,* Grievance Lt., dated May 27, 2003.

FN4. Plaintiff does not provide any specific dates as to when he received rotten or spoiled food.

FN5. It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[FN6] *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

FN6. The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

***3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[FN7] Defs.' 7.1

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.,* Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .,* Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.,* Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.,* Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

FN8. Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

***4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books were not available at the facility.[FN9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id.,* Ex. C, Lt., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

FN9. Jean Botta is not named as Defendant in this action.

FN10. "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

***5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### B. Eleventh Amendment

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

**C. Exhaustion of Remedies**

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care; [FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

> FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

***6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance

or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 [FN12] & *Mendoza v. Goord,* 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

FN12. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d. Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also* *Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

***7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action.[FN13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.,* Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

***8** Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures were 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming

estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

### D. Eighth Amendment Claims

***9** Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1974)). Instead, “reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk.” *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, “an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference.” *Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

***10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a “known or made for hire enemy” and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that “there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility” and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his “circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]” Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor he was in danger from “all gang members” but then stated that he did not tell his counselor anything of such nature since “there was no counselor for [him] to speak to” until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made “homosexual advances” on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because “things weren't working out” and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had “plenty of fights” with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom “Sergeant Bass thought was a rival gang member.” Am. Compl., Ex. “Exhaustion of my Administrative Remedies ... [with fight investigation] ...,” Fight Investigation Form, dated June. 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

***11** Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16, lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact

between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

***12** Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted.**

### E. First Amendment Claims

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord,* 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord,* 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Gill v. Riddick,* 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

***13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott,* 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things [he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

***14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

FN14. The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds).* However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
**(Cite as: 2006 WL 2795332 (N.D.N.Y.))**

claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

***15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

***16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v. Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

**F. Inadequate Visitation**

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia*, *Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

***17** Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

**G. Harassment**

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

> FN15. Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether a plaintiff had a legitimate expectation of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory as to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

***18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Sergio PERRILLA, Plaintiff,
v.
Brian FISCHER, Commissioner, NYS Doccs; Karen Bellamy, C.O.R.C. Coordinator; P. Griffin, Superintendent, Southport Correctional Facility; Iman Affy, Iman of Southport Correctional Facility; T. Meeker, Food Service Administrator, Southport Correctional Facility; and I.G.R.C, Southport Correctional Facility, Defendants.

No. 13–CV–0398M.
Oct. 28, 2013.

Sergio Perrilla, Marcy, NY, pro se.

**DECISION AND ORDER**
RICHARD J. ARCARA, District Judge.

***INTRODUCTION***

***1** Plaintiff, Sergio Perrilla, currently an inmate at the Mid–State Correctional Facility, initially commenced this *pro se* action under 42 U.S.C. § 1983 in the United States District Court for the Northern District of New York alleging a denial of his First Amendment Free Exercise rights while he was incarcerated at the Southport Correctional Facility. Because the events alleged in the complaint occurred within this District and the defendants most likely resided in this District, *see* 28 U.S.C. § 1391(b), the Northern District transferred the action to this District. (Docket No. 7, Decision and Order.) Plaintiff also sought permission to proceed *in forma pauperis* and filed a Prison Authorization. (Docket Nos. 2, 4 and 5.) For the following reasons, plaintiffs motion to proceed as a poor person is granted and some of claims alleged in the complaint are dismissed with prejudice pursuant to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A(b), for their failure to state a claim upon which relief can be granted, and the remainder of the complaint will be dismissed unless plaintiff files an amended complaint as directed below..

***DISCUSSION***

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to this action, plaintiff is granted permission to proceed *in forma pauperis.* Sections 1915(e)(2)(B) and 1915A(a) of 28 U.S.C. require the Court to conduct an initial screening of this complaint. In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). While "a court is obliged to construe [*pro se* ] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted); *see also Boykin v. Keycorp,* 521 F.3d 202, 213 (2d Cir.2008) (discussing pleading standard in *pro se* cases after *Twombly;* "even after *Twombly*, dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Generally, the Court will afford a *pro se* plaintiff an opportunity to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (*per curiam* )).

***2** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)). Based on its evaluation of the complaint, the Court finds that several of plaintiffs claims must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b) because they fail to state a claim upon which relief may be granted.

**A. PLAINTIFF'S CLAIMS**

Plaintiff alleges that on or about June 26, 2011, he forwarded a letter to defendant Iman Affy at Southport asking to be placed on the list for Ramadan Muslim Observance Services. (Complaint, ¶ 1, Exh. A.) On or about June 28, 2011, he received a memorandum from defendant Meeker, Southport's Food Service Administrator, informing inmates that Ramadan Observance Meals would begin on August 1 and that the last meal would be served on August 14, 2011. (*Id.,* ¶ 2, Exh. B.) On September 1, 2011, plaintiff wrote to Iman Affy and informed him that he had spoken to defendant Superintendent Grffin regarding why his "Shawwal Meal" had been discontinued and was advised by Griffin to contact the Iman. On that same date, plaintiff filed a grievance complaining that he had told Iman Affy that he wanted to attend Ramadan Services but was advised he could not pursuant to New York State Department of Corrections and Community Supervision Directive No. 4933, 7 N.Y. Comp. R. & Regs § 304.9, which prohibits inmates confined in SHU from participating in congregate religious services. (*Id.,* ¶ ¶ 13–4, Exhs.C, D.)

In September 2011, plaintiff filed two additional grievances, SPT–52336–11 (Grievance I") and SPT–52337–11 ("Grievance II"). Grievance I alleged that plaintiffs right to be provided Halal food during Ramadan to break his fast was denied when Meeker and Iman Affy did not provide him with "double portions" as set forth in the Ramadan Menu and oatmeal in the Sahoor bags, and that the evening meal during Ramadan was "ill[-]prepared" and served by non-believers. (Complaint, ¶ ¶ 5,10, Exh. E, J.) He also claims that when the meal was prepared by believers, the chicken and fish was "unclean, filthy and raw (not coooked peroperly)." (*Id.,* Exh. E.) The Inmate Grievance Review Committee ("IGRC") granted Grievance I in part "to the extent that per religious staff Muslim and NOI [Nation of Islam] inmates cooked and prepared Ramadan food. All food and meals served were in accordance with the Statewide Menu ... All meals were supervised by staff and prepared properly." § *Id.,* Exh. J.) Superintendent Griffin concurred with the IGRC's decision and affirmed the recommendation of the IGRC. (*Id.*)

***3** The Second Grievance complained that plaintiff was not permitted to attend congregate services during Ramadan pursuant to DOCCS Directive 4933, 7 NYCRR § 304.9(d),[FN1] which provides that individuals in SHU are not permitted to attend congregate religious services. (Complaint, ¶ ¶ 7–10, Exhs.G-l). Accommodations are provided in the form of counseling by the facility's ministerial staff and a rounding in SHU by the facility senior chaplain or a designee at least once per week. *Id.* The Grievance was denied by the IGRC pursuant to Directive 4933, and the denial was affirmed by Griffin and the Central Review Office Committee. (*Id.*)

FN1. Directive 4933, which applies only SHU inmates, provides:

(a) Counseling by a member of the facility's ministerial services staff will be provided upon written request of an inmate.

(b) The facility senior chaplain or a designated member of the ministerial services staff will be required to make a minimum of one round per week in SHU.

(c) No inmate religious advisor or assistant will be permitted to visit SHU.

(d) Attendance at congregate religious services will not be permitted.

Plaintiff's claims are brought solely under the First Amendment [FN2] and are brought against Brian Fischer, Commissioner; Karen Bellamy, CORC Director; P. Griffin, Superintendent at Southport; Iman Affy; Meeker; and Southport's IGRC Coordinator. Plaintiff seeks compensatory and punitive damages in separate amounts against each of the defendants. For the following reasons, the Court finds that (1) plaintiffs claims related to the denial of his request to attend congregate religious services must be dismissed with prejudice for their failure to state a claim upon which relief can be granted, (2) plaintiff's claims against defendants Fischer, Bellamy, Griffin and the IGRC Coordinator related to the alleged denial and preparation of Halal Meals must be dismissed with prejudice for their failure to state a claim upon which relief can be granted, and (3) plaintiff's claims against Iman Affy and Meeker *only* related to the alleged denial and preparation of Halal Meals must be dismissed unless he files an amended complaint which includes the necessary allegations regarding said claims.

FN2. The Court notes that liberally construing the complaint, as the Court must, *see Norfleet v. Walker,* 684 F.3d 688, 2012 WL 2520465, at *1 (7th Cir.2012) ("courts are supposed to analyze a litigant's claims and not just the legal theories that he propounds, especially when he is litigating pro se") (citations omitted), the facts alleged could also be construed to support a claim under the Religious Land Use and Incarcerated Persons Act of 2000, 42 U.S.C. § 2000cc–1 (a). However, plaintiff is seeking only compensatory and punitive damages which are not available under RLUIPA. *Ford v. Palmer,* ––– Fed.Appx. ––––, 2013 WL 5340395, n. 1 (2d Cir. Sept.24, 2013) (Summay Order) ("RLUIPA does not provide a cause of action for damages against state officials in their official capacities, *see Sossamon v. Texas,* ––– U.S. ––––, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011), or in their individual capacities, *see Washington v. Gonyea,* No. 11–980–cv 731 F.3d 143, 2013 WL 4792375, at*2 (2d Cir. Sept. 10, 2013) (per curiam))." Accordingly, to the extent the complaint could be construed to allege claims under RLUIPA they would be dismissed.

**1. Congregate Religious Services**

Plaintiff alleges that he was denied the right to attend congregate religious services during the Holy Month of Ramadan in 2011 and was advised by Iman Affy that pursuant to Directive No. 4933 he could not attend congregate religious services. Plaintiff also was not permitted to attend Jumah and Eid–ul–Fiter Services. (Complaint, ¶ 4, Exh. D.) While it has been held that the First Amendment does provide inmates the right to participate in congregation religious services "under most circumstances," *Johnson v. Guiffere,* 2007 WL 3046703, at *4 (N.D.N.Y., Oct.17, 2007) (citing *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993), the right is not unfettered and must "be balanced against legitimate penological concerns." *Washington v. Afify,* –––F.Supp.2d ––––, 2013 WL 4718693, at 6 (W.D.N.Y., Sept.3, 2013).

"[I]t is well-established [in this Circuit] that the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

enforcement of DOCS policies which restrict inmates in SHU from attending congregate religious services is rationally related to a valid penological interest and is the least restrictive means of serving that interest.' " *Leon v. Zon,* 920 F.3d 379, 386 (W.D.N.Y.2013) (quoting *Smith v. Artus,* 2010 WL 3910086 at *23 (N.D.N.Y.2010), *vacated on other grounds* 2013 WL 1338359, at n. 1 (2d Cir. Apr.4, 2013); [FN3] *see also Washington,* 2013 WL 4718693, at 6 ("In *Smith v. Alius* ... the court, though recognizing that 'a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock,' granted summary judgment for the defendants on the plaintiffs claim challenging a directive that SHU inmates could not attend congregate religious services, finding that the directive had valid, rational connection to the legitimate penological interest of security, staffing, and the preservation of scarce fiscal resources.) (citing *Smith v. Artus,* 2010 WL 3910086, at *31).

FN3. The Second Circuit, on appeal vacated the district court's decision on other grounds, noting that the portion of the district court's decision addressing the religious-services issue "remain[s] undisturbed by this order." *Smith v. Artus,* 2013 WL 1338359, at n. 1.

***4** Accordingly, plaintiff's claims alleging that he was denied his First Amendment right to attend congregate religious services must be dismissed with prejudice. *See Washington,* 2013 WL 4718693, at 7.

**2. Denial of and Ill–Prepared Halal Meals**

Plaintiff also claims that during Ramadan 2011, he was not provided Halal [FN4] food to break fast and that the evening meal was prepared by non-believers and that when it was prepared by believers it was ill-prepared-"unclean, filthy, and raw...." (Complaint, ¶ 5, Exh. E.) Grievance I claimed that Iman Affy and Meeker did not comply with the Ramadan Menu distributed previously (*id.,* ¶ B) inasmuch as he was not provided double portions nor was he provided with oatmeal in his Sahoor bags (*id.,* Exh. E). The Grievance was granted in part "to the extent that per religious staff Muslim and NOI [Nation of Islam] inmates cooked and prepared Ramadan food. All food and meals served were in accordance with the Statewide Menu ... All meals were supervised by staff and prepared properly." (*Id.,* Exh. J.) Superintendent Griffin concurred with the IGRC's decision and affirmed the recommendation of the IGRC. ( *Id.,* ¶ 10, Exh. J.)

FN4. As summarized by one district court the Muslim Halal dietary requirement is as follows: "[T]he Koran dictates that practicing Muslims eat food that is Halal, which means allowed or lawful. The opposite of Halal is Haram, which means prohibited or unlawful. A Halal diet includes fruits, vegetables and all things from the sea. The flesh of herbivorous animals, such as cows, lambs, chickens and turkeys, is Halal if it is slaughtered with the appropriate prayer and in the appropriate manner. Certain items are Haram and cannot be made Halal through ritual slaughter. Examples of such Haram items include pork and all pork by-products, carrion and the flesh of carnivorous animals, such as cat, dog, rat, lion, tiger, and eagle. Intoxicants of all types are also Haram. Halal does not require separate preparation and serving facilities after Halal meat is slaughtered according to ritual." *Cox v. Kralik,* 2006 WL 42122, at *1, n. 1 (S.D.N.Y., Jan.6, 2006) (citing *Abdul–Malik v. Goord,* 1997 WL 83402, at *1 (S.D.N.Y. Feb.27, 1997)).

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of gion." *O'Lone v. Estates of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citation omitted). Those protections, however, "are not as extensive as the rights enjoyed by an ordinary citizen. Rather, '[a] prison inmate ... retains those First

Page 5

Slip Copy, 2013 WL 5798557 (W.D.N.Y.)
**(Cite as: 2013 WL 5798557 (W.D.N.Y.))**

Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' " *Washington,* 2013 WL 4718693, at *4 (quoting *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004) (quoting *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995), and citing *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, ... are the interests of prison officials charged with complex duties arising from administration of the penal system") (internal quotation marks and brackets omitted)).

Whether a restriction on a prisoner's religious practices is constitutional under the First Amendment, is determined by a standard of reasonableness. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). *See also Ford,* 352 F.3d 588 ("The free exercise claims of prisoners are therefore judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights") (additional internal quotation marks omitted). "Under the First Amendment ... a generally applicable policy will not be held to violate a plaintiffs right to free exercise of religion if that policy is reasonably related to legitimate penological interests.' " *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). In order to establish a violation of the First Amendment a "prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salhuddin,* 467 F.3d at 274–75 (citation omitted). Restrictions on an inmate's free exercise rights are only permissible where they are "reasonably related to legitimate penological interests." *Pugh v. Goord,* 571 F.Supp.2d 477, 494 (S.D.N.Y.2008) (quoting *Turner v. Safley,* 482 U.S. 78, 87, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). "An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise." *Salahuddin,* 467 F.3d at 276, n. 4 (citing *Ford,* 352 F.3d at 595, n. 15 (citing *Young v. Couglin,* 866 F.2d 567 (2d Cir.1989)).

***5** The Second Circuit has stated that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). However, "[t]here may be inconveniences [regarding denials of religiously required food] so trivial that they are most properly ignored." *Tafari v. Annets,* 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008) (quoting *McEachin,* 357 F.3d at 203 n. 6). "In this respect, this area of the law is no different from many others in which the time-honored maxim *de minimis non curat lex* applies." *McEachin,* 357 F.3d at 203 n. 6. *See also Norwood v. Strada,* 249 F. App'x. 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-one half-day emergency lock-down, was "a mere *de minimis* intrusion" that failed to substantially burden the inmate's religious beliefs); *Brown v. Graham,* 2010 WL 6428251, at *15–16 (N.D.N.Y., March 30, 2010) (collecting cases finding *de minimis* burden on inmate's free exercise rights); *Tafari,* 2008 WL 2413995, at *16 (denial of Kosher meals on a few separate occasions "did not substantially burden [Plaintiff's] religious beliefs and constituted, at most, a *de minimis* violation.")

Plaintiff's complaint and the attached Grievances [FN5] do not allege a plausible claim for relief, *see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (In order to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ") (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)), that the denial of double portions to break fast

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and being provided some ill-prepared meals of chicken of fish and some meals prepared by non-believers during Ramadan in 2011 substantially burdened plaintiff's right to freely practice his Muslim faith. The allegations allege no more than what has often in this Circuit been referred to as a *de minimus* burden on plaintiffs free exercise rights. *See Brown,* 2010 WL 6428251, at *15–16 (collecting cases); *see also Washington,* 2013 WL 4718693, at *5 ("Courts have generally held that incidents that are isolated, or few in number, involving a denial of religiously-mandated food, do not give rise to a First Amendment claim.") (citations omitted). Plaintiff only claims that he was denied double portions, that he was not provided oatmeal in his Sohoor bags and that some of the meals provided were provided by non-believers or were ill-prepared. The Ramadan Menu distributed by Meeker prior to the start of Ramadan noted that inmates would be provided one bag of Halal dates for consumption prior to dawn each day and that the daily rations of dates was five and that each bag of dates would contain 14 plus rations of dates with a few extra "which will last each participant a total of [14] dates." (Complaint, Exh. B.)

FN5. "[T]he court may consider facts set forth in exhibits attached as part of the complaint as well as those in the formal complaint itself." *Chance v. Armstrong,* 143 F.3d 698, 698 n. 1 (2d Cir.1998); *see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

***6** These allegations, in addition to alleging no more than a *de minimus* burden, if at all, on plaintiff's right to practice his Muslim faith during Ramadan, also fail to allege that the denial of double portions of dates or meals prepared properly and in a more pleasing manner was, in any way, a "substantial burden" on exercising plaintiffs faith. *See Saiahuddin,* 467 F.3d at 274–75; *Washington,* 2013 WL 4718693, at *5–6.

Accordingly, the complaint fails to state a claim that plaintiff's right to freely practice his religion was denied but, according to the general rule in this Circuit, the Court will provide plaintiff the opportunity to file an amended complaint alleging that he was denied the right to freely practice his religion by Affy and Meeker only. *See Snider v. Melindez,* 199 F.3d 108, 113 (2d Cir.1999) (Except in "unmistakably clear" cases, "it is bad practice for a district court to dismiss without affording a plaintiff the opportunity to be heard in opposition.")

**3. Personal Involvement/Supervisory Liability**

With respect to the Halal Meal claims against Fischer, Griffin, Bellamy and the unnamed IGRC Supervisor they must be dismissed with prejudice because plaintiff has not alleged that these defendants were personally involved in the alleged denial of his First Amendment rights in relation to the provision or lack thereof of double portions, oatmeal and properly prepared Halal Meals. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (Leave to amend should be denied where "the problem with [plaintiffs] causes of action is substantive" such that "[b]etter pleading will not cure it.") (citation omitted).

It is axiomatic that before a plaintiff can seek to impose liability against a state government official or employee under 42 U.S.C. § 1983, he must establish that the official or employee was personally involved in the alleged constitutional deprivation because the doctrine of respondeat superior does not apply to actions brought under § 1983. *See,* e.g., *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Thus, a defendant cannot be liable for damages for a constitutional violation merely because he occupies a position of authority or is in the chain of command of the prison hierarchy. *See Colon v. Couglin,* 58 F.3d 865, 873 (2d Cir.1995).[FN6]

FN6. “Following the Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 676–77, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), there is still disagreement among district courts in this Circuit as to whether all of the [five] ‘Colon factors' still apply. It is unclear whether *Iqbal* overrules or limits *Colon,* therefore, in the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors.” *Jackson v. Goord,* 2011 WL 4829850, at 9, n. 21 (W.D.N.Y., Oct.12, 2011) (CJS) (citations omitted)).

Plaintiff's claims are brought against Fischer, former DOCCS Commissioner, based on the allegation that he had knowledge of the violations through “Executive Rounds” and the fact that grievances were appealed to his office. (Complaint, ¶ 9[2].[FN7]) However, as alleged in the complaint, Fischer was not part of rounds at Southport nor were any of the grievances appealed to him. These allegations would apply to Superintendent Griffin, not Fischer. The “WHEREFORE” Clause, alleges that Fischer failed to create proper policies used to govern Muslim Observances and failed to train his subordinates. ( *Id.,* ¶ 16.) Plaintiff's alleges that Bellamy, CORC Director, was responsible for all final decisions rendered by the Superintendent and had knowledge of the alleged violations through the appeal of Grievance I and II. ( *Id.,* ¶ 10[2] ). Griffin was the Superintendent who plaintiff alleges he told during Executive Rounds on September 1, 2011, that he had been denied his “Shawwal Fast” ( *id.,* ¶ 3) and who concurred in the IGRC's recommendation regarding Grievance I. (Complalint, Exh. J.)

FN7. The complaint contains separate paragraphs each numbered 8–11. The second paragraph is of each is denoted by “[2].”

***7** Clearly, Fischer and Bellamy are named herein solely in their supervisory roles in DOCCS' hierarchy and are not alleged to have had any personal involvement in the alleged denial of Halal food and meals. Similarly, the allegations against Griffin and the IGRC Supervisor are subject to dismissal because it is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement. *See, e.g., Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted); *James v. Poole,* 2013 WL 132492, at *7 (W.D.N.Y., January 09, 2013) (“Plaintiff attempts to establish personal involvement by Superintendent Poole and CORC Director Eagan by pointing to their roles in reviewing Plaintiffs grievances. Without more, this is insufficient to create personal involvement in Plaintiff's alleged constitutional violations.”) Moreover, because there are no allegations that Griffin was directly involved in the alleged denial of double portions or properly prepared evening Halal Meals, the claims against him must be dismissed. Griffin's role as Superintendent is insufficient to establish his personal involvement in the alleged First Amendment violation. *See Washington,* 2013 WL 4718693, at *11.

***CONCLUSION***

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization, his request to proceed *in forma pauperis* is granted. For the reasons set forth above, plaintiff's claims concerning the denial of congregate religious services and the claims against defendants Fischer, Bellamy, Griffin and IGRC Supervisor, in their entirety, are dismissed with prejudice. In addition, plaintiff's claims concerning the denial of and ill-prepared Halal Meals must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) unless he files an amended complaint which includes the necessary allegations regarding said claims as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure.

Plaintiff is advised that an amended complaint is

intended to completely replace the prior complaint in the action. "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Arce v. Walker,* 139 F.3d 329, 332 n. 4 (2d Cir.1998) (quoting *International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977)); *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Therefore, plaintiff's amended complaint must include the allegations against Iman Affy and Meeker regarding only the claims that he was denied Halal Meals so that the amended complaint may stand alone as the sole complaint in this action which the defendants must answer.

Plaintiff is forewarned that if he fails to file an amended complaint as directed, the complaint will be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiff is further forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. § 1915(e)(2)(B). *See* 28 U.S.C. § 1915(g).

***ORDER***

***8** IT HEREBY IS ORDERED, that plaintiff's motion to proceed *in forma pauperis* is granted;

FURTHER, that plaintiffs claims regarding the denial of congregate religious services and his claims against Fischer, Bellamy, Griffin and IGRC Supervisor are dismissed with prejudice and the Clerk of the Court is directed to terminate defendants Fischer, Bellamy, Griffin and IGRC Supervisor as parties to this action;

FURTHER, that plaintiff is granted leave to file an amended complaint against Iman Affy and Meeker *only* regarding his claims of a denial of Halal Meals in 2011 as directed above by **November 22, 2013;**

FURTHER, that the Clerk of the Court is directed to send to plaintiff with this order a copy of the original complaint, a blank § 1983 complaint form, and the instructions for preparing an amended complaint;

FURTHER, that in the event plaintiff fails to file an amended complaint as directed above by **November 22, 2013,** the complaint shall be dismissed with prejudice without further order of the Court;

FURTHER, that if plaintiff has not filed an amended complaint by **November** 22, 2013, the Clerk of the Court is directed to close this case as dismissed with prejudice; and

FURTHER, that in the event the complaint is dismissed because plaintiff has failed to file an amended complaint, the Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

W.D.N.Y.,2013.
Perrilla v. Fischer
Slip Copy, 2013 WL 5798557 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Slip Copy, 2014 WL 2519313 (W.D.Okla.)
**(Cite as: 2014 WL 2519313 (W.D.Okla.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Oklahoma.
Leonard RACKLEY, Plaintiff,
v.
Johnny BLEVINS, DOC Internal Affairs, Justin Jones, DOC Director, Tim Wilkinson, Warden (DCF), Mark Knutson, Director's Designee, Defendants.

No. CIV–14–145–HE.
Signed May 13, 2014.

Leonard Carmen Rackley, Cushing, OK, pro se.

***REPORT AND RECOMMENDATION***

SHON T. ERWIN, United States Magistrate Judge.

***1** Plaintiff, a state prisoner appearing *pro se* and *in forma pauperis* brings this action pursuant to 42 U.S.C. § 1983, alleging a violation of his constitutional rights. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B)-(C). An initial review of the Complaint, ECF No. 1, has been conducted pursuant to 28 U.S.C. § 1915A and 28 U.S.C. § 1915 (pertaining to *in forma pauperis* proceedings). It is recommended that the Complaint be **DISMISSED** *sua sponte* for failure to state a claim upon which relief may be granted. It is further recommended that this dismissal count as a "prior occasion" or strike pursuant to 28 U.S.C. § 1915(g).

**PROCEDURAL HISTORY**

Plaintiff brings this action against Johnny Blevins, "acting in his official capacity as Chief of Internal Affairs;" Justin Jones, "acting in his official capacity as Director of the Department" with "direct supervisory powers over Defendant Blevins;" Tim Wilkinson, identified as the Warden at the Davis Correctional Facility; and Mark Knutson, identified as the Director's Designee for the Oklahoma Department of Corrections (DOC); (Complaint, ECF at 1–2).

This case arises from the "indefinite termination" of Chasity Rackley's privilege to visit her husband, Leonard Rackley, the Plaintiff in this action. On February 23, 2008, Ms. Rackley was visiting her husband who was then incarcerated in the Oklahoma State Reformatory (OSR). A male officer and a female officer interrupted the visit, separated the two, and searched each for contraband. No contraband was found on either, but a prison official did find a cell phone in the area where the couple had been sitting in the visitation room (Complaint at 2). Plaintiff was accused of possession of a cell phone, and at his disciplinary hearing, he pled guilty to the offense. His punishment included thirty days in disciplinary segregation, loss of 365 earned credits and assignment to Level 1 for ninety days (Exhibits to Complaint, ECF 1–2 at 1). The report of Disciplinary Hearing Actions did not include loss of visiting privileges as a sanction for the possession of a cell phone.

On February 26, 2008, however, Rick Whitten, then the Acting Warden of OSR, wrote an interoffice memorandum stating that Plaintiff's visiting privileges with Chasity Danyel Rackley were indefinitely terminated, that Ms. Rackley would be removed from Plaintiff's approved list of visitors immediately, and that visits from Ms. Rackley would be denied at all DOC facilities. In addition to the cell phone recovered from the visiting area, the indefinite termination of visiting privileges was imposed because correctional officers had allegedly overheard the couple planning to have Ms. Rackley bring drugs into the facility during a future visit (ECF 1–2 at 3). Mr. Whitten also sent a letter to Ms. Rackley informing her of the in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

definite termination of visiting privileges. (ECF 1–2 at 4).

***2** Shortly after the disciplinary proceedings at OSR, Plaintiff was transferred to the Oklahoma State Penitentiary (OSP), and approximately one year after that, he was transferred to the Davis Correctional Facility (DCF). According to Plaintiff, he was allowed to visit with his wife at OSP and, initially, at DCF (Complaint at 4). But on July 28, 2010, while Plaintiff was incarcerated at DCF, Plaintiff asked that his wife be removed from his list of visitors after the two had argued. Apparently, Plaintiff regretted his decision almost immediately, because in August 2010, he asked DCF officials to put his wife back on his list of approved visitors (Complaint at 4). The request was denied, however, because DOC regulations require a prisoner to wait 120 days, in this case until November 28, 2010, before a person who had been removed from his list of visitors could be added back to the list (Complaint at 4; Exhibits, ECF 1–2 at 2). After 120 days, when Plaintiff tried again to have his wife's visitation privileges restored, he was informed of the 2008 indefinite termination of visitation imposed by Acting Warden Whitten of OSR. Defendant Tim Wilkinson, the Warden of DCF, informed Plaintiff that the Warden of the OSR was the only person who could restore Ms. Rackley's visiting privileges (ECF 1–2 at 6). In a letter dated October 19, 2011, however, the new Warden of OSR, James Rudek, declined to act on Plaintiff's request because Plaintiff was no longer incarcerated at OSR. Rudek claimed that he lacked jurisdiction to reinstate Ms. Rackley's visiting privileges (ECF 1–2 at 7).

Plaintiff next presented his case to Defendant Johnny Blevins, Administrator of the DOC's Office of Internal Affairs. In a letter dated April 2, 2012, Defendant Blevins stated that he could not "re-instate visitation at this time [ ]" because "[a]ccording to your correspondence you are still denying your actions." (ECF 1–2 at 8).

Defendant Wilkinson again denied Plaintiff's request to staff on January 29, 2013, based on Mr. Blevins' decision ECF 1–2 at 9.

On March 27, 2013, William Rankin, Plaintiff's Unit Manager at DCF, and Lesa Grizzle, Plaintiff's case manager, sent a request to Greg Williams, Administrator of Private Prisons and Jails, requesting that Chasity Rackley's visitation privileges be restored based on Plaintiff's improved conduct and the fact that visitation at DCF is by video, so there would be no opportunity for Ms. Rackley to deliver contraband to her husband (ECF 1–2 at 31–32). Mr. Williams denied the request based on the previous denial by Defendant Johnny Blevins (ECF 1–2 at 15).

After resubmitting his grievance at DCF, Plaintiff received an amended response from the reviewing authority on May 24, 2013, stating that based on the denial of relief by Greg Williams, Administrator of Private Prisons, Plaintiff's request to have his wife's name taken off the DOC visitation suspension list was denied (ECF 1–2 at 20).

Plaintiff appealed to Defendant Mark Knutson, the Director's Designee for handling inmate appeals. Defendant Knutson affirmed the denial of relief based on his finding that Plaintiff had not substantiated his appeal with any authority supporting his claim of error. Defendant Knutson then added that, although Plaintiff had exhausted his administrative remedies, "the grievance procedure does not satisfy the additional requirements for exhaustion of administrative remedies required by the Governmental Tort Claims Act, 51 O.S. § 151 et seq." (ECF 1–2 at 24).

***3** Based on Defendant Knutson's misdirection, Plaintiff filed a claim under the Oklahoma Governmental Tort Claims Act, only to have his claim denied by the Oklahoma Risk Management Department based on the Act's exclusions of claims premised on omissions by independent contractors for the State and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims stemming from the operation or maintenance of any prison, jail or correctional facility (ECF 1–2 at 26). The Oklahoma Risk Management Department added that Plaintiff's claim was also denied for “failure to exhaust administrative remedies” (ECF 1–2 at 26–27).

Plaintiff then filed this civil rights action.

**GROUNDS FOR DISMISSAL**

Pursuant to 28 U.S.C. § 1915A, this Court must review complaints filed in civil actions by prisoners seeking redress from a governmental entity or officer or employee of a governmental entity. After conducting the initial review, this Court must dismiss the complaint, or any portion of the complaint, which is frivolous, malicious or fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)-(2). *See also* § 1915(e)(2)(B)(ii) (dismissal of a complaint filed *in forma pauperis* is proper for failure to state a claim upon which relief may be granted); *Young v. Davis,* 554 F.3d 1254, 1256 (10th Cir.2009). As with a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept Plaintiff's allegations as true and construe them, and any reasonable inferences to be drawn from them, in the light most favorable to Plaintiff. *See Kay v. Bemis,* 500 F.3d 1214, 1217 (10th Cir.2007).

**ANALYSIS**

Plaintiff contends that DOC officials have failed to adhere to their own operations policy in violation of his due process and equal protection rights. He further complains that DOC officials have given him conflicting instructions about how individuals may be reinstated to an inmate's visitation list. Finally, Plaintiff contends that his fifth and fourteenth amendment rights have been violated because there is “no legal justification for continued suspension of visiting privileges.”

“To make a claim of denial of due process in violation of the Fourteenth Amendment, a plaintiff must show the deprivation of a protected liberty or property interest.” *Schmitt v. Rice,* 421 Fed. Appx. 858, 861(10th Cir.2011)(*citing Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569 (1972)). Prison operating procedures and regulations can, in limited situations, create liberty interests subject to due process protections. In *Sandin v. Conner,* 515 U.S. 472 (1995), however, the Supreme Court narrowed the scope of liberty interests created by prison regulations and procedures, limiting them to those creating conditions imposing “atypical and significant hardship on the inmates in relation to the ordinary incidents of prison life.” *Id* . at 484. After *Sandin*, the Tenth Circuit Court of Appeals has repeatedly and consistently disavowed a liberty interest in prison visitation. *See Marshall v. Morton,* 421 Fed. Appx. 832, 838 (10th Cir.2011)(stating that restrictions on a prisoner's visitation “are not different in such degree and duration as compared with the ordinary incidents of prisoner life to constitute protected liberty interests under the Due Process Clause”); *see also Jenner v. McDaniel,* 123 Fed. Appx. 900, 905 (10th Cir.2005) (holding that no protected liberty interest existed in visitation privileges); *Marsh v. Newton,* No. 97–2157, 1998 WL 39235, *1 (10th Cir.1998) (rejecting a prisoner's due process claim because her alleged restriction on visitation did not involve an “atypical and significant hardship ... in relation to the ordinary incidents of prison life” (citation omitted)); *Abad v. Furlong,* No. 96–1095, 1996 WL 693057, at *1 (10th Cir.1996) (“Plaintiff's loss of ... visitation rights, sanctions imposed apart from the disciplinary proceedings, fail[s] to provide a basis for a federal constitutional claim.” (citations omitted)); *see also Douglas v. Hilligoss,* 2010 WL 1329075 (W.D.Okla. Feb. 26, 2010) (unpublished report and recommendation by magistrate judge) (recommending dismissal of inmate's action with prejudice on grounds that an inmate had no protected liberty interest in a prison job, visitation privileges, telephone use, or recreation), adopted, 2010 WL 1328701 (W.D.Okla. Mar. 29,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010) (unpublished order by district judge); *cf. Kentucky Department of Corrections v. Thompson,* 490 U.S. 454 (1989) (pre-Sandin case holding that two prisoners lacked a protected liberty interest in visitation with particular individuals).

***4** Thus, because Plaintiff cannot show a constitutionally protected liberty interest in his visitation privileges, his claim that Defendants deprived him of the opportunity to visit his wife fails to state a viable claim for relief. Because Plaintiff's allegations against Defendants fail to state a claim upon which relief can be granted, it is recommended that his Complaint be dismissed with prejudice.

Plaintiff's suit against the named Defendants is also subject to dismissal on other grounds. First, Plaintiff has sued Defendant Blevins "in his official capacity as Internal Affaris [sic] Chief when he erroneously denied visitation privileges to claimant" (Complaint at 1). Plaintiff is seeking monetary damages from Defendant Blevins. Claims for damages against a state employee in his official capacity are construed as claims against the State. Such claims are barred by the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S. 159, 165–68 (1985) (stating that the court should treat a suit against an individual acting in an official capacity as a suit against the state itself, which the Eleventh Amendment bars); *White v. Colorado,* 82 F.3d 364, 366 (10th Cir.1996) (Eleventh Amendment sovereign immunity barred § 1983 claims against prison officials in their official capacities). While a State may waive the defense of sovereign immunity, the State of Oklahoma has not waived its immunity defense against § 1983 claims brought in federal district court cases. *See Ramirez v. Okla. Dep't of Mental Health,* 41 F.3d 584, 589 (10th Cir.1994). The Eleventh Amendment forecloses any claim for monetary damages against Defendant Blevins in his official capacity, and the undersigned recommends dismissal with prejudice.

Plaintiff has also sued Defendant Jones in his "official capacity as Director, Oklahoma Department of Corrections" (Complaint, ECF 1 at 1). As discussed above, Defendant Jones is entitled to Eleventh Amendment immunity for § 1983 claims brought against him in his official capacity.

Additionally, Plaintiff's only allegation against Defendant Jones is that he "had direct supervisory powers over Defendant Blevins." But Defendant Jones can be held liable for claims brought against him in his individual capacity pursuant to § 1983 only if he personally participated in a constitutional violation. *Bennett v. Passic,* 545 F.2d 1260, 1262–63 (10th Cir.1976). Furthermore, [g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). In *Iqbal,* the Court further declared that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* Thus, a government official "is only liable for his or her own misconduct." *Id.* at 677. A defendant-supervisor may be held liable under § 1983 if the defendant-supervisor "creates, promulgates, implements, or in some way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected' th[e] plaintiff 'to the deprivation of any rights ... secured by the Constitution.' " *Dodds v. Richardson,* 614 F.3d 1185, 1199 (quoting 42 U.S.C. § 1983) (2011). "A plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* at 1200. Plaintiff has failed to allege any facts to demonstrate that Defendant Jones personally partici-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

pated in any of the events leading to the filing of this civil rights case. Moreover, Plaintiff has not alleged sufficient facts to support a claim against Defendant Jones based on his supervision of Defendant Blevins. Accordingly, it is recommended that the claims against Defendant Jones be dismissed with prejudice.

***5** As for Defendants Wilkinson and Knutson, Plaintiff's claims against these defendants is that Defendant Wilkinson denied his grievance and that Defendant Knutson, as the Director's Designee, denied his grievance appeal. The Tenth Circuit Court of Appeals has previously held that the mere denial of a grievance is inadequate to establish personal participation for claims brought pursuant to Section 1983. *See Stewart v. Beach,* 701 F.3d 1322, 1328 (10th Cir.2012). Therefore, the claims against Defendants Wilkinson and Knutson should also be dismissed with prejudice.

**RECOMMENDATION**

In light of the foregoing, it is recommended that this action be **DISMISSED** on filing for failure to state a claim upon which relief may be granted. It is further recommended that the dismissal count as a "prior occasion" or strike pursuant to 28 U.S.C. § 1915(g). Plaintiff is advised of his right to file an objection to this Report and Recommendation with the Clerk of Court by **May 30, 2014,** in accordance with 28 U.S.C. § 636 and Fed.R.Civ.P. 72. Plaintiff is further advised that any failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Casanova v. Ulibarri,* 595 F.3d 1120, 1123 (10th Cir.2010).

This report and recommendation **disposes of all issues** referred to the undersigned Magistrate Judge in this matter.

W.D.Okla.,2014.
Rackley v. Blevins

Slip Copy, 2014 WL 2519313 (W.D.Okla.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

H
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Troy SMITH, Plaintiff,
v.
C. ROSATI, et al., Defendants.

Civil Action No. 9:10–CV–1502 (DNH/DEP).
Feb. 20, 2013.

Troy Smith, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

***1** *Pro se* plaintiff Troy Smith, a New York State prison inmate, has commenced this action, pursuant to 42 U.S.C. § 1983, against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and several DOCCS employees, alleging deprivation of his civil rights. In general terms, plaintiff's amended complaint alleges that two defendants assaulted him at the instruction of other defendants, that one defendant failed to intervene and protect him from the assault, that two defendants failed to provide him with adequate medical care, that several defendants conspired to conceal the assault, and that he was deprived procedural due process at a disciplinary hearing arising from the event.

Currently pending before the court in connection with the action is defendants' motion for the entry of partial summary judgment. Specifically, defendants seek dismissal of all claims against all defendants with the exception of those asserted against defendants Rosati and St. John, who, plaintiff alleges, assaulted him. For the reasons set forth below, I recommend that defendants' motion be granted except as it relates to the failure to intervene claim asserted against defendant Fraser and the retaliation claim interposed against defendant Goodman.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Am. Compl. (Dkt. No. 7). Although he is currently confined elsewhere, at all times relevant to this action, Smith was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *Id.* at 1. Two series of events, separately discussed below, give rise to this action.

A. *Mattress Incident*

In January 2010, plaintiff attempted to trade in his old mattress to defendant B. Mars, the laundry supervisor at Great Meadow, in return for a new one. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 9. According to plaintiff, defendant Mars improperly ordered plaintiff to pay the full price for the new mattress because she believed that plaintiff had purposely damaged his old one. *Id.* at 9–10. Defendant Mars issued a misbehavior to plaintiff, and plaintiff filed a grievance against

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant Mars with the Inmate Grievance Resolution Committee ("IGRC"), both as a result of the incident. *Id.* at 10. Defendant Craig Goodman, a corrections captain employed by the DOCCS, presided over the disciplinary hearing that resulted from the misbehavior report issued by defendant Mars. *Id.* at 11; Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1. According to plaintiff, at that hearing, defendant Goodman acknowledged that plaintiff's old mattress was damaged as a result of normal wear-and-tear, promised to testify on plaintiff's behalf at the IGRC hearing, and dismissed the misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 11. Plaintiff alleges, however, that defendant Goodman ultimately refused to testify on his behalf at the IGRC hearing, and denied that he told plaintiff his mattress was damaged as a result of normal wear-and-tear. *Id.* at 12. As a result, in January or February 2010, plaintiff filed a grievance with the IGRC alleging that defendant Goodman lied to him. *Id.* at 15, 17.

***2** In May 2010, plaintiff tested positive for marijuana use, and was issued a misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 13. Defendant Goodman presided over the ensuing disciplinary hearing and, after finding plaintiff guilty, sentenced him principally to twelve months of disciplinary confinement in the Special Housing Unit ("SHU"). *Id.* at 18, 21. Due to plaintiff's mental health status, however, this sentence was subsequently modified by the facility superintendent to six months in keeplock confinement. *Id.* at 23. On or about June 11, 2010, plaintiff arrived in keeplock at Great Meadow. *Id.*

B. *Assault*

On June 18, 2010, defendant Paul Zarnetski, a corrections lieutenant employed by the DOCCS, instructed defendant Craig Rosati, a corrections officer also employed by the DOCCS, to escort plaintiff to his scheduled disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 87; Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶¶ 1, 4. At approximately 12:45 p.m. on the same date, defendant Rosati retrieved plaintiff from his cell for the escort. Am. Compl. (Dkt. No. 7) at 9; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. As the two entered a nearby stairway, an altercation occurred between them, which resulted in both plaintiff and defendant Rosati falling down the stairs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. Plaintiff alleges that defendant Rosati pushed him down the stairs and then jumped on him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31, 35. Defendant Rosati, on the other hand, reported that plaintiff turned toward him in a threatening manner, causing him to use force that consisted of a strike to plaintiff's forehead with a closed fist. Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. It is undisputed, however, that, after plaintiff and defendant Rosati fell down the stairs, defendant Chad St. John, another corrections officer, arrived at the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. Plaintiff alleges that defendant St. John began kicking him while he was still on the ground. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36. Defendants, however, maintain that defendant St. John used force that consisted only of applying mechanical hand restraints. Goodman Decl. (Dkt. No. 79, Attach.13) at 1.

Shortly after the arrival of defendant St. John, defendant C. Fraser, a corrections sergeant at Great Meadow, also arrived on the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 37; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. The parties dispute whether defendant Fraser witnessed a further use of force by defendant Rosati when defendant Rosati pushed plaintiff's face into a wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38; Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9. It is undisputed, however, that defendant Fraser ordered that a video camera be brought to the scene; upon its arrival, a corrections officer began filming plaintiff's escort from the stairway to the Great Meadow hospital. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically

filed).

***3** Upon his arrival at the hospital, Smith was examined by defendant David Lindemann, a DOCCS registered nurse. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 40; Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶¶ 1, 4. As a result of his examination and interview of plaintiff, defendant Lindemann noted plaintiff's complaints of a sore left shoulder, pain to his left rib area, and facial area pain, but observed no decrease in plaintiff's range of motion in his shoulder and no visible injuries to his rib area. Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 5; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.8, 9). Defendant Lindemann observed a swollen area on plaintiff's head and a laceration of approximately one and one-half inches in length above plaintiff's left eye, for which he referred plaintiff to defendant Nesmith for stitches. *Id.* Defendant Ted Nesmith, a physicians assistant employed by the DOCCS, closed plaintiff's laceration above his left eye with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80; Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 5.

As a result of the incident, plaintiff was issued a misbehavior report accusing him of engaging in violent conduct, attempted assault on staff, and refusing a direct order. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5) at 2–3. A Tier III disciplinary hearing was subsequently convened by defendant Andrew Harvey, a commissioner's hearing officer, to address the charges. [FN2] *Id.* at 2. Plaintiff was assigned a corrections counselor, defendant Torres, to help him prepare his defense at the disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–79. At the close of that hearing, plaintiff was found guilty on all three counts, and was sentenced to a six-month period of disciplinary SHU confinement, together with a loss of packages, commissary, and telephone privileges for a similar period. *Id.* at 21.

FN2. The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

In the months that followed the incident involving defendants Rosati and St. John, both plaintiff and his mother, Linda Terry, wrote letters to defendant Fischer, the DOCCS Commissioner, complaining of the alleged assault. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 5, 8–12. On September 15, 2010, defendant Lucien LeClaire, the Deputy DOCCS Commissioner, responded by letter, advising plaintiff that defendant Fischer had referred plaintiff's complaint to him, and that he, in turn, had referred the matter to the Office of Special Housing/Inmate Disciplinary Programs. *Id.* at 6. The next day, defendant Albert Prack, the acting director of the Office of Special Housing/Inmate Disciplinary Programs, wrote a letter to plaintiff indicating that his letters to defendant Fischer, which he construed as a request for reconsideration of his appeal of the disciplinary conviction, was without merit, and advising plaintiff that "[n]o further administrative action will be taken." *Id.* at 7.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 13, 2010, and on February 14, 2011, filed an amended complaint as a matter of right. Dkt. Nos. 1, 7. Those named as defendants in plaintiff's amended complaint include DOCCS Commissioner Brian Fischer; DOCCS Chief Counsel and Deputy Commissioner Anthony J. Annucci; DOCCS Deputy Commissioner Lucien LeClaire, Jr.; DOCCS Inspector General

Richard Roy; Deputy Superintendent for Security at Great Meadow Charles Kelly; Deputy Superintendent for Administration at the Great Meadow D. Lindstrand; Corrections Captains Joseph Carey and Craig Goodman; [FN3] Corrections Sergeants D. Bebee and C. Fraser; Corrections Lieutenants T. Pray and Paul Zarnetski; [FN4] Commissioner's Hearing Officer Andrew Harvey; Corrections Counselor Torres; Corrections Officers Craig P. Rosati and Chad W. St. John; Physicians Assistant Ted Nesmith; [FN5] Register Nurse David Lindemann; [FN6] Laundry Supervisor B. Mars; and Acting Director of the Office of Special Housing/Inmate Disciplinary Programs Albert Prack.[FN7]

FN3. Plaintiff's amended complaint identifies defendant Goodman as a lieutenant. Am. Compl. (Dkt. No. 7) at 5. In his affidavit submitted in support of defendants' pending motion, however, defendant Goodman states that he is a corrections captain. Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1.

FN4. Defendant Zarnetski's name has been spelled by plaintiff in various ways, and is listed on the court's records as Zaratski. The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Zarnetski.

FN5. Defendant Nesmith was sued by plaintiff as “Nesmith (Ted) Fisher, III,” Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as “Nesmith Fisher.” The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Ted Nesmith.

FN6. Defendant Lindemann was sued by plaintiff as “D. Lindermann,” Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as “D. Lindermann.” The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as David Lindemann.

FN7. The record reflects that defendant Prack's name has been spelled in a variety of ways, and is listed on the court's records as “Albert Prach.” The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Albert Prack.

***4** Liberally construed, plaintiff's amended complaint asserts eight causes of action, claiming (1) the use of excessive force by defendants Rosati and St. John; (2) conspiracy to conceal the alleged assault by defendants Rosati and St. John against defendants Rosati, St. John, Fraser, Bebee, Kelly, Lindemann, Nesmith, Lindstrand, Goodman, Torres, and Harvey; (3) deliberate indifference to plaintiff's serious medical needs against defendants Lindemann and Nesmith; (4) retaliation against defendants Goodman, Rosati, and St. John; (5) failure to enforce DOCCS regulations against defendants Fischer, Annucci, Roy, and LeClaire; (6) withholding personal property against defendant Mars and Goodman; (7) procedural due process against defendants Harvey, Torres and Prack; and (8) failure to train and supervise against defendants Fischer, Annucci, LeClaire, Roy, Kelly, and Lindstrand.[FN8] Am. Compl. (Dkt. No. 7) at 19–20. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

FN8. At several points in his complaint, as amended, plaintiff alleges that defendants violated various regulations regarding such matters as reporting the requirement of prison medical personnel to assess medical conditions, and the requirement that a disciplinary hearing be held within seven days. It is well-established that the violation of a prison regulation is not redressable in a civil rights action brought pursuant to section


1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N.Y.2009) ( "[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). Plaintiff's complaint also references 18 U.S.C. § 1351, a criminal statute addressing fraud and foreign labor contracting, as well as the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350, and providing a private right of action by an alien for a tort committed in violation of international law or a United States treaty. Those sections do not appear to have any applicability to the facts of this case.

By decision and order dated June 23, 2011, following an initial review of plaintiff's amended complaint, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the court *sua sponte* dismissed all of plaintiff's claims against defendants Kelly, Lindstrand, Carey, Bebee, and Pray, without prejudice, as well as plaintiff's equal protection claims against defendants Mars and Goodman, also without prejudice, and otherwise authorized the action to go forward. Dkt. No. 10.

On May 14, 2012, following the close of discovery, defendants moved for the entry of partial summary judgment dismissing the majority of the claims made in plaintiff's amended complaint. Dkt. No. 79. In their motion, defendants argue that (1) defendants Fischer, Annucci, LeClaire, Roy, and Prack are entitled to dismissal based upon the lack of their personal involvement in the alleged constitutional violations; (2) the record fails to support a claim of deliberate medical indifference against defendant Nesmith and Lindemann; (3) the record does not disclose a basis to hold defendant Fraser liable for failure to protect or intervene; (4) plaintiff's claims against defendant Zarnetski are subject to dismissal, based upon his lack of prior knowledge of and involvement in the assault; (5) plaintiff's verbal harassment claim against defendant Goodman is not cognizable under section 1983; (6) plaintiff's procedural due process cause of action against defendant Harvey lacks merit; (7) plaintiff's claim based upon the payment of $65 for a new mattress does not state a cognizable constitutional claim; and (8) in any event, all defendants, except for defendants Rosati and St. John, are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 79, Attach.17). Defendants' motion, to which plaintiff has since responded, Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72(3)(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

***5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine

dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Personal Involvement*

In their motion, defendants seek dismissal of all claims against defendants Fischer, Annucci, LeClaire, Roy, and Prack based upon lack of personal involvement. Plaintiff responds by arguing that, through his letters, those individuals were or should have been aware of plaintiff's circumstances, but were deliberately indifferent, and additionally were derelict in the performance of their duties and in supervising subordinates, permitting the alleged constitutional deprivations to occur.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). It is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor because there is no *respondeat superior* liability under section 1983. [FN9] *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). A supervisor, however, may be held responsible for a civil rights violation when it is established that he (1) has directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN10]

FN9. Here, the defendants implicated in this portion of the pending motion are principally supervisory DOCCS employees.

FN10. The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* on the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue—specifically in deciding whether *Iqbal* effectively calls into question certain categories of supervisor liability in *Colon. Sash v. United States,* 674 F.Supp.2d 542–44 (S.D.N.Y.2009); *see also Stewart v. Howard,* No. 09–CV0069, 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) (Lowe, M.J.) ("The Supreme Court's decision in [*Iqbal* ] arguably casts in doubt the continued viability of some of the categories set forth in *Colon."* (citing *Sash* )). In

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

this case, absent any controlling authority to the contrary, the court assumes that all of the *Colon* categories still apply.

1. *Defendant Fischer*

***6** At his deposition, plaintiff testified that he sued DOCCS Comissioner Fischer for two reasons: (1) he wrote defendant Fischer about the alleged assault by defendants Rosati and St. John, and defendant Fischer failed to respond; and (2) as the DOCCS Commissioner, defendant Fischer is responsible for the actions of his subordinate employees. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 55–57. Neither of these reasons provides an adequate basis for suit under section 1983. *See, e.g., Hernandez v. Keane,* 342 F.3d 137, 144 (2d Cir.2003) ("[S]upervisor liability in a [section] 1983 action ... cannot rest on *respondeat superior."* ); *Parks v. Smith,* No. 08–CV–0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y.2011) (McAvoy, J.) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").[FN11] Except for this testimony by plaintiff, there is no other record evidence relating to defendant Fischer. As a result, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Fischer was personally involved in any of the allegations giving rise to this action.

FN11. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

2. *Defendant Annucci*

At his deposition, plaintiff testified that he sued DOCCS Chief Counsel and Deputy Commissioner Annucci in this action for four reasons: (1) he is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) he failed to investigate the alleged assault on plaintiff; (3) he merely passed the letters from plaintiff and plaintiff's family down the chain of command; (4) he did not do his job. Plf.'s Dep. Tr. (Dkt. No. 79, Attach 3) at 57–59. Plaintiff's argument that defendant Annucci did not do his job by failing to investigate is based on plaintiff's unsupported assumption that defendant Fischer forwarded plaintiff's letter to defendant Annucci and instructed him to investigate. *See id.* at 58 ("[Defendant Annucci] didn't do what I figured he was told to be done by investigating[.]"). Indeed, there is no record evidence, including any testimony from plaintiff, that plaintiff or any members of his family wrote a letter or complaint directly to defendant Annucci. In any event, even assuming that defendant Annucci received plaintiff's letters, defendant Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks,* 2011 WL 4055415, at *14 ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."). For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

3. *Defendant LeClaire*

At his deposition, plaintiff testified that he sued Deputy DOCCS Commissioner LeClaire because defendant LeClaire forwarded plaintiff's letter addressed to defendant Fischer regarding the alleged assault to the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 60; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 6. That allegation is insufficient to raise a dispute of material fact as to whether defendant LeClaire is personally involved in any of the allegations giving rise to this action. *See, e.g., Ward v. LeClaire,* No. 07–CV–0026, 2010 WL 1189354, at *5 (N.D.N.Y. Mar. 24, 2010) (Suddaby, J.) ("[I]t is well settled that referring letters and grievances to staff for investigation is not sufficient to establish personal involvement." (internal quotation marks and alterations

omitted)). Because there is no other record evidence that relates to defendant LeClaire, I find that no reasonable factfinder could conclude that he was personally involved in any of the allegations giving rise to this action.

4. *Defendant Roy*

***7** At his deposition, plaintiff stated that he sued defendant Roy because he has not received a response from the Inspector General's Office, where defendant Roy heads the Internal Affairs Department, regarding plaintiff's grievance. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 61. Plaintiff testified that he gave a copy of his grievance regarding the alleged assault to an Internal Affairs employee while at Great Meadow, and was later interviewed regarding the incident, but has not yet received a result of the investigation. *Id.* at 61–64. Importantly, plaintiff testified that he has no personal knowledge that defendant Roy, as the head of Internal Affairs, was ever personally aware of the investigation. *Id.* Because there is no *respondeat superior* liability under section 1983, this evidence is not sufficient to support a claim against defendant Roy. *Hernandez,* 342 F.3d at 144. For that reason, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Roy was personally involved in any of the allegations giving rise to this action.

5. *Defendant Prack*

At his deposition, plaintiff testified that he sued defendant Prack because Prack cursorily reviewed plaintiff's appeal of his disciplinary conviction in his capacity as the acting director of the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 92; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7. A review of the record evidence reveals that defendant Prack did, in fact, respond to plaintiff's appeal of his disciplinary conviction, and that defendant Prack indicated in that response that plaintiff's appeal was meritless. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7.

Whether review of an inmate's disciplinary conviction by a person in defendant Prack's position is sufficient to establish personal involvement in section 1983 cases is the subject of debate in this circuit. Some courts have determined that the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon.* [FN12] *See Baez v. Harris,* No. 01–CV–0807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (finding that the response of "the Director of the Special Housing/Inmate Disciplinary Program" to the plaintiff's appeal is "sufficient to withstand summary judgment on the issue of personal involvement"); *Ciaprazi v. Goord,* No. 02–CV–0915, 2005 WL 3531464, at *16 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.) (recommending that [the director of Office of Special Housing/Inmate Disciplinary Programs] not be dismissed for lack of personal involvement because a "review of [the plaintiff's appeal from a disciplinary conviction] sufficiently establishes his personal involvement based upon [the defendant] being positioned to discern and remedy the ongoing effects of any such violations"); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint sufficiently alleged personal involvement of the superintendent and DOCCS commissioner to withstand motion to dismiss because the complaint alleged that both defendants had actual or constructive notice of the alleged constitutional violation that occurred at the disciplinary hearing); *Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through ... an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) (holding that, on a motion to dismiss, the allegation that the DOCCS's commissioner "entertained" and "affirmed" the plaintiff's appeal is sufficient to state a claim against the commissioner because "the allegation that supervisory personnel learned of alleged misconduct on appeal yet

Page 9

Not Reported in F.Supp.2d, 2013 WL 1500422 (N.D.N.Y.)
**(Cite as: 2013 WL 1500422 (N.D.N.Y.))**

failed to correct it constitutes an allegation of personal participation").

FN12. *See Colon,* 58 F.3d at 873 ("The personal involvement of a supervisory defendant may be shown by evidence that: ... (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[.]").

***8** On the other hand, some courts have concluded otherwise, holding that the mere allegation that a defendant reviewed a disciplinary conviction appeal is insufficient to find that defendant personally involved. *See Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y.2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J .) ("The affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation."); *Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning [the director of the Special Housing/Inmate Disciplinary Program] ... is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU. That is not enough to establish [his] personal involvement." (internal citation omitted)); *Odom v. Calero,* No. 06–CV–15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (holding that the allegation that the director of the Special Housing/Inmate Disciplinary Program was personally involved as a result his denial of the plaintiff's appeal of his disciplinary conviction was not sufficient to trigger the second category establishing personal involvement under *Colon* because, "[o]nce the [disciplinary] hearing was over and [the defendant's] decision was issued, the due process violation was completed"); *Ramsey v. Goord,* No. 05–CV–0047A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[T]he fact that [the DOCCS commissioner and SHU director], as officials in the DOC[C]S 'chain of command,' affirmed [a] determination on appeal is not enough to establish personal involvement of their part."); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant." (internal quotation marks omitted)).

At this time, I am inclined to agree with those courts that have determined that a defendant's review and response to an appeal of a disciplinary conviction is sufficient under *Colon* to find that defendant personally involved. Mindful that on a motion for summary judgment I must view the facts, and draw all inferences, in the light most favorable to the non-movant, I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation, and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation. Additionally, because it appears that plaintiff was still serving the sentence imposed at the disciplinary hearing where his alleged due process violation occurred, I find that any violation that may have occurred was ongoing, and defendant Prack was in a position to remedy that violation, at least in part, at the time plaintiff appealed his conviction. All of this is enough to find that there is a dispute of material fact as to whether defendant Prack was personally involved in the allegations giving rise to plaintiff's due process claim by way of the second of the five potential grounds for supervisor liability under *Colon. Cf. Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) ("We disagree, however, with the district court's denial of leave to amend to add [the director of the Special Housing/Inmate Disciplinary Program], who [was] personally involved in [the plaintiff's] disciplinary proceedings[.]").[FN13]

FN13. Based on the record evidence now before the court, I find that defendant Prack could have been personally involved only in plaintiff's procedural due process claim. As

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

> discussed more completely below, however, I recommend dismissal of that claim. Therefore, the finding that a dispute of material fact exists as to whether defendant Prack was personally involved in the allegations giving rise to this action is largely academic.

***9** In summary, I recommend that defendants' motion for summary judgment on the basis of personal involvement be granted with respect to defendants Fischer, Annucci, LeClaire, and Roy, but denied as it relates to defendant Prack.

C. *Deliberate Indifference Claims Against Defendants Nesmith and Lindemann*

Defendants next seek dismissal of plaintiff's Eighth Amendment deliberate indifference claims against defendants Nesmith and Lindemann, arguing that the record lacks any evidence of their deliberate indifference to plaintiff's serious medical needs. In his amended complaint, plaintiff contends that defendants Nesmith and Lindemann failed to provide him with proper medical treatment for back pain, blurred vision, and hearing loss resulting from alleged assault by defendants Rosati and St. John on June 18, 2010. Am. Compl. (Dkt. No. 7) at 12.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v.. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (internal citations omitted).

***10** The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition sig-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

nificantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dutrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Here, after carefully reviewing the record evidence, I find that no dispute of material fact exists as to whether defendants Nesmith and Lindemann were deliberately indifferent to plaintiff's medical needs as a result of the alleged assault by defendants Rosati and St. John. More specifically, although plaintiff testified at his deposition that defendant Nesmith did not follow "his procedure as being a physician" and failed to follow-up with plaintiff, plaintiff also testified that defendant Nesmith cleaned plaintiff's laceration and closed it with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80. Importantly, plaintiff testified that, on the date of the alleged assault, defendant Nesmith did everything that plaintiff requested of him. *Id.* at 80, 81. The record also reflects that defendant Lindemann completed an examination of plaintiff upon his arrival at the Great Meadow hospital, and that he completed a two-page "Use of Force Report" and one-page "Alleged Fight Exam" report during his examination of plaintiff.[FN14] Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 4; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8); Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 4. I have also reviewed the videotape submitted by defendants that recorded the treatment that defendants Nesmith and Lindemann provided plaintiff following the alleged assault by defendants Rosati and St. John. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed). This recording did not display anything unusual, and, although the recording did not include any sound, it appeared that defendants Lindemann and Nesmith asked plaintiff questions, responded to plaintiff's answers, and provided plaintiff with thorough medical care for his reported injuries. *See generally id.* After carefully reviewing all of this evidence, including plaintiff's testimony, I conclude that no reasonable factfinder could find that the care defendants Nesmith and Lindemann provided plaintiff was inadequate, or that they acted with the requisite deliberate indifference when providing medical treatment to plaintiff.

FN14. These reports do not include any complaints of hearing loss or blurred vi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sion—complaints that plaintiff has alleged are ongoing and long-term effects of the alleged assault. *See generally* Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8).

***11** As it relates to plaintiff's allegations that he received inadequate follow-up medical treatment, the record evidence does not support this allegation. Specifically, plaintiff testified that defendant Nesmith removed his stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 83. Additionally, a review of plaintiff's ambulatory health record reveals that plaintiff was subsequently treated by other medical staff members at Great Meadow on several occasions, including on June 20 and 25, 2010; July 1, 6, 20, 23, 27, and 29, 2010; and August 3, 2010. Lindemann Decl. Exhs. (Dkt. No. 79, Attach 11). While some of those visits reference symptoms that plaintiff now attributes to the alleged assault on June 18, 2010, including a notation that plaintiff was scheduled to see an eye doctor (June 25, 2010), others involved matters unrelated to the alleged assault, including missing dentures (July 20, 2010), bug bites (July 23, 2010) and a request for toenail clippers (July 29, 2010). *Id.* Even considered in the light most favorable to plaintiff, the cumulation of this evidence leads me to find that a reasonable fact-finder could not conclude that plaintiff received inadequate follow-up medical care by any of the named-defendants, including defendants Nesmith and Lindemann, or that any of the nameddefendants acted with the requisite deliberate indifference.

In summary, I find that there is no record evidence to support a reasonable factfinder's determination that, objectively, defendants Nesmith and Lindemann provided plaintiff with inadequate treatment for a serious medical need, or that, subjectively, they knew of but disregarded an excessive risk to plaintiff's health or safety. I therefore recommend dismissal of plaintiff's deliberate medical indifference claim against those two defendants.

D. *Plaintiff's Claims Against Defendant Fraser*

Defendants next seek dismissal of all claims asserted in plaintiff's amended complaint against defendant Fraser. A careful review of plaintiff's amended complaint reveals that it asserts three causes of action against defendant Fraser, including (1) conspiracy to cover-up the alleged assault on June 18, 2010; (2) the issuance of a false misbehavior report; and (3) failure to intervene. In their motion, defendants only specifically seek dismissal of a perceived excessive force claim, and the issuance of a false misbehavior report claim against defendant Fraser. For the sake of completeness, I will nonetheless address all of the claims asserted against defendant Fraser.

To the extent that plaintiff's amended complaint may be construed as asserting an excessive force claim against defendant Fraser, I recommend dismissal of that claim because there is no record evidence that defendant Fraser used any force against plaintiff. Specifically, a review of both plaintiff's amended complaint and his deposition transcript do not reveal an allegation that defendant Fraser used any force against him. Plaintiff only alleges that defendants Rosati and St. John used force, which is not sufficient to support an excessive force claim against defendant Fraser.

***12** The remaining claims asserted against defendant Fraser, except for plaintiff's failure to intervene cause of action, are also easily discounted. Plaintiff's conspiracy claim fails against defendant Fraser, as well as defendants Rosati, St. John, Harvey and Torres, Am. Compl. (Dkt. No. 7) at 19, because there is no record evidence that these defendants agreed to violate any of plaintiff's constitutional rights. *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). Specifi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cally, plaintiff did not testify at his deposition to the existence of any agreement among those defendants, and the only mention of such an agreement is a conclusory allegation in plaintiff's amended complaint. *See* Am. Compl. (Dkt. No. 7) at 19 ("Defendant[ ]s Fraser, Rosati, St. John, Harvey, and Torres conspired to use Tier III hearing to deflect official misconduct for exercising a protected right[.]"). Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact. *See, e.g., Hilson v. Maltese,* No. 09–CV–1373, 2012 WL 6965105, at *6 n.10 (N.D.N.Y. Dec. 14, 2012) (Baxter, M.J.), *adopted by* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (Mordue, J.) ("Plaintiff's conclusory assertion ... is not sufficient to establish a material issue of fact[.]" (listing cases)).

Plaintiff's claim that defendant Fraser issued a false misbehavior report against him is not cognizable under section 1983. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report.").

The allegations in plaintiff's amended complaint related to defendant Fraser's failure to adhere to DOCCS's regulations or policies, do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N .Y.2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

Plaintiff's failure to intervene claim against defendant Fraser, however, cannot be dismissed at this juncture. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994), *accord, Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *see also Mowry v. Noone,* No. 02–CV–6257, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004) ("Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used."). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *JeanLaurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)).

***13** Here, a review of the record evidence reveals the existence of a genuine dispute of material fact as to whether defendant Rosati's continued use of force against plaintiff triggered defendant Fraser's duty to intervene. Although defendants cite plaintiff's deposition testimony for the proposition that "no further assault occurred after Defendant Fraser's arrival on the scene," Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9, the record does not support this fact. Instead, during two separate lines of questioning, plaintiff testified at his deposition that, after defendant Fraser arrived to the scene, defendant Rosati "pushed" or "mushed" plaintiff's face into the wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38, 65. Because this testimony clearly indicates that defendant Fraser was present for this alleged use of force by defendant Rosati, and because the record evidence does not conclusively support a finding that defendant Rosati's additional use of force was unconstitutional,[FN15] I find that a reasonable factfinder could conclude, based on the record evidence now before the court, that defendant Fraser's duty to intervene was triggered by defendant Rosati's conduct.

FN15. In their motion, defendants have ex-

pressly represented that they do not move for summary judgment on the excessive force claim asserted against defendants Rosati and St. John because "[t]hat claim ... necessarily involves a credibility determination ... [and] remain[s] for trial." Defs.' Memo of Law (Dkt. No. 79, Attach.17) at 3.

In summary, I recommend that all claims against defendant Fraser be dismissed, with the exception of the failure to intervene claim.

E. *Plaintiff's Claims Against Defendant Zarnetski*

Defendants next seek dismissal of all claims against defendant Zarnetski. Plaintiff's amended complaint alleges that defendant Zarnetski is liable for the force used by defendant Rosati because he should have predicted that, when he instructed defendant Rosati to escort plaintiff to the disciplinary hearing, defendant Rosati would assault him. Although such an allegation, if properly supported by the record, may give rise to a failure to intervene or conspiracy to use excessive force claim, the evidence in this case does not support either claim.

In his verified amended complaint, plaintiff avers that defendant Zarnetski sent defendant Rosati to escort him to his disciplinary hearing, and on the way to the hearing, defendant Rosati assaulted him. Am. Compl. (Dkt. No. 7) at 17. During his deposition, plaintiff elaborated on this allegation only to the extent of testifying that it is "known" at Great Meadow that defendant Rosati "is a hothead," and, as a result of this common prison knowledge, defendant Zarnetski should have predicted that defendant Rosati would assault plaintiff. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 88–89. Plaintiff also admitted, however, that, in order to attend his disciplinary hearing, he was required to be escorted by a corrections officer. *Id.* at 88. In his affidavit, defendant Zarnetski avers that he "had absolutely no foreknowledge that C.O. Rosati and plaintiff would be involved in a use of force on June 18, 2010." Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶ 4. Because, in the face of defendant Zarnetski's denial, plaintiff's allegations amount to nothing more than his rank speculation that defendant Zarnetski knew or should have known that defendant Rosati would assault plaintiff, I find that no reasonable fact-finder could conclude that defendant Zarnetski had a duty to intervene. *See Henry,* 2011 WL 5975027, at *4 (finding that, to establish liability on the part of a defendant for failure to intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene."). In addition, because none of this evidence raises a genuine dispute of material fact as to whether defendants Zarnetski and Rosati agreed to use force against plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski conspired to violate plaintiff's constitutional rights. *See Pangburn,* 200 F.3d at 72 ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). For all of these reasons, I recommend dismissing all of plaintiff's claims against defendant Zarnetski.

F. *Plaintiff's Claims Against Defendant Lieutenant Goodman*

***14** In his amended complaint, plaintiff alleges that defendant Goodman conspired with defendants Rosati and St. John to effectuate the alleged assault on plaintiff because plaintiff successfully modified a disciplinary sentence imposed by defendant Goodman. Am. Compl. (Dkt. No. 7) at 8. Plaintiff supports this contention with a further allegation that, three days after the alleged assault by defendants Rosati and St. John, defendant Goodman said to plaintiff, " 'That is what you get for getting my sentence modified [.]' " *Id.* at 14. Defendants properly construe these allega-

tions as plaintiff's assertion of a First Amendment retaliation claim, and seek its dismissal. Defendants also seek dismissal of plaintiff's verbal harassment claim asserted against defendant Goodman.

1. *First Amendment Retaliation*

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, which is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99–CV–2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Here, it is well settled that plaintiff's appeal of defendant Goodman's disciplinary sentence is constitutionally protected conduct, satisfying the first prong of a retaliation claim. *See, e.g., Santiago v. Holden,* No. 11–CV–0567, 2011 WL 7431068, at *5 (N.D.N.Y. Nov. 29, 2011) (Homer, M.J.), *adopted by* 2012 WL 651871 (N.D.N.Y. Feb. 28, 2012) (Suddaby, J.) ("There is no question that [the plaintiff's] conduct in filing grievances and appeals was conduct protected by the First Amendment."); *Brown v. Bascomb,* No. 05–CV–1466, 2008 WL 4283367, at *6 (N.D.N.Y. Sept. 16, 2008) (Mordue, C.J.). In addition, being assaulted plainly constitutes an adverse action sufficient to satisfy the second prong of a retaliation claim. *See Cole v. N.Y. S. Dep't of Corrs. Svcs.,* 2012 WL 4491825, at *13 (N.D.N.Y. Aug. 31, 2012) (Dancks, M . J.), *adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.) ("An assault by corrections officers is sufficient to chill a person of ordinary firmness from continuing to engage in his First Amendment activity." (internal quotation marks omitted)). Turning to the third requirement for a retaliation claim, requiring that a plaintiff to establish a casual connection between the protected conduct and adverse action, drawing all inferences in favor of plaintiff, I find that both plaintiff's amended complaint and his deposition testimony, if credited by a factfinder, may serve to support the allegation that defendant Goodman did, in fact, conspire with defendants Rosati and St. John to assault plaintiff. More specifically, if plaintiff's testimony regarding defendant Goodman's statements three days after the assault is credited, a reasonable factfinder could conclude that this statement was an admission by defendant Goodman that he orchestrated, in some way, the assault on plaintiff. However, because defendant Goodman explicitly denied conspiring with defendants Rosati and St. John to assault plaintiff, Goodman Decl. (Dkt. No. 79, Attach.12) at ¶¶ 3, 4, I find that a genuine dispute of fact exists as to whether defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff for having exercised his First Amendment rights. For this reason, I recommend that defendants' motion for summary judgment be denied as it relates to plaintiff's retaliation claim against defendant Goodman.

2. *Verbal Harassment*

***15** To the extent that plaintiff's amended complaint may be construed as asserting a verbal harassment claim against defendant Goodman for allegedly stating to plaintiff, " 'That is what you get for getting my sentence modified,' " Am. Compl. (Dkt. No. 7) at 14, that claim is not cognizable under section 1983. *See, e.g., Moncrieffe v. Witbeck,* No. 97–CV–0253,

2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) ("A claim for verbal harassment is not actionable under 42 U.S.C. § 1983."). For this reason, I recommend that plaintiff's verbal harassment claim asserted against defendant Goodman be dismissed.[FN16]

> FN16. In the court's initial order, plaintiff's equal protection cause of action was dismissed against defendants Goodman and Mars. Dkt. No. 10 at 16.

G. *Plaintiff's Claims Against Defendants Harvey, Torres, and Prack*

Defendants next seek dismissal of plaintiff's procedural due process claims asserted against defendants Harvey, Torres, and Prack. Defendant Harvey served as the hearing officer who presided at plaintiff's Tier III disciplinary hearing arising from the incident on June 18, 2010. Defendant Torres was assigned to assist Smith in his defense at that disciplinary hearing. Plaintiff's amended complaint also alleges that defendants Harvey and Torres conspired with others to use the Tier III hearing to conceal official misconduct. Additionally, as was briefly noted above, plaintiff's amended complaint asserts a due process claim against defendant Prack.

1. *Due Process Claims*

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See* *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564–67 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include (1) advanced written notice of the charges, (2) a hearing in which the inmate is provided the opportunity to appear at a disciplinary hearing and present witnesses and evidence, (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken, and, in some circumstances, (4) the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–70; *see also* *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner at least "some eviden[tiary]" support. *Superintendent, MA Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985).

Here, as it relates to defendant Harvey, plaintiff's amended complaint alleges that defendant Harvey failed to provide plaintiff with a timely hearing. Am. Compl. (Dkt. No. 7) at 13. To the extent that plaintiff bases this claim on an allegation that defendant Harvey violated a state agency's regulation, that claim fails as a matter of law. *See* *Bolden,* 810 F.2d at 358 ("State procedural requirements do not establish federal constitutional rights."); *Barnes,* 628 F.Supp.2d at 411 ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

***16** As it relates to defendant Torres, plaintiff's allegation that she failed to call or interview witnesses on his behalf is unsupported by the record evidence. Specifically, plaintiff admitted at his deposition that he has no basis to believe that defendant Torres failed to interview the people identified by plaintiff as potential witnesses to the alleged assault. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–76. In addition, plaintiff admitted that defendant Torres returned to plaintiff with a list of witnesses that would or would not testify on his behalf. *Id.* at 77. Finally, plaintiff admitted that he did, in fact, call as witnesses those people that agreed to testify on his behalf. *Id.* at 78. From this record evidence, I find that no reasonable factfinder could conclude that defendant Torres denied plaintiff

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Not Reported in F.Supp.2d, 2013 WL 1500422 (N.D.N.Y.)
**(Cite as: 2013 WL 1500422 (N.D.N.Y.))**

due process based on a failure to assist plaintiff in identifying and calling witnesses on his behalf.

As it relates to defendant Prack, plaintiff's amended complaint alleges that defendant Prack "failed to stop the torture in SHU." Am. Compl. (Dkt. No. 7) at 19. The court construes this allegation to suggest that, because defendant Prack denied plaintiff's appeal of his disciplinary conviction, he contributed to whatever procedural due process violations occurred during the disciplinary hearing below. The record evidence, however, does not support this conclusion because, as discussed above, defendant was provided the opportunity to investigate and present witnesses on his behalf, and he was appointed a corrections counselor to assist in the preparation of his defense. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75, 77–78. Moreover, a careful review of the Tier III hearing transcript, submitted by defendants in support of their motion, reveals that plaintiff was provided adequate due process during the disciplinary hearing from which plaintiff appealed to defendant Prack. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5). All of this evidence leads the court to conclude that no reasonable factfinder could find that defendant Prack's determination that plaintiff's appeal contributed to a due process violation.

For all of these reasons, I recommend that plaintiff's procedural due process claim asserted against defendant Harvey, Torres, and Prack be dismissed.

2. *Conspiracy Claim*

To the extent it is alleged that defendants Harvey and Torres conspired to conceal the June 18, 2010 assault, such claims are not cognizable under section 1983. *De Ponceau v. Bruner,* No. 09–CV–0605, at *7 (N.D.N.Y. Feb. 21, 2012) (Peebles, M.J.), *adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012) (Suddaby, J.). In any event, as was discussed above in determining that plaintiff's conspiracy claim asserted against defendant Fraser, there is no record evidence that defendants Harvey and Torres engaged in an agreement to violate any of plaintiff's constitutional rights. For these reasons, I recommend that plaintiff's conspiracy claim asserted against defendants Harvey and Torres be dismissed.

H. *Plaintiff's Claims Against Defendant Mars*

***17** Defendants next seek dismissal of all claims against defendant Mars, including plaintiff's claim that she violated his Fourteenth Amendment rights by making him pay $65 to replace a damaged mattress. The Fourteenth Amendment, however, does not give rise to a claim that a defendant deprived a plaintiff of private property; it only protects a plaintiff's right to due process as a result of a deprivation of private property. *See, e.g., Edwards v. Bezio,* No. 08–CV–0256, 2010 WL 681369, at *5 (N.D.N.Y. Feb. 24, 2010) (Kahn, J., *adopting report and recommendation by* Treece, M.J.) ("The lynchpin of a due process claim based on a state actor's unauthorized deprivation of private property is the availability of post-deprivation remedies provided by the state, not the deprivation itself .... Plaintiff does not allege that New York State has failed to provide a meaningful post-deprivation remedy, and, in fact, New York provides a venue for challenging such appropriations in the New York State Court of Claims."). For this reason, I recommend that any claim asserted by plaintiff against defendant Mars based on an allegation that she charged him too much money for his new mattress be dismissed.

Defendants also seek dismissal of plaintiff's claim against defendant Mars relating to the issuance of a false misbehavior report. The mere allegation of the issuance of a false misbehavior report against an inmate, however, is not cognizable under section 1983. *See Boddie,* 105 F.3d at 862 ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Moreover, even assuming that defendant Mars did issue a false misbehavior report, whatever wrong arose out of that conduct is rectified by the court's finding that plaintiff received adequate due process at the ensuing disciplinary

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

hearing. *See, e.g.,* Plf .'s Dep. Tr. (Dkt. No. 79, Attach.3) at 12–13. *See Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) (finding that, where an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them").

Finally, defendants seek dismissal of plaintiff's equal protection claim asserted against defendant Mars based on plaintiff's admission that defendant Mars did not single him out or treat him differently than other inmates based on his race. Plaintiff's equal protection claim against defendant Mars, however, was previously dismissed by the court, and it has not been revived by plaintiff's amended complaint. Dkt. No. 10 at 16.

For all of these reasons, I recommend that all of plaintiff's claims asserted against defendant Mars be dismissed.

I. *Qualified Immunity*

Because I recommend that one claim against each defendant Fraser and defendant Goodman survive defendants' pending motion for summary judgment, I will only address defendants' defense of qualified immunity as it relates to those two defendants.

***18** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson,* 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011). The inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, whether that right is clearly established at the relevant time. *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011); *Nagle v. Marron,* 663 F.3d 100, 114 (2d Cir.2011); *Doninger,* 642 F.3d at 345 (citing cases). To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft,* 131 S.Ct. at 2083 (internal quotation marks omitted). Until recently, courts were required to analyze qualified immunity by considering the two factors in order. *Doninger,* 642 F.3d at 345 (citing *Saucier,* 533 U.S. at 201). Following the Supreme Court's decision in *Pearson,* however, courts are no longer wedded to the *Saucier* "two step," and instead retain the discretion to decide the order in which the two relevant factors are to be considered.[FN17] *Id.; see also Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 429 n.9 (2d Cir.2009).

FN17. Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231 (internal quotation marks omitted).

To prevail on a qualified immunity defense, a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant must establish that "(1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Green v. Montgomery,* 219 F.3d 52, at 59 (2d Cir.2000).

1. *Defendant Fraser*

Because the right to be free from excessive force is a clearly established right, the relevant qualified immunity inquiry turns on whether a reasonable officer in defendant Fraser's position would have known that defendant Rosati's conduct amounted to excessive force. *See Green,* 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."). Defendants have already acknowledged that whether defendant Rosati's use of force against plaintiff constitutes excessive force is a question for the jury, and I agree. As a result, I cannot conclude that defendant Fraser is entitled to qualified immunity as it relates to plaintiff's failure to intervene claim.

2. *Defendant Goodman*

***19** As noted earlier, an inmate's right to appeal a disciplinary sentence is protected by the First Amendment. *Santiago,* 2011 WL 7431068, at *5. Therefore, the relevant inquiry is whether a reasonable officer in defendant Goodman's position would have known that conspiring with other corrections officers to have plaintiff assaulted in retaliation for plaintiff appealing the sentence violated his clearly established First Amendment right. Because that answer is clearly, "yes," I cannot conclude that defendant Goodman is entitled to qualified immunity as it relates to plaintiff's retaliation claim.

In summary, I recommend that defendants' motion for summary judgment be denied as it relates to defendants' qualified immunity defense.

IV. *SUMMARY AND RECOMMENDATION*

At the center of plaintiff's amended complaint in this action is his claim that he was assaulted by defendants Rosati and St. John, two corrections officers stationed at Great Meadow, during an escort from his cell to a disciplinary hearing. While defendants have moved for summary judgment dismissing many of plaintiff's other claims, they do not challenge that cause of action at this juncture, acknowledging that its resolution will undoubtedly turn upon credibility determinations, which are not properly made on a motion for summary judgment.

After carefully reviewing the record evidence in this case, I recommend that all of plaintiff's claims against all of the remaining defendants be dismissed, with the exception of plaintiff's failure to intervene claim against defendant Fraser, and plaintiff's retaliation claim against defendant Goodman. As it relates to those two remaining claims, I conclude that a reasonable factfinder could determine, if plaintiff's testimony is credited, that defendant Fraser's duty to intervene was triggered, and that defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff. Additionally, at this juncture, the record evidence does not establish a basis to find that defendants Fraser or Goodman are entitled to qualified immunity.

Addressing plaintiff's remaining claims, I find that the record before the court fails to establish a proper basis to conclude that defendants Fischer, Annucci, LeClaire, and Roy were personally involved in any of the allegations giving rise to this action. The record also reflects that no reasonable factfinder could conclude that defendant Nesmith and Lindermann are liable for deliberate medical indifference to plaintiff's serious medical needs. Similarly, plaintiff has stated no claim against defendant Zarnetski associated with the assault or otherwise, nor has he stated a cognizable due process claim against defendants Harvey, Torres or Prack. Finally plaintiff's claims against defendant Mars, related to the requirement that he pay $65 to replace a damaged mattress, and the issuance of a false misbehavior report, lack merit. Based upon the fore-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

going, it is hereby respectfully,

***20** RECOMMENDED that defendants' summary judgment motion (Dkt. No. 79) be GRANTED, in part, as it relates to all of plaintiff's claims against all defendants, with the exception of (1) plaintiff's claims against defendants Rosati and St. John, (2) plaintiff's failure to intervene claim against defendant Fraser, and (3) plaintiff's First Amendment retaliation claim against defendant Goodman.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk is respectfully directed to amend court records to reflect the correct name spellings of defendants Zarnetski, Nesmith, Lindemann, and Prack.

N.D.N.Y.,2013.
Smith v. Rosati
Not Reported in F.Supp.2d, 2013 WL 1500422 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2015 WL 403133 (N.D.N.Y.)
**(Cite as: 2015 WL 403133 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michael TOLIVER, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 9:12–CV–00077 (MAD/ATB).
Signed Jan. 29, 2015.

Michael Toliver Wallkill, NY, Plaintiff pro se.

Office of the New York, State Attorney General, Cathy Y. Sheehan, AAG Albany, NY, Attorneys for Defendants (except Defendant North).

**MEMORANDUM–DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

***1** On January 17, 2012, Plaintiff commenced this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that twenty employees of the New York State Department of Corrections and Community Supervision ("DOCCS") violated his constitutional rights during his confinement at the Shawangunk Correctional Facility ("Shawangunk"). Dkt. No. 1. By Decision and Order dated May 3, 2012, this Court dismissed, *sua sponte*, Defendants Schneiderman, Bellamy, and Prack from the action because the complaint did not state facts suggesting their personal involvement in the alleged violations of Plaintiff's constitutional rights. Dkt. No. 9 at 8–10.

On June 28, 2012, Plaintiff filed an amended complaint (Dkt. No. 27), which, by Decision and Order dated December 6, 2012 (Dkt. No. 85), this Court accepted for filing against seventeen of the original Defendants, as well as Correction Officer ("C.O.") North, who was not named in the original complaint. Liberally construed, the surviving claims in Plaintiff's amended complaint include (1) a First Amendment claim, based on Defendants' alleged filing of false misbehavior reports against Plaintiff, in retaliation for his pursuit of complaints, grievances, appeals, and Article 78 actions; (2) an equal protection claim based on alleged discrimination against Plaintiff because of his race, disability, and/or sexual orientation; (3) a conspiracy claim related to the retaliation and discrimination claims; (4) a Fourteenth Amendment claim alleging denial of procedural due process in connection with various disciplinary proceedings; and (5) an Eighth Amendment claim for failure to provide adequate medical care. Dkt. No. 27 at 8–9, 35. Plaintiff seeks both monetary and injunctive relief. Dkt. No. 27 at 14.

Defendants filed a motion, pursuant to Fed.R.Civ.P. 12(b)(6), seeking dismissal of Plaintiff's amended complaint in its entirety, on behalf of all but one of the remaining Defendants. *See* Dkt. No. 134.[FN1] Plaintiff responded to the motion to dismiss, and defense counsel chose not to file a reply. Dkt. No. 145; Dkt. No. 150. On November 17, 2014, Magistrate Judge Baxter issued a Report–Recommendation recommending that the Court grant-in-part and deny-in-part Defendants' motion to dismiss. Dkt. No. 155.

FN1. C.O. North, who is no longer an active DOCCS employee (Dkt. No. 91), has not been served with the amended complaint and is not currently represented in this action.

Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's Report–Recommendation. Dkt. No. 159. Also before the Court are Plaintiff's requests for a temporary re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

straining order, requests for sanctions, and an order against further retaliation resulting from the current lawsuit. Dkt. Nos. 161, 163, 167 & 168. Defendants have opposed Plaintiff's motions. Dkt. No. 166.

## II. BACKGROUND

### A. Facts and Contentions

For an overview of the facts and contentions, refer to Magistrate Judge Baxter's Report–Recommendation. *See* Dkt. No. 155 at 3–5.

### B. Magistrate Judge Baxter's November 17, 2014 Report–Recommendation

In his Report–Recommendation, Magistrate Judge Baxter recommended that the Court should grant Defendants' motion to dismiss in regard to Defendants Fischer, Maly, and LeClaire, and as to Plaintiff's conspiracy claim. *See* Dkt. No. 155. Magistrate Judge Baxter further recommended that the remainder of the motion to dismiss be denied. *See id.*

***2** Specifically, Magistrate Judge Baxter recommended that Defendants Fischer, LeClaire, and Maly should be dismissed "because [P]laintiff has not adequately alleged that they were personally involved in any constitutional violations. However, the allegations of personal involvement with respect to [D]efendants Smith and Pingott are adequate ....“ Dkt. No. 155 at 6–7. Next, Magistrate Judge Baxter recommends that the retaliation charge involving Defendant Budziszewski stand, because "[t]he allegations ... state a plausible claim of retaliation that cannot be dismissed under Rule 12(b)(6)." *Id.* at 18. The Report–Recommendation did not address the retaliation charge against Defendant North, because "[D]efendant North has not appeared in this case and is not a party to the pending Rule 12(b)(6) motions ....“ *Id.* at 18 n. 17.

Additionally, Magistrate Judge Baxter found that Plaintiff's equal protection claim is adequate to survive a Rule 12(b)(6) motion because Plaintiff's allegations "are sufficient to state a 'class of one' equal protection claim, and perhaps a discrimination claim based on race and/or sexual orientation." *Id.* at 22. Magistrate Judge Baxter recommended that the conspiracy claim be dismissed under the "intracorporate conspiracy doctrine," because conclusory allegations by Plaintiff of Defendants' " 'personal' agenda" are not sufficient to plausibly suggest that Defendants acted outside the scope of their employment. *Id.* at 25.

Due to Plaintiff's allegations, including that the hearing officer said to Plaintiff "[e]very time you get a ticket you will be found guilty regardless.... I ain't fair and impartial[,]" Magistrate Judge Baxter found Plaintiff has stated a plausible denial of procedural due process claim. *Id.* at 27; Dkt. No. 27 at 57. Finally, Magistrate Judge Baxter recommended that the Court deny the motion to dismiss in regard to Plaintiff's deliberate indifference claim because, at this stage, Plaintiff's allegation "that he suffered extreme pain for approximately 30 minutes before the identified defendants allowed him to get medical attention[,]" is sufficient to survive the motion. Dkt. No. 155 at 31.

### C. Plaintiff's objections

Plaintiff first objects to the dismissal of Defendant Maly from the lawsuit. Dkt. No. 159 at 2. He "seeks to supplement the complaint to detail [additional] constitutional deprivations." *Id.* According to the Report–Recommendation, "[t]he only specific allegation in the amended complaint regarding [D]efendant Maly is that, as Acting Superintendent, he denied one of [P]laintiff's grievances...." *Id.* at 9. Plaintiff wishes to add that "Defendant [Maly] sent plaintiff to 'S.H.U.' for *90 days* in direct retaliation to this lawsuit .... “ Dkt. No. 159 at 2.

Plaintiff next objects to the dismissal of Defendant Fischer from the lawsuit. *Id.* at 3. Plaintiff has not introduced any new arguments and simply repeats arguments Magistrate Judge Baxter's Report–Recommendation has already addressed. *Id.* This includes "allowing a pattern o[f] retaliation and dis-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

crimination by ignoring plaintiff's various grievances and Article 78 proceedings." *Id.*

***3** Third, Plaintiff objects to the dismissal of Defendant LeClaire from the lawsuit. Dkt. No. 159 at 4. Plaintiff alleges Defendant LeClaire condoned the retaliatory conduct of officers under his command, and that he "knew or should have known of the continued constitutional violations...." *Id.*

Finally, Plaintiff objects to the dismissal of the conspiracy claim, and alleges that Defendants "had a meeting of the minds in their individual capacities for a common goal." *Id.* at 5. Plaintiff further claims that "Defendants ... conspire[d] with each other to hurt plaintiff, to keeplock plaintiff, to place plaintiff in SHU, [and] to take all privileges away from plaintiff ....“ *Id.*

**D. Plaintiff's December 22, 2014, and December 29, 2014 requests for preliminary injunctive relief and sanctions**

Plaintiff requests a preliminary injunction to place him in protective custody, and he requests sanctions against Defendants for each day he remains outside protective custody. Dkt. No. 161 at 3–4. Plaintiff claims he "is in danger [and he has] been forced to live in general population where [his] enemies are." *Id.* at 3. He also claims that Defendants refused to place Plaintiff back in protective custody so that he "can get physically assaulted." *Id.* at 2. Finally, Plaintiff seeks an order against further retaliation resulting from this lawsuit. *Id.* at 4.

In a submission filed seven days later, Plaintiff again requests sanctions, a temporary restraining order, and an order against further retaliation due to the current proceedings. Dkt. No. 163 at 1. Plaintiff states that on December 18, 2014, "Defendants Keys, Sarkowicz, Korines, and co-working 'friends' " came to his cell and threatened his life, continued to file false misbehavior reports, and threatened to break his neck due to his participation in a hunger strike. *Id.* at 2. Plaintiff also claims that inmates who remember him from before his placement in protective custody "reminded [him] that 'the first opportunity to get [him] for snitching [he] will be "done off." ' " *Id.* at 3.

Defendants oppose Plaintiff's requests injunctive relief. Specifically, Defendants argue that "Plaintiff's request should be denied because the requested relief does not relate to any of the allegations of the underlying amended complainant or the proposed second amended complaint." Dkt. No. 166 at 1. Defendants further argue that Plaintiff's allegations are entirely speculative, and that these complaints "should be addressed through administrative channels at Shawangunk Correctional Facility ....“ *Id.* at 2.

**E. Plaintiff's January 5 and 11, 2015 requests for sanctions and injunctive relief**

In a letter request dated January 5, 2015, Plaintiff requests "additional sanctions for "further" retaliation ... as [he] was thrown out of [his] wheelchair[,] punched in the face and slapped and kicked by C.O. Stokes on December 22, 2014." Dkt. No. 167 at 2. Plaintiff also requests that the Court order his transfer from his current facility due to the alleged assault by C.O. Stokes, who is not a Defendant in this matter. *Id.* at 3. Plaintiff notes that Defendant Gardner "has recently issued a disposition placing [him] in keeplock with 30 days loss of all privileg[es] without" the required procedural due process. *Id.* at 4. Finally, Plaintiff alleges that the prison medical personnel refuse to examine him, and he "is in pain-sick call is being denied to [him] by medical staff when [they] make their tours." *Id.* at 5.

***4** In a letter dated January 11, 2015, Plaintiff cites a Supreme Court case for the proposition that an inmate "may seek injunctive relief based on the claim that defendant corrections officials are knowingly and unreasonably disregarding an objectively intolerable risk of harm and will continue absent a court order directing otherwise." Dkt. No. 168 at 8. Finally,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff objects to his current placement in the general prison population due to his status as "victim prone" of being victimized by other inmates, as defined under 7 N.Y.C.R.R. § 1701.5(c)(4)(i).

## III. DISCUSSION

### A. Standard of Review

#### *1. Review of a report-recommendation*

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2006). When a party, however, files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2006).

A litigant's failure to file objections to a magistrate judge's report-recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A pro se litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a) and former 6(e) of the Federal Rules of Civil Procedure).

#### *2. Motion to dismiss standard*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc .,* 282 F.3d 147, 152–53 (2d Cir.2002)).

***5** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a) (2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [ *Twombly,* 550 U.S.] at 557, 127 S.Ct.1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed[,]" *id.* at 570.

Despite this recent tightening of the standard for pleading a claim, complaints by *pro se* parties continue to be accorded more deference than those filed by attorneys. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (quotation omitted). As such, *Twombly* and *Iqbal* notwithstanding, this Court must continue to " 'construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' " *Weixel v. Bd. of Educ.,* 287 F.3d 138, 146 (2d Cir.2002) (quotation omitted); *Lopez v. Jet Blue Airways,* 662 F.3d 593, 596 (2d Cir.2011) (citation omitted).

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted).

***3. 42 U.S.C. § 1983***

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

**B. Plaintiff's motion to amend and supplement the amended complaint**

***6** On December 18, 2014, the Court received a motion from Plaintiff seeking to supplement the amended complaint, which included the proposed supplemental amended pleading. *See* Dkt. No. 158. The motion seeks to add additional claims and Defendants, several of whom are employed at Upstate Correction Facility. *See* Dkt. No. 158–2.

"Federal Rule of Civil Procedure 15(a) provides that any time after a responsive pleading is served a party must seek leave from the court to amend a pleading. Rule 15(a) specifically states that leave shall be freely given when justice so requires." *LaBarbera v. Audax Const. Corp.,* 971 F.Supp.2d 273, 284 (E.D.N.Y.2013) (citing Fed.R.Civ.P. 15(a)). "However, in *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court stated that denial of a Rule 15(a) motion may be appropriate in instances of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.' " *Id.* The decision to grant or deny a Rule 15(a) motion to amend is committed to the sound discretion of the district court. *See id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Federal Rule of Civil Procedure 15(d) provides that a party must obtain leave from the court to supplement a pleading setting forth transactions or occurrences or events that have happened since the date of the pleading sought to be supplemented. Rule 15(d) allows a party to supplement the complaint in order to present subsequent material that is related to the claims presented in the original complaint." *LaBarbera,* 971 F.Supp.2d at 284 (citing *Argus, Inc. v. Eastman Kodak Co.,* 552 F.Supp. 589, 602 (S.D.N.Y.1982); 3 Moore's Federal Practice ¶ 15.16[1], at 15176 (2d ed.1982)). Matters stated in a supplemental complaint should have some relation to the claim set forth in the original pleading. *See id.* (citing 3 Moore's Federal Practice ¶ 15.16[3], at 15183 (2d ed.1989)). As with Rule 15(a), the decision to grant or deny a Rule 15(d) motion is within the sound discretion of the district court. *See id.*

In the present matter, the Court finds that Plaintiff should not be permitted to supplement and amend his amended complaint. Plaintiff commenced this action on January 17, 2012, alleging violations that occurred exclusively at Shawangunk C.F. *See* Dkt. No. 1. Then, on June 28, 2012, the Court received Plaintiff's eighty-one (81) page amended complaint. *See* Dkt. No. 27. Thereafter, Plaintiff submitted several additional motions to amend and supplement his complaint. In a Decision and Order dated February 13, 2013, this Court denied the motions on several grounds. *See* Dkt. No. 98. First, the Court noted that the motions failed to comply with Local Rule 7.1(a)(4) in that it was not a complete, cohesive pleading, but rather a piecemeal compilation of prior submissions. *See id.* at 7–8. The Court found it to be an unreasonable task to ask the Court and Defendants to attempt to interpret and respond to such a pleading. *See id.* Additionally, the Court noted that the proposed amended pleading sought to add claims relating to events that occurred at Upstate C.F. and were unrelated to the claims and Defendants in this action.

***7** For many of the same reasons discussed in its February 13, 2013 Decision and Order, the Court finds Plaintiff's motion to amend and supplement his amended complaint must be denied. First, the proposed supplemental amended complaint is not a complete submission. In fact, in a letter dated January 11, 2015, Plaintiff indicates that he "merely submitted the 'supplemental' amended complaint as to be attached" to the amended complaint and admits that he *"did not* submit the *'supplemental amended complaint'* to supercede the ... amended complaint; but, to be an added attachment to the ... amended complaint." Dkt. No. 168 at 2–3 (emphasis in original).

Additionally, permitting supplementation and amendment at this point, nearly three years after Plaintiff commenced this action would be unduly prejudicial and would cause undue delay in the resolution of this action. *See Lopez v. Smiley,* 375 F.Supp.2d 19, 30 (D.Conn.2005). Finally, permitting amendment Plaintiff to amend and supplement to add claims and Defendants entirely unrelated to the claims in this case would be inappropriate. *See Klos v. Haskell,* 835 F.Supp. 710, 715–16 (W.D.N.Y.1993), *aff'd,* 48 F .3d 81 (2d Cir.1995) (denying motion to supplement the complaint to include claims occurring at subsequent correctional facility).

**C. Personal involvement**

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted). " '[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.)).

Courts have repeatedly found personal involvement is not established when a supervisory official receives letters regarding a plaintiff's grievances and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

simply refers that grievance to other personnel for investigation. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009); *see also Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). Rather, personal involvement must be established by either proving (1) the defendant directly participated in the alleged conduct; (2) the defendant knew of the circumstances establishing the complaint and failed to remedy the situation; (3) the defendant created a policy that allowed the unconstitutional practice; (4) the defendant acted grossly negligent; or (5) the defendant demonstrated deliberate indifference to the rights of the plaintiff by not acting on the plaintiff's complaints. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

In his Report–Recommendation, Magistrate Judge Baxter found that Plaintiff has not adequately alleged that Defendants Fischer, LeClaire, and Maly should be dismissed because Plaintiff failed to adequately allege that they were personally involved in any constitutional violations. *See* Dkt. No. 155 at 6–11. In his objections, Plaintiff simply repeats arguments that he made in response to Defendants' motion to dismiss and which were properly rejected by Magistrate Judge Baxter. *See Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008); *Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009).

***8** Having reviewed the Report–Recommendation and Plaintiff's submissions, the Court finds that Magistrate Judge Baxter correctly determined that Plaintiff failed to allege facts plausibly suggesting that Defendants Fischer, Maly and LeClaire were personally involved in the alleged constitutional deprivations.

**D. Conspiracy**

The amended complaint alleges that Defendants conspired to “discriminate, harass, and retaliate” against Plaintiff by pursuing false disciplinary charges against him over a period of more than one year. *See* Dkt. No. 27 at 8. Magistrate Judge Baxter agreed with Defendants that this claim should be dismissed under the “intracorporate conspiracy doctrine.” Dkt. No. 155 at 22–25.

The intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg,* No. 10 Civ. 2224, 2012 WL 4017789, *30 (S.D.N.Y. Sept. 13, 2012); *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 603–04 (S.D.N.Y.2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978), “posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other.” *Jefferson v. Rose,* 869 F.Supp.2d 312, 317–18 (E.D.N.Y.2012) (quotations and citations omitted); *see also Smith v. Town of Hempstead Department of Sanitation Sanitary District No. 2,* 798 F.Supp.2d 443, 461 (E.D.N.Y.2011) (citation omitted). The intra-corporate conspiracy doctrine “extends to public corporate bodies, including municipalities.” *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 466 (E.D.N.Y.2011) (citation omitted); *see also Michael v. County of Nassau,* No. 09–cv–5200, 2010 WL 3237143, *5 (E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to municipalities).

Contrary to Plaintiff's conclusory objections, Magistrate Judge Baxter correctly determined that the intra-corporate conspiracy doctrine mandates dismissal of Plaintiff's conspiracy claims. The allegations in the amended complaint and Plaintiff's objections make clear that all Defendants were employed by the same public entity and that they were working in the scope of their public employment during the alleged unconstitutional conduct. *See Richard v. Fischer,* ––– F.Supp.2d ––––, 2014 WL 3974158, *8–*9 (W.D.N.Y.2014) (applying the intracorporate conspiracy doctrine to bar the plaintiff's conspiracy claims brought against DOCCS employees who were acting within the scope of their employment during the alleged unconstitutional conduct).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Having reviewed this claim and Magistrate Judge Baxter's Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly determined that Defendants' motion to dismiss as to Plaintiff's conspiracy claims should be granted.

**E. Preliminary injunctive relief**

***1. Governing Legal Standard***

***9** A party seeking injunctive relief must demonstrate 1) irreparable harm; and 2) either a) a likelihood of success on the merits of the claims, or b) existence of serious questions going to the merits of the claims, and a balance of hardships tipping decidedly in the moving party's favor. *See D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* No. 00–CV–012E, 2006 WL 618576, *3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)).

A higher standard than ordinarily required must be met "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act ." *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997) (citation omitted). To meet such a higher standard, the moving party must "show[ ] 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from a denial of the injunction." *Id.* at 133 (other citations omitted). Additionally, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167 (W.D.N.Y.1997) (citing *Farmer v. Brennan,* 511 U.S. 825, 846–47, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994)) (other citations omitted).

Finally, when a party seeks preliminary injunctive relief, "the relief ... must relate to the allegations contained in the underlying complaint." *McAllister v. Goord,* No. 9:06–CV–0442, 2009 WL 5216953, *2 (N.D.N.Y. Dec. 30, 2009) (internal citations omitted).

" 'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.' " *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.,* 437 Fed. Appx. 57, 58 (2d Cir.2011) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir.2009)). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12 (1983). Rather, a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that " 'absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm .' " *Bisnews AFE (Thailand),* 437 Fed. Appx. at 58 (quoting *Faiveley,* 559 F.3d at 118).

***2. Analysis***

In the first request, Plaintiff contends that "Defendants are refusing [to place him in protective custody] so that [he] can get physically assaulted [,]" and that he "is in danger" and has "been forced to live ... where enemies are." Dkt. No. 161 at 3. However, these claims are entirely speculative and relate to possible future injury, and therefore are not sufficient to show irreparable harm.[FN2] *Salvatierra v. Connolly,* No. 09 Civ. 3722, 2010 WL 5480756, *24 (S.D.N.Y. Sept. 1, 2010) ("Plaintiff's general fear of future retaliation by Defendants is too speculative to warrant injunctive relief") (citation omitted), report and recommendation adopted by 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Ward v. LeClaire,* No. 9:07–CV–0026, 2007 WL 1532067, *2 (N.D.N.Y. May 24, 2007) ("Plaintiff's request for injunctive relief against future

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

threats or harassment by inmates and/or prison officials is too speculative to meet the irreparable harm requirement. Although Plaintiff claims that he will face future threats and harassment, Plaintiff cannot claim with any certainty how, when, or where he will be retaliated against, or that the retaliation will result in irreparable harm to Plaintiff") (citation omitted).

FN2. The Court agrees with Defendants' response to Plaintiffs request that "Plaintiff's allegations in all three motions are purely speculative [,]" and that his "issues ... should be addressed through administrative channels ....“ Dkt. No. 166 at 2.

***10** In his second request, Plaintiff alleges "Defendants Keys, Sarkowicz, Korines, and co-working 'friends' " threatened his life and threatened to break his neck. Dkt. No. 163 at 2. There are no Defendants by the names of Sarkowicz and Korines in this lawsuit, and therefore this Court has no power to enforce an injunction based on their conduct. Fed.R.Civ.P. 65(d). In regard to Defendant Keys, "allegations of future injury without more do not establish a real threat of injury." *Slacks v. Gray,* No. 9:07–CV–0510, 2008 WL 2522075, *1 (N.D.N.Y. June 25, 2008) (citation omitted). Plaintiff has not alleged a real threat of injury, and any future threats should be reported to prison staff, so as not to "immerse the federal judiciary in the management of state prisons." *Fischer,* 981 F.Supp. at 167.

Plaintiff also seeks an order against "further retaliation resulting from this lawsuit." Dkt. No. 163 at 1. Plaintiff's repeated requests for this type of relief are entirely conclusory and far too speculative to meet the irreparable harm standard. *See Ward v. LeClaire,* No. 9:07–cv–26, 2007 WL 1532067, *2 (N.D.N.Y. May 24, 2007) ("Although Plaintiff claims that he will face future threats and harassment, Plaintiff cannot claim with any certainty how, when, or where he will be retaliated against, or that the retaliation will result in irreparable harm to Plaintiff").

In his third request for injunctive relief and sanctions, Plaintiff again asks the Court to order Defendants to transfer him to a different facility because of Defendants' alleged conduct. *See* Dkt. No. 164. Plaintiff alleges that, absent a transfer, he will suffer physical harm but claims that he does not feel comfortable providing more detail because he fears that his letter will be intercepted and not reach the Court. *See id.* at 2–3. Again, these conclusory assertions regarding speculative future threats and injury are insufficient to establish irreparable harm. *See Fischer,* 981 F.Supp. at 167.[FN3]

FN3. Throughout the course of this litigation, Plaintiff has filed no less than eighteen (18) separate applications seeking injunctive relief. *See* Dkt. Nos. 7, 54, 64, 67, 71, 80, 83, 95, 101, 112, 121, 122, 123, 132, 161, 163, 164, & 167. The vast majority of these applications discuss the same conclusory allegations and speculation regarding threats to his physical safety. Noticeably lacking from these applications, which span almost three years, is any indication that Plaintiff has actually been subjected to any physical violence during his time at Shawangunk, that in any way relates to this litigation.

Plaintiff requests additional sanctions and restates his request for a TRO based on the alleged conduct of C.O. Stokes, who Plaintiff claims threw him out of his wheelchair, and then proceeded to punch and slap him in the face. Dkt. Nos. 167 & 168. Plaintiff claims that "nearby Defendants" witnessed C.O. Stokes engage in this conduct. *See id.* at 7. Again, any sought after relief against C.O. stokes must fail because he is not a party to this action. Further, Plaintiff's conclusory assertion that "nearby Defendants" witnessed this conduct is insufficient to warrant the Court granting the requested relief for this alleged past harm.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Finally, the Court also finds that Plaintiff is not entitled to the requested relief because he has made no showing that he is likely to succeed on the merits of his underlying claims.

Based on the foregoing, the Court denies Plaintiff's motions for preliminary injunctive relief (Dkt. Nos. 161, 163, 164, 167 & 168).

**F. Request for sanctions against Defendants**

***11** Included in his motions seeking injunctive relief, Plaintiff "request [s] that [Defendants] are sanctioned $10,000.00 a day" for failing to place Plaintiff in protective custody. *See, e.g.,* Dkt. No. 161 at 4. Plaintiff has not specified the legal basis for the motion for sanctions.

Sanctions may be imposed against a party to an action under Fed.R.Civ.P. 11 ("Rule 11") or 37 ("Rule 37"), 28 U.S.C. § 1927, or the Court's inherent power, none of which are applicable here. In particular, Rule 11, by its terms, is the vehicle by which sanctions may be obtained in connection with the filing in court of pleadings, motion papers, or other documents that are baseless, filed in bad faith, or intended to harass, unnecessarily delay, or needlessly increase the cost of litigation. *See* Fed.R.Civ.P. 11(b)-(c). Since Plaintiff does not seek sanctions based on any pleadings, motion papers, or other documents filed by Defendants in this action, Rule 11 provides no basis for the requested sanctions.

Sanctions against a party are also available under Rule 37(b) for failing to comply with a court order or to respond to discovery. *See* Fed.R.Civ.P. 37(b). Again, this rule provides no basis for the requested relief. Sanctions may also be ordered under 28 U.S .C. § 1927 against "an[y] attorney or other party admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously [ .]" Accordingly, by its terms, section 1927 applies to attorneys and parties "admitted to conduct cases" in a federal court. Since they are not attorneys, sanctions under section1927 are not available as against Defendants.

Finally, the Court finds that there is no basis to support invoking the Court's inherent power to sanction Defendants based on the alleged conduct. Rather, a careful reading of Plaintiff's requests for sanctions establishes that Plaintiff, rather than seeking true sanctions, offers argument in support of what may become Plaintiff's damages should he ultimately succeed in this action.

Based on the foregoing, Plaintiff's motions for sanctions are denied.

**G. Plaintiff's appeals**

Plaintiff has appealed several orders issued by Magistrate Judge Baxter. *See* Dkt. Nos. 144, 149, 153 and 154. In his first appeal, Plaintiff argues that Magistrate Judge Baxter should have sanctioned Defendants for failing to submit a responsive pleading by a certain date and that a motion to dismiss is not a responsive pleading. *See* Dkt. No. 144 at 2–3. Contrary to Plaintiff's assertions, the Rule 12(a)(4) of the Federal Rules of Civil Procedure, a motion to dismiss resets the time for filing the defendant's responsive pleading as follows: "if the court denies the motion ..., the responsive pleading must be served within 14 days after notice of the court's action [.]" Since the Court had not acted on Defendants' motion to dismiss until the filing of this Memorandum–Decision and Order, Defendants were in compliance with Magistrate Judge Baxter's order. Moreover, Magistrate Judge Baxter was well within his authority to rescind his previous order requiring Defendants to respond to Plaintiff's motion for sanctions and to *sua sponte* deny that motion as frivolous, which it was.

***12** Next, Plaintiff appeals Magistrate Judge Baxter's May 27, 2014 Decision and Order in which he denied Plaintiff's fifth motion to amend the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

amended complaint. *See* Dkt. Nos. 147 & 149. Magistrate Judge Baxter properly denied that motion based on Plaintiff's failure to attached a proposed amended pleading or to include any factual support for the claims and defendants Plaintiff was seeking to add. *See* N.D.N.Y. L.R. 7.1(a)(4).

In a submission dated August 9, 2014, Plaintiff appeals Magistrate Judge Baxter's Text Order denying his motion to preserve and compel Defendants to turn over a video tape of an incident unrelated to the facts of this case. *See* Dkt. Nos. 152 & 153. As Magistrate Judge Baxter correctly determined, the video in question is entirely unrelated to the present matter as it allegedly captures the actions of a non-defendant on June 26, 2014, long after this action was filed. Moreover, the video tape in question allegedly depicts the actions of a corrections officer at Five Points C.F., while the conduct relevant to this case allegedly occurred at Shawangunk C.F.[FN4]

> FN4. Plaintiff claims that he is seeking this video because he is concerned that Defendants and other corrections officers are tampering with his mail and that it is not reaching the Court. *See* Dkt. No. 151 at 1–2. One need only glance at the docket in this matter and in the numerous other cases Plaintiff has commenced to know that the vast majority, if not all of Plaintiff's submissions to the Court, have actually been mailed to the Court. Despite the fact that this case has not yet progressed beyond the motion to dismiss stage, there are nearly 170 docket entries in this matter, the vast majority of which are submissions by Plaintiff.

Finally, in a letter dated October 1, 2014, Plaintiff again asks the Court to sanction Defendants for their failure to file a responsive pleading. *See* Dkt. No. 154. For the reasons discussed above, Plaintiff's appeal is denied as frivolous.

Based on the foregoing, the Court denies Plaintiff's appeals (Dkt. Nos. 144, 149, 153 and 154).

**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions, Magistrate Judge Baxter's Report–Recommendation and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Baxter's November 17, 2014 Report–Recommendation is **Adopted** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 134) is **GRANTED** in part and DENIED in part; and the Court further

**ORDERS** that Defendants' motion to dismiss is **GRANTED** as to Defendants Fischer, Maly, and LeClaire, and as to Plaintiff's conspiracy claim; and the Court further

**ORDERS** that Defendants' motion to dismiss is otherwise **DENIED;** and the Court further

**ORDERS** that Plaintiff's motions for injunctive relief and for sanctions (Dkt. Nos. 161, 163, 164 & 167) are **DENIED;** and the Court further

**ORDERS** that Plaintiff's appeals (Dkt. Nos. 144, 149, 153 & 154) are **DENIED;** and the Court further

**ORDERS** that Plaintiff's motion to amend/supplement his amended complaint (Dkt. No. 158) is **DENIED;** and the Court further

**ORDERS** that all future pretrial matters are referred to Magistrate Judge Baxter; and the Court further

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Slip Copy, 2015 WL 403133 (N.D.N.Y.)
**(Cite as: 2015 WL 403133 (N.D.N.Y.))**

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

***13** On January 17, 2012, plaintiff commenced this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that 20 employees of the New York State Department of Correctional and Community Services ("DOCCS") violated his constitutional rights during his confinement at the Shawangunk Correctional Facility ("Shawangunk"). (Compl., Dkt. No. 1). By Decision and Order dated May 3, 2012, the Honorable Mae A. D'Agostino, United States District Judge, dismissed, *sua sponte,* defendants Schneiderman, Bellamy, and Prack from the action because the complaint did not state facts suggesting their personal involvement in the alleged violations of plaintiff's constitutional rights. (Dkt. No. 9 at 8–10).

On June 28, 2012, plaintiff filed an amended complaint (Dkt. No. 27), which, by Decision and Order dated December 6, 2012 (Dkt. No. 85), Judge D'Agostino accepted for filing against 17 of the original defendants, as well as Correction Officer ("C.O.") North, who was not named in the original complaint.[FN1] Liberally construed, the surviving claims in plaintiff's amended complaint include a First Amendment claim, based on the defendants' alleged filing of false misbehavior reports against plaintiff, in retaliation for his pursuit of complaints, grievances, appeals, and Article 78 actions; an equal protection claim based on alleged discrimination against plaintiff because of his race, disability, and/or sexual orientation; a conspiracy claim related to the retaliation and discrimination claims; a Fourteenth Amendment claim alleging denial of procedural due process in connection with various disciplinary proceedings; and an Eighth Amendment claim for failure to provide adequate medical attention. (Dkt. No. 27 at 8–9, 35).[FN2] Plaintiff seeks both monetary and injunctive relief. (Dkt. No. 27 at 14).

FN1. Judge D'Agostino again dismissed all claims against defendants Schneiderman, Bellamy, and Prack because the amended complaint did not adequately allege their personal involvement. (Dkt. No. 85 at 3–5).

FN2. Plaintiff has subsequently attempted to file two motions to further amend or supplement his complaint (Dkt.Nos.77, 146); but this court has denied both motions because of plaintiff's failure to support his motions with a proposed amended pleading, and because his submissions were " 'exceedingly confusing,' piecemeal, and lengthy." (Dkt. No. 147 at 4 (citing Dkt. No. 98 at 7–8), 7).

The Attorney General's Office has filed a motion, pursuant to Fed.R.Civ.P. 12(b)(6), seeking dismissal of plaintiff's amended complaint in its entirety, on behalf of all but one of the remaining defendants.[FN3] (Dkt. No. 134). Plaintiff has responded to the motion to dismiss (Dkt. No. 145), and defense counsel chose not to file a reply (Dkt. No. 150). The motion to dismiss has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by Judge D'Agostino.

FN3. C.O. North, who is no longer an active DOCCS employee (Dkt. No. 91), has not been served with the amended complaint and is not currently represented in this action. The Attorney General's Office represents former DOCCS Commissioner Brian Fischer, Supt. Joseph T. Smith, Dep. Supt. W. Maly, C.O. J. Stefinik, Lt. J. Gardner, C.O. Stone, Dep. Com. Lucien LeClaire, Sgt.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Aube, C.O. Gaye (John Doe), C .O. Keys, Cpt. L. Pingott, C.O. D. DeGraff, Sgt. Preston, C.O. R. Cutler, C.O. Budziszewski, C.O. R. Kane, and C.O. J. Peterson. (Def .s' Mem. of Law at 1, Dkt. No. 134–1). Plaintiff apparently misspelled the names of defendants Pingott and Peterson in his papers; the court will use the spellings from defense counsel's papers.

**I. *Facts and Contentions***

When plaintiff was transferred to Shawangunk in February of 2011, he required the assistance of a walker when inside his cell, and otherwise needed a wheelchair to ambulate, because of back problems. (Am. Compl., Dkt. No. 27 at 17).[FN4] He was assigned to a housing unit that was not wheelchair accessible so that he could attend a mandatory program available only in that cell block. (Dkt. No. 27 at 19). Plaintiff was told that his wheelchair had to be kept in a bin in a storage room and retrieved from that location whenever he required it to move around the facility. (Dkt. No. 27 at 17). Plaintiff alleges that he suffered substantial pain, and was injured on several occasions while attempting to store or retrieve his wheelchair, and that the defendants ignored these serious medical issues and delayed his referral for treatment. (Dkt. No. 27 at 17–18, 21–24). Plaintiff further claims that his repeated requests for inmate assistance with storing and retrieving his wheelchair were denied. (Dkt. No. 27 at 17–20).

FN4. Because the pages of the amended complaint are not all consecutively numbered, the court will refer to the pages in the header added, upon filing, by the court's CM–ECF system.

***14** Plaintiff alleges that, between March 2011 and May 2012, he filed a number of grievances, implicating various defendants, regarding the conditions of his confinement, including issues relating to the storage and retrieval of his wheelchair and his ability to take extended showers because of his medical issues. (Dkt. No. 27 at 11–13, 40–41, 72–81). Plaintiff claims that defendants filed numerous false misbehavior reports against him in retaliation for pursuing grievances (Dkt. No. 27 at 24–26, 41–59), and because of his race and sexual orientation (as overtly gay) (Dkt. No. 27 at 35, 58–59). Plaintiff further alleges that he was denied due process in connection with the disciplinary hearings against him because he was found guilty by a biased hearing officer on many misbehavior reports, despite overwhelming evidence of his innocence or other mitigating circumstances. (Dkt. No. 27 at 25, 42, 49, 51–52).

Defendants contend that defendants Fischer, Smith, Maly, Pingott, and LeClaire should be dismissed because the amended complaint does not adequately allege their personal involvement in any constitutional violation. (Def.s' Mem. of Law at 5–6, Dkt. No. 134–1). Defense counsel argues that plaintiff does not plausibly allege a causal connection between plaintiff's grievances and the misbehavior reports filed against him by various defendants, as required to support a retaliation claim. (*Id.* at 13–15). The defendants further assert that plaintiff's claim of discrimination fails because it is based on allegations of verbal harassment that are not actionable. (*Id.* at 6–7). Plaintiff's conspiracy claim is barred, according to defense counsel, by the intracorporate conspiracy doctrine. (*Id.* at 7–8). The defendants contend that plaintiff's conclusory assertion that the disciplinary hearing officer was biased do not support a due process claim. (*Id.* at 11–13). Finally, defense counsel argues that plaintiff's medical care claim does not adequately allege facts satisfying the subjective and objective elements of an Eighth Amendment violation. (*Id.* at 9–11).

For the reasons set forth below, this court recommends that the defendants' motion to dismiss be granted in part and denied in part. In particular, this court recommends that defendants Fischer, Maly, and LeClaire be dismissed based on a lack of personal

Page 14

Slip Copy, 2015 WL 403133 (N.D.N.Y.)
**(Cite as: 2015 WL 403133 (N.D.N.Y.))**

involvement, and that plaintiff's conspiracy claim be dismissed pursuant to the intracorporate conspiracy doctrine. This court otherwise recommends that defendants' motion be denied.

**II. *Motion to Dismiss***

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (*citing Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

***15** When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999). In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

**III. *Personal Involvement***

For the reasons set forth below, plaintiff's claims against defendants Fischer, LeClaire, and Maly may be dismissed because plaintiff has not adequately alleged that they were personally involved in any constitutional violations. However, the allegations of personal involvement with respect to defendants Smith and Pingott are adequate, at least in the context of a Rule 12(b)(6) motion.

**A. Legal Standards**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (*citing, inter alia, Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN5]

FN5. Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon,* are still viable after *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). *See, e.g., Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y.2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y.2011)). See also *Young v. Choinski,* 15 F.Supp.3d 172, No. 3:10–CV–606, 2014 WL 962237, at *10–12 (D.Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

**B. Analysis**

**1. Defendants Fischer and LeClaire**

The only specific allegation in the amended complaint suggesting the personal involvement of former DOCCS Commissioner Fischer andDep. Com. LeClaire relates to the latter's April 26, 2011 letter to plaintiff. (Dkt. No. 27 at 29, 31, 63, 64, 67). In the letter, defendant LeClaire states that defendant Fischer asked him to respond to plaintiff's letter regarding misbehavior reports. Defendant LeClaire then advises that he was referring plaintiff's letter to Supt. Smith for investigation and any appropriate action because there was no basis for review of the Tier II disciplinary proceeding against plaintiff above the level of the facility superintendent. (Dkt. No. 27 at 63). The personal involvement of a supervisory official cannot be established if his only involvement is to refer an inmate's complaint to the appropriate staff for investigation. *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N .Y.2008); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

***16** Plaintiff also makes conclusory claims about the failure of defendants Smith and LeClaire to oversee subordinate DOCCS employees, and the role of these two defendants in allowing a pattern or retaliation and discrimination by ignoring plaintiff's various grievances and Article 78 proceedings. Such unsupported allegations are not adequate to establish their personal involvement. *See Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement); *Pagan v. Correctional Medical Services,* No. 11–CV–1357, 2012 WL 2036041, at *6–7 (S.D.N.Y. June 6, 2012) (courts in this district have repeatedly held that affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983).[FN6]

FN6. In his response to the Rule 12(b)(6) motion, plaintiff attempts to bolster his claim that former Com. Fischer was "personally involved" in violations of plaintiff's constitutional rights. Plaintiff claims that, while the Commissioner was visiting Shawangunk "during this period," plaintiff overheard him comment "Oh, that's Toliver[;] good job with him." (Dkt. No. 145–1 at 58–59). While it is not clear when plaintiff claims defendant Fischer made this remark, it is recounted in the context of plaintiff's discussion about incidents in late 2013, well after his filing of the amended complaint. This ambiguous remark, if it was indeed made by defendant Fischer, would not seem probative of his personal involvement in the alleged consti-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tutional violations recounted in the amended complaint. In any event, generally one cannot amend a complaint in a response to a motion to dismiss. *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 390 n. 19, (S.D.N.Y.2013) (*citing Wright v. Ernst & Young. LLP,* 152 F .3d 169, 178 (2d Cir.1998)).

**2. Defendant Maly**

The only specific allegation in the amended complaint regarding defendant Maly is that, as Acting Superintendent, he denied one of plaintiff's grievances claiming that plaintiff had been denied several physical therapy appointments because of discrimination in October 2011. (Dkt. No. 27 at 12, 30, 31). According to the plaintiff, Mr. Maly's letter denying the grievance stated that Sgt. Lutz had spoken with the plaintiff and the physical therapist and determined that the plaintiff had missed several physical therapy appointments. (Dkt. No. 27 at 30).

In *McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004), the Second Circuit noted that it was "questionable [as to] whether an adjudicator's rejection of a grievance would make him liable for the conduct" of which the inmate complained.[FN7] The district courts within this Circuit "are divided regarding whether review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act." *Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (collecting cases). The *Burton* court noted that district courts have found personal involvement based on denying a grievance where (1) the official undertakes some kind of investigation into the initial denial; (2) the official provides a detailed and specific response to the grievance rather than a *pro forma* denial; or (3) the grievance involves an ongoing violation "such that the 'supervisory official who reviews the grievance can remedy it directly.' " *Id.* (*quoting Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009)); *Young v. Choinski,* 15 F.Supp.3d 172, No. 3:10–CV–606, 2014 WL 962237, at *15 (D.Conn. Mar. 13, 2014) (a supervisory official confronted with an "ongoing" constitutional violation who reviews a grievance or appeal regarding that violation, is "personally involved" if he or she can remedy the violation directly).

FN7. The Second Circuit concluded, however, that "[w]hen allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility." 386 F.3d at 438.

By delegating the investigation of this grievance to Sgt. Lutz and merely reporting Sgt. Lutz's findings in his letter to plaintiff, defendant Maly did not become personally involved in any alleged constitutional violation. *Sealey v. Giltner,* 116 F.3d at 51. Moreover, the amended complaint does not suggest that, despite his many complaints and grievances, plaintiff had any further problems with respect to physical therapy appointments. Absent allegations of an ongoing violation that Mr. Maly could have remedied, his denial of this one grievance is not sufficient to establish his personal involvement in any alleged infringement of plaintiff's constitutional rights. [FN8]

FN8. In his response to the motion to dismiss, plaintiff tried to bolster his showing of personal involvement of Dep. Supt. Maly by making allegations about his oversight of a disciplinary hearing in July 2012, after Maly had been served with the amended complaint in this action. (Dkt. No. 145–1 at 61–62). Based on the authority stated above, the court cannot decide the pending motion to dismiss based on plaintiff's attempt to rely on new allegations outside of the time frame of the operative amended complaint, without making a proper motion to supplement.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**3. Defendant Smith**

***17** With respect to Shawangunk Superintendent Smith, plaintiff alleges that he affirmed the denial of at least one grievance, filed on May 6, 2011, relating to staff denials of plaintiff's requests for assistance in moving his wheelchair. (Dkt. No. 27 at 20). Plaintiff alleges that various defendants continued to engage in retaliatory and discriminatory conduct relating to the storage and retrieval of plaintiff's wheelchair.[FN9] Based on the authority cited immediately above, plaintiff's allegations adequately allege that the Superintendent was personally involved, in that he failed to remedy an ongoing violation that was within his power to address.

FN9. For example, plaintiff alleges that after denying plaintiff's grievance in July 2011 (Dkt. No. 27 at 20), the Superintendent affirmed the guilty disposition on a misbehavior report issued by C.O. Stone in October 2011 alleging that plaintiff failed to obey an order with respect to getting out of his wheelchair and storing it (Dkt. No. 27 at 52–54).

Moreover, defendant Smith affirmed guilty dispositions on a number of misbehavior reports against plaintiff, despite plaintiff's allegations that hearing officer Gardner was biased and that he ignored evidence establishing plaintiff's innocence. (Dkt. No. 27 at 45–46, 49, 57).[FN10] In the context of a Rule 12(b)(6) motion, these allegations are sufficient to support a claim that defendant Smith was personally involved in the retaliation and due process violations alleged against defendant Gardner. *See, e.g., Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (concluding that the plaintiff had "sufficiently alleged that Superintendent Smith was personally involved in depriving him of his due process right to call witnesses" at the disciplinary hearing when Smith affirmed the guilty finding on appeal); *Friedland v. Otero,* No. 3:11cv606, 2014 WL 1247992, at *10–11 (D.Conn. Mar. 25, 2014) (defendant Choinski's review of plaintiff's due process claims in connection with the appeal of the disciplinary proceeding report constituted sufficient personal involvement, in that he failed to remedy the underlying procedural defects associated with the disciplinary hearing) (collecting cases).

FN10. *See* section VII B, below.

**4. Defendant Pingott**

Plaintiff documents that Capt. Pingott investigated and denied at least one of his grievances about the storage and retrieval of plaintiff's wheelchair and related injuries sustained in March 2011. (Dkt. No. 27 at 11–12, 45, 61). Plaintiff further alleges that he filed a grievance about defendant Pingott's response. (Dkt. No. 27 at 11–12). Finally, plaintiff claims that Capt. Pingott told his subordinates to "write [plaintiff's] ass up" on misbehavior reports in retaliation for his grievances. (Dkt. No. 27 at 65). Plaintiff's amended complaint adequately alleges Capt. Pingott's personal involvement in constitutional violations, at least in the context of a Rule 12(b)(6) motion.

**IV. *Retaliation***

**A. Legal Standards**

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

at 380.

***18** A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if the defendant initiated false disciplinary charges against plaintiff in retaliation for his exercise of a constitutionally protected right, plaintiff's First Amendment rights are implicated even if the plaintiff was entitled to, and did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Filing prison grievances and lawsuits are clearly constitutionally protected activities in the context of a retaliation claim. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* In the context of a disciplinary hearing, the type of evidence required to establish a causal connection between plaintiff's protected activity and the defendant's alleged adverse action includes: temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing, and statements from the defendants regarding their motives. *Santiago v. Whidden,* No. 3:10–CV–1839, 2012 WL 668996, at *7 (D.Conn. Feb. 29, 2012) (*citing Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007)).

**B. Analysis**

Defense counsel argues that plaintiff's "conclusory" allegations that various defendants retaliated against him, for pursuing various grievances, by filing numerous misbehavior reports against him during the same time period are insufficient to state a "plausible" claim of retaliation. (Def.s' Mem. of Law at 14–15). Defendants contend that plaintiff fails to allege, with specificity, that the defendants who filed misbehavior reports against him had knowledge of prior grievances, or other facts suggesting a causal link between plaintiff's protected activities and the defendants' alleged adverse actions. (*Id.*) While many of plaintiff's allegations of retaliation may not withstand a well-documented motion for summary judgment, they are adequate to survive a motion to dismiss under Rule 12(b)(6).

Plaintiff alleges that, on March 9 and 10, 2011, he "circulated ... to the above-named defendants" his first grievances against defendant Kane, and perhaps also against defendants Peterson and Keys, relating to their orders that plaintiff store and retrieve his wheelchair. (Dkt. No. 27 at 11, 33–34). [FN11] Plaintiff claims that five false misbehavior reports, relating to his problems with moving his wheelchair and related physical limitations, were then filed against him in retaliation for those first grievances. On March 10th, two misbehavior reports were filed against plaintiff-one issued by defendant Peterson and witnessed by his "partner," defendant Kane, and one issued by defendant Keys-defendant Kane's "friend." (Dkt. No. 27 at 33–34, 43–44). On March 13, 2011, defendant Kane's "partner," defendant Stefinik filed disciplinary charges relating to plaintiff's failure to properly store his wheelchair. (Dkt. No. 27 at 32, 45–46). Defendant Cutler filed a misbehavior report against plaintiff on March 14th, because he would not get up to go get his medications, purportedly because plaintiff could not move due to back pain and spasms. (Dkt. No. 27 at 24, 47) .[FN12] On March 25, 2011, defendant DeGraff charged plaintiff with having contraband-two Motrin pills for which plaintiff had a prescription-charges on which plaintiff was ultimately found not guilty by hearing officer Gardner. (Dkt. No. 27 at 24, 34–35, 48). [FN13]

FN11. Plaintiff's 81–page amended complaint is disorganized and often unclear about significant factual details. The court has

construed plaintiff's pro se pleading liberally, as required by Second Circuit authority.

FN12. In plaintiff's response to the Rule 12(b)(6) motion, he asserted that defendant Cutler was another "co-worker and friend" who worked on the same housing unit as the other defendants. (Dkt. No. 145–1 at 11–12).

FN13. Plaintiff asserted, in his response to the Rule 12(b)(6) motion, that defendant DeGraff was a "friend of Defendants Stef[i]nik, Pet[ ]erson, K[ ]ane, Cutler and Keys." (Dkt. No. 145–1 at 13). The amended complaint also alleges that plaintiff filed another grievance, on March 22, 2011, alleging, *inter alia,* that unspecified officers tampered with his food. (Dkt. No. 27 at 11). Plaintiff alleges that he filed additional 2011 grievances on March 25, March 30, April 22, and May 6 implicating defendants Pingott, DeGraff, and unspecified others, the last of which was denied by Supt. Smith. (Dkt. No. 27 at 11–12, 20–21, 29).

***19** A well-documented summary judgment motion might well establish that the March 10 misbehavior reports were filed **before** plaintiff submitted his first grievances. The defendants who filed the misbehavior reports in the days following plaintiff's first grievance(s) might be in a position to file affidavits documenting that they were not then aware of the grievances, notwithstanding plaintiff's claim that he "circulated" them to the defendants. Moreover, a summary judgment motion might clarify who was named in plaintiff's first grievances and persuade the court that no rational fact finder would conclude that correction officers not implicated in the grievances had any cause to retaliate against plaintiff. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (*citing Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in). However, the court cannot, based solely on the amended complaint, liberally construed, find that these allegations of retaliation should be dismissed under Rule 12(b)(6).

Plaintiff alleges that defendant Stone issued a misbehavior report against him on October 3, 2011, relating to plaintiff's refusal to use a filthy towel provided by C.O. Bucci,[FN14] even though C.O. Stone was not present for the incident. (Dkt. No. 27 at 51). During the disciplinary hearing, plaintiff asked C.O. Stone why he constantly called plaintiff a "Homo Niggerette." Plaintiff alleges that C.O. Stone retaliated against plaintiff, for his question during the hearing and for filing unspecified "grievances of discrimination based on plaintiff's race and sexual orientation" (Dkt. No. 27 at 35), by issuing another misbehavior report relating to plaintiff's use of his wheelchair, on October 14, 2011. (Dkt. No. 27 at 25–26, 35–36, 52–54). Plaintiff claims that, at some point, C .O. Stone "promised to 'make up for his mistakes at the previous hearing' " and told plaintiff" "[i]f I have to write your ass up every day I will—so prepare." (Dkt. No. 27 at 53). While plaintiff's allegations are conclusory in some respects, his amended complaint adequately alleges retaliation by C.O. Stone in connection with this sequence of events.

FN14. C.O. Bucci is not named as a defendant in the amended complaint.

On July 25, 2011, defendant Budziszewski filed a misbehavior report against plaintiff for disobeying an order to get off the phone and return to his cell. Plaintiff alleges that he was found guilty notwith-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

standing the fact that phone records showed that he made no call at the relevant time. (Dkt. No. 27 at 25, 49). Ultimately, the disposition was expunged as a result of an Article 78 proceeding plaintiff pursued in state court. (Dkt. No. 145–1 at 14–16). Plaintiff alleges that, on October 17, 2011, he filed a grievance against defendant Budziszewski, who retaliated by filing misbehavior reports against plaintiff relating to the duration of his showers on December 12, 2011, February 6, 2012, and March 7, 2012.[FN15] Plaintiff was convicted on the disciplinary charges although he purported to have a medical pass for an extended, 25–minute shower. (Dkt. No. 27 at 55–59). Plaintiff claims that, at the time of one of the disciplinary hearings, defendant Gardner told him "keep poking the Bear with these ... grievances ... and watch what happens to your ass. Every time you get a ticket you will be found guilty regardless." (Dkt. No. 27 at 57).[FN16] Ultimately, at least one of the disciplinary dispositions was reversed as a result of an Article 78 proceeding. (Dkt. No. 145–1 at 24). The allegations regarding defendant Budziszewski state a plausible claim of retaliation that cannot be dismissed under Rule 12(b)(6). [FN17]

FN15. Plaintiff alleges he filed another grievance with respect to the duration of his showers on December 12, 2011, but the amended complaint does not specify whether defendant Budziszewski was named in that grievance. (Dkt. No. 27 at 12–13).

FN16. Plaintiff, in his response to the Rule 12(b)(6) motion, claimed that, at some point before the February 6, 2012 misbehavior report was filed, defendant Budziszewski, promised to " 'get plaintiff again' for the grievances." (Dkt. No. 145–1 at 22).

FN17. Because defendant North has not appeared in this case and is not a party to the pending Rule 12(b)(6) motion, the court will not address the allegations of retaliation against C.O. North.

### V. *Discrimination/Equal Protection*

***20** The amended complaint alleges that defendants discriminated against plaintiff on the basis of his disability, sexual orientation, and/or race. (Dkt. No. 27 at 9, 35–36, 52, 56, 58–59). Defendants argue that verbal harassment of the plaintiff, including the use of the term "Homo Niggerette" by defendants Stone and Budziszewski to taunt plaintiff, does not constitute actionable discrimination under Section 1983. (Def.s' Mem. of Law at 6–7). While verbal harassment alone does not support a claim of unconstitutional discrimination, the amended complaint alleges an adequate equal protection claim.

#### A. Legal Standards

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (*citing City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). A plaintiff alleging a violation of his equal protection rights must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination, typically against an identifiable or suspect class, such as race or religion. *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Then, the plaintiff must establish that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

" 'In applying the Equal Protection Clause to most forms of state action, [courts] ... seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.' " *Pedersen v. Office of Personnel Management,* 881 F.Supp.2d 294, 309 (D.Conn.2012) (*quoting Plyler v. Doe,* 457 U.S. 202, 216 (1982)). Courts apply heightened equal protection scrutiny to those laws that burden a fundamental right or target a suspect class, such as those based on race, national origin, or sex. *Id.* (*citing, inter alia, Romer v. Evans,* 517 U.S. 620, 629,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


631 (1996)).

Certain "suspect" classifications, including those based on race, are subject to strict judicial scrutiny, and must further a compelling state interest and be narrowly tailored to accomplish the purpose. *Pyke v. Cuomo,* 567 F.3d 74, 77 (2d Cir.2009). The Second Circuit has held that homosexuality is "quasi-suspect (rather than suspect)" category, that is subject to heightened or intermediate judicial scrutiny,[FN18] but not strict scrutiny. *Windsor v. U.S.,* 699 F.3d 169, 185 (2d Cir.2012), *judgment aff'd, U.S. v. Windsor,* ––– U.S. ––––, 133 S.Ct. 2675 (2013).[FN19] "The Equal Protection Clause permits distinctions which are based on a person's disability, if they are rational and serve a legitimate end." *Wiggins v. N.Y. City Dep' of Corr.,* No. 06 Civ.1946, 2008 WL 3447573 at *8 (S.D.N.Y. Aug. 12, 2008) (*citing Garcia v. State Univ. of N.Y. Health Scis. Ctr.,* 280 F.3d 98, 109 (2d Cir.2001)).

FN18. "To withstand intermediate scrutiny, a classification must be 'substantially related to an important government interest.' ... 'Substantially related' means that the explanation must be 'exceedingly persuasive.' " 699 F.3d 185 (citations omitted).

FN19. The Supreme Court in *Windsor* did not consider whether homosexuals constitute a suspect class. 133 S.Ct. at 2695–96.

Alternatively, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination, but instead claims that he has been irrationally singled out as a "class of one." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601 (2008). The Equal Protection Clause "secure[s] every person .... against intentional and arbitrary discrimination" by state officials. *Willowbrook v. Olech,* 528 U .S. 562, 564, (2000). Thus, in a "class of one" claim, the Equal Protection Clause requires a "rational basis for the difference in treatment." *Id.*

***21** Mere verbal harassment, profanity, or even racial epithets, " 'unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *See, e.g., Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (collecting cases); *Webster v. Fischer,* 694 F.Supp.2d 163, 187 (N.D.N.Y.2010). However, when alleged harassment amounts to more than verbal taunts and includes other more serious, ongoing constitutional deprivations, a plaintiff should be given an opportunity to pursue his constitutional claims. *Toliver v. City of New York,* 530 F. App'x 90, 92–93 (2d Cir.2013) (reversing district court's granting of defendants' Rule 12(b)(6) based on the lower court's erroneous conclusion that plaintiff alleged mere verbal harassment which did not support an actionable constitutional deprivation).

**B. Analysis**

Plaintiff alleges that, unlike four other handicapped inmates who were allowed to take extended showers with impunity, he was disciplined for trying to take longer showers, despite having medical authorization. (Dkt. No. 27 at 13, 58–59). Plaintiff also claims that defendant Budziszewski, who filed multiple, retaliatory misbehavior reports against plaintiff relating to the length of his showers, was one of the correction officers who consistently referred to plaintiff as "The Homo Niggerette." (Dkt. No. 27 at 59). Based on the authority cited above, plaintiff's allegations of racist taunts, combined with the more serious, related claims of unconstitutional retaliation, are sufficient to state a "class of one" equal protection claim, and perhaps a discrimination claim based on race and/or sexual orientation. In the context of a summary judgment motion, defendants may be able to document a rational, or even compelling penological interest in how they treated plaintiff vis à vis other handicapped inmates in connection with use of the shower. However, the equal protection claim in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

amended complaint is adequate to withstand a Rule 12(b)(6) motion.[FN20]

FN20. In his response to the Rule 12(b)(6) motion, plaintiff also argues that he was denied equal protection because, by requiring him to store and retrieve his wheelchair under physically difficult circumstances, the defendants treated plaintiff differently from “similarly situated inmates using wheelchairs and/or walkers.” (Dkt. No. 145–1 at 19). While this equal protection claim is more difficult to discern from the amended complaint, the court will not preclude plaintiff from pursuing this claim, without prejudice to the defendants challenging it in a subsequent summary judgment motion.

**VI. *Conspiracy***

The amended complaint alleges that all of the defendants conspired to “discriminate, harass, and retaliate” against plaintiff by pursuing false disciplinary charges against him over a period of more than one year. (Dkt. No. 27 at 8). Defense counsel argues that plaintiff's conspiracy claim should be dismissed under the “intracorporate conspiracy doctrine.” This court agrees, and recommends that the duplicative and conclusory conspiracy claim in the amended complaint be dismissed.

**A. Legal Standards**

“To survive a motion to dismiss, a conspiracy claim under 42 U.S .C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal.... Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed.” *Vega v. Artus,* 610 F.Supp.2d 185, 202–03 (N.D.N.Y.2009) (*citing, inter alia, Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002)).

***22** “The intracorporate conspiracy doctrine provides that ‘if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... employees, each acting within the scope of his employment[,] there can be no actionable conspiracy.’ ... The intracorporate conspiracy doctrine ‘bars conspiracy claims against employees of entities such as [DOCCS] (when those employees are alleged to have conspired solely with each other) unless, pursuant to the doctrine's ‘scope of employment’ exception, the employees were pursuing personal interests wholly separate and apart from the entity by whom they were employed.” *Richard v. Fischer,* No. 11–CV–6013, 2014 WL 3974158, at *8 (W.D.N.Y. Aug. 7, 2014) (collecting cases).

**B. Analysis**

The Second Circuit has not yet validated the “intracorporate conspiracy doctrine” in the context of a section 1983 action. *Rahman v. Fischer,* No. 9:10–CV–1496 (LEK/TWD), 2012 WL 4492010, at *13 (N.D.N.Y. Sept. 28, 2012) (”[t]he Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, ... but has not extended its application of the doctrine to conspiracy claims under § 1983) (citations omitted). However, numerous district courts have applied the doctrine to dismiss conspiracy charges, under Rule 12(b)(6), relating to Section 1983 claims of retaliation and discrimination similar to those raised in this case. *See, e.g ., Vega v. Artus,* 610 F.Supp. at 193, 205–06 (dismissing intracorporate conspiracy claim relating to allegations that defendants harassed, discriminated against, and retaliated against plaintiff (*inter alia,* by filing false misbehavior reports), because of plaintiff's perceived sexual orientation); *Graham v. Peters,* No. 13–CV–705JTC, 2013 WL 5924727, at *1, 5 (W.D.N.Y. Oct. 31, 2013) (dismissing, under intracorporate conspiracy doctrine claim that defendants conspired to retaliate against plaintiff for exercising his First Amendment rights, by subjecting him to excessive force and false disciplinary charges); *Richard v. Fischer,* 2014 WL 3974158.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

at *8–9 (dismissing conspiracy claim under intracorporate conspiracy doctrine based on allegations that the defendants discriminated in making inmate work assignments based on race and religion); *Rahman v. Fischer,* 2012 WL 4492010, at *1, 13 (dismissing, based on the intracorporate conspiracy doctrine, claims that defendants conspired to retaliate against plaintiff, by denying him access to classes and a locker, to punish him for pursuing his First Amendment rights to exercise his religion and access the courts).

Some district courts in this Circuit have declined to apply the intracorporate conspiracy doctrine to dismiss conspiracy claims based on more egregious constitutional violations, such as unprovoked assaults, finding there was at least an issue of fact as to whether defendant correction officers were acting, not in the scope of their employment, but for purely personal reasons. [FN21] However, given the nature of the underlying alleged constitution claims in this case, plaintiff's conclusory allegations that the defendants were clearly pursuing a "personal" agenda (Dkt. No. 145–1 at 74), are not enough to state a plausible claim that the defendants were not acting within the scope of their employment. *See, e.g., Vega v. Artus,* 610 F.Supp. at 205 ("in order to allege facts plausibly suggesting that individuals were pursuing personal interests wholly separate and apart from the entity" to overcome the intracorporate conspiracy doctrine, "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against the plaintiff"). Based on the authority above, this court recommends that plaintiff's conspiracy claim be dismissed under the intracorporate conspiracy doctrine.[FN22]

FN21. *See, e.g., Medina v. Hunt,* No. 9:05–CV–1460, 2008 WL 4426748, at *8–10 (N.D.N.Y. Sept. 25, 2008) (a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleged that officers assaulted him in retaliation for participating in a federal lawsuit); *Hill v. City of New York,* No. 03 CV 1283, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (finding that the personal interest exception applies, and allowing conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force); *Randle v. Alexander,* 960 F.Supp.2d 457, 475 (S.D.N.Y.2013) (there is no fair interpretation of plaintiff's allegations that suggests that the defendants were acting within the scope of their responsibilities as prison guards when they forced plaintiff and another inmate to fight each other in the mantrap area, and then tried to cover up the fight).

FN22. The courts notes that, as in *Rahman v. Fischer,* 2012 WL 4492010, at *13 n. 18, plaintiff's conspiracy claim "appears largely duplicative of many of the other claims raised in his [Amended] Complaint."

## VII. *Due Process*

### A. Legal Standards

***23** To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

significant hardship on the inmate in relation to the ordinary incidents of prison life." FN23

FN23. Most, if not all, of the disciplinary proceedings against plaintiff involved "Tier II" hearings, for which the maximum possible confinement was 30 days of segregated housing or keeplock. *See* N.Y. Comp.Codes R. & Regs. tit. 7 § 253.7(a)(1)(iii). The federal district courts in New York, applying *Sandin,* have consistently held that terms of special housing or "keeplock" of approximately 30 days, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement. *See, e.g., Brown v. Secore,* 9:08–CV–085, 2010 WL 980233, at *5 (N.D.N.Y. Mar. 15, 2010) (collecting cases); *Pilgrim v. Bruce,* 9:05–CV–198 (GLS/GHL), 2008 WL 2003792, at *15 (N.D.N.Y. May 7, 2008) (plaintiff's conclusory allegations, which notably do not include claims that he was denied food, clothing, bedding, heat, running water, toiletries, or medicine during his 60 days in keeplock, fail to establish that he was subjected to more severe conditions than in normal restrictive confinement); *Holland v. Goord,* 05–CV–6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (77 days in keeplock during which plaintiff was deprived of TV, phone, packages, and commissary, and was unable to go to Muslim services and classes, did not create a protected liberty interest). However, defendants' pending motion does not challenged plaintiff's due process claim on the basis that he was not deprived of a liberty interest (perhaps because he received multiple, sequential disciplinary sentences); so the court will not address that issue.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (*citing, inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

**B. Analysis**

Liberally construed, the amended complaint alleges that defendant Gardner, who presided at most of plaintiff's disciplinary hearings, was not fair and impartial and found plaintiff guilty in the absence of even "some" evidence. For example, plaintiff alleges that he was found guilty by defendant Gardner of disobeying an order to get off the telephone, even though records indicated that plaintiff was not using the phone during the relevant time period; the disposition was later expunged in an Article 78 proceeding. (Dkt. No. 27 at 25, 49; Dkt. No. 145–1 at 14–16). Similarly, plaintiff was found guilty on several misbehavior reports relating to the duration of his showers despite having medical orders allowing extended showers; at least one of those dispositions was allegedly reversed in an Article 78 proceeding. (Dkt. No. 27 at 5559; Dkt. No. 145–1 at 24). Plaintiff claims that, on one occasion, hearing officer Gardner told plaintiff "Every time you get a ticket you will be found guilty regardless.... I ain't fair and impartial." (Dkt. No. 27 at 57).

The allegations in the amended complaint are sufficient to state a plausible claim that plaintiff was denied procedural due process in connection with at least some of his disciplinary proceedings because the hearing officer was not impartial and/or because of the lack of "some" supporting evidence. The court does not decide whether this due process claim could

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

withstand a summary judgment motion, properly-documented with hearing transcripts and supporting documents and affidavits.

**VIII. *Denial of Medical Care***

**A. Legal Standards**

***24** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (*citing, inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (*citing, inter alia, Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**B. Analysis**

***25** Because of back injuries, plaintiff used a walker to ambulate short distances and needed a wheelchair otherwise. (Dkt. No. 27 at 17). He allegedly complained to various defendants, including Aube, Peterson, Kane, Stefinik, Gaye, Keys, and Cutler that storing and retrieving his wheelchair was causing him pain; but they denied him the assistance of other inmates. (Dkt. No. 27 at 18–20). On May 9, 2011, while trying to move his wheelchair, plaintiff "felt a ... 'needle sharp' pain" in his spine and leg, collapsed on the floor, and could not move. (Dkt. No.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

27 at 21).[FN24] Plaintiff was treated in the hospital and, upon his return to his housing unit, defendants Peterson and Kane continued to require that plaintiff move his wheelchair without assistance, notwithstanding his protests that he could not do so, given his pain. (Dkt. No. 27 at 22). As plaintiff struggled to store his wheelchair, he again collapsed on the floor. Plaintiff claims that C.O. Stefinik told the nurse "Nothing's wrong with him, he just ... laid down on the floor[,]" and Sgt. Aube stated "leave his ass on the floor." (Dkt. No. 27 at 23). The defendants did not allow plaintiff to be taken for medical attention for "approximately half an hour" by which time, plaintiff's pain was so intense that he cried. (Dkt. No. 27 at 23). [FN25]

FN24. Elsewhere in the amended complaint, plaintiff seems to allege that his physical collapses while storing or retrieving his wheelchair happened in March 2011, not May 2011. (Dkt. No. 27 at 45).

FN25. The amended complaint seems to allege that plaintiff collapsed under similar circumstances on at least one subsequent occasion. (Dkt. No. 27 at 23–24).

Plaintiff does not state that the delay in his treatment following his "second" collapse (Dkt. No. 27 at 45) resulted in any substantial deterioration of his medical condition. However, the amended complaint, liberally construed, alleges that he suffered extreme pain for approximately 30 minutes before the identified defendants allowed him to get medical attention. While a summary judgment motion, supported by plaintiff's medical records, may well establish that the one, relatively brief delay in allowing plaintiff medical attention was not sufficiently "serious" to satisfy the objective prong of the Eighth Amendment standard, this court cannot make that determination in the context of a Rule 12(b)(6) motion. Similarly, while the court concludes that plaintiff has adequately alleged that the named corrections officers were deliberately indifferent to plaintiff's medical needs on at least one occasion, a summary judgment motion supported by affidavits from the defendant may establish that no rational fact finder could conclude that plaintiff satisfied the subjective prong necessary to establish an unconstitutional delay in medical care.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 134) be **GRANTED** as to defendants Fischer, Maly, and LeClaire, and as to plaintiff's conspiracy claim, and it is further

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 134) be otherwise **DENIED,** and it is further

**ORDERED,** that if the District Court adopts this recommendation, she shall return the case to me to set a schedule for discovery and any further substantive motions with respect to the surviving claims and defendants.

***26** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (*citing Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Nov. 17, 2014.

N.D.N.Y.,2015.
Toliver v. Fischer
Slip Copy, 2015 WL 403133 (N.D.N.Y.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Slip Copy, 2015 WL 403133 (N.D.N.Y.)
**(Cite as: 2015 WL 403133 (N.D.N.Y.))**

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Meshach VALLADE, Plaintiff,
v.
Brian FISCHER, J. Conway, Sgt. Dino, Officer Scolese, Nurse R. Killinger, Dr. Abbasey, Dr. Lekowski, Sandra Pursak, and P. Chappius, Defendants.

No. 12–CV–00231 (A)(M).
Signed Oct. 29, 2014.

Meshach Vallade, Bronx, NY, pro se.

George Michael Zimmermann, Office of the New York State Attorney General, Buffalo, NY, for Defendants.

ORDER

RICHARD J. ARCARA, District Judge.

***1** The above-referenced case was referred to Magistrate Judge Jeremiah J. McCarthy, pursuant to 28 U.S.C. § 636(b)(1)(B). On September 29, 2014, Magistrate Judge McCarthy filed a Report and Recommendation, recommending that defendants' motion for summary judgment (Dkt. No. 30) be granted in part and denied in part.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge McCarthy's Report and Recommendation, the defendants' motion for summary judgment (Dkt. No. 30) is granted to the extent it seeks dismissal of plaintiff's retaliation and deliberate indifference to medical needs claims, with prejudice, and plaintiff's access to courts claim, without prejudice, but is otherwise denied.

The case is referred back to Magistrate Judge McCarthy for further proceedings.

IT IS SO ORDERED.

**REPORT AND RECOMMENDATION**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

Before me is defendants' motion for summary judgment [30].[FN1] This motion, being dispositive, has been referred to me by Hon. Richard J. Arcara for a Report and Recommendation [39]. For the following reasons, I recommend that defendants' motion be granted in part and denied in part.

FN1. Bracketed references are to the CM/ECF docket entries.

**BACKGROUND**

Plaintiff, an inmate, commenced this action *pro se* pursuant to 42 U.S.C. § 1983 against various correction officers employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). Complaint [1]. His claims arise from a March 30, 2009 accident that occurred at the Attica Correctional Facility.

**The March 30, 2009 Accident**

The Complaint [1] alleges that "[o]n or about March 30, [20]09 plaintiff was coming back from recreation handcuffed behind his back while going up the stairs ... [and] tripped in shoes (several sizes to[o]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

big for him) ... and fell down many steps on the stairs" (*id.,* p. 7 of 46, ¶ 3). He alleges that defendants Brian Kohl and Paul Scolese, the Correction Officers escorting him," were deliberately indifferent to [his] safety by not holding him by the arms while he was going up the stairs" and "failed to protect [him] from falling and should of been aware of the potential hazard and injuries that could occur if an inmate fell down the stairs handcuffed behind the back" (*id.*, pp. 7–8 of 46, ¶ 4).[FN2]

FN2. Plaintiff also asserted claims against defendants Conway and Fischer arising from the March 30, 2009 fall, which were dismissed, with prejudice, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. *See Vallade v. Fischer,* 2012 WL 4103864, *3–4 (W.D.N.Y.2012) (Curtin, J.).

Discovery demonstrates that plaintiff arrived at Attica Correctional Facility in February 2009, and was housed on the second floor of the Special Housing Unit. Statement of Undisputed Facts [30–1], ¶¶ 9–10. Upon his arrival, his boots were taken and an admissions officer provided him with size 11 shoes for his size nine-and-a-half to 10 feet (*id.,* ¶¶ 11–14).[FN3] When plaintiff complained about the oversized shoes, he was directed to write to the "State Shop", which provides shoes for inmates (*id.,* ¶¶ 15–16).

FN3. When deposed plaintiff testified that his shoes were size nine-and-a-half, but stated in his April 3, 2009 grievance that he was a size 10. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 13–14.

***2** On March 30, 2009, plaintiff was escorted to recreation by defendants Scolese and Kohl (*id.,* ¶ 36).[FN4] When these officers returned to recreation to escort plaintiff back to his cell, defendant Scolese acknowledges that he "noticed that [plaintiff's] shoes were not on properly, and felt that this could cause him to fall and be injured. When I pointed this out, [plaintiff] told me that his shoes were to big". Scolese Declaration [37], ¶ 8. Notwithstanding his belief that plaintiff's shoes could cause him to fall and be injured, defendant Scolese states-"I did not feel that he could be seriously injured due to the fact that he was being escorted by myself and another officer" (*id.,* ¶ 18). Unlike defendant Scolese, defendant Kohl states that when he escorted plaintiff on March 30, 2009, he "was not aware that his shoes did not fit properly". Kohl Declaration [34], ¶ 8. However, this is disputed by plaintiff, who testified that defendant Kohl was aware that his shoes did not fit properly and that he had previously stumbled in front of defendant Kohl while wearing the oversized shoes. Plaintiff's deposition transcript [31], pp. 27–28 of 73.

FN4. Although defendants allege that plaintiff did not have any difficulty going down the stairs to recreation on March 30, 2009 (Defendants' Statement of Undisputed Facts [30–1], ¶ 46) the page they cite of plaintiff's deposition transcript (p. 30) in support of this allegation is not included in the record before me. Plaintiff also testified that he had previously stumbled in his shoes in front of defendant Kohl. Plaintiff's deposition transcript [31], p. 27 of 73.

While being escorted back to his cell, plaintiff was handcuffed behind his back as required by DOCCS' and Attica's policies. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 28–30, 48. Plaintiff alleges that when he was almost to the top of the stairs his shoe slipped off and he tripped causing him to fall on his right shoulder (*id.,* ¶¶ 55, 57, 58).[FN5]

FN5. Defendant Scolese's April 1, 2009 memorandum of the incident indicates that plaintiff fell on his knees. Scolese Declaration [37], Ex. A, Bates No. 00046.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff testified that at the time of his fall defendants Scolese and Kohl were “rushing me, like oh, we gotta get back, we got to bring all these inmates back to the[ir] cells, so you ... gotta hurry up. So I'm like, you know, ... [t]he sneakers are big on my feet. I can't move as fast as you want me to. So he kept saying you got to hurry up, hurry up”. Plaintiff's deposition transcript [31], pp. 32–33 of 73. Plaintiff also testified, consistent with his Complaint ( [1], pp. 7–8 of 46, ¶ 4), that neither officer was “even that close” to him and were not holding on to him as they ascended the stairs. Plaintiff's deposition transcript [31], pp. 33–34 of 73.

By contrast, defendant Scolese states that he was holding plaintiff's arm the entire time (Scolese Declaration [37], ¶ 9), which appears consistent with the reports plaintiff provided in his grievances following the incident. *See* Grievances dated April 3, 2009[31], p. 71 of 73, Bates No. 00038 (“C.O. Scoles [e] wasn't firmly holding my arm so when I fell he wasn't able to stop me from hitting the steps”); May 15, 2009[22], p. 13 of 175, Bates No. 00011 (“the escorting offices wasn't holding properly in case I fall which I did”); June 11, 2009[22], p. 8 of 175, Bates No. 00006 (“I fell because of him not holding me properly”). Indeed, consistent with his reports following the incident, plaintiff's Affidavit submitted in opposition to defendants' motion for summary judgment alleges (contrary to the Complaint and his deposition testimony) that defendants Scolese and Kohl were holding him when he fell. *See* Plaintiff's Affidavit [40], ¶ 5 (“defendants ... were suppose to hold my arms or cuffs to provide support and stability, but having taken this walk routinely thousands of time, they may have relaxed their protocol and relaxed the firmness of their grips”).

***3** Following the fall, defendant Scolese asked plaintiff if he was alright, and he responded affirmatively. Scolese Declaration [37], ¶ 10; Kohl Declaration [34], ¶¶ 10, 11. Defendant Scolese then informed the second floor reception officers that plaintiff's shoes were too big. Defendants' Statement of Undisputed Facts [30–1], ¶ 59. The officers attempted to locate the proper size shoes for plaintiff, but none were found (*id.*, ¶ 60).

**Retaliation**

Plaintiff's Complaint [1] alleges that “[o]n or about April 3, 2009 [defendant Dean Acquard, a Sergeant,] came to [his] cell harassing him and threatening him with bodily harm for writing grievances and letters to get a copy of the video tape where the fall happen[ed].... Plaintiff then wrote grievances on [defendant Acquard] for threatening him. Plaintiff started getting denied food and recreation because of his grievances and lived in fear of getting beat up. Plaintiff is on mental health's case load for psychiatric issues and this behavior by [defendant Acquard] hampered his ability to function and made him even more depressed and gave him bad anxiety” (*id.,* p. 10 of 46, ¶¶ 9–10). [FN6]

FN6. Although the Complaint identifies this defendant as “Sgt. Dino”, Dean Acquard has answered the Complaint and plaintiff does not dispute that this is the individual he sought to name as a defendant. *See* Plaintiff's deposition transcript [31], p. 68 of 73. Judge Curtin interpreted plaintiff's Complaint as not asserting an Eighth Amendment claim against defendant Acquard arising from the March 30, 2009 fall. *See Vallade,* 2012 WL 4103864, *2 n. 1.

Although plaintiff concedes that the grievance defendant Acquard was reacting to was authored by him on April 3, 2009 (defendants' Statement of Undisputed Facts [30–1], ¶ 80; plaintiff's Rely [40], p. 1 of 5, ¶ 3), that grievance was not received by the Inmate Grievance Coordinator's Officer until April 7, 2009. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 80, 81. Moreover, the April 3, 2009 grievance states-“On 4–3–09 right after lunch [defendant Acquard] came to my cell ... and threaten me

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

about not pursuing the incident on March 30, 2009 because he was the Sgt on duty when I fell and no medical attention was giv[en] to me". [33], p. 12 of 22, Bates No. 00039. This suggests that defendant Acquard could not have been threatening retaliation for the April 3, 2009 grievance, but rather that the grievance was written in response to the threat.

In any event, plaintiff conceded at his deposition that he was not deprived of food, but rather stopped eating because he did not trust the officers who provided him with the food (*id.*, ¶¶ 82–83). In an apparent contradiction to his allegations of being denied recreation in retaliation for his complaints, his April 3, 2009 grievance states that his shoulder pain rendered him unable to participate in a number of activities. [33], p. 12 of 22, Bates No. 000039. He also testified that he stopped attending recreation because defendant Acquard threatened him. Defendants' Statement of Undisputed Facts [30–1], ¶ 84.

**Deliberate Indifference**

The Complaint [1] alleges that following his March 30, 2009 fall, plaintiff "put in numerous sick calls to be seen and treated complaining of pain for approximately 5 weeks until he was taken to a Dr. and adequately treated" (*id.*, p. 8 of 46, ¶ 6). The record demonstrates that to obtain medical attention, an inmate puts in for sick call to be seen by a nurse. Defendants' Statement of Undisputed Facts [30–1], ¶ 87. On April 1, 2009, plaintiff first complained of pain from the March 30, 2009 fall. [41–7], Bates No. 000515.[FN7] At that time, a nurse gave plaintiff Ibuprofen for the pain and scheduled him to be seen by a doctor. Defendants' Statement of Undisputed Facts [30–1], ¶ 99. He was then again seen at sick call on April 2 and 4, 2009 for shoulder and hip pain and was given Tylenol. Defendants' Statement of Undisputed Facts [30–1], ¶ 102; Laskowski Declaration [35], ¶¶ 11–12. He continued to be seen on April 5 and 6, 2009 for complaints of "excruciating" shoulder and hip pain and was given Tylenol for his pain. Laskowski Declaration [35], ¶ 13.

FN7. Although plaintiff testified that it was not until April 1, 2009 that he first had an opportunity to advise the medical department of his injured shoulder (plaintiff's deposition transcript [31], p. 39 of 73), he was seen on March 31, 2009 by Nurse Hawley, and at that time requested lotion for his skin. [41–7], Bates No. 000515. This is confirmed by plaintiff's own March 31, 2009 grievance against Nurse Hawley, alleging that she disregarded his itchy skin itchy. [22], p. 33 of 175, Bates No. 00031.

***4** Plaintiff was first seen by defendant Steven Laskowski, M.D.,[FN8] for complaints of right shoulder and hip pain on April 8, 2009. [41–7], Bates No. 000513. At that time, defendant Laskowski examined him, ordered an x-ray and MRI, and provided him with Motrin. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 104–08; Laskowski Declaration [35], ¶ 14; [41–7], Bates No. 000513. On April 19, 2009, DOCCS' Health Management Organization ("HMO") requested more information concerning defendant Laskowski's request for an MRI. Defendants' Statement of Undisputed Facts [30–1], ¶ 112. An MRI screening sheet was completed on April 21, 2009, which was part of the process necessary for obtaining authorization from the HMO. Laskowski Declaration [35], ¶ 21. It is undisputed that defendant Laskowski lacked the authority to have an MRI performed without authorization from DOCCS or its HMO. Defendants' Statement of Undisputed Facts [30–1], ¶ 113.

FN8. In the Complaint he is identified as Dr. Lekowski.

In the meantime, plaintiff continued to be seen at sick call on April 9, 11, 13, 15, 17, 20 and 24, 2009, and was provided with Tylenol or Ibuprofen for his complaints of pain (*id.*, ¶ 111). On April 26, 2009,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff requested to be seen by a doctor and was seen by Dr. Abbasey two days later (*id.,* ¶¶ 115, 117).[FN9] Dr. Abbasey recommended an x-ray of plaintiff's shoulder and physical therapy and prescribed him Naprosyn (*id.,* ¶ 118). While awaiting his prescription of Naprosyn, plaintiff was seen at sick call on May 2 and 4, 2009, and was given Motrin and Tylenol for the pain (*id.,* ¶ 120).

FN9. The defendants' submissions identify him as Dr. Albassey. I have adopted the spelling used on his DEA stamp contained in the medical records [41–3], p. 23 of 30.

An x-ray of plaintiff's right shoulder was taken on May 5, 2009, which showed an "acromioclavicular separation" (*id.,* ¶ 122). On May 6, 2009, plaintiff was seen at sick call complaining that his hip x-ray was not performed, but it was noted that no x-ray of his hip had been ordered. Laskowski Declaration [35], ¶ 28. On May 7, 2009, plaintiff complained that the Naprosyn was causing stomach pains and on May 8, 2009, he reported that he had stopped taking the Naprosyn and requested to be seen by a physician. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 125–26; Laskowski Declaration [35], ¶¶ 29–30. On May 12, 2009, plaintiff was seen at sick call for complaints of shoulder and hip pain, and he was provided with Tylenol. Defendants' Statement of Undisputed Facts [30–1], ¶ 129.

Plaintiff was next seen by defendant Laskowski on May 14, 2009, and at that time his assessment was a right hip contusion and a probable rotator cuff tear of the right shoulder (*id.,* ¶ 130).[FN10] Defendant Laskowski's treatment plan was an x-ray of the right hip and shoulder and "to consider an MRI". Laskowski Declaration [35], ¶ 32. Plaintiff was also prescribed physical therapy for his shoulder, but after being evaluated the therapist decided to delay physical therapy due to the acromioclavicular separation. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 131–32.

FN10. Curiously, defendant Laskowski's treatment notes state that plaintiff reported to him that he was involved in an altercation in early April 2009 resulting in an injury to his right shoulder and hip, suggesting that after his fall and after defendant Laskowski saw him on April 8, 2009, he sustained another injury. Laskowski Declaration [35], ¶ 32; [41–7], Bates No. 00507.

***5** Plaintiff continued to seen at sick call on May 15, 17, 18 and 20, 2009, and was given Tylenol for pain (*id.,* ¶ 133). A second x-ray was performed on May 22, 2009, which showed that plaintiff's hip was normal and, contrary to the May 5, 2009 x-ray, showed that the acromioclavicle of the right shoulder "appear[ed] normal", but the radiologist "suggest[ed] weight bearing films to further evaluate the right AC joint". Defendants' Statement of Undisputed Facts [30–1], ¶ 134; Laskowski Declaration [35], ¶ 38; [41–4], Bates No. 000355.

Plaintiff continued to be seen at sick call on May 24 and 26, 2009, and was given Tylenol when he complained that Motrin upset his stomach. Defendants' Statement of Undisputed Facts [30–1], ¶ 135. On May 27, 2009, plaintiff was seen by Physician's Assistant Debbie Graf for complaints of right shoulder pain. Laskowski Declaration [35], ¶ 40. PA Graf referred him for an orthopedic consult and prescribed Percogesic since plaintiff was having trouble with other pain medications. Defendants' Statement of Undisputed Facts [30–1], ¶ 136. On June 3, 2009, plaintiff was seen at sick call for complaints of numbness in his right arm (*id.,* ¶ 137).

Plaintiff was seen by defendant Laskowski for the third time on June 8, 2009, but this call-out was terminated by defendant Laskowski after plaintiff became belligerent (*id.,* ¶ 138). On June 9, 2009, plaintiff was seen at sick call for complaints of pain. Las-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

kowski Declaration [35], ¶ 44. He was next seen on June 18, 2009 for complaints that the Percogesic was ineffective (*id.,* ¶ 45). At that time, it was noted that the orthopedic consult requested by PA Graf had been denied by DOCCS, and that a physician call-out was scheduled for early July (*id.*). Plaintiff continued to be seen at sick call on June 20 and 21, 2009 for complaints of pain and was provided with Ibuprofen on June 21, 2009 (*id.,* ¶¶ 46–47).

On June 26, 2009, plaintiff was examined by Dr. Abbasey, who discussed the results of the x-rays. Defendants' Statement of Undisputed Facts [30–1], ¶ 141. At that time, it was noted that plaintiff had no deficits in motion (*id.*). Plaintiff complained that the Percogesic was causing itching and Dr. Abbasey prescribed Ibuprofen or Tylenol every eight hours for pain (*id.*). However on June 29, 2009, plaintiff requested a refill of his Percogesic (*id.,* ¶ 142).

On July 1, 2009, plaintiff was again evaluated for physical therapy, and the physical therapist noted “will try another trial of [treatment] per physician”. [41–5], Bates No. 000396. On that day, he was also seen at sick call for complaints of shoulder pain and pursuant to Dr. Abbasey's June 26, 2009 treatment notes, PA Graf prescribed Motrin to plaintiff, but he returned the Motrin the next day, stating-“I can't take that”. Laskowski Declaration [35], ¶ 52; [41–7] Bates No. 503. He returned to sick call on July 3, 2009, complaining that he could not take Motrin and was allergic to Percogesic, but this call was terminated when he became argumentative. Laskowski Declaration [35], ¶ 54. He returned to sick call the following day for complaints of shoulder and right hip pain, and it was noted that he had been approved for physical therapy for his shoulder (*id.,* ¶ 55).

***6** Plaintiff was seen by defendant Laskowski for the fourth time on July 6, 2009. At that time, defendant Laskowski's impression was that plaintiff had a “right [acromioclavicle] separation” (*id.,* ¶ 56). His plan was to have an “occupational therapy evaluation scheduled” (*id.*). While Dr. Laskowski later treated plaintiff on March 15, 2010 for hypertension (Laskowski Declaration [35], ¶ 76), July 6, 2009 was the last time defendant Laskowski treated plaintiff for his shoulder and hip injuries.[FN11]

FN11. While defendant Laskowski also states that he examined plaintiff on September 19, 2011 (Laskowski Declaration [35], ¶ 100), the Ambulatory Health Record Progress Notes from that date do not appear to support this *See [41–3],* Bates No. 000317. In any event, they do not appear to relate to treatment for shoulder or hip pain, but rather injuries plaintiff sustained during an altercation with another inmate. *See* Laskowski Declaration [35], ¶ 93.

Plaintiff's complaints of right shoulder pain persisted. On July 7 and 30, 2009, he was seen at sick call and provided with Tylenol. Defendants' Statement of Undisputed Facts [30–1], ¶ 147. Plaintiff commenced physical therapy on August 3, 2009, and received nine sessions before being discharged due to a lack of progress (*id.,* ¶¶ 149, 150).

On August 10, 2009, plaintiff was seen by Dr. Abbasey, who offered plaintiff a shot of Cortisone, which he declined because he did not “like needles”. [41–7], Bates No. 00497. Instead, Dr. Abbasey wrote a prescription for Indocin (*id.*). Changing his mind, plaintiff made a request on August 27, 2009 to receive the injection and a call-out was scheduled with Dr. Abbasey, who provided him with an injection of Depromedal and Xylocaine. Defendants' Statement of Undisputed Facts [30–1], ¶ 152. At that time, Dr. Abbasey also extended his prescription for Indocin for ten more days (*id.*).

When plaintiff's complaints of shoulder pain resumed on October 19, 2009, he was provided with Ibuprofen (*id.,* ¶ 153). He returned to sick call on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

November 3, 2009, and requested to see a physician. At that time he was given Tylenol. Laskowski Declaration [35], ¶ 68. He was then seen by a nurse on November 13 and 23, 2009, and was given Advil for his complaints of right shoulder pain (*id.,* ¶¶ 69–70).

Plaintiff was next seen by Dr. Abbasey on December 21, 2009, and was referred for an orthopedic consultation, which was denied by the HMO. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 155–56. Dr. Abbasey's assessment was that plaintiff's shoulder affected his activities of daily living. Laskowski Declaration [35], ¶ 71; [41–3] Bates No. 000325.

On February 5, 2010, plaintiff returned to sick call with complaints of pain in his shoulder. Laskowski Declaration [35], ¶ 74. He was given Tylenol and scheduled to follow-up with Dr. Abbasey (*id.*). Dr. Abbasey saw plaintiff on February 19, 2010, and he ordered an MRI and prescribed Valtaren. He also indicated that he would again request an orthopedic consultation once the MRI was performed. Defendants' Statement of Undisputed Facts [30–1], ¶ 159. An MRI was conducted on March 20, 2010, which found: "[m]inimal tendinosis is present of the supraspinatus tendon. A rotator cuff tear is not seen. A small amount of fluid is present in the subdeloid bursa. The labrum has a normal appearance. There is no tendon dislocation. The AC joint has no significant hypertrophy." [41–4], Bates No. 000353. Plaintiff's prescription for Valtaren was refilled on April 15, 2010. Defendants' Statement of Undisputed Facts [30–1], ¶ 162.

***7** Plaintiff returned to sick call on April 29, 2010 for complaints of right shoulder pain, and was provided with Motrin. Laskowski Declaration [35], ¶ 80. Plaintiff was next examined by Dr. Rao on May 6, 2010, who prescribed Fiorcet for ten days and recommended an arm sling. Defendants' Statement of Undisputed Facts [30–1], ¶ 164. He was then seen at sick call on June 4, 8 and 18, 2010 for shoulder pain and was provided with Tylenol or Ibuprofen (*id.,* ¶ 165). Dr. Rao re-examined plaintiff on July 6, 2010, and made an orthopedic referral, which resulted in a recommendation for surgery (a Mumford Procedure) by the orthopedic surgeon (*id.,* ¶¶ 166–67). According to Dr. Rao's notes, plaintiff declined the surgery. [41–3], Bates No. 000319. Although plaintiff denies that he "ever refused a procedure" (plaintiff's Affidavit [40], ¶ 13), included in the record is a waiver dated August 12, 2010 signed by plaintiff, stating-"My family told me not to get the surgery because they don't [*sic* ] nothing to go wrong so they said wait til I come home to get it done". [41–6], Bates No. 000468.

Plaintiff was next seen for shoulder pain on October 10, 2010, and provided with a balm for his shoulder. Defendants' Statement of Undisputed Facts [30–1], ¶ 171. He did not complain of shoulder pain again until May 10, 2012 (*id.,* ¶¶ 172–76). On June 8, 2012, plaintiff was seen by Dr. Abbasey. Dr. Abbasey's notes indicate that at that time plaintiff wanted to defer surgery until he was released from custody next year and declined a Cortisone injection. [41–3], Bates No. 000313. Plaintiff was not seen again by medical personnel before his transfer out of Attica on August 24, 2012. Defendants' Statement of Undisputed Facts [30–1], ¶ 178.

Since leaving Attica, plaintiff has received medication, but no active treatment for his shoulder (*id.,* ¶ 182). When asked at his deposition if "[a]side from the surgery ... has any doctor ever told you you should have any treatment that you haven't had?", plaintiff responded "Nobody said nothing different". Plaintiff's deposition transcript [31], p. 57 of 73. Defendant Laskowski states that he was not plaintiff's primary care giver, a role performed by Dr. Abbasey. Laskowski [35], ¶ 101.[FN12]

FN12. Although the record before me encompasses the entirety of the medical treatment plaintiff received at Attica following the March 30, 2009 fall, his deliberate indifference claims against Drs. Rao and Ab-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

basey and Nurse Killinger were dismissed, with prejudice. *See* Vallade, 2012 WL 4103864 at *4–6.

**Access to Courts**

The plaintiff's Complaint [1] alleges that he wrote defendants Paul Chappius, the Deputy Superintendent for Security at Attica, and Sandra Prusak, the Inmate Records Coordinator ("IRC") at Attica, "to purchase a copy of the video coverage [of his fall] and was denied and told it doesn't exist", which "was a lie in an attempt to cover up the fall" (*id.,* p. 9 of 46, ¶ 7). The record demonstrates that the location of plaintiff's fall has security cameras. Defendants' Statement of Undisputed Facts [30–1], ¶ 185. Defendant Chappius was responsible for management of these security tapes. Chappius Declaration [33], ¶¶ 1, 9. Defendant Chappius states that unless the tape involves a use of force or other unusual incident, it is maintained for 14 days before being recycled (*id.,* ¶ 10). He also states that since there was no report of an inmate injury or use of force or unusual incident reports generated from plaintiff's fall, the recording would not have been considered significant and would not have been maintained for more than 14 days (*id.,* ¶ 14).

***8** Defendant Prusak is responsible for coordinating requests from inmates for documents and other items under New York's Freedom of Information Law ("FOIL"). Prusak Declaration [36], ¶ 4 The parties dispute when plaintiff requested the videotape and when he received a response to that request. These documents, which are only maintained by the facility for one year, were destroyed before the suit was filed. Prusak Declaration [36], ¶ 21.

According to plaintiff, he wrote a letter to defendant Prusak requesting the videotape of the incident on March 31, 2009, and she responded a week later, advising him that the tape did not exist. Plaintiff's deposition transcript [31], pp. 62–63 of 73.[FN13] Supporting plaintiff's version of events, the record includes a letter from plaintiff dated April 3, 2009, complaining that defendant Prusak denied his request for the videotape. [36], p. 11 of 11, Bates No. 00083. That letter was received in the DOCCS' Commissioner's Office in Albany, New York on April 16, 2009(*id.*).

FN13. In response to defendants' motion, plaintiff's Affidavit [40] states, "annexed hereto as exhibit 'A' is a copy of plaintiffs letter to I.R.C. Sandra Pr[u]sak, and D.S.S. Paul W. Chappius" (*id.,* ¶ 18), but that letter does not accompany the Affidavit.

By contrast to plaintiff's version of events, defendants rely on the IRC FOIL log book, which indicates that plaintiff's request for the videotape was received at the IRC office on April 6, 2009.[36], p. 7 of 11.[FN14] It also shows that plaintiff's request for the videotape was responded to on April 17, 2009(*id.*).[FN15] The log book states that result of plaintiff's request was "deny/appeal recycled 14 days" [36], p. 7 of 11.

FN14. Defendant Prusak states that she believes that the April 6, 2009 date on the log book is incorrect and that given the surrounding entries, the correct date is April 16, 2009. Prusak Declaration [36], ¶¶ 17–19.

FN15. In response to that portion of defendants' Statement of Undisputed Facts [30–1] alleging that plaintiff's request for the video was responded to on April 17, 2009 (*id.,* ¶ 211), plaintiff states he believes this allegation. Plaintiff's Reply [40], p. 1 of 5, ¶ 6.

Plaintiff also filed a grievance concerning the March 30, 2009 fall, and stated on April 3, 2009, "I want the video and audio tapes reserved *[sic]* of this incident or allow me to purchase a copy to be place[d] in my personal property". [33], p. 13 of 22. However, grievances are filed with the Inmate Grievance Coor-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

dinator, not the IRC. Defendants' Statement of Undisputed Facts [30–1], ¶ 216.

**ANALYSIS**

**A. The Summary Judgment Standard**

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

However, "[w]hen the moving party has carried its burden ... its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**B. Timeliness of Claim Against Defendant Kohl**

***9** "[T]he applicable statute of limitations for § 1983 actions in New York is three years". *Murphy v. Lynn,* 53 F.3d 547, 548 (2d Cir.1995). Here, the Complaint was filed on March 22, 2012, the eve of the expiration of the three-year statute of limitations, and identified defendant Kohl as a "John Doe" defendant. Judge Curtin's screening Order requested the New York State Attorney General's Office to attempt to identify the John Doe defendant. *See Vallade,* 2012 WL 4103864 at *3 n. 2. The New York State Attorney General's Office responded by identifying defendant Kohl, and he was added as a defendant by Judge Arcara on October 25, 2012[10].

Defendants argue that plaintiff's failure to identify and substitute defendant Kohl as the John Doe defendant prior to the expiration of the statute of limitations renders the claim against him untimely. Defendants' Memorandum of Law [30–2], Point I. They also argue that plaintiff fails to meet the requirements for the relation back of claims set forth in Fed.R.Civ.P. ("Rule") 15(c) (*id.*). Although plaintiff does not respond to this portion of defendants' motion, the Second Circuit has recently instructed that where a *pro se* litigant makes a "partial response to a motion ... *i.e.*, referencing some claims or defenses but not others .... [,]the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate". *Jackson v. Federal Express,* ––– F.3d ––––, 2014 WL 4412333, *6 (2d Cir.2014).

"For an Amended Complaint adding a new party to relate back under Rule 15(c)(1)(C), the following conditions must be met: (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity,* the original action would have been brought against it; and (4) the second and third criteria are fulfilled within 120 days of the filing of the Original Complaint, and the Original Complaint was filed within the limitations period." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir.2013) (emphasis in origi-

nal) (internal quotations omitted). As argued by defendants, "Rule 15(c)(1)(C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a mistake of identity". *Hogan,* 738 F.3d at 518. However, defendants ignore the fact that "even if a plaintiff's claims are barred by Rule 15(c)(1)(C), the Second Circuit has held that an amended pleading asserting § 1983 claims against John Doe defendants may still relate back under Rule 15(c) (1)(A)." *JCG v. Ercole,* 2014 WL 1630815, *13 (S.D.N.Y.), *adopted* 2014 WL 2769120 (S.D.N.Y.2014).

Rule 15(c) (1)(A) permits an amendment to a pleading to relate back to the date of the original pleading when "the law that provides the applicable statute of limitations allows relation back". "New York law provides a more forgiving principle of relation back in the John Doe context, compared to the federal relation back doctrine under Rule 15(c)." *Strada v. City of New York,* 2014 WL 3490306, *5 (E.D.N.Y.2014). "To take advantage of [New York Civil Practice Law and Rules] § 1024, a party must meet two requirements. First, the party must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name. Second, the party must describe the John Doe party in such form as will fairly apprise the party that he is the intended defendant." *Hogan,* 738 F.3d at 519 (internal quotations and citations omitted). Defendants make no attempt to address either of these requirements; therefore, I recommend that this portion of their motion be denied.

**C. Eighth Amendment Violation: Deliberate Indifference to Plaintiff's Safety**

***10** "The [Eighth] Amendment ... imposes duties on ... officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates". *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[U]nder 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate". *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620 (2d Cir.1996).

"The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent.... The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 62021. "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result' ". *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (*quoting Farmer,* 511 U.S. at 835).

In order to prevail, plaintiff "is not required to show that [defendant] acted 'with the very purpose of causing harm,' ... but must demonstrate that [defendant] knew of and disregarded an excessive risk to his health and safety". *Carbonell v. Goord,* 2000 WL 760751, *8 (S.D.N.Y.2000). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842.

Initially, defendants argue that plaintiff's deposition testimony that neither defendants Scolese nor Kohl had a hold of his arm when he fell is a "recent contrivance" that should be rejected, given the contrary information he provided in the weeks following

the fall. Defendants' Memorandum of Law [30–2], Point III. "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken". *Russell v. Acme Evans Co.,* 51 F.3d 64, 6768 (7th Cir.1995). Since in plaintiff's Affidavit opposing defendants' motion for summary judgment [40] he reverts to stating that defendants "relaxed the firmness of their grips and I fell down the stairs" (*id.,* ¶ 5), an account that is consistent with his statements following the incident, I assume that his deposition testimony was mistaken and will disregard it for purposes of this motion. Nonetheless, this is not dispositive of plaintiff's claim.

***11** Defendants do not contest the objective prong of plaintiff's claim. Defendants' Memorandum of Law [30–2], p. 6. Instead, they argue that the subjective prong "is completely lacking" (*id.,* p. 6). The crux of their argument is that there is "no evidence that [defendant Scolese] could have know known that the plaintiff could sustain a serious injury while going up (not down) the stairs" (*id.,* p. 7).

"Courts ... have concluded that forcing an inmate with an obvious impairment to ... descend stairs without adequate assistance presents a triable issue of fact as to deliberate indifference." *Krontz v. Westrick,* 2009 WL 2633761, *3 (N.D.Ohio 2009). This case is no different. Defendant Scolese's acknowledgment that he recognized that plaintiff's shoes were not on properly and could cause him to fall (Scolese Declaration [37], ¶ 8), coupled with plaintiff's testimony that he was being rushed up the stairs while handcuffed behind the back (plaintiff's deposition testimony [31], pp. 32–33 of 73) and not properly supported by defendant Scolese (plaintiff's Affidavit [40], ¶ 5), is sufficient to raise a triable issue of fact as to whether defendant Scolese's conduct transcended mere negligence to deliberate indifference of a risk of serious injury. Though defendants allege that there is a lesser degree of possible harm from falling on stairs while ascending as opposed to descending, this distinction is unavailing. Whether ascending or descending, falling in a stairwell while handcuffed behind the back posses a risk of injury from an unbraced fall.

Alternatively, defendants argue that defendant Scolese and Kohl are entitled to qualified immunity for their actions. Defendants' Memorandum of Law [30–2], p. 21. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). But even where a right is well established, a defendant may enjoy qualified immunity "if it was objectively reasonable for him to believe that his acts did not violate" that right. *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), cert. *denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993).

Defendants argue "at the time of the relevant events, an inmate's rights not to be escorted up a flight of stairs in shoes one and a half sizes too big, with his hands cuffed behind his back, was not clearly established as constitutional violations". Defendants' Memorandum of Law [30–2], p. 21. This argument ignores the fact that "[t]he Eighth Amendment right of inmates '[t]o be furnished with the basic human needs, one of which is reasonable safety' is both clearly established and well-settled". *Armstrong v. Breslin,* 2006 WL 436009, *5 (E.D.N.Y.2006) (*quoting Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

***12** Defendants also argue that "[m]erely having the plaintiff walk upstairs while handcuffed behind, in shoes which were at most one and a half sizes too big, when plaintiff had no problem going down the same stairs in the same shoes several hours earlier, is an objectively reasonable action which should be afforded qualified immunity protection". Defendants' Memorandum of Law [30–2], p. 21. However, given

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant Scolese's admission that he knew that plaintiff's shoes were not on properly and could cause him to fall and be injured (Scolese Declaration [37], ¶ 8) and the factual dispute as to whether Kohl had similar knowledge, I cannot conclude as a matter of law that it would be objectively reasonable to rush plaintiff up the stairs without sufficiently supporting him to prevent a fall. Therefore, I recommend that this portion of defendants' motion be denied.

**D. First Amendment Violation: Retaliation**

Defendants argue that "the uncontested facts do not bear out that Acquard took adverse action against the plaintiff, nor that there was a causal connection between the two". Defendants' Memorandum of Law [30–2], p. 14. Beyond challenging the "exploited distortion" of Acquard's "unsworn statements", plaintiff appears to offer no other arguments in response to this portion of defendants' motion. Plaintiff's Affidavit [40], ¶ 8.[FN16]

FN16. While plaintiff challenges defendant Acquard's Declaration and the other declarations submitted by defendants as being unsworn (Plaintiff's Affidavit [40], ¶ 8), unsworn declarations are permitted pursuant to 28 U.S.C. § 1746.

"Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 87172 (2d Cir.1995). To prevail on a claim of retaliation, an inmate bears the burden of showing "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "[B]ecause [of] ... both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, ... prisoners' claims of retaliation [are examined] with skepticism and particular care." *Colon,* 58 F.3d at 872.

As defendants argue, "[d]iscovery has shed new light on this claim". Defendants' Memorandum of Law [30–2], p. 11. Whereas plaintiff alleged that he was deprived of food in retaliation for his grievances concerning the March 30, 2009 incident and subsequent threats by defendant Acquard (Complaint [1], p. 10 of 46, ¶ 10), he later conceded that was not deprived of food, but rather ceased eating because he did not trust the food provided by the officers. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 82, 83. Likewise, rather than being denied recreation as plaintiff alleges, he testified that he did not go to recreation because of defendant Acquard's threat (*id.,* ¶ 84).

***13** Moreover, plaintiff fails to establish a causal connection between the threats and his April 3, 2009 grievance. In fact, the April 3, 2009 grievance was not prepared until *after* defendant Acquard's alleged threats. *See Saunders v. Vinton,* 554 Fed.Appx. 36, 39 (2d Cir.2014) (Summary Order) ("any retaliation claim ... would have failed, as the conduct did not deter him from continuing to file grievances"). Therefore, I recommend that this portion of defendants' motion be granted.

**E. Eighth Amendment: Deliberate Indifference to Plaintiff's Medical Needs**

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs". *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As discussed above, the deliberate indifference standard has both objective and subjective components. "[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Nevertheless, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan". *Id.*

Defendants focus solely on the subjective component, arguing that defendant Laskowski did not act with a "sufficiently culpable state of mind", since he was not plaintiff's "primary medical provider" and that "while plaintiff is clearly dissatisfied with the treatment he received ... the record indicates that the medical staff were anything but indifferent". Defendants' Memorandum of Law [30–2], pp. 15–16. I agree with defendants.

As defendants note, while plaintiff received treatment by various medical providers at Attica for his shoulder and hip injuries, defendant Laskowski had only limited involvement in his treatment, seeing him on the following four occasions for his complaints of shoulder and hip pain:

—On April 8, 2009, defendant Laskowski scheduled plaintiff for an x-ray and MRI and gave him Motrin for his pain. Defendants' Statement of Undisputed Facts [30–1], ¶¶ 104–08; Laskowski Declaration ¶¶ 35, 14; [41–7] Bates No. 000513. The x-ray was performed on May 5, 2009. Laskowski Declaration [35], ¶ 27. Although the MRI was not performed at that time, it is undisputed that defendant Laskowski's request was denied by DOCCS' HMO and that he did not have authority to obtain an MRI without this approval. Defendants' Statement of Undisputed Facts [30–1], ¶ 113.

—On May 14, 2009, defendant Laskowski assessed plaintiff as having a right hip contusion and a probable rotator cuff tear of the right shoulder (*id.,* ¶ 130). Defendant Laskowski's treatment plan was an x-ray of the right hip and shoulder and to consider an MRI (*id.*). X-rays to recheck the results of the May 5, 2009 x-ray and to check the right hip were performed on May 22, 2009. Laskowski Declaration [35], ¶ 38.

***14** —On June 8, 2009, the call-out was terminated by defendant Laskowski after plaintiff became belligerent. Defendants' Statement of Undisputed Facts [30–1], ¶ 138. On July 6, 2009, defendant Laskoski's impression was that plaintiff had a "right [acromioclavicle] separation". Laskowski Declaration [35], ¶ 56. His plan was to have "an occupational therapy evaluation scheduled" (*id.*).

In dismissing the deliberate indifference claims against defendant Dr. Abbasey, Judge Curtin concluded that "[g]iven plaintiff's admission that he did receive treatment for his injuries-in the form of x-rays, pain relief, medication and a shoulder sling-and that he was in fact referred to and seen by an outside specialist, his allegations ... amount at most to plaintiff's disagreement with the treatment received, or a delay in treatment, i.e. the delay in referring him to an outside specialist.... [S]uch allegations do not, without more, give rise to a claim of deliberate indifference". *Vallade,* 2012 WL 4103864 at *6. The same holds true here. Discovery has demonstrated that defendant Laskowski attempted to diagnose and treat plaintiff's injuries with pain medication, x-rays, an MRI, and physical therapy. Nothing more has been established in discovery.

Plaintiff's Complaint against defendant Laskowski was permitted to proceed based, in part, upon his attached June 8, 2009 grievance against defendant Laskowski, which alleged that he came to his cell on June 8, 2009 "acting very unprofessional with a wicked smirk on his face" and when plaintiff asked him to take his medical problems more seriously, he walked away without giving him the results of his May 22, 2009 x-ray. Complaint [1], p. 39 of 46. *See Vallade,* 2012 WL 4103864 at *6. However, discovery has demonstrated that defendant Laskowski termi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

nated his June 8, 2009 call-out when plaintiff became belligerent. Defendants' Statement of Undisputed Facts [30–1], ¶ 138.[FN17]

FN17. Instead of denying or attempting to contest this portion of defendants' Statement of Undisputed Facts, plaintiff merely responded that he lacks sufficient information to admit the truth or falsity of this allegation. Plaintiff's Reply [40], p. 1 of 5, ¶ 5.

While the treatment defendant Laskowski provided may not have alleviated plaintiff's complaints, "[m]ere negligence, or even medical malpractice, is not actionable". *Vallade,* 2012 WL 4103864 at *5. Even if defendant Laskowski had broader responsibility for plaintiff's medical care than the four occasions he treated plaintiff, the entirety of the care he received for his shoulder and hip conditions was similarly sufficient. As described by defendant Laskowski, plaintiff's treatment followed an "accepted course of starting with the most conservative treatment (i.e. pain medication), followed by more intensive treatment (physical therapy), before recommending the most invasive treatment (surgery)". Laskowski Declaration [35], ¶ 113. Although plaintiff may disagree with this course of treatment or its pace, "[d]eliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Shire v. Greiner,* 2007 WL 840472, *12 (S.D.N.Y.2007).

***15** Instead, plaintiff must establish that defendant "acted with a sufficiently culpable state of mind, i.e., deliberate indifference. [He] must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment." *Tafari v. Stein,* 2009 WL 331378, *6 (W.D.N.Y.2009) (Scott, M.J.), *reconsideration denied,* 2009 WL 1322317, 2009 WL 1579530. No such evidence has been presented here. Therefore, I recommend that this portion of defendants' motion be granted.

**F. Access to Courts**

Defendants Prusak and Chappius argue, *inter alia,* that plaintiff "has not pled or alleged that defendants' actions hindered his efforts to pursue a legal claim". Defendants' Memorandum of Law [30–2], p. 18. They note that "his claim has not been dismissed but has proceeded apace" and that "the recycling of the tape did not deny the plaintiff access to the Court" (*id.*).

"It is ... established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). "The constitutional right of access is violated where government officials obstruct legitimate efforts to seek judicial redress." *Whalen v. County of Fulton,* 126 F.3d 400, 406 (2d Cir.1997). "Courts of Appeals have recognized two variants of right-of-access claims." *Sousa v. Marquez,* 702 F.3d 124, 127 (2d Cir.2012). Forward-looking claims exist where " 'systemic official action' frustrated their ability to file a suit". *Id.* (*quoting Christopher v. Harbury,* 536 U.S. 403, 413, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)). "The second variant of right-of-access claims is 'backward-looking access claims,'... covering suits that 'cannot now be tried (*or tried with all material evidence),* no matter what official action may be in the future.' " *Id.* at 127–28 (*quoting Christopher,* 536 U.S. at 41314) (emphasis added). "The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, ..., the loss of an opportunity to sue, ... or the loss of an opportunity to seek some particular order of relief". *Christopher,* 536 U.S. at 413–14.

In either category of access to courts claim, "a plaintiff must show that the defendants (1) engaged in deliberate and malicious conduct that (2) resulted in actual injury, *i.e.,* that hindered the plaintiff's effort to pursue a legal claim". *DeMeo v. Tucker,* 509

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fed.Appx. 16, 18 (2d Cir.2013) ( Summary Order). *See Pontervio v. Kaye,* 2007 WL 141053, *9 (S.D.N.Y.), *recon. denied,* 2007 WL 1029901 (S.D.N.Y.2007), aff'd, 328 Fed.Appx. 671 (2d Cir.2009) (Summary Order) ("The essence of a denial of access claim is that a plaintiff must have effectively lost (or was severely hampered in) the ability to file a lawsuit, typically by egregious or systemic violations of due process"). "[T]he requirement of actual injury 'derives ultimately from the doctrine of standing.' " *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997), cert. *denied*, 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998) (*quoting Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

***16** Plaintiff's claim appears to be a backward-looking access claim. Although not argued by the defendants, the Second Circuit has recently recognized that "[t]he viability of backward-looking right-of-access claims is far from clear in this Circuit". *Sousa,* 702 F.3d 124 at 128. Nonetheless, in addressing a backward-looking access suit arising from the government's alleged concealment or manipulation of material facts during a prior civil suit, the Second Circuit has stated that "[s]uch claims, if recognized, would be available only if the governmental action caused the plaintiff's suit to be dismissed as untimely ..., or if official misconduct was so severe as to 'render[ ] hollow his right to seek redress' " *Id. (quoting Bell v. City of Milwaukee,* 746 F.2d 1205, 1261 (7th Cir.1984), *overruled on other grounds by Russ v. Watts,* 414 F.3d 783 (7th Cir.2005)). Even if "if public officials withheld from the plaintiff 'key facts which would form the basis of the ... claims for redress' " (*id. quoting* Bell, 746 F.2d at 1261), such claims are available only if a judicial remedy was 'completely foreclosed' by the ... nondisclosure". *Id. (quoting Broudy v. Mather,* 460 F.3d 106, 120 (D.C.Cir.2006)).

As plaintiff argues, the videotape constitutes "the best and definitive evidence" of defendant Scolese's and Kohl's culpability. Plaintiff's Affidavit [40], ¶ 22. *See Harrell v. Cook,* 169 F.3d 428, 432 (7th Cir.1999) ( "Deliberate destruction of evidence can sabotage a case ..., if it effectively deprives the plaintiff of essential proof"). Nonetheless, even if the tape was willfully destroyed in an effort to cover-up defendants' conduct, plaintiff has not established that this caused him to lose or inadequately settle a meritorious action, since his underlying Eighth Amendment claim arising from the March 30, 2009 accident remains pending. *See Parrish v. Solis,* 2014 WL 1921154, * 13 (N.D.Cal.2014) ("Plaintiff has failed to allege or show the loss of his underlying Eighth Amendment claim. Indeed, Plaintiff cannot allege the 'loss' of this claim at this point in time because litigation of that claim is still pending in this very Court"); *Broudy,* 460 F.3d at 120 ("if relief on the underlying claims is still available in ... a "presently existing claim', the plaintiffs cannot meet [establish complete foreclosure]").

Unlike an access to courts claim arising from the loss of a prior or current suit due to the concealment of material facts, it remains to be seen what injury, if any, plaintiff may sustain from the destruction of the video tape. "This leads to the conclusion not only that Plaintiff cannot allege an actual injury for purposes of standing, but that his claim is premature and not ripe for adjudication". *Parrish,* 2014 WL 1921154 at *13. *See Lynch v. Barrett,* 2010 WL 3938359, *6 (D.Colo.2010) ("the damages Plaintiff would receive for his access-to-courts claim are presumptively the same as those he would receive for his excessive force claim. Recovery in both claims would, consequently, be superfluous. This fact supports the notion that Plaintiff has not yet experienced the requisite injury to bring his access-to-courts claim. Plaintiff has yet to experience a concrete injury, or denial of meaningful relief, and therefore, his access-to-courts claim is unripe"); *Raymond v. Sloan,* 2014 WL 4215378, *3 (D.Idaho 2014) ("At this stage in the litigation, it is premature to determine whether defendants' alleged cover-up will result in the defeat of her negligence claim. Instead of speculating upon the fate of that claim, the court will instead dismiss plaintiff's § 1983

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

claim without prejudice”).

***17** Therefore, I recommend that defendants' motion be granted to the extent of dismissing plaintiff's access to courts claim, without prejudice.[FN18]

FN18. Since I conclude that plaintiff's access to courts claim is premature, I have not addressed defendants' alternative arguments.

**CONCLUSION**

For these reasons, I recommend that defendants' motion for summary judgment [30] be granted to the extent it seeks dismissal of plaintiff's retaliation and deliberate indifference to medical needs claims, with prejudice, and plaintiff's access to courts claim, without prejudice, but otherwise be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by October 16, 2014 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who “fails to object timely ... waives any right to further judicial review of [this] decision”. *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall “specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority”, and must include “a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge”. Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Filed Sept. 29, 2014.

W.D.N.Y.,2014.
Vallade v. Fischer
Slip Copy, 2014 WL 5481881 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Jack VIGLIOTTI, Plaintiff,
v.
Director Donald SELSKY, et al., Defendants.

No. 08–CV–00875–JJM.
Signed April 14, 2014.

Hedwig M. Auletta, Patrick B. Curran, Damon Morey LLP, Buffalo, NY, for Plaintiff.

David J. Sleight, George Michael Zimmermann, Office of the Attorney General, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

***1** The parties have consented to proceed before a Magistrate Judge pursuant to 28 U.S.C. § 636(c) [29].[FN1] Before me are the parties' cross-motions for partial summary judgment [123, 131]. Oral argument was held on February 14, 2014[147]. For the following reasons, defendants' motion is granted in part and denied in part, and plaintiff's motion is denied.

FN1. Bracketed references are to the CM/ECF docket entries.

**BACKGROUND**

Plaintiff commenced this action *pro se* on November 25, 2008 pursuant to 42 U.S.C. § 1983, alleging that on September 12, 2005, while he was incarcerated at the Wende Correctional Facility, he was assaulted by defendant Correctional Officer Timothy Benson. Complaint [1], First Cause of Action. Plaintiff further alleges that certain due process violations occurred at his disciplinary hearing arising from the incident, which was conducted by defendant Captain Martin Kearney. *Id.*, Second Cause of Action. On October 18, 2005 defendant Kearney found plaintiff guilty of some of the charges against him and sentenced him to 180 days of confinement in the Special Housing Unit ("SHU") and 180 days loss of packages, television, commissary, and telephone. *Id.* at ¶ 21, p. 11. On December 7, 2005, defendant Donald Selsky, the Director of Special Housing, denied plaintiff's appeal and affirmed defendant Kearney's determination. *Id.* at ¶ 24, p. 14.

The parties cross-move for partial summary judgment on the Second and Third Causes of Action alleging due process violations against defendants Kearney and Selsky.

**ANALYSIS**

**A. Summary Judgment Standard**

The standard to be applied on a motion for summary judgment in this Circuit is well settled. "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**B. Due Process Standard**

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Nevertheless, inmates are "entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship". *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004).[FN2] These protections include "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken". *Id. (citing Wolff,* 418 U.S. at 563–67). "In addition, due process requires that there be some evidence to support the findings made in the disciplinary hearing." *Washington v. Gonyea,* 538 Fed.Appx. 23, 25 (2d Cir.2013) (Summary Order). *See Luna v. Pico,* 356 F.3d 481, 491 (2d Cir.2004) (interpreting the "some evidence" standard to require "reliable evidence").

FN2. Neither party has moved for summary judgment on the issue of whether plaintiff's six months of confinement in the Special Housing constitutes an atypical and significant hardship under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

***2** "[R]egardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff".* *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004). Therefore, violations of "state regulations during [a] disciplinary hearing do not give rise to a § 1983 due process claim". *Austin v. Fischer,* 453 Fed.Appx. 80, 83 (2d Cir.2011) (Summary Order). *See also Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process").

"[P]rison disciplinary hearings are subject to a harmless error analysis." *Tafari v.* Rock, 2012 WL 1340799, *5 (W.D.N.Y.2012) (Telesca, J.) (*citing Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991)). Thus, "to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." *Eleby v. Selsky,* 682 F.Supp.2d 289, 292 (W.D.N.Y.2010) (Larimer, J.).

With this standard in mind, I will address each of the alleged deficiencies raised by plaintiff.

**C. Inadequate Assistance**

Plaintiff was assigned an Inmate Assistant, Angelo Amato, to prepare for his disciplinary hearing. Defendants' Statement of Undisputed Facts [124], ¶ 8. He alleges that Amato failed to provide him with adequate assistance, in violation of his due process rights, by not contacting witnesses and by not providing him with certain documentation. Plaintiff's Memorandum of Law [134], pp. 4–5.

"Prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). However, since Amato is not named as a defendant, it is unnecessary for me to determine whether he provided plaintiff with adequate assistance. *See Sowell v. Weed,* 2013 WL 3324049, *13 (W.D.N.Y.2013) (Telesca, J.) ("Sowell's claim founders ... because he has failed to sue either of his legal assistants"). Therefore, this claim is dismissed.

**D. Defendant Kearney**

**1. Delay in Completing the Disciplinary Hearing**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

Plaintiff alleges a due process violation arising from the failure of defendant Kearney to complete the hearing within 14 days as the New York State Department of Corrections and Community Supervision regulations require (7 NYCRR § 251 5.1(b)). Defendants argue that this claim must be dismissed since "a violation of a state ... regulation, in and of itself, does not give rise to liability under § 1983". Defendants' Memorandum of Law [125], p. 6. I agree with defendants. *See Nimmons v. Fischer,* 2013 WL 4495006, *4, 10 (W.D.N.Y.2013) (Arcara, J./Foschio, M.J.) (dismissing claim that a disciplinary hearing was not completed within 14 days). Therefore, this claim is dismissed.

**2. Notice**

***3** Plaintiff alleges that he was not provided with adequate notice that Correction Officer Glen Krathaus was going to be called as a witness. Plaintiff's Memorandum of Law [134], pp. 5–6. Due process requires advance written notice of the claimed violation in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are". *Wolff,* 418 U.S. at 564.

However, plaintiff cites no authority suggesting that due process requires advance notice of the witnesses a hearing officer may call. In any event, since Krathaus was a participant in the incident and a co-signator to the Misbehavior Report ( [124–1], Bates No. 000189), it should not have been a surprise to plaintiff that he would be called as a witness. Moreover, when plaintiff indicated that he was not prepared to question Krathaus, defendant Kearney advised plaintiff to "[t]ake [his] time" before he proceeded with his questioning (*id.,* Bates No. 000060). Therefore, this claim is dismissed.

**3. Opportunity to Present a Defense**

Plaintiff claims that he was denied documentary evidence, was precluded from questioning defendant Benson in a meaningful way, and not permitted to be present for the questioning of his inmate witnesses. Plaintiff's Memorandum of Law [134], pp. 6–10. An "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals". *Wolff,* 418 U.S. at 566. However, "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony". *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d. Cir.1999).[FN3]

FN3. *Compare with Amaker v. Coombe,* 2002 WL 523388, * 10 (S.D.N.Y.2002) ("[A]n inmate's right to present documentary evidence in his defense does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests for his case [,][e]ven when documents are relevant and obtainable").

**a. Denial of Documentary Evidence**

Plaintiff points to three pieces of documentary evidence which were denied to him. First, he alleges that he was denied the Final Unusual Incident Report (plaintiff's Counterstatement of Facts [133], ¶ 1),[FN4] which would have alerted him that defendant Kearney was the reporting officer and permitted him to challenge directly with defendant Kearney whether this was a basis for his recusal. [131–3], Bates No. 000243. The Final Unusual Incident Report also contained a number of relevant documents. As defendant Kearney testified, the preliminary version of the report was "only two sheets", whereas the final version "consists of all documentation related to the incident, medical reports, use of force reports, and all employee names and any witnesses". Kearney's deposition transcript [131–2], p. 25.

FN4. Defendants allege that the Unusual Incident Report was finalized on September 20, 2005, and a copy was provided to plaintiff

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

> some time before the conclusion of the hearing. Defendants' Reply Memorandum of Law [144], p. 5 of 15 (*citing* Kearney's deposition transcript [145], pp. 30–31). However, it is not clear from the transcript of the disciplinary hearing whether the Final Unusual Incident Report was provided to plaintiff. In fact, plaintiff alleges that even in discovery he has never been provided with the Final Unusual Incident Report, thereby leaving him to attempt to reconstruct what would have been contained in that report from defendant Kearney's testimony. Curran Affidavit [131–1], ¶ 4.

Second, plaintiff points to defendant Kearney's denial of his request for defendant Benson's injury report. Defendant Kearney summarily denied this request, stating only "That's something that's not done". Even when plaintiff offered him case law in support of his entitlement to that information, he stated-"I do not do case law.OK?" Hearing transcript [124–2], Bates Nos. 000015–16.

***4** Due process requires more. "Although [the right to documentary evidence] can give way to legitimate concerns over institutional safety ... an inmate is still entitled to *some* explanation of the basis for a hearing officer's denial of the inmate's request for ... items of evidence." *Loret v. Selsky,* 595 F.Supp.2d 231, 234 (W.D.N.Y.2009) (Larimer, J.) (emphasis in original). *See Collins v. Ferguson,* 804 F.Supp.2d 134, 139 (W.D.N.Y.2011) (Larimer, J.) ("prison officials may be required to explain, in a limited manner, the reason ... why requested evidence was excluded or denied" *quoting Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)).

Lastly, plaintiff also requested the logbook to establish that defendant Benson was not located where he was stationed at the time of the alleged assault. Hearing transcript [124–2], Bates No. 000015. However, the hearing transcript does not indicate that this was ever provided to plaintiff, and it is not clear from the transcript what justification, if any, defendant Kearney would have for withholding this information from plaintiff.

Defendants argue that even if these materials were not provided to plaintiff, he has not established that he was prejudiced by the denial of this information. Defendants' Reply Memorandum of Law [144], pp. 2–6 of 15. However, the documents plaintiff was allegedly deprived of were plainly relevant, and what use he may have made of those documents in defending against the charges cannot be resolved as a matter of law. Therefore, this claim must be resolved by the jury.

**b. Opportunity to Meaningfully Question Defendant Benson and to be Present for the Questioning of the Inmate Witnesses**

Plaintiff argues that he was denied a meaningful opportunity to question defendant Benson and was not permitted to be present for the questioning of his inmate witnesses. However, "it is well settled that an inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings". *Fernandez v. Callens,* 2010 WL 4320362, *11 (W.D.N.Y.2010) (Schroeder, M.J.) (*citing Wolff,* 418 U.S. at 567 68). *See also Silva v. Casey,* 992 F.2d 20, 22 (2d. Cir.1993) ("an inmate has no constitutional right of confrontation"); *Sowell,* 2013 WL 3324049 at *10 ("As a matter of federal constitutional law, an inmate does not have a right to cross-examine adverse witnesses at a disciplinary hearing") [FN5]; *Toliver v. New York City Department of Corrections,* 2013 WL 3779125, *10–11 (S.D.N.Y.2013) ("Mr. Toliver also claims that he was denied his right to call the officers, who had issued him [the infraction], to testify at the hearing. However, due process protection does not provide inmates right to confront and cross-examine those furnishing evidence against the inmate"). It is also "not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate". *Kalwasinski,* 201 F.3d at 109;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

*Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) ("Prison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding") [FN6]; *LeBron v. Artus,* 2008 WL 111194, *10 (W.D.N.Y.2008) (Bianchini, M.J.) ("Due process is not violated when the hearing officer decides to take the testimony of a witness outside the presence of an inmate"). *See also* *Bogle v. Murphy,* 2003 WL 22384792, *7 (W.D.N.Y.2003) (Siragusa, J.) ("[A]lthough New York regulation section 254.6 explicitly provides inmates a right to be present at their disciplinary proceedings, it does not create a constitutional due process right. Since, under *Wolff,* inmates are not afforded a constitutional due process right to be present at their hearings, plaintiff's ejection during his disciplinary hearing was not a due process violation").[FN7]

FN5. Although plaintiff disputes whether his questioning of defendant Benson was cross-examination (plaintiff's Reply Memorandum of Law [146] ), he was plainly an adverse witness.

FN6. *Compare with* *Young v. Kihl,* 1990 WL 33183, *3 (W.D.N.Y.1990) (Elfvin, J.) (*Francis* does not provide "a rationale for extending the per se rule against the confrontation of adverse witnesses to the realm of the friendly or favorable witness. In this Court's view, absent a justification for a per se rule in the latter circumstances, the balance of interests in each case should be decided on an individualized basis in keeping with the general principle that inmates may enjoy those constitutional rights which are not inconsistent with legitimate penological objectives. Nevertheless, this Court is obliged to follow the appellate court's clear determination").

FN7. Plaintiff's reliance on *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992) (plaintiff's Memorandum of Law [134], p. 10) is unavailing. In *Young,* the disciplinary hearing was conducted in the defendant's absence and the hearing officer had determined that the inmate had forfeited his right to call witnesses. 970 F.2d at 1156. Those circumstances are distinct from questioning certain witnesses outside the presence of an inmate, but otherwise permitting the inmate to be present during the disciplinary hearing. *See* *Vogelfang v. Capra,* 889 F.Supp.2d 489, 512–15 (S.D.N.Y.2012).

***5** Plaintiff also argues that he was deprived of the ability to ask follow-up questions of his inmate witnesses after he heard the recording of their testimony. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Reed v. Wolczyk,* 2012 WL 5520714, *10 (N.D.N.Y.), *adopted* 2012 WL 5520679 (N.D.N.Y.2012). Although plaintiff may not have been permitted to ask every question he may have wanted, a review of the hearing transcript demonstrates that defendant Kearney permitted him to extensively question not just his inmate witnesses, but defendant Benson and Krathaus as well.

Therefore, this claim is dismissed.

**4. Impartial Hearing Officer**

"The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). In the prison context, "an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen". *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "Administrators serving as adjudicators are presumed to be unbiased." Allen, 100 F.3d at 259. *See* *Rodriguez v. Selsky,* 2011 WL 1086001, *11 (N.D.N.Y.), *adopted* 2011 WL 830639 (N.D.N.Y.2011) ("Because prison

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2014 WL 1451984 (W.D.N.Y.)
**(Cite as: 2014 WL 1451984 (W.D.N.Y.))**

officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased”).[FN8]

FN8. Although not argued by defendants, some cases have noted that “[a] hearing officer may satisfy the standard of impartiality if there is ‘some evidence in the record’ to support the findings of the hearing”. *Fernandez,* 2010 WL 4320362 at *12 *citing Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). *See Murray v. Jacobs,* 2011 WL 4074531, *8 (W.D.N.Y.2011) (Siragusa, J.) (same).

Plaintiff argues that as the “reporting person” on the Unusual Incident Report, defendant Kearney was prohibited from acting as the hearing officer. Plaintiff's Memorandum of Law [125], pp. 13–14. However, “the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias”. *Phelan v. Hersh,* 2011 WL 6031940, *9 (N.D.N.Y.), *adopted* 2011 WL 6031071 (N.D.N.Y.2011). *See Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994) (rejecting argument that a violation of regulation prohibiting a review officer from acting as a hearing officer in a case that he has reviewed constitutes a due process violation).

While defendant Kearney's role as the reporting officer was limited, he testified that he did not “rubber stamp” the Final Unusual Incident Report and that he was responsible to “insure that the report is complete and factual” and that “the facts and the misbehavior report are all consistent”. Kearney deposition transcript [131–2], pp. 20–21. The Final Unusual Incident Report dated September 21, 2005, which was prepared prior to the completion of the disciplinary hearing, indicated that the incident was caused by plaintiff coming off “of the wall during a pat frisk and str[iking] ... Benson in the chest”, but failed to mention plaintiff's version of events. [131–3], Bates No. 000243. To the extent it was defendant Kearney's role to ensure that the Final Unusual Incident Report was factual, this suggests that, even before the conclusion of the hearing, he may have viewed it as being a complete and factual verison of the events.

***6** During the hearing, defendant Kearney's conduct, at times, also suggested that he had prejudged the witnesses' credibility. For example, when plaintiff attempted to question defendant Benson about whether he was already on the wall when he allegedly reached his hand into his pocket, defendant Kearney stated-“I will ask him any question that you give me to ask him, however, it's clearly in the body of the report”. Hearing transcript [124–2], Bates Nos. 00040–41. After plaintiff explained that he was asking this question in order to attempt to demonstrate inconsistences in defendant Benson's version of events, defendant Kearney stated-“I understand that you're defending yourself .... [b]ut I can't sit here while you say that he lied in the report” (*id.,* Bates No. 000041). While defendants characterize this as defendant Keareny's attempt to remind plaintiff that he could not call defendant Benson a liar (defendants' Reply Memorandum of Law [144], p. 10 of 15), this explanation is difficult to reconcile with the fact that plaintiff never directly accused defendant Benson of lying, and with defendant Kearney's testimony that he considered plaintiff to be respectful toward him and the witnesses. Kearney's deposition transcript [145], p. 141.

Likewise, when plaintiff attempted to question Krathaus about his version of events, defendant Kearney reverted to the misbehavior report, apparently considering it to be an accurate report of the incident. For example, when plaintiff attempted to ask-“Did Officer Benson grab me with one hand or two hands?”, defendant Kearney stated-“Well, the body of the report indicates that ... you moved his arm into your arm”. Hearing transcript [124–2], Bates No. 000062. Significantly, at the conclusion of Krathaus' testimony, Kearney told him “good job” (*id.,* 000063).

Furthermore when plaintiff attempted to ask de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendant Benson how he grabbed him, defendant Kearney stated-“He's testified that he grabbed your shirt” (*id.*, Bates No. 000037). Yet, defendant Benson never testified that he grabbed plaintiff's shirt. In fact, when defendant Benson was later asked this question, he did not testify that he grabbed plaintiff's shirt (*id.*).

Defendants point to a variety of conduct as establishing defendant Kearney's impartiality, including assisting plaintiff to identify and locate his inmate witnesses, finding plaintiff not guilty of some of the charges, permitting plaintiff to speak at length in his own defense and to raise a number of objections, and advising him of his appeal rights if he disagreed with his rulings at the hearing. Defendants' Memorandum of Law [125], p. 8. On balance, I conclude that there exists a genuine issue of material fact as to whether defendant Kearney was an impartial hearing officer which must be resolved by a jury.

**5. Written Disposition**

Plaintiff argues that “by merely reciting every piece of evidence and identifying every testifying witness, as defendant Kearney did, the fact-finder does not give any meaningful idea of either the evidence that he rejected or the evidence upon which he relied”. Plaintiff's Memorandum of Law [134], p. 18.

***7** Defendant Kearney prepared a written statement of the evidence he relied upon ( [124–1], Bates No. 000182), which he read into the record:

> “[T]he misbehavior report authored by Correction Officer Benson. The testimony of Officers Benson and Krathaus at the tier hearing, the testimony of Inmate Vigliotti at the hearing, the vigorous defense he put on, as well as the numerous objections he raised. Also taken into consideration is the unusual incident packet, the use of force forms and the memos contained therein, the testimony of Inmate Vigliotti's witnesses, inmates Hall and Wells”. Hearing transcript [124–2], Bates No. 000082.

Defendant Kearney also prepared a written statement of the reasons for his disposition ( [124–1], Bates No. 000182), which he read into the record:

> “The disposition as always is put in place in an effort to modify the inmates behavior to acceptable limits. It is hoped that it will do so in the future. The disposition shall serve to impress upon the inmate that this type of behavior will not be tolerated in the correctional setting. The hearing officer notes that this the second time charges of this type have been lodged against the inmate during this incarceration.” Hearing Transcript [124–2], Bates Nos. 000082–83.

“[I]n order to comply with constitutional due process standards, the only record of a disciplinary hearing that must be maintained is a written statement describing the evidence relied upon and the reasons for the determination”. *Murray v. Jacobs,* 2011 WL 4074531, *6 (W.D.N.Y.2011) (Siragusa, J.). As explained in *Wolff,* the purpose of requiring a written statement containing the evidence relied on and reasons for the disciplinary action is to “protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding” and “to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly.” *Wolff,* 418 U.S. at 565.

“While a more detailed discussion of the evidence on which [the hearing officer] relied would have been desirable, given the existence of the transcript, due process has been satisfied.” *Allah–Kasiem v. Sidorowicz,* 2012 WL 2912930, *12 (S.D.N.Y.2012). Therefore, this claim is dismissed.

**E. Defendant Selsky**

Defendants argue that since due process does not include the right to an administrative appeal, plaintiff's claims against defendant Selsky must be dismissed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants' Memorandum of Law [125], p. 9 of 13. "Courts have repeatedly held that the Fourteenth Amendment does not require any administrative review of disciplinary convictions". *Excell v. Woods,* 2009 WL 3124424, *22 (N.D.N.Y.2009) (citing cases). "Nevertheless, once the state has created a right to administrative review, it cannot deprive a prisoner of that right arbitrarily.... Therefore, once an officer has been assigned by state law to decide an issue that may result in the loss of a liberty interest, that officer may, depending on how he exercises his authority, be personally involved in the deprivation of a due-process right that arises from the imposition of a disciplinary sentence of sufficient severity." *Thomas v. Calero,* 824 F.Supp.2d 488, 504 (S.D.N.Y.2011).[FN9]

> FN9. *Compare with Gates v. Selsky,* 2005 WL 2136914, * 10 (W.D.N.Y.), *recon. granted on other grounds* 2005 WL 3132725 (W.D.N.Y.2005) (Scott, M.J.) ("As for defendant Selsky, plaintiff does not have a due process right to an administrative appeal or to a particular result in such an appeal. Therefore, plaintiff's due process claims against ... Selsky also fails").

***8** Defendants next argue that defendant Selsky lacks sufficient personal involvement since there is "no evidence ... that [he] took a proactive role in reviewing Plaintiff's administrative appeal". Defendants' Memorandum of Law [125], pp. 10–11 of 13. "Courts within this circuit have held ... that while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Collins v. Ferguson,* 804 F.Supp.2d 134, 140 (W.D.N.Y.2011) (Larimer, J.).

Since I have found a question of fact as to whether certain of defendant Kearney's conduct violated plaintiff's due process rights, I likewise find that a triable issue of material fact exists as to whether defendant Selsky's conduct in affirming defendant Kearney's determination also violated plaintiff's due process rights, especially given the fact that he received from plaintiff a voluminous written appeal [132–5], followed by subsequent lengthy motion for reconsideration [132–6] and testified that his decision on the appeal was "not a rubber stamp decision". Selsky deposition transcript [131], pp. 42–43. *See Smith v. Rosati,* 2013 WL 1500422, *8 (N.D.N.Y.), *adopted* 2013 WL 1501022 (N.D.N.Y.2013) ("I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation, and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation"). Therefore, defendant Selsky is not dismissed from this action.

## CONCLUSION

For these reasons, defendants' motion for partial summary judgment [123] is granted in part and denied in part, and plaintiff's motion for partial summary judgment [131] is denied.

**SO ORDERED.**

W.D.N.Y.,2014.
Vigliotti v. Selsky
Slip Copy, 2014 WL 1451984 (W.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.